**Exhibit H**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,               :        INDICTMENT

          -v.-                          :        11 Cr. _____  (_____)

BEDA SINGENBERGER,                      :

          Defendant.                    :

- - - - - - - - - - - - - - - -x        **11 CRIM   620**

### COUNT ONE
### (Conspiracy)

The Grand Jury charges:

#### The Defendant and His Company

1.   At all times relevant to this Indictment, BEDA
SINGENBERGER, the defendant, was a citizen and resident of
Switzerland.   SINGENBERGER was a Certified Public Accountant.

2.   At all times relevant to this Indictment, BEDA
SINGENBERGER, the defendant, owned, operated, and controlled
Sinco Treuhand AG ("Sinco").   Sinco maintained its principal
place of business in Zurich, Switzerland.   Acting directly and
indirectly through Sinco and its employees, SINGENBERGER
provided wealth management and tax advice to individuals around
the world.

#### Overview of the Conspiracy

3.   From at least in or about 1998 through at least
in or about 2009, BEDA SINGENBERGER, the defendant, conspired

with various U.S. taxpayers and others to ensure that his U.S. taxpayer clients could hide the U.S. taxpayers' Swiss-based accounts, and the income generated in them, from the taxation authority of the United States, the Internal Revenue Service (the "IRS").

4.   In or about 2001, the Swiss banks at which BEDA SINGENBERGER, the defendant, helped his U.S. taxpayer clients hide accounts voluntarily agreed with the IRS to undertake new obligations with respect to, among other things, obtaining documents concerning the beneficial owners of accounts at those banks.   In furtherance of the conspiracy, SINGENBERGER, together with his U.S. taxpayer clients and others, used sham entities created under the laws of countries other than the United States to hide from the IRS the Swiss-based accounts, and the income generated in them, and to circumvent the commitments that the Swiss banks made to the IRS.   And in about 2008, when it became publicly known that UBS AG ("UBS"), one of the Swiss banks at which SINGENBERGER helped his U.S. taxpayer clients hide accounts, was being investigated by law enforcement in the United States, and was at risk of having to identify U.S. taxpayers who had accounts at that bank, SINGENBERGER undertook to move the accounts of his U.S. taxpayer clients from UBS to other Swiss banks, each of which engaged in conduct

substantially similar to UBS, but which, unlike UBS, did not have a physical presence or office in the United States.

5.    The collective maximum value of the assets in undeclared accounts beneficially owned by U.S. taxpayer clients of BEDA SINGENBERGER, the defendant, and that were either opened with SINGENBERGER's assistance or were managed by SINGENBERGER, was more than approximately $184 million, as set forth more fully below.

## Background

### Obligations of United States Taxpayers
### With Respect to Foreign Financial Accounts

6.    Citizens and residents of the United States who have income in any one calendar year in excess of a threshold amount ("U.S. taxpayers") are obligated to file a U.S. Individual Income Tax Return, Form 1040 ("Form 1040"), for that calendar year with the IRS.  On Form 1040, U.S. taxpayers are obligated to report their income from any source, regardless of whether the source of their income is inside or outside the United States.  In addition, on Schedule B of Form 1040, the filer must indicate whether "at any time during [the relevant calendar year]" the filer had "an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account."  If the U.S. taxpayer answers that question in the

affirmative, then the U.S. taxpayer must indicate the name of the particular country in which the account is located.

7.    Separate and apart from the obligation to file Forms 1040 that included all income, U.S. taxpayers who have a financial interest in, or signature authority over, a financial account in a foreign country with an aggregate value of more than $10,000 at any time during a particular calendar year are required to file with the IRS a Report of Foreign Bank and Financial Accounts, Form TD F 90-22.1 ("FBAR").   The FBAR for any calendar year is required to be filed on or before June 30 of the following calendar year.   In general, the FBAR requires that the U.S. taxpayer filing the form identify the financial institution with which the financial account is held, the type of account (either bank, securities, or other), the account number, and the maximum value of the account during the calendar year for which the FBAR is being filed.

### Swiss Banks at Which Sinco's U.S. Taxpayer Clients Held Accounts

8.    BEDA SINGENBERGER, the defendant, and Sinco had more than 60 clients who were U.S. taxpayers.

9.    For example, between in or about 2007 and 2010, BEDA SINGENBERGER, the defendant, provided to one of his U.S. taxpayer clients a written document containing significant

details regarding many of his clients, and prospective clients, who were U.S. taxpayers, including:

      a.    The U.S. taxpayers' last names and, in some cases, first names;

      b.    Their places of residence;

      c.    The dates and places of SINGENBERGER's last meeting with the U.S. taxpayers;

      d.    The names of the entities through which the U.S. taxpayers held their accounts;

      e.    The jurisdictions under whose laws these entities were formed, for example, Hong Kong or Liechtenstein;

      f.    The names of the Swiss banks at which the entities held the U.S. taxpayers' accounts; and

      g.    The names of the client advisor that serviced the U.S. taxpayers' accounts at the identified banks.

    10.  Because Sinco was not a depository institution and could not maintain custody of the accounts of Sinco's clients, BEDA SINGENBERGER, the defendant, typically either:

      a.    managed pre-existing accounts held at various banks located in Switzerland on behalf of U.S. taxpayers, which accounts had been opened prior to SINGENBERGER's involvement with the accounts; and/or

b.    arranged for U.S. taxpayers to open accounts at various banks located in Switzerland, some of which were subsequently managed by SINGENBERGER.

11.   BEDA SINGENBERGER, the defendant, provided the services described above and others in exchange for fees that, through Sinco, he typically arranged to be deducted directly from the undeclared accounts maintained by his U.S. taxpayer clients and credited to bank accounts maintained by Sinco.

