UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                :

IN RE: VARIOUS GRAND JURY SUBPOENAS  :

                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**TO BE FILED UNDER SEAL**

12 Misc.

# 12 MISC 00381

**MEMORANDUM OF LAW IN SUPPORT OF GOVERNMENT'S
MOTION TO COMPEL COMPLIANCE WITH GRAND JURY SUBPOENAS**

PREET BHARARA
United States Attorney for the
Southern District of New York

DANIEL W. LEVY
DAVID B. MASSEY
JASON H. COWLEY
Assistant United States Attorneys
   - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :        **TO BE FILED UNDER SEAL**

IN RE: VARIOUS GRAND JURY SUBPOENAS   :        12 Misc. _____

                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH GRAND JURY SUBPOENAS

The United States respectfully submits this Memorandum of Law in support of its motion to compel compliance with five substantially identical grand jury subpoenas.  Each of the grand jury subpoenas seeks records of foreign bank accounts that are required to be kept by a valid regulatory regime, specifically, regulations promulgated by the Department of the Treasury as directed by the Bank Secrecy Act.  In response to the subpoenas, each of the recipients has asserted an act of production privilege against self-incrimination under the Fifth Amendment. As three Circuits and several District Courts have held within the past 21 months with respect to identical subpoenas directed at those believed by the Government to be hiding bank accounts in Switzerland, the recipients of the subpoenas should be compelled to comply with the subpoenas notwithstanding their invocation of the privilege.

**I.    Factual and Legal Background**

Each of the recipients of the grand jury subpoenas at issue (collectively, the "Subpoenas"; individually "Subpoena A" through "Subpoena E") is the subject of an ongoing grand jury investigation being conducted by the Internal Revenue Service ("IRS") and the United States Attorney's Office for the Southern District of New York.  A copy of the Subpoenas addressed to the five unrelated recipients (collectively, the "Subjects"; individually "Subject A" through

1

"Subject E") is attached to the accompanying Declaration of Daniel W. Levy ("Levy Decl.") as Exhibits A through E.[1]   The grand jury seeks to determine, among other things, whether there exist bank accounts held in Switzerland or elsewhere overseas that the Subjects failed to disclose to the IRS as required by the regulatory regime described below and, therefore, whether the Subjects violated, among other statutes, 31 U.S.C. §§ 5314(a) and 5322(a), both of which are part of the Bank Secrecy Act of 1970 (the "BSA"), P.L. 91-508, 84 Stat. 1114, 31 U.S.C. §§ 5311 et seq.[2]

Section 5314(a) requires, among other things, that the Secretary of the Treasury promulgate regulations to require individuals to keep records regarding foreign bank accounts:

> Considering the need to avoid impeding or controlling the export or import of monetary instruments and the need to avoid burdening unreasonably a person making a transaction with a foreign financial agency, the Secretary of the Treasury shall require a resident or citizen of the United States or a person in, and doing business in, the United States, to keep records, file reports, or keep records and file reports, when the resident, citizen, or person makes a transaction or maintains a relation for any person with a foreign financial agency.

31 U.S.C. § 5314(a); see also 31 U.S.C. § 5312(a)(1-2) (defining "financial agency" and "financial institution").   Pursuant to this statutory directive, the Secretary of the Treasury has promulgated regulations that require individuals who have a specified relationship with an account maintained outside the United States to: (1) inform the Secretary of the Treasury of

---

[1] Consistent with the secrecy provisions of Rule 6(e) of the Federal Rules of Criminal Procedure: (1) counsel for each of the Subjects has been provided with a copy of the Subpoena relevant to his client only; (2) the Order to Show Cause by which the Government brought this motion and the accompanying Levy Declaration were served on each of the Subjects in redacted form; and (3) the Order to Show Cause, this Memorandum of Law, and the Levy Declaration have been filed under seal.

[2] A copy of all of the statutes and regulations cited in this Memorandum of Law are included in the attached Appendix A.

certain details concerning the account; and (2) maintain certain records concerning the account for a specified time period.

Specifically, as to the first requirement, the reporting requirement, 31 C.F.R. § 103.24, now codified at § 1010.350,[3] provides, in pertinent part, that:

> Each United States person having a financial interest in, or signature or other authority over, a bank, securities, or other financial account in a foreign country shall report such relationship to the Commissioner of Internal Revenue for each year in which such relationship exists and shall provide such information as shall be specified in a reporting form prescribed under 31 U.S.C. 5314 to be filed by such persons. The form prescribed under section 5314 is the Report of Foreign Bank and Financial Accounts (TD-F 90-22.1), or any successor form.