12.   Among the various banks at which BEDA SINGENBERGER, the defendant, managed accounts and/or arranged for accounts to be opened (collectively, the "Singenberger Banks") were:

a.    UBS:  At all times relevant to this Indictment, UBS was a bank organized under the laws of Switzerland and was Switzerland's largest bank.  UBS owned and operated banking, investment banking, and stock brokerage businesses around the world, including in the Southern District of New York and elsewhere in the United States.

b.    Swiss-Liechtenstein Bank No. 1:  At all times relevant to this Indictment, Swiss-Liechtenstein Bank No. 1 was the Swiss-based subsidiary of a bank with its headquarters in Liechtenstein.  At all times relevant to this Indictment, Swiss-Liechtenstein Bank No. 1 did not maintain an office in the United States.

c.   <u>Swiss Bank No. 1</u>:  At all times relevant to this Indictment, Swiss Bank No. 1 was a bank organized under the laws of Switzerland.  At all times relevant to this Indictment, Swiss Bank No. 1 did not maintain an office in the United States.

d.   <u>Swiss Bank No. 2</u>:  At all times relevant to this Indictment, Swiss Bank No. 2 was a bank organized under the laws of Switzerland.  Until in or about 2005 or 2006, Swiss Bank No. 2 maintained an office in the Southern District of New York.

e.   <u>Swiss Cantonal Bank No. 1</u>:  At all times relevant to this Indictment, Swiss Cantonal Bank No. 1 was a bank organized under the laws of Switzerland.  At all times relevant to this Indictment, Swiss Cantonal Bank No. 1 did not maintain an office in the United States.  Swiss Cantonal Bank No. 1 is one of approximately 24 banks that are either entirely or majority owned by one of the cantons (member states) of Switzerland.

13.  Among other services, the Singenberger Banks provided private banking services -- that is, banking, investment, wealth management, and other financial services typically involving sizable assets and as contrasted with mass-market retail banking -- to U.S. taxpayers.

7

### The IRS' Qualified Intermediary Program

14.   In or about 2000, the IRS launched a new
initiative called the Qualified Intermediary ("QI") Program.
The program took effect starting in or about January 2001.   The
QI Program was intended, among other things, to encourage
foreign financial institutions to report "U.S. source income" to
the IRS and to withhold taxes on that income as required by U.S.
tax law so that U.S. taxpayers are properly paying U.S. tax.
"U.S. source income" includes dividends paid on U.S. stock and
capital gains paid on sales of U.S. stock, regardless of whether
such dividends and capital gains are paid to a U.S. taxpayer.

15.   The QI Program was also designed to help ensure
that non-U.S. persons are subject to the proper U.S. withholding
tax rates, including at reduced tax rates under applicable tax
treaties, with respect to U.S. source income generated in an
account overseas.

16.   In or about 2001, each of the Singenberger Banks
separately entered into a Qualified Intermediary Agreement ("QI
Agreement") with the IRS.   The QI Agreements with the
Singenberger Banks were later renewed and were in effect
throughout 2009.

17.   Among other things, the QI Agreements that the
Singenberger Banks each separately executed required them, in
general, to verify the identity and citizenship/domicile of

8

certain of its clients through the execution of various forms. The QI Agreements also required the Singenberger Banks, in general, to withhold and pay over to the IRS taxes on certain transactions in accounts that were beneficially owned by U.S. taxpayers.

18. In order to verify the identity and citizenship/domicile of certain of its clients, the QI Agreements generally required the Singenberger Banks to obtain and maintain one of two forms:

a. The first form, Request for Taxpayer Identification Number and Certification (IRS Form W-9) ("W-9"), generally applied to bank clients who were U.S. persons. For such persons, the Singenberger Banks were required generally to file annually with the IRS a Form 1099 reporting the bank client's name, taxpayer identification number, and all reportable payments made to the bank client's accounts, such as dividends paid on U.S. securities.

b. In contrast, the second form, Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding (IRS Form W-8BEN) ("W-8BEN"), generally applied to bank clients who were non-U.S. persons. On the Form W-8BEN, the bank client was required to provide various identifying information and to complete applicable certifications under penalties of perjury. One of the certifications under penalties

9

of perjury on the Form W-8BEN was that the bank client was not a
U.S. person.  Under the QI Agreements, the Singenberger Banks
were required to accept the Form W-8BEN, or a substantially
similar substitute, and verify the information on it using other
documents accepted as part of their account-opening procedures,
such as articles of incorporation of the entities identified in
the Form W-8BEN, in accordance with the rules already
established by the jurisdiction in which QI participants were
located.  As exemplified fully below, BEDA SINGENBERGER, the
defendant, prepared and signed Form W-8BENs, or the substitute
forms utilized by the Singenberger Banks, that falsely and
fraudulently stated under penalties of perjury that the
beneficial owner of accounts maintained at the Singenberger
Banks was "not a U.S. person."  In truth and in fact, and as
SINGENBERGER then and there knew, the beneficial owners were
U.S. persons, a fact that was evident from documents maintained
in the files of the Singenberger Banks, among other ways.

19.  The contractual requirement in the QI Agreements
that the Singenberger Banks verify the identity of the
beneficial owner of accounts held at the Singenberger Banks was
generally consistent with a voluntary code of conduct adopted by
the Swiss Bankers Association, of which the Singenberger Banks
were members, which was referred to in an addendum to the QI
Agreements.  The Swiss Bankers Association, founded in 1912, was

a professional membership organization that, among other things, sought to develop self-regulatory standards for Swiss banks. The Agreement on the Swiss Banks' Code of Conduct with Regard to the Exercise of Due Diligence (the "Swiss Banks Code") provided, in general, that signatories to the Swiss Banks Code engage in substantial efforts to verify the identity of the client in whose name the account was opened (referred to in the Swiss Banks Code as the "contracting party") and, if not the same as the "contracting party," verify the identity of the beneficial owner of the account.  The 1998 version of the Swiss Banks Code was identified in the QI Agreements themselves as one of the regulations governing the obligations of the Singenberger Banks to obtain documentation concerning the identity of account holders.

20.   For example, as of 2008, the Swiss Banks Code provided, in part, that:

> If the contracting partner is not the same as the beneficial owner, or if this is in doubt, the banks must require the contracting partner to complete Form A, thereby providing a written declaration of the identity of the beneficial owner.