31 C.F.R. § 1010.350(a). The form prescribed for this reporting is commonly known as an FBAR. A sample FBAR form is attached as Exhibit F to the Levy Declaration. The Treasury Department's regulatory regime provides for a specific timeframe in which FBARs are to be filed. See, e.g., 31 C.F.R. § 1010.306(c) (requiring FBAR to be filed "on or before June 30 of each calendar year with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year").

As to the second requirement, the record-keeping requirement, 31 C.F.R. § 103.32, now codified at 31 C.F.R. § 1010.420, provides that:

> Records of accounts required by § 1010.350 [formerly codified at § 103.24] to be reported to the Commissioner of Internal Revenue shall be retained by each person having a financial interest in or signature or other authority over any such account. Such records shall contain the name in which each such account is maintained, the number or other designation of such account, the name and address of the foreign bank or other person with whom such account is maintained, the type of such account, and the maximum value of each such account during the reporting period. Such records shall be retained for a period of

---

[3] Regulations concerning foreign bank accounts were recodified in March 2011. A chart cross-referencing the original regulations with the newly codified regulations is included at the end of Appendix A.

> 5 years and shall be kept at all times available for inspection as authorized by law. In the computation of the period of 5 years, there shall be disregarded any period beginning with a date on which the taxpayer is indicted or information instituted on account of the filing of a false or fraudulent Federal income tax return or failing to file a Federal income tax return, and ending with the date on which final disposition is made of the criminal proceeding.

31 C.F.R. § 1010.420.  Section 1010.430 specifies that "[a]ll records that are required to be retained by this chapter" "shall be filed or stored in such a way as to be accessible within a reasonable period of time, taking into consideration the nature of the record, and the amount of time expired since the record was made."  31 C.F.R. § 1010.430(d).

The types of relationship that a person must maintain with an overseas account in order to become subject to the reporting and record-keeping requirements are defined in 31 C.F.R. § 1010.350(e-f).  Specifically, that subsection defines a "financial interest" in an account and "signature or other authority" over an account, as described more fully below.

A failure to comply with the reporting requirement or the record-keeping requirement may be punishable civilly, criminally, or both.  See, e.g., 31 C.F.R. § 1010.820(g) (providing for civil penalty); 31 U.S.C. § 5321 (same); 31 C.F.R. § 1010.840 (providing for criminal penalty); 31 U.S.C. § 5322 (same); see also 31 U.S.C. § 5321(d) (providing that "civil money penalty may be imposed under subsection [5321](a) with respect to any violation of this subchapter notwithstanding the fact that a criminal penalty is imposed with respect to the same violation."). Civil injunctive relief is also available "[w]hen the Secretary of the Treasury believes a person has violated, is violating, or will violate this subchapter or a regulation prescribed or order issued under this subchapter."  31 U.S.C. § 5320.

The grand jury investigation revealed preliminarily that each of the Subjects had a financial interest in, or signature or other authority over, at least one foreign bank account.  For

example, in several instances, the evidence preliminarily indicated that the Subjects were

receiving checks and/or wire transfers that were drawn on the U.S. correspondent bank accounts

of one or more Swiss banks.  Various investigations conducted by the Government have revealed

that some Swiss banks have used correspondent bank accounts maintained by them in the United

States to permit U.S. taxpayers holding secret Swiss bank accounts to repatriate funds from their

secret accounts.  For example, in the investigation of Swiss bank Wegelin & Co. ("Wegelin"),

the Government uncovered extensive evidence of the use of Wegelin's correspondent bank

account to help certain U.S. taxpayer clients repatriate undeclared funds to the United States by

issuing checks drawn on, and executing wire transfers

through, the correspondent bank account.  In addition, Wegelin helped at least two other Swiss

banks repatriate undeclared funds to their U.S. taxpayer-clients by issuing checks drawn

on Wegelin's correspondent bank account for the benefit of the clients of the two other Swiss

banks.  See United States v. Wegelin & Co., et al., Indictment S1 12 Cr. 02 (JSR) at ¶¶ 15, 16(i-

j), 32, 98, 108-137 (attached hereto as Exh. G).  This information led the IRS to serve Subpoenas

A through D.