As of 2003, the Swiss Banks Code provided, in part, that:

> All due diligence which can be reasonably expected under the circumstances must be exercised in establishing the identity of the beneficial owner. If there is any doubt as to whether the contracting partner is himself the beneficial owner, the bank shall require by means of Form A a written declaration setting forth the identity of the beneficial owner.

11

The Swiss Banks Code attached a specimen Form A to be used for this purpose.  In general, Form A required the person executing it to declare the beneficial owner of the assets deposited in the account opened in the name of the contracting partner.  The Singenberger Banks generally employed Form A for this purpose.

### The Conspiracy

21.  From at least in or about 1998 through at least in or about 2009, BEDA SINGENBERGER, the defendant, agreed with various U.S. taxpayers and others known and unknown, to defraud the United States, to conceal from the IRS on false tax returns the existence of bank accounts maintained at the Singenberger Banks, and the income earned in these accounts, and to evade U.S. taxes on income generated in these accounts.

### Means and Methods of the Conspiracy

22.  Among the means and methods by which BEDA SINGENBERGER, the defendant, and his co-conspirators would and did carry out the conspiracy were the following:

a.   SINGENBERGER and his co-conspirators opened "undeclared accounts" on behalf of U.S. taxpayers at the Singenberger Banks, that is, financial accounts maintained outside the United States and beneficially owned by U.S. taxpayers, but that were not to be disclosed to the IRS on

Schedule B of Form 1040 or on an FBAR and the income generated in which was not to be reported to the IRS on Form 1040.

b.   SINGENBERGER and his co-conspirators used sham "foundations" and "establishments" formed under the laws of Liechtenstein to conceal, from the IRS and others, the ownership by U.S. taxpayers of accounts established at the Singenberger Banks and the income generated in those accounts.

c.   SINGENBERGER and his co-conspirators used sham corporations formed under the laws of Hong Kong, among other jurisdictions, to conceal, from the IRS and others, the ownership by U.S. taxpayers of accounts established at the Singenberger Banks and the income generated in those accounts.

d.   SINGENBERGER and his co-conspirators prepared W-8BENs, or the substitute forms utilized by the Singenberger Banks, that falsely and fraudulently stated under penalties of perjury that the beneficial owner of a given undeclared account maintained at the Singenberger Banks was "not a U.S. person," when, in truth and in fact, SINGENBERGER and his co-conspirators knew that, as reflected on Form A's and other documents contained within the files of the Singenberger Banks, the beneficial owner of the particular undeclared account was a U.S. person.

e.   Co-conspirators of SINGENBERGER filed false and fraudulent Forms 1040, which, among other things, failed to

report their interest in their undeclared accounts and the income generated in their undeclared accounts.

       f.   Co-conspirators of SINGENBERGER failed to file FBARs identifying their undeclared accounts or filed false and fraudulent FBARs omitting their undeclared accounts.

       g.   SINGENBERGER and his co-conspirators transferred their assets in their undeclared accounts at UBS to other Singenberger Banks when they believed that UBS might be forced to identify the beneficial owners of undeclared accounts to the IRS.

       h.   SINGENBERGER and his co-conspirators arranged for account statements for the undeclared accounts of U.S. taxpayers not to be sent to the U.S. taxpayers in the United States.

       i.   SINGENBERGER, while in the United States, distributed cash from the undeclared accounts of his U.S. taxpayer clients to his U.S. taxpayer clients.

       j.   SINGENBERGER, while in the United States, accepted cash from his U.S. taxpayer clients to be credited to the undeclared accounts of his U.S. taxpayer clients at the Singenberger Banks.

### SINGENBERGER'S U.S. Taxpayer Clients

    23.  At all times relevant to this Indictment, BEDA SINGENGERGER, the defendant, acting through Sinco and its

employees, opened and managed dozens of undeclared accounts for U.S. taxpayers.

24.   For example, BEDA SINGENBERGER, the defendant, and Sinco opened and/or managed more than approximately 60 undeclared accounts for U.S. taxpayers at UBS, more than approximately 40 undeclared accounts for U.S. taxpayers at Swiss-Liechtenstein Bank No. 1, and more than approximately 20 undeclared accounts for U.S. taxpayers at Swiss Bank No. 1. Details for several examples of U.S. taxpayers for whom SINGENBERGER helped maintain undeclared accounts are set forth more fully below.

25.   The collective maximum value of the assets in undeclared accounts beneficially owned by clients of SINGENBERGER and Sinco and that were either opened with SINGENBERGER's assistance or were managed by SINGENBERGER was more than approximately $184 million, as reflected in paragraphs 40, 50, 55, 68, 79, and 86.

## Client 1

26.   In or about October 2000, a lawful permanent resident of the United States who was a U.S. taxpayer ("Client 1") opened an undeclared account at UBS. At or about the time that Client 1 opened Client 1's undeclared account at UBS, Client 1 informed UBS, in writing, that "as the holder of the . . . account," Client 1 was "liable to tax in the USA as a US

person."  Between in or about 2000 and early 2001, Client 1

funded the account with approximately $1.5 million.

27.  In or about 2001, Client 1's client advisor at

UBS ("Advisor 1") informed him that, as a result of changes in

law, Client 1 could no longer trade in U.S. securities in Client

1's account at UBS.  In order to assist Client 1 in evading U.S.

taxes, Advisor 1 informed Client 1, in substance and in part,

that, notwithstanding these changes in applicable law, UBS had

available a mechanism whereby Client 1 could continue to trade

U.S. securities in an account at UBS.  Advisor 1 referred Client

1 to BEDA SINGENBERGER, the defendant.  SINGENBERGER recommended

to Client 1 that Client 1 establish a corporation organized

under the laws of the British Virgin Islands to hold Client 1's

assets at UBS as a mechanism to hide Client 1's beneficial

ownership of the assets.