   Subpoenas A through D directed to Subjects A through D, required those Subjects to

produce:

> any and all records created, obtained, and or maintained from [a date
> approximately five years before issuance of the subpoena] to the present that are
> in your care, custody, or control relating to any and all bank, securities, or other
> types of financial accounts in any foreign country in which you have a present or
> future financial interest, legal interest, beneficial ownership interest, or over
> which you have signature or other authority, if the aggregate value of these
> accounts exceeded $10,000 at any time during any calendar year, including but
> not limited to records required to be maintained pursuant to 31 C.F.R. § 1010.420,
> namely, records reflecting the name in which each such account is maintained, the
> number or other designation of such account, the name and address of the foreign
> bank or other person with whom such account is maintained, the type of such

5

account, and the maximum value of each such account during each calendar year.

Levy Decl., Exhs. A-D.

One of the five Subpoenas, Subpoena E, was worded very slightly differently and required Subject E to produce:

> Any and all records created, obtained, and or maintained from October 5, 2005, to the present that are in your care, custody, or control relating to any and all bank, securities, or other types of financial accounts in any foreign country in which you have a financial interest, beneficial ownership interest, or over which you have signature authority, if the aggregate value of these accounts exceeded $10,000 at any time during any calendar year, including but not limited to records required to be maintained pursuant to 31 C.F.R. § 103.32, namely, records reflecting the name in which each such account is maintained, the number or other designation of such account, the name and address of the foreign bank or other person with whom such account is maintained, the type of such account, and the maximum value of each such account during each calendar year, including but not limited to accounts held in the name of or for the benefit of:
>
> [Subject E]; and/or
>
> [a Specified] Stiftung, a/k/a "[a Specified] Foundation"

Levy Decl., Exh. E.

Unlike Subpoenas A through D, Subpoena E specified that accounts held in the name of, or for the benefit of, a particular "stiftung," or foundation (the "Subpoena E Foundation") were required to be produced.  A stiftung is a legal entity akin to a trust and exists under the law of the Principality of Liechtenstein.  Various investigations conducted by the Government revealed that many U.S. taxpayers caused these foundations to be created under the law of Liechtenstein in order to hide bank accounts in Switzerland.  Typically, the stiftungs held the accounts at the Swiss banks and the U.S. taxpayers were the beneficiaries of the foundations.  Typically, U.S. taxpayers who utilized stiftungs and other similar entities worked through financial and/or legal advisors to create the stiftungs and the financial advisors and/or legal were appointed by the U.S.

6

taxpayers to act on behalf of the stiftungs.[4]

One of the financial advisors who was involved in using stiftungs to help U.S. taxpayers maintain secret Swiss bank accounts is Beda Singenberger ("Singenberger").  In approximately July 2011, a grand jury sitting in this District returned Indictment 11 Cr. 620 (LAK) (the "Singenberger Indictment") charging Singenberger with conspiring with U.S. taxpayers, among others, to defraud the IRS, evade taxes, and file false tax returns.  A copy of the Singenberger Indictment is attached to the Levy Declaration as Exhibit H.  Financial advisors such as Singenberger effected transactions in the Swiss bank accounts at the request of the U.S. taxpayers and provided cash to the U.S. taxpayers in the United States and elsewhere.  The use of a stiftung and a financial advisor as an intermediary had the effect of insulating the U.S. taxpayers from the Swiss bank accounts and making detection of the account, and the income in the account, difficult for U.S. taxation authorities.  The use of sham foundations and other entities (such as Liechtenstein-based "establishments") to hide Swiss bank accounts is described in several paragraphs of the Singenberger Indictment.  See Exh. H at ¶¶ 4, 14-20, 22, 31-32, 45-46, 53-55, 74-77.  Information obtained in the course of the investigation led the Government to believe that Subject E used the services of Singenberger to create the Subpoena E Foundation and, as a result, the IRS directed Subpoena E to Subject E.

Further confirming the accuracy of the information obtained in the course of the investigation concerning Subject E, following the issuance of Subpoena E, Subject E filed a 2010

---

[4] Another difference between Subpoena E and Subpoenas A through D was that Subpoena E omitted the phrase "present or future" before the phrase "financial interest, beneficial ownership interest" and omitted the phrase "legal interest" before "beneficial ownership interest."  In addition, Subpoena E specified that accounts held in the name of, or for the benefit of, Subject E were required to be produced.  These differences are irrelevant to this motion.

tax return indicating, in substance and in part, that she received total distributions of $49,267 from the Subject E Foundation over the years 2006, 2007, 2008, and 2008. Her 2010 tax return further indicated that those distributions were received in cash and that the Subject Foundation had been in existence for four years. Singenberger's providing cash to his U.S. taxpayer clients was typical of the manner in which he helped them maintain secret bank accounts in Switzerland. See, e.g., Exh. H at ¶¶ 22(i-j), 70.