28.  In order to assist Client 1 in evading U.S.

taxes, in or about June 2001, BEDA SINGENBERGER, the defendant,

with the assistance of Advisor 1, completed documents necessary

to open a second undeclared account at UBS in the name of Lucky

Overseas Ventures Ltd., a corporation that had previously been

organized by SINGENBERGER and/or Sinco under the laws of the

British Virgin Islands.  Although Client 1 was the beneficial

owner of the assets held in the name of Lucky Overseas Ventures

Ltd., SINGENBERGER was identified as the president of Lucky

16

Overseas Ventures Ltd. SINGENBERGER arranged for correspondence related to the Lucky Overseas Ventures Ltd. account at UBS to be sent to Sinco and never to Client 1 in the United States. At or about the same time, SINGENBERGER signed a Form A in which he declared that the beneficial owner of the assets in the Lucky Overseas Ventures Ltd. account at UBS was Client 1. The Form A listed Client 1's U.S. address. In order to assist Client 1 in evading U.S. taxes, at or about the same time as he executed the Form A and contrary to the statements made in the Form A, SINGENBERGER falsely and fraudulently swore in a W-8BEN under penalties of perjury that the beneficial owner of the account was not a U.S. person. In truth and in fact, and as SINGENBERGER then and there well knew, the beneficial owner of the Lucky Overseas Ventures Ltd. account at UBS was Client 1 and also a U.S. person, which was evident from documents maintained in the files of UBS.

29. About a month after the Lucky Overseas Ventures Ltd. account at UBS was opened, all of the assets from Client 1's original UBS account were transferred into the newly opened account held in the name of Lucky Overseas Ventures Ltd.

30. In or about 2003, because, according to Advisor 1, information regarding accounts held by companies formed under the laws of the British Virgin Islands was going to be provided to the IRS, Advisor 1 suggested to Client 1, in substance and in

part, that Client 1 transfer the assets that Client 1 held in the Lucky Overseas Ventures Ltd. account at UBS to an account held in the name of another entity.

    31.   Thereafter, Client 1 met with BEDA SINGENBERGER, the defendant, Advisor 1, and others to arrange the following structure to hold Client 1's assets, the purpose of which was to obscure from the IRS to the greatest extent possible the beneficial ownership of the assets in Client 1's undeclared account at UBS:

        a.   A UBS account was opened in the name of Great Island Holdings Ltd., a corporation that had previously been organized by SINGENBERGER and/or Sinco under the laws of Hong Kong and of which SINGENBERGER was a director;

        b.   In turn, Great Island Holdings Ltd. was substantially owned by Matofin Ltd., a Hong Kong corporation controlled by SINGENBERGER;

        c.   In turn, Matofin Ltd. held shares of Great Island Holdings Ltd. in trust for TFV Tango Stiftung, a foundation that had previously been organized under the laws of Liechtenstein; and

        d.   The sole beneficiary of TFV Tango Stiftung was Client 1.

    32.   BEDA SINGENBERGER, the defendant, utilized a similar structure (an undeclared account that was beneficially

owned by a U.S. taxpayer, but was, in fact, owned by a corporation typically formed under the laws of Hong Kong or the British Virgin Islands, which corporation was, in turn, owned by a Liechtenstein foundation) for numerous U.S. taxpayers other than Client 1 who were clients of Sinco.

33. Shortly after the Great Island Holdings Ltd. account at UBS was opened, all of the assets from Client 1's Lucky Overseas Ventures Ltd. account at UBS were transferred into the newly opened account held in the name of Great Island Holdings Ltd.

34. In or about the end of 2004, Advisor 1 left the employment of UBS to work for another Swiss firm (the "Swiss Asset Manager") that provided services for U.S. taxpayers similar to those provided by Sinco. Like Sinco, the Swiss Asset Manager was not a depository institution. As a result, the Swiss Asset Manager maintained custody of its clients' accounts at other financial institutions, such as Swiss Bank No. 1, Swiss Bank No. 2, and others. In or about early 2005, Advisor 1, now employed at the Swiss Asset Manager, encouraged Client 1 to transfer the management of Client 1's assets from UBS to the Swiss Asset Manager, which assets would actually be held at Swiss Bank No. 2. Advisor 1 told Client 1, in substance and in part, that, because Swiss Bank No. 2 did not have a presence in the United States, Swiss Bank No. 2 was less susceptible to

pressure from U.S. authorities and that Client 1's assets would be more shielded from discovery by the IRS.

35.  In order to assist Client 1 in evading U.S. taxes, in or about June and July 2005, BEDA SINGENBERGER, the defendant, completed documents necessary to open an account at Swiss Bank No. 2 in the name of Great Island Holdings Ltd.  At or about the same time, SINGENBERGER falsely and fraudulently swore under penalties of perjury in a W-8BEN that the beneficial owner of the account was not a U.S. person.  In truth and in fact, and as SINGENBERGER then and there well knew, the beneficial owner of the Great Island Holdings Ltd. account at Swiss Bank No. 2 was Client 1, a U.S. taxpayer, which was evident from documents maintained in the files of Swiss Bank No. 2.  At or about the same time, SINGEBERGER executed a document instructing Swiss Bank No. 2 to hold all mail related to the Great Island Holdings Ltd. account at Swiss Bank No. 2.

36.  In or about July 2005, BEDA SINGENBERGER, the defendant, instructed UBS to transfer all of the assets and securities held in the Great Island Holdings Ltd. account at UBS to the Great Island Holdings Ltd. account at Swiss Bank No. 2.

37.  In or about 2007, Client 1 determined that Client 1 should diversify the banks at which Client 1 maintained Client 1's undeclared accounts in order to more effectively hide them from the IRS.  As a result, BEDA SINGENBERGER, the defendant,

arranged for yet another corporation previously formed under the laws of Hong Kong, Landsdowne Investments Ltd., to open an account at Swiss Bank No. 2 for Client 1.  As with Great Island Holdings Ltd., the owner of Landsdowne Investments Ltd. was Matofin Ltd. and, in turn, Matofin Ltd. held shares of Landsdowne in trust for TFV Tango Stiftung, the sole beneficiary of which was Client 1.