The regulatory regime created by the Treasury Department contemplated that there would be those who used sham entities and financial intermediaries to avoid the reporting and record-keeping requirements. As noted above, each of the Subpoenas sought information about accounts in which the Subjects had a "financial interest" or over which the Subjects had "signature or other authority." Levy Decl., Exhs. A-E. The definition of "financial interest" embraces standard concepts such as the owner of record or legal title to the account. See 31 C.F.R. § 1030.350(e)(1). The definition of "financial interest" also contained what it terms an "anti-avoidance rule," which provides that:

> A United States person that causes an entity, including but not limited to a corporation, partnership, or trust, to be created for a purpose of evading this section shall have a financial interest in any bank, securities, or other financial account in a foreign country for which the entity is the owner of record or holder of legal title.

31 C.F.R. § 1030.350(e)(3). As a result of these definitions, the Subpoenas sought records of accounts maintained in the names of entities, such as Liechtenstein-based stiftungs and Subpoena E specified the name of the relevant stiftung. Similarly, contemplating the possibility that one of the Subjects might share authority over an offshore bank account with a financial advisor, the Subpoenas sought records of accounts even where the Subject had only some authority, or shared

authority, to control the disposition of funds in the accounts.  See 31 C.F.R. § 1030.350(f) ("Signature or other authority means the authority of an individual (alone or in conjunction with another) to control the disposition of money, funds or other assets held in a financial account by direct communication (whether in writing or otherwise) to the person with whom the financial account is maintained") (emphasis added).[5]

Each of the Subjects did not produce any records in response or file a motion to quash any of the Subpoenas.  Instead, counsel for each of the Subjects responded, in substance and in part, by asserting that the relevant Subject intended to assert his or her Fifth Amendment privilege.  As set forth below, because the Subjects have no Fifth Amendment right to withhold the records called for by the Subpoenas, the Government now seeks enforcement of the Subpoenas.

## II.   Relevant Law

### A.   The "Act of Production" Privilege and the "Required Records" Doctrine

The only aspect of the Fifth Amendment privilege against self-incrimination that the Subjects have specified in resisting compliance with the Subpoenas is the "act of production" privilege.  The act of producing documents can be considered testimonial when the production of responsive documents is itself evidence that the document exists.  See In re Grand Jury Subpoena Duces Tecum Dated Oct. 29, 1992, 1 F.3d 87, 93 (2d Cir. 1993) (reasoning that the act of production privilege applies when producing documents unknown to the Government or where the production would implicitly authenticate the documents).

---

[5] Subpoena E also sought additional documents that Subject E refused to produce.  This motion does not seek enforcement of Subpoena with respect to these additional items and, accordingly, the legal issues presented by all five Subpoenas are identical.

9

The Fifth Amendment privilege may be overcome, however, when the records sought by subpoena are required by a legitimate regulatory regime to be maintained. The "required records" doctrine provides that the privilege against self-incrimination does not prevent Congress from imposing record-keeping and reporting requirements as conditions of engaging in an activity that Congress could prohibit entirely. Shapiro v. United States, 335 U.S. 1, 32 (1948); see also Grosso v. United States, 390 U.S. 62, 67-68 (1968); In re Two Grand Jury Subpoenae Duces Tecum Dated Aug. 21, 1985, 793 F.2d 69, 73 (2d Cir. 1986). In essence, Shapiro stands for the proposition that, because Congress chose to regulate offshore bank accounts rather than forbid them outright, Congress may legitimately require that those who decide to have an offshore bank account to preserve their records and produce those records on demand, even though the act of producing documents may have communicative aspects. Shapiro, 335 U.S. at 31-33. In setting out the contours of the required records doctrine, the Supreme Court in Shapiro held, among other things, that the doctrine "applies not only to public documents in public offices, but also to records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation, and the enforcement of restrictions validly established." Id. at 17.