38.  In or about August 2007, BEDA SINGENBERGER, the defendant, completed at least one document necessary to open an account at Swiss Bank No. 2 in the name of Landsdowne Investments Ltd.  At or about the same time, an employee of Sinco, purportedly acting on behalf of Landsdowne, falsely swore under penalties of perjury in a W-8BEN that the beneficial owner of the account was not a U.S. person.  At or about the same time, an employee of Sinco executed a document instructing Swiss Bank No. 2 to hold all mail related to the Landsdowne Investments Ltd. account.

39.  In or about November 2008, BEDA SINGENBERGER, the defendant, completed documents necessary to open an account at Swiss Bank No. 1 in the name of Landsdowne Investments Ltd. and an account at Swiss Bank No. 1 in the name of Great Island Holdings Ltd.  At or about the time that Client 1's accounts at Swiss Bank No. 1 were opened, Client 1 provided to representatives of Swiss Bank No. 1 Client 1's U.S. residence

address, U.S. driver's license, and U.S. lawful permanent residence (or "green") card.  Thereafter, all of the assets held by Client 1 in Client 1's accounts at Swiss Bank No. 2 were transferred into the newly opened accounts at Swiss Bank No. 1.

40.  At their height, Client 1's accounts at Swiss Bank No. 2 held assets valued at approximately $4.6 million.

41.  On the Forms 1040 filed by Client 1 after approximately January 2001 and before approximately February 2009, Client 1 did not report either Client 1's interest in or signature or other authority over Client 1's accounts at UBS or Swiss Bank No. 2.  Moreover, prior to approximately February 2009, Client did not 1 file an FBAR disclosing Client 1's accounts at UBS or Swiss Bank No. 2.

### Client 2

42.  In or about July 2007, a citizen of the United States who was a U.S. taxpayer ("Client 2") was informed by Client 2's father that Client 2's father had an undeclared account at UBS.

43.  In or about November 2007, Client 2 traveled with Client 2's father to UBS's office in Zurich so that Client 2 could be added as a signatory on the UBS account.  Client 2 executed various documents necessary to make this change on the UBS account.

44.  In or about May 2008, Client 2's father died.

45.   On or about May 6, 2008, UBS publicly disclosed
that United States and Swiss law enforcement authorities were
investigating its U.S. cross-border banking business.  Reports
in the press to like effect followed the disclosure by UBS.  For
example, on or about May 15, 2008, May 23, 2008, and May 30,
2008, a major news organization based in New York reported, in
substance and in part, that the United States Government was
actively conducting a criminal investigation of UBS's U.S.
cross-border banking business.  One such article, published on
or about May 30, 2008, reported, in substance and in part, that
Bradley Birkenfeld, a United States citizen who had worked as a
director of UBS's U.S. cross-border banking business, was
expected to enter a guilty plea and cooperate with
investigators, and that UBS was cooperating with the criminal
inquiry.  The article also stated, in part, that "Mr.
Birkenfeld's case underscores how federal authorities are
stepping up scrutiny of offshore transactions that allow wealthy
investors to avoid taxes.  The inquiry focuses on American
clients of UBS's private bank, based in Zurich."

46.   In or about October 2008, Client 2 met with BEDA
SINGENBERGER, the defendant, and an employee of Sinco in Zurich
and informed SINGENBERGER that Client 2 had inherited an
undeclared account at UBS.  SINGENBERGER explained, in substance
and in part, that SINGENBERGER could arrange for Client 2's

account to be treated in the same manner as the account of Client 2's father, that is, as an undeclared account, at a different Swiss bank.   SINGENBERGER further stated, in substance and in part, that only banks with operations in the United States were in a position to be affected by the investigation of UBS.

47.   Thereafter, Client 2 selected the name of a Hong Kong corporation -- Sinohigh Investments Ltd. -- from a list that Sinco provided and signed various documents: (a) relating to the creation of the corporation; (b) opening a new account in the name of the corporation; and (c) transferring the account from UBS to the new bank.

48.   On or about October 31, 2008, BEDA SINGENBERGER, the defendant, executed various documents necessary to open an account in the name of Sinohigh Investments Ltd. at Swiss Cantonal Bank No. 1, including, among others:

a.   A Form A indicating that the beneficial owner of the account opened by Sinohigh Investments Ltd. was Client 2 and that Client 2 was a U.S. citizen; and

b.   A form indicating that Sinohigh Investments Ltd. "declares that it is the beneficial owner under US tax law of the assets and income to which this form refers."   In truth and in fact, and as SINGENBERGER then and there well knew, the beneficial owner of the Sinohigh Investments Ltd. account at

Swiss Cantonal Bank No. 1 was Client 2 and also a U.S. person, which was evident from documents maintained in the files of Swiss Cantonal Bank No. 1.

49.   On various occasions thereafter, Client 2 traveled to Zurich to meet with an employee of Sinco.  During those meetings, Client 2 discussed with the Sinco employee the results of Sinco's management of the Sinohigh Investments Ltd. account at Swiss Cantonal Bank No. 1 and received cash, typically in the amount of $10,000, from the Sinco employee.

50.   At or about the end of December 2008, the Sinohigh Investments Ltd. account at Swiss Cantonal Bank No. 1 held assets valued at approximately $2.3 million.

51.   Client 2 did not file Forms 1040 for the tax years 2007 through and including 2008 and, accordingly, Client 2 did not report either Client 2's interest in or signature or other authority over Client 2's accounts at UBS or Swiss Cantonal Bank No. 1.  Moreover, for the tax years 2007 through and including 2008, Client 2 did not file an FBAR disclosing Client 2's accounts at UBS or Swiss Cantonal Bank No. 1.

## Client 3

52.   In or about the 1960's, a citizen of the United States who was a U.S. taxpayer and resided in Manhattan ("Client 3") opened an undeclared account at UBS.