Thus, whatever the scope of a person's Fifth Amendment privilege, the required records doctrine provides that this privilege can be overcome or, stated another way, is waived when a person voluntary participates in a regulated activity. Id. (explaining that the custodian of documents required to be produced in response to a subpoena may "voluntarily assume[] a duty which overrides his claim of privilege"); Smith v. Richert, 35 F.3d 300, 301-02 (7th Cir. 1994) ("[The witness's] choice to enter such [a regulated] industry was a voluntary one, and once in it

he was required to abide by its rules."); In re Grand Jury Subpoena Duces Tecum (Underhill),

781 F.2d 64, 70 (6th Cir. 1986) ("[B]y doing business in an area where the government requires

recordkeeping, an individual may be deemed to have waived the Fifth Amendment privilege as

to the production of those records.").

 The rationale behind the "required records" doctrine is well supported by legal precedent.

Voluntarily engaging in an activity that carries with it a record-keeping requirement constitutes,

in essence, a waiver of the act of production privilege, "at least in cases in which there is a nexus

between the Government's production request and the purpose of the record-keeping

requirement."  In re Two Grand Jury Subpoenae Duces Tecum, 793 F.2d at 73; see Rajah v.

Mukasey, 544 F.3d 427, 442 (2d Cir. 2008) (requiring alien to produce foreign passports and

other documents because they fell within required records doctrine; "Fifth Amendment is not an

impediment to the enforcement of a valid civil regulatory regime"; "Fifth Amendment's act of

production privilege does not cover records that are required to be kept pursuant to a civil

regulatory regime"); Underhill, 781 F.2d at 70 (applying required records exception to

automobile dealer's production of odometer statements); In re Grand Jury Subpoena (Spano), 21

F.3d 226, 230 (8th Cir. 1994) (relying on Underhill and requiring production of tax returns, W-2

forms, unemployment records, worker's compensation records, and records relating to the

purchase and sale of automobiles).  In other words, the critical question in determining the

applicability of the required records doctrine is whether the "incriminating evidence" is "the

byproduct of obedience" to a legitimate "regulatory requirement."  Hubbell, 530 U.S. at 35.

**B.     The Supreme Court's Test in *Grosso***

Over time, the Supreme Court has established three criteria, typically referred by reference to the Supreme Court's decision in <u>Grosso</u>, for application of the required records doctrine.  The three prongs of the <u>Grosso</u> test are: (1) the purpose of the relevant record-keeping requirement must be regulatory in nature; in other words, the regulatory scheme may not be directed exclusively or almost exclusively to individuals inherently suspected of criminal activities; (2) the information must be of a type that the regulated party normally maintains; and (3) the records must have assumed public aspects analogous to public documents.  <u>In re Doe</u>, 711 F.2d 1187, 1191 (2d Cir. 1983) (citing <u>Grosso v. United States</u>, 390 U.S. at 67-68); <u>see also</u> <u>Rajah</u>, 544 F.3d at 442.[6]

**III.    The Three Circuits and Host of District Courts To Have Considered
        The Identical Issue Have All Compelled Production of the Records**

In the past 15 months, three Circuits -- the Ninth, Seventh, and Fifth -- have addressed whether the required records doctrine is applicable to subpoenas seeking records of foreign bank accounts required to be maintained by the same statutes and regulations at issue in this case.  The facts underlying those cases, including the grand jury subpoenas at issue in those cases, are virtually identical to those at issue in this motion.  These three Courts of Appeals have uniformly concluded that the required records doctrine compels production under the circumstances and that grand jury subpoenas just like the Subpoenas at issue in this case meet the Supreme Court's

---

[6] There is some question as to whether the second prong -- that the records be of the type customarily kept by the regulated party -- is truly mandated by Supreme Court precedent.  <u>See</u>, <u>e.g.</u>, <u>Baltimore City Dep't of Social Servs. v. Bouknight</u>, 493 U.S. 549, 555-59 (1990) (describing and applying required records doctrine without reference to "customarily kept" requirement); <u>In re Grand Jury Subpoena</u>, 696 F.3d 428, 433-34 & n.2 (5th Cir. 2012).  Because this factor is so easily met, the Government assumes, for the sake of argument, that this is, in fact, a requirement.

Grosso test.  And one District Court in this Circuit, as well as others around the country, have held to like effect.  The Court should follow this virtually uniform line of cases and compel compliance with the Subpoenas.