53.   In or about March 1998, BEDA SINGENBERGER, the defendant, and Client 3 opened and caused to be opened an account at a predecessor of UBS in the name of Stunt Facilities International Establishment, a entity previously formed under the laws of Liechtenstein, into which the assets from Client 3's original undeclared account at UBS were transferred.

54.   At or about the same time, SINGENBERGER signed a Form A in which he declared that the beneficial owner of the assets in the Stunt Facilities International Establishment account at UBS was Client 3.   The Form A listed Client 3's Manhattan address.

55.   In or about December 2000, the Stunt Facilities International Establishment account at UBS held assets valued at approximately $4.896 million.

56.   In or about June 2002, BEDA SINGENBERGER, the defendant, and Client 3 opened and caused to be opened another account at UBS in the name of Real Cool Investments Limited, a corporation previously formed under the laws of Hong Kong. SINGENBERGER was a director of Real Cool Investments Limited. At or about the same time, SINGENBERGER signed a Form A in which he declared that the beneficial owner of the assets in the Real Cool Investments Limited account at UBS was Client 3.   The Form A listed Client 3's Manhattan address.

57. At or about the same time as he executed the Form A and contrary to the statements made in the Form A, BEDA SINGENBERGER, the defendant, falsely and fraudulently swore under penalties of perjury in a substitute W-8BEN that Real Cool Investments Limited was "the beneficial owner according to US tax law." In truth and in fact, and as SINGENBERGER then and there well knew, the beneficial owner of the Real Cool Investments Limited account at UBS was Client 3 and also a U.S. person, which was evident from documents maintained in the files of UBS.

58. Shortly after the Real Cool Investments Limited account at UBS was opened, an employee of Sinco requested that the assets in the Stunt Facilities International Establishment account at UBS be transferred into the Real Cool Investments Limited account at UBS. At various times from in or about 2002 until in or about 2008, Client 3 held U.S. securities in the Real Cool Investments Limited account at UBS.

59. While the Real Cool Investments Limited account at UBS was open, Client 3 routinely communicated from Manhattan with Client 3's client advisor at UBS and BEDA SINGENBERGER, the defendant. For example:

a. On or about June 7, 2001, Client 3 directed Client 3's client advisor at UBS by handwritten letter to send to Client 3 in Manhattan ten checks "each in the amount of

27

approximately $3,000." On or about June 28, 2001, Client 3 advised Client 3's client advisor at UBS by handwritten letter that Client 3 had "received ten (10) checks, each in approximate amounts of $3000.00 -- A total of $30,323.30."

      b.   On or about July 18, 2005, Client 3 sent by fax from Manhattan a handwritten letter to SINGENBERGER in which Client 3 noted that Client had "mailed home" "several $1,000 American Express Traveler's checks," but that Client 3 had not received one of the envelopes.

      60.   In or about June 2008 and following reports in the press concerning the criminal investigation of UBS's cross-border banking business, as further set forth in paragraph 45, above, BEDA SINGENBERGER, the defendant, and Client 3 opened and caused to be opened an account at Swiss-Liechtenstein Bank No. 1 in the name of Real Cool Investments Limited. At or about the same time, SINGENBERGER signed a Form A in which he declared that the beneficial owner of the assets in the Real Cool Investments Limited account at UBS was Client 3. The Form A listed Client 3's Manhattan address.

      61.   Shortly thereafter and in order to hide Client 3's accounts from the IRS, should UBS be forced to identify accounts held by U.S. taxpayers and to disclose records relating to them, two employees of Sinco requested that the assets in the Real Cool Investments Limited account at UBS be sold and

transferred into the Real Cool Investments Limited account at Swiss-Liechtenstein Bank No. 1.

62.   On Client 3's Forms 1040 for the tax years 1998 through and including 2008, Client 3 did not report either Client 3's interest in or signature or other authority over Client 3's accounts at UBS or Swiss-Liechtenstein Bank No. 1. Moreover, for these years, Client 3 did not file an FBAR disclosing Client 3's accounts at UBS or Swiss-Liechtenstein Bank No. 1.

## Client 4

63.   In or about 1987, a citizen of the United States who resided in Manhattan and who was a U.S. taxpayer ("Client 4") inherited an undeclared account at a predecessor of UBS from Client 4's mother.

64.   In or about 1989, Client 4 opened an undeclared account at a predecessor of UBS and transferred into it assets held in the account that Client 4 had inherited from Client 4's mother.

65.   In or about the late 1990's, Client 4's client advisor at UBS informed Client 4 that Client 4 could no longer hold U.S. securities in Client 4's account at UBS.  Client 4's client advisor at UBS referred Client 4 to BEDA SINGENBERGER, the defendant, and indicated that SINGENBERGER could solve this

problem and that large clients of Client 4's client advisor at UBS were employing SINGENBERGER's services.

66.   In order to assist Client 4 in evading U.S. taxes, in or about October 2000, BEDA SINGENBERGER, the defendant, completed documents necessary to open an account at UBS in the name of a corporation that had previously been organized by SINGENBERGER and/or Sinco under the laws of the British Virgin Islands (the "Client 4 Corporation"). SINGENBERGER was identified as the president and one of the directors of the Client 4 Corporation.   At or about the same time, SINGENBERGER signed a Form A in which he declared that the beneficial owner of the assets in the Client 4 Corporation account at UBS was Client 4.   The Form A listed Client 4's Manhattan address.   In or about December 2000 and contrary to the statements made in the Form A, SINGENBERGER falsely and fraudulently swore under penalties of perjury in a W-8BEN that the beneficial owner of the account was not a U.S. person.   In truth and in fact, and as SINGENBERGER then and there well knew, the beneficial owner of the Client 4 Corporation account at UBS was Client 4 and also a U.S. person, which was evident from documents maintained in the files of UBS.

67.   Within days after the Client 4 Corporation account at UBS was opened, all of the assets from Client 4's

original UBS account were transferred into the newly opened account held in the name of Client 4 Corporation.