      **A.**     **The Purpose of the Record-Keeping**
                  **Requirement is Essentially Regulatory**

The first prong of the Grosso test requires that the statutory scheme giving rise to the record-keeping requirement be "essentially regulatory" and not criminal in nature.  Grosso, 390 U.S. at 67-68.  Each of the three Circuits to have recently considered this issue easily concluded that the requirement in Section 1010.420, formerly Section 103.32, that certain records concerning foreign bank accounts be maintained, is essentially regulatory.  See In re Grand Jury Investigation M.H., 648 F.3d 1067, 1073-74 (9th Cir. 2011) (affirming finding by judge in Southern District of California that witness who refused to produce records relating to offshore bank account was in contempt), cert. denied, 2012 WL 553924 (June 25, 2012); In re Grand Jury Subpoena, 696 F.3d 428, 433-35 (5th Cir. 2012) (overruling denial by judge in Southern District of Texas of Government's motion to compel production of records of offshore bank accounts); In re Special February 2011-1 Grand Jury Subpoena Dated September 12, 2011, 691 F.3d 903, 909 (7th Cir. 2012) (overruling grant of motion to quash subpoena for records of offshore bank accounts by judge in Northern District of Illinois), rehearing & rehearing en banc denied (Oct 24, 2012).  The same is true with three District Courts that have also considered the issue.  See In re Grand Jury Subpoenas Dated September 9, 2011, No. 11 Misc. 747 (JFB), slip op. at 9-10 (E.D.N.Y. Dec. 30, 2011); In re Grand Jury Subpoenas Dated January 3, 2011, No. 11 Mag. 6164, slip op. at 2-3 (S.D. Fla. Mar. 4, 2011); In re Grand Jury Subpoena No. 10-04-400, slip op.

at 2-4 (D. Ariz. Feb. 16, 2011).[7]

    In holding that the maintenance of certain records concerning foreign bank account is essentially regulatory, these courts have advanced several rationales.  For example, the Ninth Circuit pointed out that there is nothing inherently illegal about having an overseas bank account and that the activity targeted by the regulations is engaged in lawfully by hundreds of thousands of people.  M.H., 648 F.3d at 1074-75.  The Ninth Circuit also noted that the information required to be maintained -- basic information concerning overseas banks accounts -- was "not inherently criminal."  Id.  And the Fifth Circuit referred, as support for its conclusion, to the legislative history that makes clear that the purpose of the BSA was to assist in criminal investigations as well as in the supervision of financial institutions and in the collection of statistical information.  Grand Jury Subpoena, 696 F.3d at 434.

    Although one purpose of the BSA was "to detect criminal activity," the Supreme Court explained that Congress "seems to have been equally concerned with civil liability which might go undetected by reason of the transactions of the type required to be recorded or reported." California Bankers Ass'n v. Shultz, 416 U.S. 21, 76 (1974) (emphasis added) (noting that "the fact that a legislative enactment manifests a concern for the enforcement of the criminal law does not cast any generalized pall of constitutional suspicion over it").  The Supreme Court's charact-erization of the multiple purposes of the BSA is entirely consistent with the BSA's express

_____

    [7] These six opinions are attached hereto in Appendix B.  The respondent in the Eastern District of New York case filed a notice of appeal, but it was subsequently withdrawn.  There is presently on appeal a case in the Eleventh Circuit in which the United States District Court for the Northern District of Georgia granted the Government's motion to compel enforcement of a subpoena virtually identical to the ones at issue in this motion.  Oral argument in that case is currently scheduled for January 30, 2013.  The District Court's Order in the Northern District of Georgia case has not been unsealed and, therefore, has not been included in Appendix B.

statement of its purposes: "to require certain reports or records where they have a high degree of usefulness in <u>criminal, tax, or regulatory</u> <u>investigations or proceedings, or in the conduct of</u> <u>intelligence or counterintelligence activities</u>." 31 U.S.C. § 5311 (emphasis added).[8]

The holdings of the Ninth, Fifth, and Seventh Circuits that the record-keeping provisions of current Section 1010.420/former Section 103.32 are essentially regulatory are fully consistent with a prior Second Circuit case that concerned a different, but similar, provision of the BSA, specifically, one that required the reporting of the transportation of $5,000 or more of cash or monetary instruments across the border.  <u>United States v. Dichne</u>, 612 F.2d 632 (2d Cir. 1979). In <u>Dichne</u>, the Second Circuit held that this reporting requirement was primarily regulatory, rather than criminal, in nature.  In doing so, the Second Circuit noted that the requirement at issue did "not involve a direct link to any related criminal activity" and that the vast majority of people subject to the requirement "will be completely uninvolved in any related criminal action." <u>Id.</u> at 639-40 (noting that "[w]hile Congress clearly intended the [BSA's] disclosure requirements to be of some use in criminal proceedings, we regard these non-prosecutorial interests as substantial"); <u>see</u> <u>United States v. Goldberger & Dubin</u>, 935 F.2d 501, 503 (2d Cir. 1991) (upholding requirement to report cash transactions in excess of $10,000 over Fifth and Sixth Amendment challenges); <u>United States v. Mickens</u>, 926 F.2d 1323, 1331 (2d Cir. 1991) (concluding that currency-transaction reporting requirement in Section 5313(a) does not violate privilege against self-incrimination because, among other things, it "does not require the