68. In or about December 2000, the Client 4 Corporation account at UBS held assets valued at approximately $916,000. At various times from in or about October 2000 until in or about June 2004, Client 4 held U.S. securities in the Client 4 Corporation account at UBS.

69. In or about June 2004, BEDA SINGENBERGER, the defendant, arranged for the assets held in the Client 4 Corporation account at UBS to be sold and the cash generated to be transferred to an account opened in the name of Client 4 Corporation at Swiss-Liechtenstein Bank No. 1. SINGENBERGER charged Client 4 $50,000 to facilitate the transfer of the assets from UBS to Swiss-Liechtenstein Bank No. 1.

70. On multiple occasions while BEDA SINGENBERGER, the defendant, was managing Client 4's accounts at UBS and Swiss-Liechtenstein Bank No. 1, SINGENBERGER traveled to Manhattan to meet with, among other clients of SINGENBERGER's, Client 4. On multiple occasions during these trips, SINGENBERGER delivered cash from Client 4's account while in Manhattan -- typically in the amounts of $10,000 or $20,000 -- to Client 4.

71. After June 2004, Client 4 decided that Client 4 no longer wished to have BEDA SINGENBERGER, the defendant,

manage Client 4's undeclared account at Swiss-Liechtenstein Bank
No. 1. Client 4 requested, in substance and in part, to remove
Client 4's funds from SINGENBERGER's management, but
SINGENBERGER refused to permit this. Eventually, Client 4's
client advisor at UBS who, by 2005, had left UBS, assisted
Client 4 in transferring Client 4's assets from Swiss-
Liechtenstein Bank No. 1 to Swiss Bank No. 1.

72. On Client 4's Forms 1040 for the tax years 2002
through and including 2008, Client 4 did not report either
Client 4's interest in or signature or other authority over
Client 4's accounts at UBS, Swiss-Liechtenstein Bank No. 1, or
Swiss Bank No. 1. Moreover, for the tax years 2000 through and
including 2008, Client 4 did not file an FBAR disclosing Client
4's accounts at UBS, Swiss-Liechtenstein Bank No. 1, or Swiss
Bank No. 1.

### Client 5

73. In or about 1986, a citizen of the United States
who was a U.S. taxpayer and who resided in Manhattan ("Client
5") inherited an undeclared account at a predecessor of UBS.

74. On or about February 3, 1993, Client 5 opened an
undeclared account at a predecessor of UBS in the name of Rivaro
Foundation, a foundation formed under the laws of Liechtenstein.
In a Form A executed by Client 5 in or about 1994, Client 5
listed Client 5's Manhattan address and identified Client 5 as

32

the beneficial owner of the assets in the undeclared account opened in the name of Rivaro Foundation.

75.   On or about July 22, 2000, Client 5 signed a UBS form in which Client 5 confirmed to UBS "as the holder of the above-mentioned account, that I am liable to tax in the USA as a US person."  In the same form, Client 5 "avail[ed] [his/her]self of the following right":  "I would like to avoid disclosure of my identity to the US Internal Revenue Service under the new tax regulations."

76.   In or about 2004, Client 5's client advisor at UBS ("Advisor 2") introduced Client 5 to BEDA SINGENBERGER, the defendant, and, in substance and in part, suggested to Client 5 that Client 5 utilize the services of SINGENBERGER's firm because things were getting difficult at UBS.  Client 5 was further informed, in substance and in part, that using a structure in Hong Kong or Panama would keep Client 5's name hidden from the IRS and allow Client 5 to invest in U.S. securities.

77.   In or about 2005, BEDA SINGENBERGER, the defendant, completed documents necessary to open an undeclared account in the name of Grand Partner International Ltd., a corporation that had previously been formed under the laws of Hong Kong.  One of the directors of Grand Partner International Ltd. was SINGENBERGER.  At or about the same time, SINGENBERGER

signed a Form A in which he declared that the beneficial owner
of the assets in the Grand Partner International Ltd. account at
UBS was Client 5.  At or about the same time as he executed the
Form A and contrary to the statements made in the Form A,
SINGENBERGER falsely and fraudulent swore in a substitute W-8BEN
that Grand Partner International Ltd. was "the beneficial owner
under US tax law."  In truth and in fact, and as SINGENBERGER
then and there well knew, the beneficial owner of the Grand
Partner International Ltd. account at UBS was Client 5 and also
a U.S. person, which was evident from documents maintained in
the files of UBS.

78.  About a month after the Grand Partner
International Ltd. account at UBS was opened, Client 5 requested
that all of the assets from Client 5's original UBS account be
transferred into the newly opened account held in the name of
Grand Partner International Ltd.

79.  At or about the end of 2007, the assets held in
the Grand Partner International Ltd. account at UBS were valued
at more than $11.2 million.  At various times from in or about
2000 until in or about June 2008, Client 5 held U.S. securities
in the Grand Partner International Ltd. account at UBS.

80.  In or about June 2008 and following reports in
the press concerning the criminal investigation of UBS's cross-
border banking business, as further set forth in paragraph 45,

above, BEDA SINGENBERGER, the defendant, informed Client 5, in

substance and in part, that UBS wished to have Client 5 close

Client 5's account at UBS.

81.   In order to assist Client 5 in evading U.S.

taxes, in or about June 2008, BEDA SINGENBERGER, the defendant,

opened and caused to be opened on behalf of Client 5 an account

at Swiss-Liechtenstein Bank No. 1 in the name of Grand Partner

International Ltd.   Client 5 had chosen another Swiss bank, but

SINGENBERGER chose Swiss-Liechtenstein Bank No. 1 because a

relative of SINGENBERGER's worked at that bank.   SINGENBERGER

also advised Client 5, in substance and in part, that Swiss-

Liechtenstein Bank No. 1 was the best place for Client 5 to put

Client 5's money because Swiss-Liechtenstein Bank No. 1 did not

have a branch in the United States.

82.   In or about June 2008, the assets in the Grand

Partner International Ltd. account at UBS were sold and the cash

generated transferred to the Grand Partner International Ltd.

account at Swiss-Liechtenstein Bank No. 1.