---

[8] <u>See also</u> H.R. Rep. No. 91-975, at 10 (1970), <u>reprinted in</u> 1970 U.S.C.C.A.N. 4394, 4405 (listing the purposes of the record-keeping requirements in Title II of the BSA as: (1) "facilitat[ing] the supervision of financial institutions"; (2) aiding the "authorities in lawful investigations"; and (3) "provid[ing] for the collection of statistics necessary for the formulation of monetary and economic policy").

reporting of information that would necessarily be criminal"); see also United States v. Sturman, 951 F.2d 1466, 1486-87 (6th Cir. 1991) (rejecting constitutional challenge to requirement that persons having minimum amount of money overseas report details concerning accounts because, among other reasons, the BSA "applies to all persons making foreign deposits, most of whom do so with legally obtained funds.  The requirement is imposed in the banking regulatory field which is not infused with criminal statutes").

The exact same, i.e., that they are primarily regulatory, rather than criminal, in nature, can be said of the reporting and record-keeping requirements concerning foreign bank accounts. And, indeed, a judge in the Eastern District of New York has already said it.  See September 9, 2011, slip op. at 9-10 (discussing Dichne and holding that "regulatory scheme giving rise to the record-keeping requirement is 'essentially regulatory' and not criminal in nature").  After all, hundreds of thousands of people lawfully file reports concerning their offshore bank accounts every year.  See Treasury Inspector General for Tax Administration, "New Legislation Could Affect Filers of the Report of Foreign Bank and Financial Accounts, but Potential Issues are Being Addressed," Ref. 2010-30-125 (Sept. 29, 2010) at 7 (noting increase in number of FBARs filed from over 200,000 in 2004 to over 500,000 in 2009) (available at <<www.treasury.gov/tigta/auditreports/ 2010reports/ 201030125fr.pdf>>).

In short, the record-keeping provisions of current Section 1010.420/former Section 103.32 do not "apply exclusively or almost exclusively to people engaged in criminal activity." Grand Jury Subpoena, 696 F.3d at 434.  The first prong of the Grosso test is satisfied.

**B.     The Subpoenaed Records Are of A**
**Type that An Individual Maintains**

The second requirement under <u>Grosso</u> is that the records sought be of the type

customarily kept by the regulated party.  <u>Grosso</u>, 390 U.S. at 67-68.  The records required under

Section 1010.420/Section 103.32 are ordinary banking records that are customarily kept and

maintained by a client of a foreign bank.  The records that are required to be kept are: "the name

in which each such account is maintained, the number or other designation of such account, the

name and address of the foreign bank or other person with whom such account is maintained, the

type of such account, and the maximum value of each such account during the reporting period."

31 C.F.R. § 1010.420.

Plainly, these basic bank records are of the type that would ordinarily be kept by a bank

account holder, regardless of a reporting or record-keeping requirement.  <u>M.H.</u>, 648 F.3d at 1076

("The information that § 1010.420 requires to be kept is basic account information that bank

customers would customarily keep, in part because they must report it to the IRS every year as

part of the IRS's regulation of offshore banking, and in part because they need the information to

access their foreign bank accounts. . . . A bank account's beneficiary necessarily has access to

such essential information as the bank's name, the maximum amount held in the account each

year, and the account number.  Both common sense and the records reviewed <u>in camera</u> support

this assessment.  We conclude that the records sought are customarily kept."); <u>Grand Jury</u>

<u>Subpoena</u>, 696 F.3d at 435 ("That the records sought are of a kind customarily kept is not

contested."); <u>September 9, 2011</u>, slip op. at 10-11; <u>January 3, 2011</u>, slip op. at 3 ("And the

Movants do not dispute that the second prong in <u>Grosso</u>, that the records at issue are the type of

information that the regulated party would ordinarily keep, is also satisfied.").