83.   On various occasions from in or about 2005 to in

or about 2008, Client 5 and a member of Client 5's family

("Family Member A") traveled from Manhattan to UBS's office in

Zurich and to the office of Swiss-Liechtenstein Bank No. 1 in

Zurich for the purpose of withdrawing large sums of cash from

the Grand Partner International Ltd. account at UBS and Swiss-Liechtenstein Bank No. 1.

84.  For example, in or about December 2007, Client 5 directed UBS to give Family Member A approximately $300,000 in cash.  On or about December 12, 2007, BEDA SINGENBERGER, the defendant, instructed UBS in writing to give $300,000 to Family Member A.  On the same day, at UBS's offices in Zurich, Family Member A withdrew $300,000 in currency from the Grand Partner International Ltd. account at UBS.

85.  On Client 5's Forms 1040 for the tax years 2002 through and including 2008, Client 5 did not report either Client 5's interest in or signature or other authority over Client 5's accounts at UBS or Swiss-Liechtenstein Bank No. 1. Moreover, for the tax years 2000 through and including 2008, Client 5 did not file an FBAR disclosing Client 5's accounts at UBS or Swiss-Liechtenstein Bank No. 1.

### Additional U.S. Taxpayer Clients of SINGENBERGER

86.  In furtherance of the conspiracy, BEDA SINGENBERGER, the defendant, assisted, among other U.S. taxpayers, the following U.S. taxpayers in ways that were substantially similar to the services that he provided to Clients 1 through 5, as described above:

| State of U.S. Taxpayer's Residence | Approximate Dates During Which UBS Account Open | Swiss Bank to Which Assets Were Transferred from UBS | Highest Approximate Value of Account between 2003 and 2008 |
|---|---|---|---|
| New York | 1956-2009 | n/a | $74,000,000 |
| California | 1979-2007 | n/a | more than $2,500,000 |
| New Jersey | 2004-2008 | Swiss-Liechtenstein Bank No. 1 | more than $2,500,000 |
| California | 1975-2008 | Swiss Cantonal Bank No. 1 | more than $2,500,000 |
| New York | 1960-2002 | Swiss Bank No. 2 | more than $2,500,000 |
| California | 1992-2008 | Swiss-Liechtenstein Bank No. 1 | more than $1,000,000 |
| New Jersey | 1999-2008 | Swiss-Liechtenstein Bank No. 1 | more than $2,500,000 |
| California | 1980-2009 | Swiss Cantonal Bank No. 1 | more than 10,000,000 |
| New York | 1980-2008 | Swiss-Liechtenstein Bank No. 1 | more than $2,500,000 |
| Florida | 1985-2003 | Swiss Bank No. 1 | $6,000,000 |
| California | 2002-2008 | Swiss-Liechtenstein Bank No. 1 | $47,000,000 |
| New York | 1990-2002 | Swiss Bank No. 1 | more than $2,500,000 |
| New York | 1990-2008 | n/a | more than $2,500,000 |
| Massachusetts | 2003-2008 | Swiss-Liechtenstein Bank No. 1 | more than $2,500,000 |
| Total | | | more than $160,500,000 |

## Statutory Allegations

87.  From at least in or about 1998 through at least in or about 2009, in the Southern District of New York and elsewhere, BEDA SINGENBERGER, the defendant, together with others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to

defraud the United States of America and an agency thereof, to wit, the IRS, and to commit offenses against the United States, to wit, violations of Title 26, United States Code, Section 7201, and Title 26, United States Code, Section 7206(1).

88.  It was a part and an object of the conspiracy that BEDA SINGENBERGER, the defendant, together with others known and unknown, willfully and knowingly would and did defraud the United States of America and the IRS for the purpose of impeding, impairing, obstructing, and defeating the lawful governmental functions of the IRS in the ascertainment, computation, assessment, and collection of revenue, to wit, federal income taxes.

89.  It was further a part and an object of the conspiracy that BEDA SINGENBERGER, the defendant, together with others known and unknown, willfully and knowingly would and did attempt to evade and defeat a substantial part of the income tax due and owing to the United States of America from clients of SINGENBERGER's who were U.S. taxpayers, in violation of Title 26, United States Code, Section 7201.

90.  It was further a part and an object of the conspiracy that BEDA SINGENBERGER, the defendant, together with others known and unknown, willfully and knowingly would and did make and subscribe returns, statements, and other documents, which contained and were verified by written declarations that

they were made under the penalties of perjury, and which
SINGENBERGER, together with others known and unknown, did not
believe to be true and correct as to every material matter, in
violation of Title 26, United States Code, Section 7206(1).

### Overt Acts

91.    In furtherance of the conspiracy and to effect
the illegal object thereof, BEDA SINGENBERGER, the defendant,
and others known and unknown, committed the following overt
acts, among others, in the Southern District of New York and
elsewhere:

a.    In or about June 2001, SINGENBERGER signed a
Form A concerning an account opened at UBS on behalf of Client
1.

b.    On or about October 31, 2008, SINGENBERGER,
signed a Form A concerning an account opened at Swiss Cantonal
Bank No. 1 on behalf of Client 2.

c.    On or about July 18, 2005, Client 3 sent by
fax from Manhattan a handwritten letter to SINGENBERGER.

d.    In or about December 2000 and in connection
with opening an undeclared account for Client 4, SINGENBERGER
swore under penalties of perjury in a W-8BEN that the beneficial
owner of an account at UBS was not a U.S. person.

      e.   In or about 2004, SINGENBERGER met with Client 5 at a hotel in Manhattan.

      (Title 18, United States Code, Section 371.)

_____
FOREPERSON

_____
PREET BHARARA
United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

BEDA SINGENBERGER,

Defendant.

## INDICTMENT

11 Cr. _____ (_____)

(Title 18, United States Code,
Section 371.)

_____
PREET BHARARA
United States Attorney.

**A TRUE BILL**

_____
Foreperson.