17

The Subjects may argue that Swiss banks and other banks in secrecy jurisdictions do not send out statements and, therefore, that it cannot be expected that the records sought by the Subpoenas would be maintained.  Such an argument is utterly meritless.  The third prong of the Grosso test asks whether the records are of the type customarily maintained by the regulated party.  And people maintaining a bank account overseas, even people who are trying to hide overseas bank accounts, can be expected to note, in some fashion or another, the name in which their account is maintained, the account number, the name and address of the foreign bank, the type of account, and the balance in the account.  The notion that, for example, a person hiding hundreds of thousands of dollars overseas would commit to memory the account number and name of the bank is inconceivable.  After all, should the person hiding the money die, their heirs would be hard-pressed to access the funds.

### C.      The Records Have Assumed Public Aspects

The final requirement under Grosso is that the records at issue must have "public aspects."  390 U.S. at 67-68.  The "public aspect" prong has been satisfied here, because "[r]ecords required to be kept pursuant to a reasonable regulatory scheme have 'public aspects.'" United States v. Silverman, 449 F.2d 1341, 1345 (2d. Cir. 1971) (citing cases); Donovan v. Mehlenbacher, 652 F.2d 228, 231 (2d Cir. 1983) (under required records doctrine, "records required to be kept pursuant to valid regulatory programs have a 'public aspect' for purposes of constitutional analysis, and thus are not private papers entitled to the protection of the fourth or fifth amendments"); see e.g., Shapiro, 335 U.S. at 32-34 (records had "public aspects" because defendant "was required to keep [them] as a licensee under the Price Control Act," which was "a legitimate exercise" of Congress's "constitutional authority to prescribe commodity prices as a

18

war emergency measure").

The several courts to have considered this issue in the precise context presented by the Subpoenas to the Subjects have easily concluded that the records required to be kept by Section 1010.420/Section 103.32 have assumed public aspects for the purposes of Grosso.  See M.H., 648 F.3d at 1077-79; Grand Jury Subpoena, 696 F.3d at 435-46 (rejecting argument that, because individuals subject to BSA's foreign account record keeping requirement are not licensed, records have not assumed public aspects); September 9, 2011, slip op. at 11.

And the fact that Section 1010.420/Section 103.32 require foreign bank account-holders to maintain, but not file, those records, does not eliminate the public aspects of the records because, as the Supreme Court has held, "there is no distinction between records required to be kept by law and records regularly or 'easily accessed' by the government." September 9, 2011, slip op. at 11 (citing Marchetti v. United States, 390 U.S. 39, 56 n.14 (1968)).  Plus, the reporting requirement in Section 1010.350 and the FBAR form, see Levy Decl., Exh. F, require the reporting to the IRS of much of the same information required to be maintained by Section 1010.420/103.32.  Moreover, the public aspects of the records is confirmed by the fact that Section 1010.420/Section 103.32 requires that the records that must be maintained "shall be kept at all times available for inspection as authorized by law."  31 C.F.R. § 1010.420; see also 31 C.F.R. § 1010.430(d) (requiring records to be "filed or stored in such a way as to be accessible within a reasonable period of time, taking into consideration the nature of the record, and the amount of time expired since the record was made").

After all, Congress did not exempt persons maintaining bank accounts overseas from actually filing the documents that it instead required to be maintained because it deemed the

records so private.  Rather, it required record-keeping, as opposed to the filing of the documents with the IRS, because it sought to "avoid impeding or controlling the export or import of monetary instruments" and "to avoid burdening unreasonably a person making a transaction with a foreign financial agency."  31 U.S.C. § 5314(a).

In short, the third and final prong of the <u>Grosso</u> test is satisfied.

## IV.   **Conclusion**

The Subjects cannot assert a Fifth Amendment privilege over the documents that they were required to keep under the BSA because the documents fall under the "required records" exception to the Fifth Amendment.  The Government has established that the records that it seeks are within the "required records" doctrine and are consistent with the precedent of the Supreme Court and of this Circuit.  Therefore, the Court should order the Subjects to comply promptly with the Subpoenas.

Dated:   New York, New York
         November 19, 2012

                                    Respectfully submitted,

                                    PREET BHARARA
                                    United States Attorney for the
                                    Southern District of New York

                          By:   _____
                                    Daniel W. Levy/David B. Massey/
                                    Jason H. Cowley
                                    Assistant United States Attorneys
                                    Telephone: (212) 637-1062/2283/2479