# Appendix B

**In re Grand Jury Investigation M.H.,**

**M.H., Witness–Appellant,**

**v.**

**United States of America, Appellee.**

**No. 11–55712.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 24, 2011.

Filed Aug. 19, 2011.

**Background:** Individual, as the target of grand jury investigation seeking to determine whether he used secret Swiss bank accounts to evade paying federal taxes, was found in contempt by the United States District Court for the Southern District of California, Irma E. Gonzalez, Chief Judge, for refusing to comply with grand jury subpoena duces tecum demanding that he produce certain records related to his foreign bank accounts. Individual appealed.

**Holding:** The Court of Appeals, Tallman, Circuit Judge, held that requested records fell under the required records doctrine, rendering Fifth Amendment privilege against self-incrimination inapplicable.

Affirmed.

**1. Contempt ⬤66(7)**

A court of appeals reviews de novo mixed questions of law and fact contained within the analysis of a civil contempt proceeding, and reviews for clear error any factual findings underlying the contumacious behavior.

**2. Contempt ⬤66(8)**

Where incarceration has been stayed pending appeal and no party is harmed by the delay, a court of appeals may exceed the 30-day time limit for deciding appeals that the recalcitrant witness statute would otherwise impose. 28 U.S.C.A. § 1826.

**3. Grand Jury ⬤36.4(1)**

Obligation of individual, as the target of grand jury investigation seeking to determine whether he used secret Swiss bank accounts to evade paying federal taxes, to comply with grand jury subpoena duces tecum demanding that he produce certain records related to his foreign bank accounts was not contingent upon whether the government had proved the Bank Secrecy Act (BSA) and its regulations applied to him as a United States taxpayer who had previously filed reports of foreign bank and financial accounts (FBARs) with the Department of Treasury; government only had to show a "reasonable probability" that the subpoena would serve the grand jury's legitimate investigative purpose. 31 U.S.C.A. § 5311.

**4. Criminal Law ⬤393(1)**

When compelled disclosure has incriminating potential, the judicial scrutiny is invariably a close one. U.S.C.A. Const. Amend. 5.

**5. Witnesses ⬤298**

In evaluating the danger of incrimination with respect to compelled disclosure under the required records doctrine, which recognizes that when certain conditions are met, records required to be maintained by law fall outside the scope of the Fifth Amendment privilege, a court considers whether the requirement in question is essentially regulatory or criminal in nature; in doing so, it is irrelevant that records kept for regulatory purposes may be useful to a criminal grand jury investigation, and, instead, a court considers whether the statutory or regulatory requirement involves an area permeated with criminal statutes, whether it is aimed at a highly selective group inherently suspect of criminal activities, and whether complying with the requirement would generally prove a significant link in a chain of evidence tend-

ing to establish guilt. U.S.C.A. Const. Amend. 5.

**6. Witnesses ⇐298**

Regulation requiring taxpayers using offshore bank accounts to keep and maintain banking information for government inspection was essentially regulatory in nature, supporting application of required records doctrine to bring records requested pursuant to the regulation outside the scope of the Fifth Amendment privilege; nothing about having a foreign bank account on its own suggested a person was engaged in illegal activity, and the information the regulation required taxpayers to maintain was not inherently criminal. U.S.C.A. Const.Amend. 5; 31 C.F.R. § 1010.420.

**7. Witnesses ⇐298**

The Fifth Amendment does not apply when the Government compels individuals to create records that they would customarily keep. U.S.C.A. Const.Amend. 5.

**8. Witnesses ⇐298**

Banking information that regulation required taxpayers using offshore bank accounts to keep and maintain for government inspection was customarily kept by the taxpayers, supporting application of required records doctrine to bring records requested pursuant to the regulation outside the scope of the Fifth Amendment privilege; information was basic account information that bank customers were required to report to the Internal Revenue Service (IRS) each year as part of the IRS's regulation of offshore banking, or information the customers need to access their foreign bank accounts. U.S.C.A. Const.Amend. 5; 31 C.F.R. § 1010.420.

**9. Witnesses ⇐298**

The mere fact that the government has formalized its demands in the attire of a statute does not automatically ascribe public aspects to otherwise private documents, so as to support application of re-

quired records doctrine to bring requested records outside the scope of the Fifth Amendment privilege. U.S.C.A. Const. Amend. 5.

**10. Witnesses ⇐298**

That information sought is traditionally private and personal as opposed to business-related does not automatically implicate the Fifth Amendment. U.S.C.A. Const.Amend. 5.

**11. Witnesses ⇐298**

Where personal information is compelled in furtherance of a valid regulatory scheme, that information assumes a public aspect, supporting application of required records doctrine to bring the personal information outside the scope of the Fifth Amendment privilege. U.S.C.A. Const. Amend. 5.

**12. Witnesses ⇐298**

Banking information that regulation required taxpayers using offshore bank accounts to keep and maintain for government inspection had public aspects, supporting application of required records doctrine to bring records requested pursuant to the regulation outside the scope of the Fifth Amendment privilege; documents in question were required to be kept to aid in the enforcement of a valid regulatory scheme. U.S.C.A. Const.Amend. 5; 31 C.F.R. § 1010.420.

**13. Witnesses ⇐298**

For purposes of the required records doctrine, which recognizes that when certain conditions are met, records required to be maintained by law fall outside the scope of the Fifth Amendment privilege, it does not matter whether the production of that information is requested through a subpoena, a court order, or the regulation itself. U.S.C.A. Const.Amend. 5.

**14. Witnesses ⇐298**

Whether a document is easily accessible has nothing to do with whether a docu-

ment has public aspects, so as to support application of required records doctrine to bring the document outside the scope of the Fifth Amendment privilege. U.S.C.A. Const.Amend. 5.

**15. Witnesses ⊕298**

The fact that documents have privacy protections elsewhere does not transform those documents into private documents under the Fifth Amendment for the purpose of grand jury proceedings. U.S.C.A. Const.Amend. 5.

**16. Criminal Law ⊕393(1)**

A statute or regulation directed at a selective group inherently suspect of criminal activities fails to render the privilege against self-incrimination inapplicable. U.S.C.A. Const.Amend. 5.

———————

Pamela J. Naughton and Rebecca S. Roberts, Sheppard Mullin Richter & Hampton LLP, San Diego, CA, for appellant M.H.

Frank P. Cihlar, Gregory Victor Davis, Alexander P. Robbins, Tax Division, Department of Justice, Washington, D.C., for appellee United States of America.

Appeal from the United States District Court for the Southern District of California, Irma E. Gonzalez, Chief District Judge, Presiding.  D.C. No. 10–GJ–0200.

Before: WILLIAM C. CANBY, JR., RONALD M. GOULD, and RICHARD C. TALLMAN, Circuit Judges.

**OPINION**

TALLMAN, Circuit Judge:

Appellant M.H. is the target of a grand jury investigation seeking to determine whether he used secret Swiss bank accounts to evade paying federal taxes.  The district court granted a motion to compel M.H.'s compliance with a grand jury subpoena duces tecum demanding that he produce certain records related to his foreign bank accounts.  The court declined to condition its order compelling production upon a grant of limited immunity and, pursuant to the recalcitrant witness statute, 28 U.S.C. § 1826, held M.H. in contempt for refusing to comply.  M.H. appealed.

The foreign bank account information the Government seeks is information M.H. is required to keep and maintain for inspection under the Bank Secrecy Act of 1970 (BSA), 31 U.S.C. § 5311, and its related regulations.  M.H. argues that if he provides the sought-after information, he risks incriminating himself in violation of his Fifth Amendment privilege.  He asserts that the information he is being asked to produce might conflict with other information M.H. has previously reported to the Internal Revenue Service (IRS).  Production might reveal, for instance, that he has accounts he has not reported or that the information he *has* previously reported is inaccurate.  On the other hand, if M.H. denies having the records, he risks incriminating himself because failing to keep the information when required to do so is a felony.

The district court concluded that under the Required Records Doctrine, the Fifth Amendment did not apply.  That doctrine recognizes that when certain conditions are met, records required to be maintained by law fall outside the scope of the privilege.  We agree that, under the Required Records Doctrine, the Fifth Amendment does not apply.  We therefore affirm the district court's order of contempt for failing to produce the information the grand jury sought.

**I**

In 2009, as part of a deferred-prosecution agreement with the United States De-

partment of Justice, the Swiss bank UBS AG (UBS) provided the federal government with bank account records identifying approximately 250 U.S. taxpayers UBS might have aided in committing tax evasion. The UBS records showed that in 2002, M.H. transferred securities from his UBS account to a different Swiss bank, UEB Geneva. IRS agents began investigating him.

In June 2010, a San Diego federal grand jury issued a subpoena duces tecum to M.H. for records he was required to keep pursuant to Treasury Department regulations governing offshore banking. The subpoena demanded production of:

> [a]ny and all records required to be maintained pursuant to 31 C.F.R. § 103.32 [subsequently relocated to 31 C.F.R. § 1010.420] relating to foreign financial accounts that you had/have a financial interest in, or signature authority over, including *records reflecting the name in which each such account is maintained, the number or other designation of such account, the name and address of the foreign bank or other person with whom such account is maintained, the type of such account, and the maximum value of each such account during each specified year.*

(Emphasis added).[1] M.H. declined to provide the requested information and also declined to deny having it, reasoning that

either response posed a risk of self-incrimination under the Fifth Amendment to the United States Constitution. The district court ordered him to comply anyway. When he again refused to produce the requested documents, the court conducted a show-cause hearing for failing to comply with its order and found him in contempt. However, because the district court considered M.H.'s arguments "substantial and worthy of appellate review," the court stayed the contempt order pending appeal, contingent on M.H.'s posting of a $250,000 cash bond. M.H. is not currently incarcerated and may travel without restriction.

The information identified in the subpoena mirrors the banking information that 31 C.F.R. § 1010.420[2] requires taxpayers using offshore bank accounts to keep and maintain for government inspection. The information the subpoena seeks is also identical to information that anyone subject to § 1010.420 already reports to the IRS annually through Form TD F 90–22.1, known as a "Report of Foreign Bank and Financial Accounts," or "FBAR." Therefore, the information at issue in this contempt proceeding is information that M.H.—if he has a foreign bank account and meets other qualifications specified in the BSA—must keep, report to the Treasury Department, and maintain for IRS inspection.

## II

[1, 2] We review de novo mixed questions of law and fact contained within the

---

1. The regulation cited in the subpoena, 31 C.F.R. § 103.32, has since been relocated to 31 C.F.R. § 1010.420. For ease of reference, this opinion will refer to the current citation.

2. The regulation reads, in relevant part:

   Records of accounts required by [31 C.F.R. § 103.24 (relocated to 31 C.F.R. § 1010.350)] to be reported to the Commissioner of Internal Revenue shall be retained by each person having a financial interest in or signature or other authority over any such account. Such records shall contain the name in which each such account is maintained, the number or other designation of such account, the name and address of the foreign bank or other person with whom such account is maintained, the type of such account, and the maximum value of each such account during the reporting period. Such records shall be retained for a period of 5 years and shall be kept at all times available for inspection as authorized by law.

analysis of a civil contempt proceeding. *Shoen v. Shoen*, 48 F.3d 412, 414 (9th Cir.1995). We review for clear error any factual findings underlying the contumacious behavior. *United States v. Bright*, 596 F.3d 683, 694 (9th Cir.2010). Where incarceration has been stayed pending appeal and no party is harmed by the delay, we may exceed the thirty-day time limit for deciding appeals that § 1826 would otherwise impose. *In re Grand Jury Witness*, 695 F.2d 359, 361 n. 4 (9th Cir.1982).

### III

### A

[3] As a preliminary matter, M.H. argues that—for a number of reasons—§ 1010.420 does not apply to him, so he is not required to comply with the grand jury's subpoena and we need not reach the Fifth Amendment question. But at this point in its investigation, the Government need not prove the regulation or the BSA apply. It need only show a "reasonable possibility" that the subpoena will serve the grand jury's legitimate investigative purpose. *United States v. R. Enters., Inc.*, 498 U.S. 292, 300–01, 111 S.Ct. 722, 112 L.Ed.2d 795 (1991).

The Government is not required to justify the issuance of a grand jury subpoena by presenting evidence sufficient to establish probable cause because the very purpose of its inquiry is to establish whether probable cause exists to accuse the taxpayer of violating our tax laws. *See id.* at 297, 111 S.Ct. 722 ("The grand jury occupies a unique role in our criminal justice system. It is an investigatory body charged with the responsibility of determining whether or not a crime has been committed. Unlike this Court, whose jurisdiction is predicated on a specific case or controversy, the grand jury 'can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.'" (citation omitted)).

There are, of course, limits to the grand jury's authority. *See, e.g., id.* at 299, 111 S.Ct. 722 (stating that a grand jury may not "engage in arbitrary fishing expeditions" or base its investigation on "malice or an intent to harass"). But there is no evidence of excess here. We have examined the evidence in the sealed record along with the evidence the district court reviewed in camera. That evidence confirms that the grand jury's inquiry is a legitimate exercise of its investigatory authority. If it is later established that, for whatever legal reason, the regulation at issue does not apply to M.H., then the Government will be unable to successfully prosecute him and there is no risk of a Fifth Amendment violation. Until then, however, M.H.'s obligation to comply with the grand jury subpoena is not contingent upon whether the Government has proven the BSA and its regulations apply to him as a U.S. taxpayer who has previously filed FBARs with the Department of the Treasury.

### B

M.H. argues that the Required Records Doctrine—which, if it applies, renders the Fifth Amendment privilege inapplicable—does not apply to this case and that the district court erred in finding otherwise. The Fifth Amendment to the United States Constitution states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." The Supreme Court has held that where documents are *voluntarily* created and kept, compelling their disclosure does not implicate the privilege against self-incrimination. *See United States v. Doe*, 465 U.S. 605, 611–12, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984) (citing *Fisher v. United States*, 425 U.S. 391, 409–10, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976)). Where documents are *required* to be kept and then produced, they are arguably compelled. However, the Su-

preme Court has recognized that in such circumstances, the privilege does not extend to records required to be kept as a result of an individual's voluntary participation in a regulated activity. *See Shapiro v. United States,* 335 U.S. 1, 17, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948) (noting that the nature of documents and the capacity in which they are held may indicate that "the custodian has voluntarily assumed a duty which overrides his claim of privilege" (quoting *Wilson v. United States,* 221 U.S. 361, 380, 31 S.Ct. 538, 55 L.Ed. 771 (1911))). Our task is to determine whether the records sought in this case fall into the former or latter category. If they fall into the latter, the Required Records Doctrine applies and the privilege is unavailable to M.H., who has voluntarily participated in a regulated activity.

In *Shapiro*—credited for establishing the principles of what has come to be known as the Required Records Doctrine—the Supreme Court required a wholesaler of fruit and produce to turn over certain records he was obliged to keep and maintain for examination pursuant to the Emergency Price Control Act, which applied in part to records "customarily kept." *See Marchetti v. United States,* 390 U.S. 39, 55, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968). The Court reasoned that the Required Records "principle applies not only to public documents in public offices, but also to records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation, and the enforcement of restrictions validly established." *Shapiro,* 335 U.S. at 17, 68 S.Ct. 1375.

Twenty years after *Shapiro,* the Court considered two cases that examined whether being required to pay an excise tax on one's gambling wagers violated the Fifth Amendment. Those two cases were *Marchetti* and *Grosso v. United States,* 390

U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968). In its analysis in those cases, the Court identified three principles from *Shapiro* that distinguished it from *Grosso* and *Marchetti* where, the Court concluded, the Required Records Doctrine did not apply. *See Marchetti,* 390 U.S. at 56–57, 88 S.Ct. 697 ("We think that neither *Shapiro* nor the cases upon which it relied are applicable here.... Each of the three principal elements of the [Required Records Doctrine], as it is described in *Shapiro,* is absent from this situation."); *Grosso,* 390 U.S. at 67–68, 88 S.Ct. 709 ("The premises of the [Required Records Doctrine], as it is described in *Shapiro,* are evidently three: first, the purposes of the United States' inquiry must be *essentially regulatory;* second, information is to be obtained by requiring the preservation of records of a kind which the regulated party has *customarily kept;* and third, the records themselves must have assumed '*public aspects*' which render them at least analogous to public documents.... [B]oth the first and third factors are plainly absent from this case." (emphasis added)).

Since *Grosso* and *Marchetti,* the Supreme Court has applied *Shapiro* and the principles underlying the Required Records Doctrine broadly to "items that are the legitimate object of the government's noncriminal regulatory powers," *Baltimore City Dept. of Soc. Servs. v. Bouknight,* 493 U.S. 549, 557, 110 S.Ct. 900, 107 L.Ed.2d 992 (1990), regardless of whether they are required to be kept and regardless of whether they are records. *See, e.g., California v. Byers,* 402 U.S. 424, 427–31, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971) (applying Required Records Doctrine principles and concluding that a state statute requiring drivers involved in vehicle accidents to stop at the scene of the accident and leave their names and addresses for police did not infringe the Fifth Amendment); *Bouknight,* 493 U.S. at 558, 110 S.Ct. 900 (ap-

plying the Required Records Doctrine to determine that a parent lacked a Fifth Amendment privilege in producing her child in response to a court's order).

We have recognized that the three principles announced in *Grosso* define the Required Records Doctrine, but have also adopted the Supreme Court's flexibility in applying those principles. *See In re Grand Jury Proceedings (Doe M.D.),* 801 F.2d 1164, 1168 (9th Cir.1986) ("Under [the Required Records Doctrine], the Fifth Amendment privilege does not apply if: (1) the purpose of the government's inquiry is regulatory, not criminal; (2) the information requested is contained in documents of a kind the regulated party customarily keeps; and (3) the records have public aspects."); *see also U.S. SEC v. Fehn,* 97 F.3d 1276, 1291–92 (9th Cir.1996) (observing that we have applied the Required Records Doctrine "principles in a variety of contexts, and have accorded them varying emphasis").

Even though M.H. is being asked to turn over reports he is required to keep pursuant to the BSA and its regulations, the Government, citing *Byers, Bouknight,* and *Fehn,* suggests that all three requirements need not be met. While it is true that when the Required Records Doctrine is applied to items other than records a rigid application of all three factors may not be necessary, *see, e.g., Bouknight,* 493 U.S. at 558–60, 110 S.Ct. 900 (applying the "principles" of the Required Records Doctrine and concluding that a mother compelled to produce her child through a court order could not invoke a Fifth Amendment privilege against self-incrimination to resist the order); *United States v. Des Jardins,* 747 F.2d 499, 507–09 (9th Cir.1984) (concluding that the Fifth Amendment privilege does not apply to a requirement under the BSA that travelers transferring more than $5,000 out of the country file a written report, but considering only

whether the regulation at issue was essentially regulatory or criminal in nature), *rev'd on other grounds,* 772 F.2d 578 (9th Cir.1985), we need not resolve that issue here. Even if we assume, for purposes of decision, that all three prongs of the test set forth in *Grosso* apply, we conclude that all three requirements are met in this case.

#### 1. "Essentially regulatory"

**[4, 5]** We begin by recognizing that when compelled disclosure has incriminating potential, "the judicial scrutiny is invariably a close one." *Byers,* 402 U.S. at 427, 91 S.Ct. 1535. In evaluating the danger of incrimination, we consider whether the requirement in question is essentially regulatory or criminal in nature. *Doe M.D.,* 801 F.2d at 1168. In doing so, "[i]t is irrelevant that records kept for regulatory purposes may be useful to a criminal grand jury investigation." *Id.* Instead, we consider whether the statutory or regulatory requirement involves an area "permeated with criminal statutes," whether it is "aimed at a highly selective group inherently suspect of criminal activities," *Des Jardins,* 747 F.2d at 508 (internal citations and quotation marks omitted), and whether complying with the requirement would "generally . . . prove a significant 'link in a chain' of evidence tending to establish guilt." *Id.* at 509 (internal quotation marks omitted). M.H. argues that, for several reasons, the BSA's record-keeping provision is criminal in nature, not regulatory. Our precedent indicates otherwise.

M.H. first argues that § 1010.420 is criminal in nature because the BSA's "primary purpose is to detect criminal conduct, specifically money laundering, terrorism and tax evasion." To support this position, M.H. points to language in the BSA describing the purpose of the statute as requiring "certain reports or records, where they have a high degree of useful-

ness in criminal, tax, or regulatory investigations or proceedings, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism." *See* 31 U.S.C. § 5311. M.H. also cites language from the IRS Web site describing the BSA as the first law to fight money laundering in the United States, along with legislative history indicating congressional interest in combating criminal activity.

The Supreme Court has already considered and rejected these arguments as they relate to the BSA generally. In *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 76–77, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974), the Court observed that the goal of assisting in the enforcement of criminal laws "was undoubtedly prominent in the minds of the legislators," as they considered the BSA. However, it noted that "Congress seems to have been equally concerned with civil liability which might go undetected by reason of transactions of the type required to be recorded or reported." *Id.* at 76, 94 S.Ct. 1494. The Court concluded that "the fact that a legislative enactment manifests a concern for the enforcement of the criminal law does not cast any generalized pall of constitutional suspicion over it." *Id.* at 77, 94 S.Ct. 1494. Therefore, that Congress aimed to use the BSA as a tool to combat certain criminal activity is insufficient to render the BSA essentially criminal as opposed to essentially regulatory.

Turning to the specific regulation in question, our analysis in *Des Jardins* is informative. There, we considered whether a particular BSA record-reporting provision, which required travelers to report transporting more than $5,000 in monetary instruments across the United States border, was essentially criminal in nature and determined it was not. In that case, a U.S. Customs Agent working at the Los Angeles International Airport—as part of

a project to detect narcotics-related criminal activity—noticed that Des Jardins's travel route paralleled those drug couriers frequently took. *Des Jardins*, 747 F.2d at 501. The agent inspected Des Jardins's luggage and found $5,000. Upon searching Des Jardins's person, the agent discovered several thousand more dollars. *Id.* at 502. Des Jardins was ultimately convicted for violating the reporting requirement.

We considered whether the reporting requirement violated Des Jardins's Fifth Amendment privilege, and we analyzed whether the fact that the regulation was not "*exclusively* regulatory" made it essentially criminal. *Id.* at 508–09 (emphasis added). We determined it did not. *Id.* at 509. We reasoned in part that "[s]ince the transportation of monetary instruments in such amounts is not itself illegal and since there is no reason to suppose that the transportation of monetary instruments in such amounts is generally connected with criminal activity, the vast majority of people subject to the requirement are not suspect of illegality." *Id.*

**[6]** The same can be said here. There is nothing inherently illegal about having or being a beneficiary of an offshore foreign banking account. According to the Government, § 1010.420 applies to "hundreds of thousands of foreign bank accounts—over half a million in 2009." Nothing about having a foreign bank account on its own suggests a person is engaged in illegal activity. That fact distinguishes this case from *Marchetti* and *Grosso*, where the activity being regulated—gambling—was almost universally illegal, so that paying a tax on gambling wagers necessarily implicated a person in criminal activity. Admitting to having a foreign bank account carries no such risk. That the information contained in the required record may ultimately lead to criminal charges does not convert an essentially

regulatory regulation into a criminal one. *See Des Jardins*, 747 F.2d at 508; *see also Marchetti*, 390 U.S. at 57, 88 S.Ct. 697.

Considering whether the sought-after information would likely serve as a significant chain in a link of evidence establishing guilt, we found relevant in *Des Jardins* the nature of the specific information travelers were required to report (the legal capacity in which the person filing the report was acting; the origin, destination, and route being traveled; and the amount and kind of monetary instruments transported). We concluded that because such evidence lacked an inherently criminal quality, it would not likely serve as a significant link in a chain of evidence. *Des Jardins*, 747 F.2d at 508–09.

M.H. was required to maintain, and through the subpoena is being asked to produce, the following information:

(1) The name in which each account is maintained;

(2) The number or other designation of such account;

(3) The name and address of the foreign bank or other person with whom such account is maintained;

(4) The type of such account;

(5) The maximum value of each such account during the reporting period.

This information is not inherently criminal. As in *Des Jardins*, it is the act of *not* reporting (or in this case the act of *not* maintaining for inspection) the information that suggests criminality, not the information itself. Because the information being requested of M.H. is not inherently criminal, being required to provide that information would generally not establish a significant link in a chain of evidence tending to prove guilt. *See Des Jardins*, 747 F.2d at 509 ("Since the requirement concerns such relatively innocuous matters . . . any information obtained would be at best tangentially related to criminal activity."); *see also Wilson*, 221 U.S. at 380, 31 S.Ct. 538

("But the physical custody of incriminating documents does not of itself protect the custodian against their compulsory production. The question still remains with respect to the nature of the documents and the capacity in which they are held.").

M.H. suggests that *Des Jardins* should not apply because in that case we considered a reporting requirement instead of a record-keeping requirement. But *Des Jardins*'s analysis of whether the regulation in question was essentially regulatory did not hinge on the "reporting" aspect of the regulation. *Des Jardins* relied on cases interpreting the Required Records Doctrine and is clearly applicable to the "essentially regulatory" aspect of that doctrine, which does not turn on whether a reporting requirement exists, but—as we have already explained—on whether the information sought is inherently criminal in nature. While *Des Jardins* does not answer the precise question at issue in this case, we apply the rules recognized there to inform our Fifth Amendment inquiry. Those rules suggest that because § 1010.420 does not target inherently illegal activity or a highly selective group of people inherently suspect of criminal activity, it is essentially regulatory, not criminal.

We have held that whether a requirement to maintain records involves a reporting requirement is not determinative for purposes of deciding whether it is essentially regulatory. *See United States v. Rosenberg*, 515 F.2d 190, 199–200 (9th Cir. 1975) (holding that the Required Records Doctrine applied even though the statute in question only required records to be kept for two years and did "not expressly provide that records shall be open to inspection by state officials"). Thus, the lack of an "automatic" reporting requirement does not mean § 1010.420 is not essentially regulatory. This conclusion

makes sense because, as we have already explained, the heart of the "essentially regulatory" inquiry is whether the regulation in question targets inherently illegal activity. As we observed in *Rosenberg,* where the purpose of the record-keeping requirement "is to aid in the enforcement of" the statutory scheme, the Required Records Doctrine may apply, regardless of whether the regulation itself includes a reporting requirement, automatic or otherwise. *Id.* at 200.

Moreover, § 1010.420 *has* a reporting requirement. The regulation mandates that the required records "shall be kept at all times available for inspection as authorized by law." The Supreme Court has indicated that no meaningful difference exists "between an obligation to maintain records for inspection, and such an obligation supplemented by a requirement that those records be filed periodically with officers of the United States." *Marchetti,* 390 U.S. at 56 n. 14, 88 S.Ct. 697.

Because § 1010.420 is essentially regulatory in nature, we conclude that the first prong of the Required Records Doctrine is satisfied.

### 2. Customarily Kept

[7] We have not assigned a specific definition to the term "customarily kept," but records appear to be customarily kept if they would typically be kept in connection with the regulated activity. As the case law dealing with this requirement suggests, the Fifth Amendment does not apply when the Government compels individuals to create records that they would customarily keep.

In *Shapiro,* the records a fruit wholesaler "customarily kept" in compliance with the Emergency Price Control Act of 1942 were not privileged. By contrast, in *Marchetti,* records regarding a person's gambling expenses were deemed *not* customarily kept and were privileged. Some

courts have recognized records as "customarily kept" where they are required to be retained as part of the general regulatory scheme, as they were in *Shapiro.* *See, e.g., In re Doe,* 711 F.2d 1187, 1191 (2d Cir.1983) ("That the W–2s are records of a kind customarily kept by taxpayers is not open to dispute."). Most, however, seem to simply make a cursory statement that the records are, or are not, customarily kept. *See, e.g., Doe M.D.,* 801 F.2d at 1168 (concluding without analysis that "it is evident that Doe customarily maintained the documents in his possession").

[8] The information that § 1010.420 requires to be kept is basic account information that bank customers would customarily keep, in part because they must report it to the IRS every year as part of the IRS's regulation of offshore banking, and in part because they need the information to access their foreign bank accounts. That M.H.'s bank keeps the records on his behalf does not mean he lacks access to them or that they are records offshore banking customers would not customarily keep. A bank account's beneficiary necessarily has access to such essential information as the bank's name, the maximum amount held in the account each year, and the account number. Both common sense and the records reviewed in camera support this assessment. We conclude that the records sought are customarily kept.

### 3. "Public aspects"

The Supreme Court has recognized that if the government's purpose in imposing the regulatory scheme is essentially regulatory, then it necessarily has some "public aspects." *Shapiro,* 335 U.S. at 33, 68 S.Ct. 1375 (noting that "the privilege which exists as to private papers cannot be maintained in relation to records required by law to be kept in order that there may be suitable information of transactions which

are the appropriate subjects of governmental regulation, and the enforcement of restrictions validly established" (citation and internal quotation marks omitted)); *id.* at 34, 68 S.Ct. 1375 (observing that because the Price Control Act required the records in question to be kept, they had "public aspects").

**[9–11]** The mere fact that the government has "formalized its demands in the attire of a statute" does not automatically ascribe "public aspects" to otherwise private documents. *See Marchetti,* 390 U.S. at 57, 88 S.Ct. 697. However, that the information sought is traditionally private and personal as opposed to business-related does not automatically implicate the Fifth Amendment. Where personal information is compelled in furtherance of a valid regulatory scheme, as is the case here, that information assumes a public aspect. *See Byers,* 402 U.S. at 431–32, 91 S.Ct. 1535 (holding that a California statutory requirement that drivers involved in automobile accidents provide their names and addresses to police did not infringe on the Fifth Amendment privilege because "[d]isclosure of name and address is an essentially neutral act. Whatever the collateral consequences of disclosing name and address, the statutory purpose is to implement the state police power to regulate use of motor vehicles"). Similarly, disclosure of basic account information is an "essentially neutral" act necessary for effective regulation of offshore banking.

**[12]** M.H. argues that the records in question, even if they are essentially regulatory, lack public aspects because "nothing in the record keeping provision of the BSA requires [M.H.] to produce bank records to the Government." However, we have held that a regulation need not have an express reporting requirement in order to have public aspects. *See Rosenberg,* 515 F.2d at 199–200 (finding no Fifth Amendment violation even though the stat-

ute required records to be kept but not produced (citing *Shapiro,* 335 U.S. 1, 68 S.Ct. 1375, and *Grosso,* 390 U.S. at 68, 88 S.Ct. 709)).

**[13]** Furthermore, as we have already noted, § 1010.420 *does* require M.H. to produce to the Government the information being sought upon request, as long as that request is authorized by law. The regulation states that records "shall be retained for a period of 5 years and shall be kept at all times available for inspection as authorized by law." § 1010.420. Additionally, the information required to be kept under § 1010.420 is the same information disclosed in FBAR forms. For purposes of the Required Records Doctrine, it does not matter whether the production of that information is requested through a subpoena (as in this case and *Shapiro* ), a court order (as in *Bouknight* ), or the regulation itself (as in *Byers* ). *See Marchetti,* 390 U.S. at 56 n. 14, 88 S.Ct. 697 (rejecting the argument that "the crucial issue respecting the applicability of *Shapiro* is the method by which information reaches the Government"). Even if § 1010.420 lacked any reporting requirement whatsoever, it would still have public aspects because, as was the case in *Rosenberg,* the documents in question are required to be kept to aid in the enforcement of a valid regulatory scheme.

**[14]** M.H. next suggests that because the BSA provides that a person need only disclose records "as required by law" and the House report accompanying the legislation specified that the records "will not be made automatically available for law enforcement purposes," the records are not public because they are not "easily accessed" by the Government. But court orders and subpoenas *are* legal processes that prevent law enforcement from automatically retrieving information, and whether a document is easily accessible has nothing to do with whether a docu-

ment has public aspects. *See Marchetti*, 390 U.S. at 56 n. 14, 88 S.Ct. 697; *see also Rosenberg*, 515 F.2d at 199–200. The language "as required by law" does not prevent the sought-after records from assuming public aspects for purposes of the Required Records Doctrine.

**[15]** M.H.'s argument that, because the law recognizes special privacy interests in bank records and tax documents, those documents cannot have "public aspects" is also flawed. The fact that documents have privacy protections elsewhere does not transform those documents into private documents for the purpose of grand jury proceedings. *See Doe M.D.*, 801 F.2d at 1168 (finding that confidential patient records have "public aspects" for purposes of the Required Records Doctrine and that "expectations of privacy do not negate a finding that there is a public aspect to the files under the . . . regulatory schemes"); *see also Fisher*, 425 U.S. at 401, 96 S.Ct. 1569 ("We adhere to the view that the Fifth Amendment protects against 'compelled self-incrimination, not the disclosure of private information.'" (citation and internal markings omitted)).

M.H. emphasizes decisions from other circuits that have found certain personal income tax documents beyond the scope of the Required Records Doctrine. Those cases are not binding in this Circuit, but even if they were, they fail to support M.H.'s position. For example, M.H. relies heavily on *Smith v. Richert*, 35 F.3d 300, 303 (7th Cir.1994). There, the court held that where the "production of personal tax records of the character of W–2's and 1099's would have testimonial force and incriminate the taxpayer . . . the required-records doctrine is inapplicable and that production is excused by the self-incrimination clause." *Smith*, 35 F.3d at 304.

But the rationale behind that ruling was that "[t]he decision to become a taxpayer cannot be thought voluntary . . . [because] [a]lmost anyone who works is a taxpayer, along with many who do not." *Id.* at 303. The court reasoned that the obligatory nature of paying taxes was distinguishable from "the case of the individual who enters upon a regulated activity knowing that the maintenance of extensive records available for inspection by the regulatory agency is one of the conditions of engaging in the activity." *Id.* In the latter scenario—which is precisely the situation here because no one is required to participate in the activity of offshore banking—the required records doctrine *would* apply.

Furthermore, in *Smith* the subpoena did not indicate that the records being sought related to a regulated activity, whereas in this case the subpoena so indicates. *See id.* (determining that the Required Records Doctrine did not apply in part because "[n]othing in the subpoena identifies the records sought as records required by the state's agricultural statutes to be kept"). Here, the subpoena explicitly requires the production of banking records required to be kept and maintained for inspection pursuant to regulations implemented through the BSA.

**[16]** Finally, M.H. argues that allowing the regulatory nature of a requirement to render it as having "public aspects" allows the exception to swallow the rule that "[t]he Government's anxiety to obtain information known to a private individual does not without more render that information public." *Marchetti*, 390 U.S. at 57, 88 S.Ct. 697. But, as stated above, a statute or regulation "directed at a selective group inherently suspect of criminal activities" fails to render the privilege against self-incrimination inapplicable. *Id.* Determining whether a regulation is essentially regulatory or criminal requires analysis that goes beyond the label Congress or an agency provides, thus safeguarding against the exception swallowing the rule. Furthermore, in this instance,

M.H. has not made a compelling argument that the information he is being asked to provide lacks "public aspects" despite its essentially regulatory nature. We therefore conclude that the records in question have public aspects.

## IV

Because the records sought through the subpoena fall under the Required Records Doctrine, the Fifth Amendment privilege against self-incrimination is inapplicable, and M.H. may not invoke it to resist compliance with the subpoena's command. *See Doe M.D.*, 801 F.2d at 1167 ("Records that are required to be maintained by law are outside the scope of the privilege [against self-incrimination].").  Because M.H.'s Fifth Amendment privilege is not implicated, we need not address his request for immunity.  *Bouknight*, 493 U.S. at 562, 110 S.Ct. 900 (declining to "define the precise limitations that may exist upon the State's ability to use the testimonial aspects of Bouknight's act of production in subsequent criminal proceedings").

The district court's order is AFFIRMED.



Yaogang REN, Petitioner,

v.

Eric H. HOLDER Jr., Attorney General, Respondent.

No. 08–71315.

United States Court of Appeals,
Ninth Circuit.

Argued Aug. 1, 2009.

Submitted June 30, 2011.

Filed Aug. 19, 2011.

**Background:**  Chinese national brought Petition for Review from final order of Board of Immigration Appeals (BIA), denying his application for asylum, withholding of removal and relief under Convention Against Torture (CAT).

**Holdings:**  The Court of Appeals, Reinhardt, Circuit Judge, held that:

(1) national satisfied exhaustion requirement for judicial review;

(2) substantial evidence did not support adverse credibility determination by immigration judge (IJ); and

(3) national failed to provide sufficient corroborating evidence when requested to do so.

Petition denied.

**1. Aliens, Immigration, and Citizenship**
⟝613

Where Board of Immigration Appeals (BIA) summarily adopts decision of immigration judge (IJ) without opinion, Court of Appeals reviews IJ's decision as if it were BIA's decision. 8 C.F.R. § 1003.1(e)(4).

**2. Aliens, Immigration, and Citizenship**
⟝618(2)

Findings of fact by immigration judge (IJ) are reviewed under "substantial evidence" standard, and are conclusive unless any reasonable adjudicator would be compelled to conclude to contrary. Immigration and Nationality Act, § 242(b)(4)(B), 8 U.S.C.A. § 1252(b)(4)(B).

**3. Aliens, Immigration, and Citizenship**
⟝603

Chinese national appealing denial of his application for asylum satisfied exhaustion requirement for judicial review, where national properly challenged immigration judge's (IJ) dispositive corroboration finding before Board of Immigration Appeals (BIA); although national did not use specific word "corroboration," it was clear that he was challenging IJ's determination that

696 F.3d 428, 2012-2 USTC P 50,588
**(Cite as: 696 F.3d 428)**

C

United States Court of Appeals,
Fifth Circuit.
In re GRAND JURY SUBPOENA.

No. 11–20750.
Sept. 21, 2012.

**Background:** Target of grand jury investigation was subpoenaed to produce any records of foreign bank accounts he was required to keep under Treasury Department regulations governing offshore banking. Witness informed government that he would not comply with subpoena, citing his Fifth Amendment privilege against self-incrimination, and government moved to compel witness to comply. The United States District Court for the Southern District of Texas, Lynn N. Hughes, J., denied government's motion, and government appealed.

**Holding:** The Court of Appeals, Dennis, Circuit Judge, held that required records doctrine brought records requested pursuant to regulation outside scope of Fifth Amendment privilege against self-incrimination.

Reversed.

West Headnotes

**[1] Witnesses 410 ⟨⟩298**

410 Witnesses
    410III Examination
        410III(D) Privilege of Witness
            410k298 k. Privilege as to production of documents. Most Cited Cases

Under the required records doctrine, the government may require that certain records be kept and later produced without implicating the privilege against self-incrimination. U.S.C.A. Const.Amend. 5.

**[2] Criminal Law 110 ⟨⟩1147**

110 Criminal Law
    110XXIV Review
        110XXIV(N) Discretion of Lower Court
            110k1147 k. In general. Most Cited Cases

The Court of Appeals reviews a district court's decision granting a motion to quash or modify a subpoena for abuse of discretion; although this is a deferential standard, the district court abuses its discretion if its ruling is based on an erroneous view of the law.

**[3] Witnesses 410 ⟨⟩298**

410 Witnesses
    410III Examination
        410III(D) Privilege of Witness
            410k298 k. Privilege as to production of documents. Most Cited Cases

The required records doctrine permits the government to have the means, over an assertion of the Fifth Amendment privilege against self-incrimination, to inspect the records it requires an individual to keep as a condition of voluntarily participating in a regulated activity. U.S.C.A. Const.Amend. 5.

**[4] Witnesses 410 ⟨⟩298**

410 Witnesses
    410III Examination
        410III(D) Privilege of Witness
            410k298 k. Privilege as to production of documents. Most Cited Cases

Regulation requiring taxpayers using offshore bank accounts to keep and maintain banking information for government inspection was essentially regulatory in nature, supporting application of required records doctrine to bring records of foreign bank accounts, which were requested pursuant to regulation from witness in grand jury proceeding, outside scope of Fifth Amendment privilege against self-incrimination; record-keeping requirements under Bank Secrecy Act (BSA) did not apply exclusively to those engaged in criminal activity,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

696 F.3d 428, 2012-2 USTC P 50,588
**(Cite as: 696 F.3d 428)**

and record-keeping requirements served purposes unrelated to criminal law enforcement. U.S.C.A. Const.Amend. 5; 31 U.S.C.A. §§ 5311–5325; 31 C.F.R. §§ 1010.350, 1010.420.

**[5] Witnesses 410 ☞298**

410 Witnesses
    410III Examination
        410III(D) Privilege of Witness
            410k298 k. Privilege as to production of documents. Most Cited Cases

That a statute relates to criminal law in addition to regulatory matters does not strip the statute of its status as "essentially regulatory" under the required records doctrine, which recognizes that when certain conditions are met, records required to be maintained by law fall outside the scope of the Fifth Amendment privilege. U.S.C.A. Const.Amend. 5.

**[6] Witnesses 410 ☞298**

410 Witnesses
    410III Examination
        410III(D) Privilege of Witness
            410k298 k. Privilege as to production of documents. Most Cited Cases

Banking information that regulation required taxpayers using offshore bank accounts to keep and maintain for government inspection was customarily kept by the taxpayers, supporting application of required records doctrine to bring records of foreign bank accounts, which were requested pursuant to regulation from witness in grand jury proceeding, outside scope of Fifth Amendment privilege against self-incrimination; records were of same type that witness must report annually to IRS pursuant to IRS's regulation of offshore banking, the name, number, and type of accounts, the name and address of the bank where account was held, and the maximum value of the account during reporting period, and records sought were of same type that reasonable account holder would keep in order to access account. U.S.C.A. Const.Amend. 5; 31 U.S.C.A. § 5311; 31 C.F.R. §§ 1010.350, 1010.420.

**[7] Witnesses 410 ☞298**

410 Witnesses
    410III Examination
        410III(D) Privilege of Witness
            410k298 k. Privilege as to production of documents. Most Cited Cases

Banking information that regulation required taxpayers using offshore bank accounts to keep and maintain for government inspection had public aspects, supporting application of required records doctrine to bring records of foreign bank accounts, which were requested pursuant to regulation from witness in grand jury proceeding, outside scope of Fifth Amendment privilege against self-incrimination; Treasury Department shared information it collected pursuant to Bank Secrecy Act's (BSA) record-keeping and reporting requirements with a number of other agencies, and data sharing was designed to serve an important public purpose. U.S.C.A. Const.Amend. 5; 31 U.S.C.A. §§ 5311–5325.

**[8] Witnesses 410 ☞298**

410 Witnesses
    410III Examination
        410III(D) Privilege of Witness
            410k298 k. Privilege as to production of documents. Most Cited Cases

In order to satisfy the third prong of the required records doctrine, which recognizes that when certain conditions are met, records required to be maintained by law fall outside the scope of the Fifth Amendment privilege, the records sought must have assumed public aspects which render them at least analogous to public documents. U.S.C.A. Const.Amend. 5.

***430** Frank Phillip Cihlar, Sr. Counsel, Gregory Victor Davis, Samuel Robert Lyons, Alexander Patrick Robbins (argued), Tax Div., App. Sec., Jonathan Richard Marx, U.S. Dept. of Justice, Washington, DC, for Plaintiff–Appellant.

Larry A. Campagna, Chamberlain, Hrdlicka, White,

696 F.3d 428, 2012-2 USTC P 50,588
**(Cite as: 696 F.3d 428)**

Williams & Aughtry, Houston, TX, George Blay Abney (argued), Chamberlain, Hrdlicka, White, Williams & Aughtry, Atlanta, GA, for Defendant–Appellee.

Appeal from the United States District Court for the Southern District of Texas.

Before DAVIS, DENNIS and HAYNES, Circuit Judges.

DENNIS, Circuit Judge:

This appeal arises from a grand-jury investigation in which the target of the investigation (the "witness") was subpoenaed to produce any records of foreign bank accounts he was required to keep under Treasury Department regulations governing offshore banking. The witness informed the government that he would not comply with the subpoena, citing his Fifth Amendment privilege against self-incrimination, and the government moved to compel the witness to comply. After hearing argument, the district court denied the government's motion, and the government subsequently appealed.

[1] This appeal requires us to address the Required Records Doctrine, under which the government may require that certain records be kept and later produced without implicating the privilege against self-incrimination. Two of our sister circuits have held that the doctrine applies to subpoenas identical to the one at issue and that, therefore, the subpoenas' targets must comply with them. *See In re M.H.,* 648 F.3d 1067, 1079 (9th Cir.2011); *In re Special Feb. 2011–1 Grand Jury Subpoena Dated Sept. 12, 2011,* 691 F.3d 903, 908–09 (7th Cir.2012). Because we conclude that the Required Records Doctrine applies in this case, we decline the witness's invitation to create a circuit split and accordingly**431** REVERSE the district court's denial of the government's motion to compel the witness to comply with the subpoena.

## BACKGROUND
### I.

The witness in this case is the target of a grand-jury investigation in the Southern District of Texas seeking to determine whether he used secret Swiss bank accounts to evade his federal income taxes. In February 2009, following an investigation into its cross-border banking business, the Swiss investment bank UBS AG ("UBS") entered into a deferred-prosecution agreement with the Justice Department under which UBS (1) admitted to conspiring to defraud the U.S. government by helping U.S. taxpayers commit tax evasion and (2) provided the account records of approximately 250 of these taxpayers, including the witness.

Based on the records obtained from UBS, the government determined that the witness, through an offshore nominee entity, established an account with UBS in 2005. A grand-jury investigation subsequently uncovered other offshore entities the witness controlled. On February 25, 2011, the grand jury issued a subpoena to the witness for any foreign-account records he was required to keep under Treasury Department regulations governing offshore banking. *See* 31 U.S.C. § 5314; 31 C.F.R. § 1010.420. The subpoena requires the witness to produce, for the years 2005 to 2008,

[a]ny and all records required to be maintained pursuant to 31 C.F.R. § 103.32 relating to foreign financial accounts that [the witness] had/[has] a financial interest in, or signature authority over, including records reflecting the name in which each such account is maintained, the number or other designation of such account, the name and address of the foreign bank or other person with whom such account is maintained, the type of such account, and the maximum value of each such account during each specified year.[FN1]

FN1. Since the subpoena was issued, 31 C.F.R. § 103.32 has been transferred to 31 C.F.R. § 1010.420.

The subpoena then states that "[s]uch accounts include, but are not necessarily limited to, the ac-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

696 F.3d 428, 2012-2 USTC P 50,588
**(Cite as: 696 F.3d 428)**

counts of the following entities" and lists six entities that the witness allegedly controls.

On March 16, 2011, the witness informed the government, through counsel, that he would not comply with the subpoena, citing the Fifth Amendment. The witness argues that requiring him to produce the records sought would compel him to (1) admit the existence of the account, (2) admit his control over it, and (3) authenticate the records. Alternatively, the witness argues, assuming he has a foreign bank account but failed to comply with the record-keeping requirements of the Bank Secrecy Act ("BSA" or "the Act"), compelling him to produce these records would force him to admit to a violation of the Act's record-keeping provisions.

The government moved the district court to compel the witness to comply with the subpoena. The district court heard argument and subsequently denied the government's motion, which the government now appeals.

II.

The Currency and Foreign Transactions Reporting Act of 1970, Pub.L. 91–508, 84 Stat. 1118 (1970) (codified as amended at **432** 31 U.S.C. §§ 5311 –25) (the BSA), regulates offshore banking and contains a number of record-keeping and inspection provisions. Its purpose is "to require certain reports or records where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." 31 U.S.C. § 5311. Section 241(a) of the Act instructs the Treasury Secretary to require U.S. citizens, residents, and institutions to "keep records and file reports" regarding foreign financial transactions and relationships. *Id.* § 5314. Accordingly, the Treasury Secretary implemented regulations that require (1) U.S. citizens and residents to disclose their foreign bank accounts, *see* 31 C.F.R. § 1010.350, and (2) that the records for such accounts "be retained by each person having a financial interest in or signature or other authority over any such account" for at least five years and be kept "available for inspection as authorized by law," *id.* § 1010.420. These record-

keeping regulations were in effect at all times relevant to this case.

**DISCUSSION**

Because the BSA's record-keeping requirement is "essentially regulatory," the records sought are of a kind "customarily kept" by account holders such as the witness, and the records have assumed "public aspects," we conclude that the Required Records Doctrine applies and requires the witness to comply with the subpoena.

I.

[2] "We review a district court's decision granting a motion to quash or modify a subpoena for abuse of discretion." *In re Grand Jury Proceedings,* 115 F.3d 1240, 1243 (5th Cir.1997). Although this is a deferential standard, the district court abuses its discretion if its ruling is based on an erroneous view of the law. *In re MBS Mgmt. Servs., Inc.,* 690 F.3d 352, 354 (5th Cir.2012).

II.

The Fifth Amendment to the United States Constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. The Supreme Court has held that the privilege against self-incrimination bars the government from "compelling a person to give 'testimony' that incriminates him." *Fisher v. United States,* 425 U.S. 391, 409, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). Because "the privilege protects a person only against being incriminated by his own compelled testimonial communications," the Court determined that it does not shield production of private papers voluntarily prepared or prepared by a third party. *Id.* at 409–10, 96 S.Ct. 1569.

Although one could reason that "[w]here documents are *required* to be kept and then produced, they are arguably compelled," *In re M.H.,* 648 F.3d at 1071, the Supreme Court has held that the privilege against self-incrimination does not bar the government from imposing record-keeping and inspection requirements as part of a valid regulatory

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

696 F.3d 428, 2012-2 USTC P 50,588
**(Cite as: 696 F.3d 428)**

scheme, *see Shapiro,* 335 U.S. at 32–33, 68 S.Ct. 1375. In *Shapiro,* the Court explained that Congress may impose record-keeping and inspection requirements as a condition of engaging in an activity that is within its power to regulate. *Id.* at 33, 68 S.Ct. 1375. In that case, "the Supreme Court required a wholesaler of fruit and produce to turn over certain records he was obliged to keep and maintain for examination pursuant to the Emergency Price Control Act, which applied in part to records 'customarily kept.' " *In re M.H.,* 648 F.3d at 1072. The Supreme Court explained that this Required Records Doctrine "applies **\*433** not only to public documents in public offices, but also to records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation, and the enforcement of restrictions validly established." *Shapiro,* 335 U.S. at 17, 68 S.Ct. 1375.

[3] That being said, the Required Records Doctrine does not empower the government to command every citizen to keep a diary of their crimes under the guise of regulation. *See id.* at 71, 68 S.Ct. 1375 (Jackson, J., dissenting). Rather, any record-keeping or inspection requirement under *Shapiro* must be directed at "an essentially non-criminal and regulatory area of inquiry," *Marchetti v. United States,* 390 U.S. 39, 57, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968) (internal quotation marks omitted), and may not be "directed almost exclusively to individuals inherently suspect of criminal activities," *Grosso v. United States,* 390 U.S. 62, 68, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968) (holding that the Required Records Doctrine does not permit the government to require record keeping of "wagering activities" as part of a "wagering excise tax" when gambling was generally illegal). Thus, the government may not make an end run on the Fifth Amendment and require criminals to self-report their offenses.

However, "[t]he hypothetical case in which every individual is required to maintain a record of everything he does that interests the government is remote from the case of the individual who enters upon a regulated activity knowing that the maintenance of extensive records available for inspection by the regulatory agency is one of the conditions of engaging in the activity." *Smith v. Richert,* 35 F.3d 300, 303 (7th Cir.1994). Thus, the Required Records Doctrine permits "the government ... [to] have the means, over an assertion of the Fifth Amendment [privilege against self-incrimination], to inspect the records it requires an individual to keep as a condition of voluntarily participating in [a] regulated activity." *In re Special Grand Jury Subpoena,* 691 F.3d at 908–09.

### III.

In *Grosso,* the Supreme Court identified three "premises" of the Required Records Doctrine: "[F]irst, the purposes of the United States' inquiry must be essentially regulatory; second, information is to be obtained by requiring the preservation of records of a kind which the regulated party has customarily kept; and third, the records themselves must have assumed 'public aspects' which render them at least analogous to public documents." 390 U.S. at 67–68, 88 S.Ct. 709. These three premises—(1) "essentially regulatory"; (2) "customarily kept"; and (3) "public aspects"—have been recognized by half of the twelve courts of appeals (excluding the Federal Circuit).[FN2] Although the Fifth Circuit has applied the first and third prongs of the Required Records Doctrine, *see, e.g., In re Grand Jury Proceedings,* 601 F.2d 162, 167–71 (5th Cir.1979), it has not applied the second prong, and so the government argues that the customarily kept prong is not required for the Required Records Doctrine to apply. However, "[e]ven if we assume, for purposes of decision, that all three prongs of the test set forth in *Grosso* apply, we conclude that all three requirements**\*434** are met in this case." *In re M.H.,* 648 F.3d at 1073.

FN2. *See In re M.H.,* 648 F.3d at 1072; *In re Grand Jury Subpoena,* 21 F.3d 226, 228 (8th Cir.1994); *United States v. Lehman,* 887 F.3d 1328, 1333 (7th Cir.1989); *In re*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

696 F.3d 428, 2012-2 USTC P 50,588
**(Cite as: 696 F.3d 428)**

*Grand Jury Subpoena Duces Tecum Served upon Underhill,* 781 F.2d 64, 67 (6th Cir.1986); *In re Doe,* 711 F.2d 1187, 1191 (2d Cir.1983); *United States v. Webb,* 398 F.2d 553, 556 (4th Cir.1968).

### A.

[4] The witness argues that the text of the BSA and its legislative history indicate that the record-keeping requirements imposed on foreign bank accounts are meant to aid law enforcement and that therefore the Act is not "essentially regulatory." Implicit in the witness's argument is that because the BSA lists first among its purposes the gathering of information that has a "high degree of usefulness in criminal ... investigations," 31 U.S.C. § 5311, the Act's chief purpose is to fight crime.

[5] Notwithstanding his own argument, the witness acknowledges that the BSA has more than one purpose. And that a statute relates to criminal law in addition to regulatory matters does not strip the statute of its status as "essentially regulatory." *See Cal. Bankers Ass'n v. Shultz,* 416 U.S. 21, 76, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974) ("[T]hat a legislative enactment manifests a concern for the enforcement of the criminal law does not cast any generalized pall of constitutional suspicion over it."); *In re M.H.,* 648 F.3d at 1074 ("[T]hat Congress aimed to use the BSA as a tool to combat certain criminal activity is insufficient to render the BSA essentially criminal as opposed to essentially regulatory.").

Furthermore, although *one* purpose of the BSA was to help ferret out criminal activity, the Act requires records to be kept "where they have a high degree of usefulness in criminal, *tax, or regulatory investigations.*" 31 U.S.C. § 5311 (emphasis added). Elaborating on the non-criminal purposes of the BSA, the House Report acknowledges that the Acts's record-keeping and reporting requirements "aid duly constituted authorities in lawful investigations" but also underscores that the requirements "facilitate the supervision of financial institutions properly subject to federal supervision" and

"provide for the collection of statistics necessary for the formulation of monetary and economic policy." H.R. Rep. 91–975 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4394, 4405. Consequently, the Treasury Department shares the information it collects pursuant to the Act's requirements with other agencies—including the Office of the Comptroller of the Currency, the Consumer Financial Protection Bureau, the Federal Reserve Board, the Federal Deposit Insurance Corporation, the National Credit Union Administration, and the Office of Thrift Supervision—none of which are empowered to bring criminal prosecutions. *See* 31 U.S.C. § 5319; 31 C.F.R. § 1010.950(a) – (b). Furthermore, the Supreme Court has noted, in discussing "the record-keeping and reporting requirements of the [BSA]," that Congress "seems to have been equally concerned with civil liability which might go undetected by reason of the transactions of the type required to be recorded or reported." *Shultz,* 416 U.S. at 76, 94 S.Ct. 1494.

The district court's application of the "essentially regulatory" requirement was therefore erroneous. The district court ruled that the BSA's record-keeping requirements fail under *Marchetti* and *Grosso* because the "regulatory justifications" for the requirement "are but smoke and mirrors for [the government's] real concern: crime." However, even ignoring the non-criminal purposes of the BSA, the question is not whether Congress was subjectively concerned about crime when enacting the Act's record-keeping provisions, but rather whether these requirements apply exclusively or almost exclusively to people engaged in criminal activity. *See Marchetti,* 390 U.S. at 57, 88 S.Ct. 697 .

**\*435** Here, the BSA's record-keeping requirements do not apply exclusively to those engaged in criminal activity. "There is nothing inherently illegal about having or being [the] beneficiary of an off-shore foreign banking account," and "[n]othing about having a foreign bank account on its own suggests a person is engaged in illegal activity," *In*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

696 F.3d 428, 2012-2 USTC P 50,588
**(Cite as: 696 F.3d 428)**

re M.H., 648 F.3d at 1074, points that the witness does not dispute. Because the BSA's record-keeping requirements serve purposes unrelated to criminal law enforcement and because the provisions do not exclusively target people engaged in criminal activity, we conclude that the requirements are "essentially regulatory," satisfying the Require Records Doctrine's first prong.

### B.

[6] That the records sought are of a kind customarily kept is not contested. Even if this were not the case, this prong of the Required Records Doctrine is easily satisfied here. The records sought are of the same type that the witness must report annually to the IRS pursuant to the IRS's regulation of offshore banking: the name, number, and type of account(s), the name and address of the bank where an account is held, and the maximum value of the account during the reporting period. See In re M.H., 648 F.3d at 1076; 31 C.F.R. §§ 1010.350, 1010.420. Furthermore, the records sought are also of the same type that a reasonable account holder would keep in order to access his account. See In re M.H., 648 F.3d at 1076. Accordingly, we find that the records the subpoena seeks are of a kind "customarily kept" by the witness in satisfaction of the Require Records Doctrine's second prong.

### C.

[7][8] Finally, we consider the witness's arguments that the third prong of the Required Records Doctrine is not met. In order to satisfy this prong, "the records [sought] must have assumed 'public aspects' which render them at least analogous to public documents." Grosso, 390 U.S. at 68, 88 S.Ct. 709. Two courts of appeals have held that "if the government's purpose in imposing the regulatory scheme is essentially regulatory, then it necessarily has some 'public aspects,' " sufficient for the Required Records Doctrine's third prong. In re M.H., 648 F.3d at 1076 (citing Shapiro, 335 U.S. at 33–34, 68 S.Ct. 1375); accord Donovan v. Mehlenbacher, 652 F.2d 228, 231 (2d Cir.1981).

Drawing a distinction between individuals who publicly engage in business and those who privately open a foreign bank account, the witness argues that "[i]ndividuals subject to the BSA's foreign account record keeping requirements are not licensed, are subject to no substantive restrictions, and generally have not engaged in activities with the public or in the public sphere." Br. for Appellee 22. Thus, the witness contends that substantive restrictions, like those imposed in Shapiro, were enacted in order to protect the public and that record-keeping requirements are meant to aid in the enforcement of these substantive restrictions. Accordingly, the "public aspects" necessary for the third prong do not come from record-keeping requirements, the witness argues, but rather from the underlying substantive restrictions enacted to protect the public. Because the BSA imposes no substantive restrictions on the holding of foreign bank accounts, the witness maintains that records of these accounts lack the "public aspects" required for the third prong of the Required Records Doctrine.

The witness misapprehends this prong of the Required Records Doctrine. Although the witness argues that substantive regulations designed to protect the public **436** from harm may imbue otherwise private documents with public aspects, it does not follow that public aspects exist *only* under these circumstances. Furthermore, adopting a rule that the legitimacy of a record-keeping requirement depends on Congress first enacting substantive restrictions would lead to absurd results. "If the witness's argument were correct, then Congress would be prohibited from imposing the least regulatory burden necessary; it would instead be required to supplement a reporting or recordkeeping scheme with additional and unnecessary 'substantive restrictions' for the sole purpose of upholding its record keeping and reporting requirements." Reply Br. for Appellant 25. Additionally, that the records sought are typically considered private does not bar them from possessing the requisite public aspects. See In re M.H., 648 F.3d at 1077 ("[T]hat the information sought is traditionally private and personal as opposed to business-related does not auto-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

696 F.3d 428, 2012-2 USTC P 50,588
**(Cite as: 696 F.3d 428)**

matically implicate the Fifth Amendment."); *In re Kenny,* 715 F.2d at 52–54 (reasoning that subpoenaed medical records possessed sufficient "public aspects" to satisfy the Required Records Doctrine's third prong).

Here, the Treasury Department shares the information it collects pursuant to the Act's record-keeping and reporting requirements with a number of other agencies. That this data sharing is designed to serve an important public purpose sufficient to imbue otherwise private foreign bank account records with "public aspects" is not difficult to imagine. The witness "has not made a compelling argument that the information he is being asked to provide lacks 'public aspects' despite its essentially regulatory nature." *In re M.H.,* 648 F.3d at 1079. Accordingly, we find that the records sought have "public aspects" sufficient to satisfy the Required Records Doctrine's third prong.

## CONCLUSION

For the foregoing reasons, we REVERSE the district court's denial of the government's motion to compel the witness to comply with the subpoena.

C.A.5 (Tex.),2012.
In re Grand Jury Subpoena
696 F.3d 428, 2012-2 USTC P 50,588

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

691 F.3d 903, 2012-2 USTC P 50,540
**(Cite as: 691 F.3d 903)**

H

United States Court of Appeals,
Seventh Circuit.
In re SPECIAL FEBRUARY 2011–1 GRAND
JURY SUBPOENA DATED SEPTEMBER 12,
2011.

No. 11–3799.
Argued April 17, 2012.
Decided Aug. 27, 2012.

**Background:** Target of investigation regarding alleged use of secret offshore bank accounts to evade his federal income taxes filed motion to quash a grand jury's subpoena for records for foreign financial accounts that target was required to keep under the Bank Secrecy Act. The United States District Court for the Northern District of Illinois, James F. Holderman, Chief Judge, 2011 WL 6973429, granted the motion. Government appealed.

**Holdings:** The Court of Appeals, Bauer, Circuit Judge, held that:
(1) act of production privilege was not an obstacle to application of required records doctrine, and
(2) required records doctrine was applicable to records kept by target under Bank Secrecy Act.

Reversed.

West Headnotes

**[1] Witnesses 410 ☞298**

410 Witnesses
    410III Examination
        410III(D) Privilege of Witness
            410k298 k. Privilege as to production of documents. Most Cited Cases
    Under the "required records doctrine," the Fifth Amendment privilege against self-incrimination which exists as to private papers cannot be maintained in relation to records required by law to be kept in order that there may be suitable information

of transactions which are the appropriate subjects of governmental regulation, and the enforcement of restrictions validly established. U.S.C.A. Const.Amend. 5.

**[2] Witnesses 410 ☞298**

410 Witnesses
    410III Examination
        410III(D) Privilege of Witness
            410k298 k. Privilege as to production of documents. Most Cited Cases
    The three requirements for determining the applicability of the required records doctrine, under which the Fifth Amendment privilege against self-incrimination cannot be maintained in relation to records required by law to be kept, are: (1) the purposes of the government inquiry must be essentially regulatory; (2) information is to be obtained by requiring the preservation of records of a kind which the regulated party has customarily kept; and (3) the records themselves must have assumed public aspects which render them at least analogous to a public document. U.S.C.A. Const.Amend. 5.

**[3] Witnesses 410 ☞298**

410 Witnesses
    410III Examination
        410III(D) Privilege of Witness
            410k298 k. Privilege as to production of documents. Most Cited Cases
    The act of production privilege recognizes that, while the contents of the documents may not be privileged under the Fifth Amendment protection against self-incrimination, the act of producing them may be, because producing incriminating documents under government compulsion may have testimonial aspects, aside from the contents of the documents, that are protected under the Fifth Amendment. U.S.C.A. Const.Amend. 5.

**[4] Witnesses 410 ☞298**

410 Witnesses

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

691 F.3d 903, 2012-2 USTC P 50,540
**(Cite as: 691 F.3d 903)**

410III Examination
   410III(D) Privilege of Witness
      410k298 k. Privilege as to production of documents. Most Cited Cases

Act of production privilege was not an obstacle to application of required records doctrine, under which Fifth Amendment privilege against self-incrimination cannot be maintained in relation to records required by law to be kept, to records for foreign financial accounts that target of investigation regarding alleged use of secret offshore bank accounts was required to keep under the Bank Secrecy Act, and that were sought pursuant to grand jury subpoena. U.S.C.A. Const.Amend. 5; 31 C.F.R. § 1010.420.

**[5] Witnesses 410 ⚖298**

410 Witnesses
   410III Examination
      410III(D) Privilege of Witness
         410k298 k. Privilege as to production of documents. Most Cited Cases

The required records doctrine, under which Fifth Amendment privilege against self-incrimination cannot be maintained in relation to records required by law to be kept, is better regarded as an exception to the privilege rather than a threshold test to determine whether there is a privilege. U.S.C.A. Const.Amend. 5.

**[6] Witnesses 410 ⚖298**

410 Witnesses
   410III Examination
      410III(D) Privilege of Witness
         410k298 k. Privilege as to production of documents. Most Cited Cases

One of the rationales, if not the main rationale, behind the required records doctrine is that the government or a regulatory agency should have the means, over an assertion of the Fifth Amendment privilege against self-incrimination, to inspect the records it requires an individual to keep as a condition of voluntarily participating in that regulated activity. U.S.C.A. Const.Amend. 5.

**[7] Witnesses 410 ⚖298**

410 Witnesses
   410III Examination
      410III(D) Privilege of Witness
         410k298 k. Privilege as to production of documents. Most Cited Cases

Required records doctrine, under which Fifth Amendment privilege against self-incrimination cannot be maintained in relation to records required by law to be kept, applied to records for foreign financial accounts that target of investigation regarding alleged use of secret offshore bank accounts was required to keep under the Bank Secrecy Act, and that were sought pursuant to grand jury subpoena. U.S.C.A. Const.Amend. 5; 31 C.F.R. § 1010.420.

**\*904** Frank P. Cihlar, Gregory V. Davis, Samuel R. Lyons, Alexander P. Robbins, Attorneys, Dept. of Justice, Tax Div., CATEPS, Washington, DC, James M. Conway, Attorney, Office of the United States Attorney, Chicago, IL, for Appellant.

Michael J. Garcia, Kirkland & Ellis LLP, New York City, Mark E. Matthews, Caplin & Drysdale, Washington, DC, Gregory J. Scandaglia (argued), Attorney, Chicago, IL, for Appellee.

Before BAUER, KANNE and SYKES, Circuit Judges.

BAUER, Circuit Judge.

In this appeal, we are asked to decide whether compulsory production of foreign bank account records required to be maintained under the Bank Secrecy Act would violate appellee T.W.'s Fifth Amendment privilege against self-incrimination. Because we find that the Required Records Doctrine applicable to this case, we hold that T.W. must produce the subpoenaed records.

## I. BACKGROUND

Appellee T.W. (T.W. stands for target witness) learned in October 2009 that the IRS had opened a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

691 F.3d 903, 2012-2 USTC P 50,540
**(Cite as: 691 F.3d 903)**

"file" on him, and that two investigators—an IRS special agent and DOJ tax division prosecutor—were assigned to investigate whether he used secret offshore bank accounts to evade his federal income taxes. About two years **\*905** into the investigation, a grand jury issued T.W. a subpoena requiring that he produce, for the time period of October, 2006 until present,

> Any and all records required to be maintained pursuant to 31 C.F.R. § 103.32 [subsequently relocated to 31 C.F.R. § 1010.420] relating to foreign financial accounts that you had/have a financial interest in, or signature authority over, including records reflecting the name in which each such account is maintained, the number or other designation of such account, the name and address of the foreign bank or other person with whom such account is maintained, the type of such account, and the maximum value of each such account during each specified year.

> (brackets in original).

The records that the Government demands T.W. to produce are records that he is required to keep under the Bank Secrecy Act of 1970. T.W. filed a motion to quash the subpoena on the grounds that producing the demanded records would violate his Fifth Amendment privilege against self-incrimination; complying with the subpoena may, for instance, reveal that T.W. has not reported bank accounts that should have been reported or that he has reported inaccurate information. On the other hand, if T.W. denies having the requested records, he still risks incriminating himself because failure to keep those records is a felony under the Act.

The Government argued that the Required Records Doctrine overrides T.W.'s Fifth Amendment privilege. Under that doctrine, records required to be kept pursuant to a valid regulatory program fall outside the scope of the Fifth Amendment privilege if certain conditions are met. The district court quashed the Grand Jury's subpoena, concluding that

the required records doctrine did not apply because the act of producing the required records was testimonial and would compel T.W. to incriminate himself. The Government appeals that order.

## II. DISCUSSION

The district court found that, beyond dispute, T.W.'s compliance with the subpoena, that is, the act of producing the requested records, is incriminating. The dispute in this case, instead, concerns whether, under those circumstances, the Required Records Doctrine is still applicable—T.W. contends that it is not, and the district court agreed. He also argues, alternatively, that even if it were applicable, the contents of the requested records do not satisfy the criteria of the Required Records Doctrine.

Because this case concerns the combined effect of the Required Records Doctrine and the act of production privilege, a discussion of both is warranted.

The Required Records Doctrine's origin can be traced to *Shapiro v. United States,* 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948). In *Shapiro,* a fruit wholesaler invoked his Fifth Amendment privilege in response to an administrative subpoena that sought various business records. *Id.* at 4–11, 68 S.Ct. 1375. The records in question were required to be maintained under the Emergency Price Control Act (EPCA), which was passed immediately following the outbreak of World War II to prevent inflation and price gouging. *See id.*

[1] The Supreme Court determined that the EPCA represented a valid exercise of Congress' regulatory authority and that the record-keeping provisions of the EPCA were essential to the administration of the statute's objectives. *Id.* at 32, 68 S.Ct. 1375. The Court reasoned that "the privilege which exists as to private papers cannot be maintained in relation to records **\*906** required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation, and the enforce-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

691 F.3d 903, 2012-2 USTC P 50,540
**(Cite as: 691 F.3d 903)**

ment of restrictions validly established." *Id.* at 33, 68 S.Ct. 1375 (internal citation omitted).

Critical to its holding, the Court observed that the required records had attained "public aspects," such that they could be considered quasi-public records; it was the quasi-public nature of the records in *Shapiro* that allowed their compulsory production. *See id.*

[2] The Court revisited its decision in *Shapiro* twenty years later in *Marchetti v. United States,* 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968) and *Grosso v. United States,* 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968). In holding that the Required Records Doctrine was inapplicable to the circumstances before it in both those cases, the Court articulated three requirements—derived from *Shapiro's* holding—for determining the applicability of the Required Records Doctrine. As summarized in *Grosso,* those three requirements are: (1) the purposes of the government inquiry must be *essentially regulatory;* (2) information is to be obtained by requiring the preservation of records of a kind which the regulated party has *customarily kept;* and (3) the records themselves must have assumed *public aspects* which render them at least analogous to a public document. *Grosso,* 390 U.S. at 67–68, 88 S.Ct. 709 (emphasis added). When the requirements of the Required Records Doctrine are met, a witness cannot resist a subpoena by invoking the Fifth Amendment privilege against compelled, testimonial self-incrimination.

[3][4] The criteria for the Required Records Doctrine aside, T.W. argues that the doctrine is not applicable to a case such as his where the act of producing the requested documents is compelled, testimonial, and self-incriminating. That the *act* of producing documents may be testimonial and incriminating is not a phenomenon unique to this case. The act of production privilege recognizes that, while the contents of the documents may not be privileged, the act of producing them may be. *See, e.g., Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); *United States v.*

*Doe (Doe I ),* 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984); *Braswell v. United States,* 487 U.S. 99, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988); *Doe v. United States (Doe II ),* 487 U.S. 201, 108 S.Ct. 2341, 101 L.Ed.2d 184 (1988). In other words, producing incriminating documents under government compulsion may have testimonial aspects—aside from the contents of the documents—that are protected under the Fifth Amendment. For example, compliance with the subpoena tacitly concedes the existence (or nonexistence) of the records demanded and their possession or control by the witness. *See Fisher,* 425 U.S. at 410, 96 S.Ct. 1569. The Government does not dispute this, but argues the Required Records Doctrine applies nonetheless, and overrides any act of production privilege that T.W. has.

The Government's position finds support in several cases where the Required Records Doctrine—or its rationale—was applied to negate a witness's act of production privilege. *See, e.g., Baltimore City Dep't of Soc. Servs. v. Bouknight,* 493 U.S. 549, 110 S.Ct. 900, 107 L.Ed.2d 992 (1990); *Smith v. Richert,* 35 F.3d 300 (7th Cir.1994); *United States v. Lehman,* 887 F.2d 1328 (7th Cir.1989); *United States v. Porter,* 711 F.2d 1397 (7th Cir.1983); *In re Grand Jury Subpoena,* 21 F.3d 226 (8th Cir.1994); *In re Grand Jury Subpoena Duces Tecum Served Upon Underhill,* 781 F.2d 64 (6th Cir.1986).

**\*907** T.W. makes several arguments to get out from underneath these cases. He first argues that, under *Shapiro,* the Required Records Doctrine is not a stand-alone exception to the privilege against self-incrimination; rather, he argues, it is a threshold inquiry to determine whether there is a privilege in the first place—i.e., whether the witness is being compelled to incriminate himself through some form of testimony. We disagree with that characterization of the Required Records Doctrine.

[5] We note that it makes little difference, practically speaking, whether the Require Records Doc-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

691 F.3d 903, 2012-2 USTC P 50,540
**(Cite as: 691 F.3d 903)**

trine is an outright exception to the Fifth Amendment privilege—and by exception we mean that it overrides or supersedes the privilege—or whether it is a threshold inquiry to determine whether the privilege attaches in the first place; under the former, the privilege exists but is superseded and, under the latter, the privilege cannot attach because one or more of its requirements (usually the testimonial aspect) are missing by virtue of the records satisfying the three requirements laid out in *Grosso;* either way, the outcome is the same: the witness is denied the use of the privilege and must produce the potentially incriminating documents. Still, we think the Required Records Doctrine is better regarded as an exception rather than a threshold test to determine whether there is a privilege.

Building on his argument above, T.W. twists *Shapiro* even further by asserting that the Required Records Doctrine, as a mechanism to determine if there is a privilege, is only relevant when challenging the constitutionality of a record-keeping requirement on its face. It is true that *Shapiro* started out primarily as a statutory interpretation case and that it did decide whether a record-keeping and reporting requirement was facially unconstitutional. To that effect, the *Shapiro* Court stated, "It may be assumed at the outset that there are limits which the Government cannot constitutionally exceed in requiring the keeping of records which may be inspected by an administrative agency and may be used in prosecuting statutory violations committed by the record-keeper himself." *Shapiro,* 335 U.S. at 32, 68 S.Ct. 1375. But *Shapiro* did more than set the constitutional parameters for record-keeping requirements; it determined that the Fifth Amendment is not a barrier to the enforcement of a valid civil regulatory scheme.

Since *Shapiro,* several courts, including this one, have applied the Required Records Doctrine broadly and in situations where the act of production privilege has been invoked. *See, e.g., Baltimore City Dep't of Soc. Servs. v. Bouknight,* 493 U.S. 549, 110 S.Ct. 900, 107 L.Ed.2d 992 (1990); *Smith v. Richert,* 35 F.3d 300 (7th Cir.1994); *United States v. Lehman,* 887 F.2d 1328 (7th Cir.1989); *United States v. Porter,* 711 F.2d 1397 (7th Cir.1983); *In re Grand Jury Subpoena,* 21 F.3d 226 (8th Cir.1994); *In re Grand Jury Subpoena Duces Tecum Served Upon Underhill,* 781 F.2d 64 (6th Cir.1986).

To get around these cases, T.W. argues that in each of them one or more of the requirements of the Fifth Amendment privilege (testimonial, incriminating, and compelled) were missing. *See Hiibel v. Sixth Judicial Dist. Court,* 542 U.S. 177, 189, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004) ("To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled."). Again, T.W. is wrong. In each of those cases, a valid Fifth Amendment privilege existed, or was assumed, and any such assumption naturally presupposes that all the requirement of the privilege have been met.

**\*908** That is perhaps best illustrated in *Bouknight,* which was not a required records case, but nonetheless, applied its underlying principles. In *Bouknight,* the Court held that the Fifth Amendment did not shield a mother from complying with a juvenile court order directing her to produce her infant son. 493 U.S. at 555, 110 S.Ct. 900. In coming to that conclusion, the Court assumed that an act of production privilege existed: "Even assuming that this limited testimonial assertion is sufficiently incriminating and sufficiently testimonial for purposes of the privilege ... Bouknight may not invoke the privilege to resist the production order because ... production is required as part of a noncriminal regulatory regime." *Id.* at 555, 110 S.Ct. 900. (internal quotation omitted).

In *United States v. Lehman,* the petitioner—like T.W.—argued that by "producing the records he would be testifying as to their existence and to his control over them in a way that is protected by his Fifth Amendment privilege against self-incrimination." 887 F.2d 1328, 1332 (7th Cir.1989).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

691 F.3d 903, 2012-2 USTC P 50,540
**(Cite as: 691 F.3d 903)**

We rejected that argument and accepted the Sixth Circuit's reasoning that the required records exception must apply to the act of production. *Id.* at 1332 (citing *In re Grand Jury Subpoena Duces Tecum (Underhill)*, 781 F.2d 64 (6th Cir.1986)). To get around our holding in *Lehman*, T.W. argues that, in that case, the witness's act of production was neither testimonial nor incriminating. But even assuming that were true, it proves nothing; in *Lehman*, we said that *Fisher* and its progeny "might be applicable ... *were it not for the required records exception.*" *Id.* (emphasis added). Thus in *Lehman* we held that, to whatever extent the petitioner might have had an act of production privilege under *Doe* and *Fisher*, the Required Records Doctrine superseded it. *See id.*

In *Smith v. Richert,* 35 F.3d 300 (7th Cir.1994), we provided a thumbnail sketch of the evolution of the Required Records Doctrine, and in doing so, recapitulated *Lehman's* holding. There, we said that if the documents being sought were required records, "the person could not resist the subpoena" on the ground that producing the records was testimonial and incriminating, "for the only acknowledgment conveyed by compliance would be of the existence and applicability of the regulatory program that required him to maintain the records." *Id.* at 302. (citation omitted). The district court incorrectly interpreted this to mean that the Required Records Doctrine is not applicable when the "compelled production of the subpoenaed records causes [an individual] to admit any incriminating fact beyond the mere existence and applicability of the regulatory program." But we never held that a witness's acknowledgment of the existence and application of a regulatory scheme could not be incriminating. In fact, we said that is precisely the context in which the Required Records Doctrine is particularly useful:

The only time the government needed the required records doctrine anymore was when the act of production was itself testimonial, that is, when it communicated knowledge possessed by the person making the production and was, therefore—but for the doctrine—protected by the Fifth Amendment from being compelled by the government.

*Id.; see also Commodity Futures Trading Com'm v. Collins,* 997 F.2d 1230, 1232 (7th Cir.1993) (noting that the "doctrine only comes into play if, were it not for the doctrine, the government would be forcing a person to incriminate himself").

[6] One of the rationales, if not the main rationale, behind the Required Records Doctrine is that the government or a regulatory agency should have the means, **\*909** over an assertion of the Fifth Amendment Privilege, to inspect the records it requires an individual to keep as a condition of voluntarily participating in that regulated activity. *Smith,* 35 F.3d at 303; *Commodity Futures,* 997 F.2d at 1232. That goal would be easily frustrated if the Required Records Doctrine were inapplicable whenever the act of production privilege was invoked.

The voluntary choice to engage in an activity that imposes record-keeping requirements under a valid civil regulatory scheme carries consequences, perhaps the most significant of which, is the possibility that those records might have to be turned over upon demand, notwithstanding any Fifth Amendment privilege. That is true whether the privilege arises by virtue of the contents of the documents or the by act of producing them. The district court erred to the extent that it held that the Required Records Doctrine was not applicable because T.W.'s compelled production was incriminating and thus protected under the Fifth Amendment.

[7] Having determined that T.W.'s act of production privilege is not an obstacle to the Required Records Doctrine, we must decide whether the records sought under the subpoena fall within the Required Records Doctrine. In order for the Required Records Doctrine to apply, three requirements must be met: (1) the purposes of the United States inquiry must be *essentially regulatory;* (2) informa-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

691 F.3d 903, 2012-2 USTC P 50,540
**(Cite as: 691 F.3d 903)**

tion is to be obtained by requiring the preservation of records of a kind which the regulated party has *customarily kept;* and (3) the records themselves must have assumed *public aspects* which render them at least analogous to public document. *Grosso,* 390 U.S. at 67–68, 88 S.Ct. 709 (emphasis added).

Recently, in a case nearly identical to this one, the Ninth Circuit held that records required under the Bank Secrecy Act fell within the Required Record Doctrine. *In re M.H.,* 648 F.3d 1067 (9th Cir.2011) *cert. denied,* No. 11–1026, ––– U.S. –––, ––– S.Ct. –––, ––– L.Ed.2d –––, 2012 WL 553924 (U.S. June 25, 2012). In the Ninth Circuit's case, the court held that the witness could not resist a subpoena—identical to the one in this case—on Fifth Amendment grounds because the records demanded met the three requirements of the Required Records Doctrine. *Id.* We need not repeat the Ninth Circuit's thorough analysis, determining that records under the Bank Secrecy Act fall within the exception. It is enough that we find—and we do—that all three requirements of the Required Records Doctrine are met in this case.

Because the Required Records Doctrine is applicable, and the records sought in the subpoena fall within the doctrine, T.W. must comply with the subpoena.

### III. CONCLUSION

For the reasons stated above, we REVERSE the district court's order granting appellee T.W.'s motion to quash the grand jury subpoena.

C.A.7 (Ill.),2012.
In re Special February 2011-1 Grand Jury Subpoena Dated September 12, 2011
691 F.3d 903, 2012-2 USTC P 50,540

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

Nº 11-mc-00747 (JFB)

---

IN RE GRAND JURY SUBPOENAS DATED SEPTEMBER 9, 2011

UNITED STATES OF AMERICA

Movant,

VERSUS

JOHN DOE

Respondent.

---

**MEMORANDUM AND ORDER**
December 30, 2011

---

JOSEPH F. BIANCO, District Judge:

The United States of America (the "government") seeks an order compelling John Doe ("Doe")[1] to comply with two grand jury subpoenas dated September 9, 2011, and seeks to hold Doe in contempt for Doe's refusal to comply with the subpoenas. Doe has opposed the government's motion on the grounds that, according to Doe, his production of the documents would violate the Fifth Amendment's act of production privilege. Since the serving of the two subpoenas, the government has (1) limited the first subpoena to the production of the 47 sealed boxes of documents in counsel for Doe's possession, and (2) limited the second

subpoena to the production of documents required to be maintained pursuant to 31 C.F.R. § 1010.420 for the five years prior to September 9, 2011. For the reasons set forth on the record on November 30, 2011 and in detail below, the Court orders Doe to comply with the two grand jury subpoenas. The Court holds that Doe may not assert the Fifth Amendment's act of production privilege with respect to the first grand jury subpoena, and the records demanded by the second grand jury subpoena fall within the "required records" exception to the act of production privilege.

In particular, the first subpoena seeks production of ▮▮sealed boxes of documents, containing various business and personal records of Doe, which were delivered to Doe's attorney by a third party ▮▮▮▮▮▮▮▮▮▮

---

[1] Because this case pertains to an ongoing grand jury investigation, the parties have been permitted to file documents under seal. Thus, this Memorandum and Order excludes identifying factual information.

and have been maintained by Doe's attorneys since that time. With respect to these documents, the government has demonstrated that the existence and location of the documents are a foregone conclusion, and Doe's production of the documents does not implicitly authenticate them. Doe does not need to assemble or compile any documents in response to the subpoena. In fact, the discrete, sealed set of documents were initially subpoenaed by the government when they were in the possession of a third party and, with the permission of the government, were transferred to the custody of Doe's attorney. Under these circumstances, the act of production adds absolutely nothing to the government's sum total of information, and thus is simply a question of surrender, not testimony. The fact that the government does not know the substance of the particular documents in the sealed boxes is of no legal significance in this case where the existence and location of the documents is crystal clear. To hold otherwise would be to disregard over three decades of Supreme Court and Second Circuit jurisprudence regarding the scope of the act of production privilege. Accordingly, Doe may not assert the Fifth Amendment's act of production privilege with respect to the █ boxes sought by the first subpoena and, with the exception of any documents being withheld on the grounds of attorney-client privilege, must produce those boxes.

Similarly, with respect to the second subpoena, the government seeks only documents regarding foreign financial accounts that must be maintained for five years under 31 C.F.R. § 1010.420 of the Bank Secrecy Act ("BSA"), 31 U.S.C. § 5311 *et seq*. The Court concludes that these documents fall within the "required records" exception and, thus, are outside the scope of Fifth Amendment privilege. Specifically, pursuant to the framework established by the Supreme Court, this Court concludes that these documents (1) are not inherently criminal and, thus, are essentially regulatory, (2) are customarily kept in connection with this regulated activity, and (3) have public aspects that make them analogous to public documents. Although the Second Circuit has never decided whether records kept pursuant to this particular provision of the BSA are "required records," this Court finds persuasive the analysis of the Ninth Circuit and several other courts that have reached the same conclusion in connection with this precise provision. Accordingly, because the "required records" exception to the act of production privilege applies to these documents, Doe must produce the records commanded by the second grand jury subpoena for the five years prior to September 9, 2011.

I. BACKGROUND



2



On September 1, 2011, the Clerk of the Court for the Eastern District of New York ("EDNY") issued a subpoena directed to the third party seeking any records in her possession pertaining to Doe. On September 7, 2011, Doe's criminal defense attorney in State X advised the Assistant U.S. Attorney ("AUSA") assigned to the case that the documents sought from the third party were also the subject of the ████████████. Doe's criminal defense attorney in State X explained that he and Doe's civil attorney in State X would take custody of the documents in accordance with the State X court's order, and that they would produce the documents to the EDNY. The AUSA thereby withdrew the subpoena served upon the third party.

On September 12, 2011, an agent with the IRS served Doe's civil attorney in State X with the first grand jury subpoena dated September 9, 2011 ("first grand jury subpoena"), and served Doe's criminal defense attorney in State X with the second grand jury subpoena dated September 9, 2011 ("second grand jury subpoena"). The same day, the third party's attorney delivered ██ sealed boxes containing Doe's documents to Doe's civil attorney in State X. On October 18, 2011, Doe's criminal



defense attorney in State X and Doe's criminal defense attorney in New York advised the AUSA that Doe would assert the act of production privilege pursuant to the Fifth Amendment with respect to all of the documents contained in the ██ boxes, and that the boxes were being moved from the State X civil attorney's office to the office of Doe's New York criminal defense attorney. The AUSA objected to this procedure. On October 19, 2011, the New York criminal defense attorney responded to the two grand jury subpoenas on behalf of Doe, explaining that Doe intended to invoke the act of production privilege. In response, the government moved to compel Doe's compliance with the subpoenas on October 31, 2011. On November 21, 2011, Doe filed his opposition to the government's motion. On November 29, 2011, the government filed its reply. On November 30, 2011, the Court heard oral argument and, following the argument, issued an oral decision granting the government's motion to compel.

## II. DISCUSSION

### A. The First Grand Jury Subpoena

#### 1. Applicable Law

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Fifth Amendment applies "when the accused is compelled to make a testimonial communication that is incriminating." *Fisher v. United States*, 425 U.S. 391, 408 (1976); *see United States v. Hubbell*, 530 U.S. 27, 34 (2000) ("The word 'witness' in the constitutional text limits the relevant category of compelled incriminating communications to those that are 'testimonial' in character.").

3

In *Fisher*, the Supreme Court recognized that the "act of producing evidence in response to a subpoena . . . has communicative aspects of its own, wholly aside from the contents of the papers produced." 425 U.S. at 410; *see also United States v. Doe*, 465 U.S. 605, 612 (1984) ("A government subpoena compels the holder of the document to perform an act that may have testimonial aspects and an incriminating effect."). Specifically, complying with a subpoena may "tacitly concede[] the existence of the papers demanded and their possession or control by" the subpoena recipient and the subpoena recipient's "belief that the papers are those described in the subpoena." *Fisher*, 425 U.S. at 410. The question is whether the "tacit averments" made in producing the responsive evidence are both "'testimonial' and 'incriminating' for purposes of applying the Fifth Amendment." *Id.*; *see In re Three Grand Jury Subpoenas Duces Tecum Dated January 29, 1999*, 191 F.3d 173, 178 (2d Cir. 1999) ("[I]t is now settled that an individual may claim an act of production privilege to decline to produce documents, the contents of which are not privileged, where the act of production is, itself, (1) compelled, (2) testimonial, and (3) incriminating."). There may be no "categorical answers" to these questions; instead, "their resolution may instead depend on the facts and circumstances of particular cases or classes thereof." *Fisher*, 425 U.S. at 410.

In *Fisher*, taxpayers who were being investigated by the IRS obtained documents from their accountants relating to the preparation of their tax returns, and then transferred those documents to their attorneys. 425 U.S. at 394. The IRS served summonses on the attorneys to produce the documents. *Id.* In analyzing whether the act of production privilege protected the taxpayers from producing the documents,

the Supreme Court explained that where "[t]he existence and location of the papers are a foregone conclusion and the taxpayer adds little or nothing to the sum total of the Government's information by conceding that he in fact has the papers . . . '[t]he question is not of testimony but of surrender,'" and the act of production privilege does not apply. *Fisher*, 425 U.S. at 411 (quoting *In Re Harris*, 221 U.S. 274, 279 (1911)). The existence and location of the taxpayers' documents in *Fisher* was a "foregone conclusion" because the documents "belong[ed] to the accountant, were prepared by him, and are the kind usually prepared by an accountant working on the tax returns of his client." *Id.* The Court further noted that there was no danger that responding to the summons would authenticate the documents because the "taxpayer did not prepare the papers and could not vouch for their accuracy." *Fisher*, 425 U.S. at 413.

In *In re Grand Jury Subpoena Duces Tecum Dated Oct. 29, 1992* ("*In re GJS Oct. 29, 1992*"), the Second Circuit set forth the following test for determining whether the act of producing documents in response to a subpoena could "require incriminating testimony": "(1) 'if the existence and location of the subpoenaed papers are unknown to the government'; or (2) where production would 'implicitly authenticate' the documents." 1 F.3d 87, 93 (2d Cir. 1993) (quoting *United States v. Fox*, 721 F.2d 32, 36 (2d Cir. 1983)). The standard with respect to the first part of the test is whether the government can "'demonstrate with reasonable particularity that it knows of the existence and location of the subpoenaed documents'" at the time the subpoena was issued. *In re GJS Oct. 29, 1992*, 1 F.3d at 92 (quoting *In re Grand Jury Subpoena Duces Tecum Dated November 13, 1984*, 616 F. Supp. 1159, 1161 (E.D.N.Y. 1985)); *see United States v. Ponds*, 454 F.3d 313, 324

4

(D.C. Cir. 2006) (The "threshold question [is] whether the government has 'establish[ed] its [pre-subpoena] knowledge of the existence, possession, and authenticity of the subpoenaed documents with 'reasonable particularity' such that 'the communication inherent in the act of production can be considered a foregone conclusion.'" (quoting *United States v. Hubbell*, 167 F.3d 552, 579 (D.C. Cir. 1999), *aff'd* 530 U.S. 27 (2000))).

### 2. Application

The First Grand Jury Subpoena commanded production of records pertaining to Doe and/or to any entity controlled by Doe or in which Doe has an interest.[3] The government made clear

---

[3] The subpoena sought:

All financial records including all financial statements, bank statements, cancelled checks, credit card statements, agreements, contracts, applications for account, signature cards, all records relative to treasury notes or certificates of deposit purchased, cash accounts, ready asset accounts, mutual fund accounts, commodity accounts, margin accounts, or other accounts. All records pertaining to payments of bills and expenses. All records pertaining to transfer and movement of funds. All travel records. All letters, correspondence, e-mails, memos, letters, diaries, instructions, lists and notes. All tax returns, schedules and correspondence associated [with] the preparation of tax returns. All business records, plans and proposals pertaining to [Doe's] business operations.

Other records revealing a description of the securities transacted, quantity bought or sold, date of transactions, purchase or sales price and commissions paid.

All personal records including diaries, e-mails, letters, photographs.

(Govt. Ex. 8.)

through e-mail correspondence and conversations with Doe's civil and criminal attorneys in State X that it was construing the subpoena as seeking production only of the documents being delivered to the office of Doe's civil attorney in State X – i.e., the ██ boxes that were the subject of the ██ ██action in State X.

Doe asserts that he is protected by the Fifth Amendment act of production privilege from producing these boxes because the government failed to describe the papers it seeks with "reasonable particularity." Specifically, Doe argues that because the government cannot describe the papers contained in the 47 boxes with reasonable particularity, the existence, possession, and responsiveness of the specific documents contained in the boxes are not a foregone conclusion. The Court disagrees.

As set forth above, the Fifth Amendment act of production privilege applies "(1) 'if the existence and location of the subpoenaed papers are unknown to the government'; or (2) . . . production would 'implicitly authenticate' the documents." *In re GJS Oct. 29, 1992*, 1 F.3d at 93 (quoting *Fox*, 721 F.2d at 36). The standard with respect to the first part of the test is whether the government can "demonstrate with reasonable particularity that it knows of the existence and location of the subpoenaed documents" at the time the subpoena was issued. *In re GJS Oct. 29, 1992*, 1 F.3d at 93 (quotations omitted).

The existence and location of the documents sought in this case are clearly a "foregone conclusion." Doe, through his statements ██████ unequivocally acknowledged that the documents subject to the first grand jury subpoena – namely, the ██ boxes – were his and were in the third party's possession.

5

Thus, the government has met its burden of showing that it knew of the existence and location of the subpoenaed documents "with reasonable particularity" when the subpoena was issued. It is important to emphasize that Doe is not required to compile or assemble any documents in response to the subpoena. Instead, he must simply produce a third party's pre-assembled, discrete set of sealed documents, in their current form, as they were given to him by the third party. In fact, the government initially subpoenaed the boxes of documents while they were in the possession of the third party, but voluntarily allowed the third party to deliver the boxes to Doe's counsel before they would be produced. Under these particular circumstances, Doe is testifying to nothing by his act of production — other than that he received these documents in the boxes from the third party, a fact which is certainly not itself incriminating to him and is a foregone conclusion. His production of these documents simply does not confirm anything that was previously unknown to the government concerning the existence and location of these materials.[4]

Doe's main contention for the application of the act of production privilege is that the government has no knowledge of the content of the particular papers contained in these boxes. As a threshold

matter, before serving the first grand jury subpoena, the government was aware of the categories of documents in the third party's possession.[5] Thus, the government had a general understanding of the categories of documents contained in the boxes. In any event, knowledge of the particular documents contained in the boxes is not necessary because the ▓▓ boxes are a self-contained unit whose existence and location the government has knowledge of as a consequence of the civil ▓▓▓▓ action. In other words, as long as the government can demonstrate with reasonable particularity that it knows of the existence and location of the particular documents being subpoenaed, there is no separate requirement that the government identify the contents of those documents. The D.C. Circuit has emphasized this precise point:

> The failure of the government to identify each produced document specifically is of no moment. To be consistent with *Fisher*, in which there is no indication that the government knew of each document within the set of documents of which it was aware, the "reasonable particularity" standard cannot demand that the subpoena name every scrap of paper that is produced.

---

[4] As the Court noted at oral argument, if the government had obtained the boxes of documents through the subpoena to the third party and not agreed to have them delivered to Doe's counsel first, Doe clearly could not claim any act of production privilege based upon the third party's production of the boxes. Such a privilege does not magically appear simply because those same sealed boxes are delivered to Doe's counsel, and then immediately sought by the government. Although Doe's counsel suggested at oral argument that Doe would be able to assert an act of production privilege even if the boxes had been obtained directly from the third party (prior to delivery to Doe's counsel), counsel was unable to cite any case authority for that proposition of law.

[5] Doe admitted ▓▓▓▓▓▓▓▓ that the third party had possession of, *inter alia*, his personal and business papers, bills, bank statements, checkbook, cancelled checks, and business plans. (Govt. Ex. 2, 3.) The government was aware that Doe engaged in banking overseas and involved the third party in a number of his transactions, including wiring money to different offshore accounts and foreign companies that Doe owned. (Govt. Ex. 1, 2, 4.) Finally, the government was aware that the records held by the third party were ones that Doe needed to conduct his business affairs and to file tax returns. (Govt. Ex. 2.)

*Ponds*, 454 F.3d at 325; *see also In re Grand Jury Subpoena to Sebastien Boucher*, No. 2:06-mj-91, 2009 WL 424718, at *3 (D. Vt. Feb. 19, 2009) ("Second Circuit precedent, however, does not require that the government be aware of the incriminatory *contents* of the files; it requires the government to demonstrate 'with reasonable particularity that it knows of the existence and location of subpoenaed documents.'" (quoting *In re GJS Oct. 29, 1992*, 1 F.3d at 93)).

In addition, there is no danger that production will "implicitly authenticate" the documents. The government can authenticate the documents through the third party who had possession of the documents previously, or through Doe's statements under oath ▮▮▮▮▮▮▮▮▮. *See In re GJS Oct. 29, 1992*, 1 F.3d at 93 (no act of production privilege where the record-holder had already "produced a copy of the calendar [demanded by the subpoena] to the SEC and testified about his possession and use of it" and the government could independently authenticate the calendar); *see also SEC v. First Jersey Sec., Inc.*, 843 F.2d 74, 76-78 (2d Cir. 1988) (affirming contempt finding against subpoenaed individual for refusing to produce documents similar to those previously produced and which could be authenticated by means other than the act of production); *United States v. Rue*, 819 F.2d 1488, 1494 (8th Cir. 1987) (affirming contempt finding against subpoenaed individual who asserted act of production privilege over documents whose existence he had indirectly acknowledged, and where records could be independently authenticated); *United States v. Schlansky*, 709 F.2d 1079, 1083 (6th Cir. 1983) (affirming order directing taxpayer to produce documents because there was "no testimonial ingredient in the act of producing" a binder of tax documents whose existence, possession by the taxpayer, and

authenticity were established through testimony of accounting firm employees). In short, the act of producing these documents does not supply a necessary link in the evidentiary chain, and would not, in any manner, involve an incriminating testimonial communication.

The cases upon which Doe relies are inapposite. All involve scenarios in which the government could not establish that the subpoenaed records actually existed or were in the subpoenaed party's possession or control. *See, e.g., Doe*, 465 U.S. at 614 n.12 (nothing in the record "'indicate[s] that the United States knows, as a certainty, that each of the myriad documents demanded by the five subpoenas in fact is in the [record-holder's] possession or subject to his control'" (quoting the lower court's decision, *In re Grand Jury Empanelled March 19, 1980*, 680 F.2d 327, 335 (3d Cir. 1982))); *Ponds*, 454 F.3d at 325-26 (the government "failed to establish its prior knowledge of the existence or location of" subpoenaed records such as documents regarding the record-holder's use of a car or documents relating to the record-holder's sister); *Fox*, 721 F.2d at 38 (government's lack of knowledge about whether records existed would "require[] [the record-holder] to become the primary informant against himself"). Additionally, in each of these cases, the documents had to be assembled. In this case, however, Doe is not required to identify, assemble, or compile anything. His lawyer simply has to surrender documents that have already been compiled by someone else.

For these reasons, the documents demanded by the first grand jury subpoena are not protected by the Fifth Amendment act of production privilege.

B. The Second Grand Jury Subpoena

7

### 1. Applicable Law

Documents falling within the "required records" exception are outside the scope of Fifth Amendment protection. *See Grosso v. United States*, 390 U.S. 62, 67-68 (1968). Although the privilege against self-incrimination does not apply where documents "are *voluntarily* created and kept, . . . [w]here documents are *required* to be kept and then produced, they are arguably compelled." *In re Grand Jury Investigation M.H.*, 648 F.3d 1067, 1071 (9th Cir. 2011) (emphasis in original). In such circumstances, however, "the Supreme Court has recognized" that "the privilege does not extend to records required to be kept as a result of an individual's voluntary participation in a regulated activity." *Id.* at 1071-72; *see Shapiro v. United States*, 335 U.S. 1, 17 (1948).

The rationale behind the "required records" doctrine is "twofold." *In re Two Grand Jury Subpoenae Duces Tecum*, 793 F.2d 69, 73 (2d Cir. 1986). First, engaging in an activity that requires record-keeping may be deemed as waiving the act of production privilege, "at least in cases in which there is a nexus between the government's production request and the purpose of the record-keeping requirement." *Id.* Second, since the records must be kept by law, the "record-holder 'admits' little in the way of control or authentication by producing them." *Id.*

"To constitute 'required records' the documents must satisfy a three-part test: (1) the requirement that they be kept must be essentially regulatory, (2) the records must be of a kind which the regulated party has customarily kept, and (3) the records themselves must have assumed 'public aspects' which render them analogous to public documents." *In re Doe*, 711 F.2d 1187, 1191 (2d Cir. 1983) (citing *Grosso*,

390 U.S. at 67-68); *see also Rajah v. Mukasey*, 544 F.3d 427, 442 (2d Cir. 2008) ("the Fifth Amendment's act of production privilege does not cover records that are required to be kept pursuant to a civil regulatory regime").

### 2. Application

On September 12, 2011, the IRS served Doe's attorney with the second grand jury subpoena dated September 9, 2011. The subpoena commanded production of:

> For the years 2003 – present any and all records required to be maintained pursuant to 31 C.F.R. § 103.32[6] relating to foreign financial accounts that [Doe] had/have a financial interest in, or signature authority over, including records reflecting the name in which each such account is maintained, the number of [sic: or] other designation of such account, the name and address of the foreign bank or other person with whom such account is maintained, the type of such account, and the maximum

---

[6] The regulation cited in the subpoena has been relocated to 31 C.F.R. § 1010.420. The regulation reads, in relevant part:

> Records of accounts required by §1010.350 to be reported to the Commissioner of Internal Revenue shall be retained by each person having a financial interest in or signature or other authority over any such account. Such records shall contain the name in which each such account is maintained, the number or other designation of such account, the name and address of the foreign bank or other person with whom such account is maintained, the type of such account, and the maximum value of each such account during the reporting period. Such records shall be retained for a period of 5 years and shall be kept at all times available for inspection as authorized by law.

8

value of each such account during each specified year.

The regulation at issue, 31 C.F.R. § 1010.420, is part of the BSA, 31 U.S.C. § 5311 *et seq.* It requires each person having a financial interest or signatory authority over a foreign bank account to maintain records of those accounts for a period of five years and to keep such records available "at all times . . . for inspection as authorized by law." 31 C.F.R. § 1010.420. Under a related provision, 31 C.F.R. § 1010.350, any U.S. person with an ownership interest in or signatory authority over a foreign bank account must report that interest to the Secretary of the Treasury by filing Form TD F 90-22.1 (known as a "Report of Foreign Bank and Financial Accounts" or "FBAR").[7]

The government asserts that these documents are "required records" that are therefore exempt from Fifth Amendment protection. Doe contends that these records do not fall within the "required records" exception to the act of production privilege.

As discussed below, the Court concludes that the government has met its burden of proving that the foreign financial account documents sought from Doe, which must be maintained by Doe under the BSA, met all three requirements set forth by the Supreme Court in *Grosso* for the "required records" exception to apply. Although the Second Circuit has not decided this issue, this Court's conclusion is consistent with decisions by the Ninth Circuit and two district courts that have also held that documents related to foreign financial accounts maintained by individuals pursuant to 31 C.F.R. § 1010.420 fall within the "required records" exception to the Fifth Amendment privilege against self-

incrimination. *See In re Grand Jury Investigation M.H.*, 648 F.3d at 1070, 1079; *see also In re Grand Jury Subpoena No. 10-04-400*, No. GJ 10-04 (D. Ariz. May 18, 2011) (annexed to government's motion papers); *In re Grand Jury Subpoenas dated January 3, 2011*, No. FGJ 10-403-073 (S.D. Fla. Mar. 4, 2011) (annexed to government's motion papers). *But see In re Grand Jury Subpoena Dated February 11, 2011*, Misc. Act. H-11-174 (S.D. Tex. Sept. 21, 2011) (annexed to Doe's opposition papers). Moreover, the Court's holding in this case also is consistent with the Second Circuit's holdings on analogous provisions.

### a. "Essentially Regulatory"

The first prong of the *Grosso* test requires that the statutory scheme giving rise to the record-keeping requirement is "essentially regulatory" and not criminal in nature.

In *United States v. Dichne*, 612 F.2d 632 (2d Cir. 1979), the Second Circuit held that a similar recordkeeping requirement of the BSA did not violate the Fifth Amendment's privilege against self-incrimination. The provision at issue in *Dichne* required anyone exporting or importing monetary instruments worth more than $5,000 (now $10,000) to file a report with the Secretary of the Treasury. *See* 31 U.S.C. § 1101. The Second Circuit noted that because "the transportation of such amounts of currency is by no means an illegal act, the District Court was correct in its finding that the reporting requirement was not addressed to a highly selective group inherently suspect of criminal activities." *Dichne*, 612 F.2d at 639 (internal quotation marks omitted). The court therefore held that "[i]n view of the lack of a direct linkage between the required disclosure and the potential criminal activity, and in view of the fact that the statute is not directed at an inherently

---

[7] These forms are prescribed by 31 U.S.C. § 5314.

9

suspect group, we conclude that the reporting requirement does not present such a substantial risk of incrimination so as to outweigh the governmental interest in requiring such a disclosure." *Id.* at 641 (internal quotation marks omitted). Consequently, the statute did not violate the Fifth Amendment's privilege against self-incrimination. *See also United States v. Sturman,* 951 F.2d 1466, 1487 (6th Cir. 1991) ("The Bank Secrecy Act applies to all persons making foreign deposits, most of whom do so with legally obtained funds. The requirement is imposed in the banking regulatory field which is not infused with criminal statutes. In addition, the disclosures do not subject the defendant to a real danger of self-incrimination since the source of the funds is not disclosed . . . . Thus, the defendant has failed to show that the Bank Secrecy Act violated any individual right *Marchetti* or *Grosso* seek to protect.").

Similarly, the provisions at issue here, 31 U.S.C. § 5314[8] and 31 C.F.R. § 1010.420, apply to hundreds of thousands of foreign bank accounts.[9] "There is nothing inherently illegal about having or being a beneficiary of an offshore foreign banking account." *In re Grand Jury Investigation M.H.,* 648 F.3d at 1074. Because the record-keeping requirements of 31 C.F.R.

§ 1010.420 do not target inherently illegal activity, the provision is essentially regulatory in nature. *See In re Grand Jury Investigation M.H.,* 648 F.3d at 1075 (in addressing whether records kept pursuant to 31 C.F.R. § 1010.420 were "essentially regulatory," the Ninth Circuit held that the information sought was "not inherently criminal," so "being required to provide that information would generally not establish a significant link in a chain of evidence tending to prove guilt."); *In re Grand Jury Subpoena No. 10-04-400,* No. GJ 10-04 (D. Ariz. May 18, 2011) (reporting requirements of 31 C.F.R. § 1010.420 are essentially regulatory because they are "directed to the public at large and are intended to advance the important public purposes inherent in the regulatory tax scheme"); *In re Grand Jury Subpoenas dated January 3, 2011,* No. FGJ 10-403-073 (S.D. Fla. Mar. 4, 2011) ("record-keeping and reporting requirements of the BSA have consistently been determined to be regulatory, and not criminal, in nature").

Therefore, the Court concludes that these foreign financial records are essentially regulatory, and the first *Grosso* requirement is met.

### b. "Customarily Kept"

The second prong of the *Grosso* test asks whether the records are typically kept in connection with the regulated activity. The Ninth Circuit held that the information required to be kept by 31 C.F.R. § 1010.420 is "basic account information that bank customers would customarily keep, in part because they must report it to the IRS every year as part of the IRS's regulation of offshore banking, and in part because they need the information to access their foreign bank accounts." *In re Grand Jury Investigation M.H.,* 648 F.3d at 1076. This Court agrees. Moreover, in the instant case,

---

[8] This provision of the BSA reads, in part: "the Secretary of the Treasury shall require a resident or citizen of the United States or a person in, and doing business in, the United States, to keep records, file reports, or keep records and file reports, when the resident, citizen, or person makes a transaction or maintains a relation for any person with a foreign financial agency . . ."

[9] *See* Treasury Inspector General for Tax Administration, "New Legislation Could Affect Filers of the Report of Foreign Bank and Financial Accounts, but Potential Issues are Being Addressed," Ref. #2010-30-125 (Sept. 29, 2010) at 7, *available at* http://www.treasury.gov/tigta/auditreports/2010reports/201030125fr.pdf.

Doe admitted in general terms in the civil complaint against the third party that he kept these types of records and needed them to file his tax returns. The information at issue, therefore, is of the type that is "customarily kept." Accordingly, the second *Grosso* requirement is satisfied.

### c. "Public Aspects"

The third requirement of the *Grosso* test is that the records have public aspects that make them analogous to public documents. Doe argues that an individual's personal financial records do not possess sufficient public aspects to satisfy this prong of the test. However, as the Ninth Circuit correctly noted, "[w]here personal information is compelled in furtherance of a valid regulatory scheme, as is the case here, that information assumes a public aspect." *In re Grand Jury Investigation M.H.*, 648 F.3d at 1077. Additionally, the fact that 31 C.F.R. § 1010.420 requires foreign bank-account holders merely to keep records, but not to file those records with the government, does not eliminate the public aspects of the records. *Id.* The Supreme Court has explained that there is no distinction between records required to be kept by law and records regularly or "easily accessed" by the government. *See Marchetti v. United States*, 390 U.S. 39, 56 n.14 (1968) ("We perceive no meaningful difference between an obligation to maintain records for inspection, and such an obligation supplemented by a requirement that those records be filed periodically with officers of the United States."). Thus, the Court finds that the record-keeping requirements of 31 C.F.R. § 1010.420 have "public aspects." Accordingly, the third *Grosso* requirement is met.

\*     \*     \*

In sum, the records demanded by the second grand jury subpoena are "required records" exempt from the Fifth Amendment privilege against self-incrimination. The government concedes, however, that the second grand jury subpoena should be limited to a period of five years because 31 C.F.R. § 1010.420 requires only that responsive records be retained for a period of five years. The Court therefore orders Doe to comply with the second grand jury subpoena, but limits the second grand jury subpoena to command the production of documents required to be maintained pursuant to 31 C.F.R. § 1010.420 for the five years prior to September 9, 2011.

### IV. CONCLUSION

Given that there is no act of production privilege, the Court orders Doe to produce the ▮▮ boxes responsive to the first grand jury subpoena, with the exception of documents that fall within the attorney-client privilege. Because the "required records" doctrine applies to the records demanded by the second grand jury subpoena, the Court finds no act of production privilege and orders Doe to produce the records commanded by the second grand jury subpoena, limited to the five years prior to September 9, 2011.

On December 9, 2011, Doe's counsel advised the Court that Doe intends to appeal the Court's decision compelling him to produce documents pursuant to the above-captioned subpoenas. In order to permit such an appeal, Doe requested that the Court issue an order of contempt and stated that the parties would propose an appropriate procedure by which Doe could be held in contempt and move forward with the appeals process.[10] On December 16, 2011,

---

[10] At the time of its oral ruling on November 30, 2011, the Court stated that, if Doe decided to appeal, the Court would stay any contempt order against Doe

11

Doe's counsel submitted a proposed stipulation requesting that Doe be held in civil contempt for failure to comply with the Court's November 30, 2011 Order and requesting that the Court stay execution of its contempt order until Doe's appeal is resolved by the Second Circuit. The Court has scheduled a hearing for January 10, 2012 to formally hold Doe in civil contempt for his noncompliance and to execute the proposed stipulation to allow him to appeal.

SO ORDERED.

s/ Joseph F. Bianco

Judge Joseph F. Bianco
United States District Judge

Date:    December 30, 2011
         Central Islip, NY

\*    \*    \*

Movant is represented by Loretta Lynch, U.S. Attorney, Eastern District of New York, 610 Federal Plaza, Central Islip, N.Y. 11722 by Richard Thomas Lunger, Jr., Assistant U.S. Attorney. Respondent is represented by Bryan Charles Skarlatos, Kostelanetz & Fink LLP, 7 World Trade Center, 34th Floor, New York, N.Y. 10007.

---

for noncompliance with the Court's Order, pending the outcome of Doe's appeal to the Second Circuit.

Misc # 11-6164-WJZ

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NOS. FGJ 10-403-073
FGJ 10-403-074

In Re: Grand Jury Subpoenas
Dated January 3, 2011

*Redacted — Unsealed as per Judge Zloch.*

ORDER (SEALED)

_____/

THIS MATTER is before the Court upon the Motion To Quash Two Grand Jury Subpoenas Dated January 3, 2011, filed herein by John Doe I and John Doe II. The Court has carefully reviewed said Motion, the entire court file and is otherwise fully advised in the premises.

By the instant Motion, filed February 4, 2011, John Doe I and John Doe II move to quash two Federal Grand Jury Subpoenas dated January 3, 2011, each calling for the following document production:

> FOR THE YEARS 2003 - present. Any and all records required to be maintained pursuant to 31 C.F.R. §103.32 relating to foreign financial accounts that you had/have a financial interest in, or signatory authority over, including records reflecting the name in which each such account is maintained, the number or other designation of such account, the name and address of the foreign bank or other person with whom such account is maintained, the type of such account, and the maximum value of each such account during each specified year.

Movants John Doe I and John Doe II allege that such production of foreign bank account records is privileged, as it violates their Fifth Amendment privilege against self-

incrimination. Specifically, they assert that "[c]ompliance with the grand jury subpoenas would present a real and substantial hazard of self-incrimination for each of them." Movants do not further elaborate on the "real and substantial" harm they assert the production called for by the Subpoenas would impose upon them. However, the Court notes that even assuming <u>arguendo</u> such harm exists, the production of the records described in the Subpoenas would not implicate the Movants' Fifth Amendment rights against self-incrimination where the records sought are deemed to fall within the "required records" exception. <u>Davis v. United States</u>, 328 U.S. 582, 593 (1946); <u>Shapiro v. United States</u>, 335 U.S. 1, 32-35, (1948). "[R]equired records are those records which meet the following criteria: (1) the purpose of the recordkeeping is essentially regulatory, rather than criminal; (2) the records contain the type of information that the regulated party would ordinarily keep; and (3) the records have assumed public aspects rendering them analogous to public documents." <u>In re Grand Jury Subpoena (Spano)</u>, 21 F.3d 226, 228 (8th Cir. 1994)(<u>citing Grosso v. United States</u>, 390 U.S. 62, 67-68 (1968)).

Both of the Subpoenas at issue here clearly seek "[a]ny and all records required to be maintained pursuant to 31 C.F.R. §103.32." <u>See</u> Exs. C & D to the instant Motion. Section 103.32 is part of the Bank Secrecy Act ("BSA"), 31 U.S.C. §§ 5321, 5322, and the various record-keeping and reporting requirements of the BSA have consistently been determined to be regulatory, and not

2

criminal, in nature. <u>See</u>, <u>e.g.</u>, <u>United States v. Dichne</u>, 612 F.2d
632, 639-40 (2d Cir. 1979). Thus, the first prong of the "required
records" exception analysis set forth in <u>Grosso</u> is easily
satisfied. And the Movants do not dispute that the second prong in
<u>Grosso</u>, that the records at issue are the type of information that
the regulated party would ordinarily keep, is also satisfied. The
Court now turns to the third and final prong.

It is the position of the Movants that the subpoenaed records
have no "public aspects," and that the "required records" exception
is therefore inapplicable here. However, there is persuasive
authority for the proposition that documents which must be
maintained pursuant to regulation necessarily have "public aspects"
and thus fall within the "required records" exception. <u>See</u>, <u>e.g.</u>,
<u>In re Grand Jury Subpoena (Spano)</u>, 21 F.3d at 229; <u>In re Kenny</u>, 715
F.2d 51, 52-53 (2d Cir. 1983); <u>Donovan v. Mehlenbacher</u>, 652 F.2d
228, 231 (2d Cir. 1981) ("Under that doctrine [required records],
records required to be kept pursuant to valid regulatory programs
have a 'public aspect' for purposes of constitutional analysis
....."). Thus, the subpoenaed foreign banking records fall squarely
within the required records exception. The instant Motion will
therefore be denied.

However, the Court notes that §103.32 clearly requires that
the records to which the regulation applies "shall be retained <u>for</u>
<u>a period of 5 years</u> and shall be kept at all times available for
inspection as authorized by law." 31 C.F.R. §103.32 (emphasis

3

added).  Therefore, the Court will modify the subject Subpoenas, which seek documents from as far back as the year 2003, and strike the requests for documents from <u>more than five years prior</u> to January 3, 2011, the date of both Subpoenas.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** as follows:

1. The Motion To Quash Two Grand Jury Subpoenas Dated January 3, 2011, filed herein by   John Doe I        and   John Doe II be and the same is hereby **DENIED**; and

2. The Grand Jury Subpoenas dated January 3, 2011, be and the same is hereby **MODIFIED** as follows: the request for documents from more than five years prior to January 3, 2011, made in the Subpoenas issued John Doe I        and  John Doe II      , be and the same is hereby **STRICKEN**.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this _____ day of March, 2011.

WILLIAM J. ZLOCH
United States District Judge

Copies furnished:

Jeffrey A. Neiman, Esq., AUSA
Kevin Dowing, Esq., AUSA
Joseph A. DiRuzzo, III, Esq.
Edward M. Robbins, Jr., Esq.

4

1
2
3
4
5
6                          IN THE UNITED STATES DISTRICT COURT
7                              FOR THE DISTRICT OF ARIZONA
8
9   In re Grand Jury Subpoena No. 10-04-400)        No. GJ 10-04
10                                           )
                                             )      **ORDER**          SEALED
11                                           )      (Under Seal)
                                             )
12                                           )
13                                           )
14   _____)
15

16   [John Doe] is the target of a grand jury investigation conducted by the Internal

17   Revenue Service, the Tax Division of the United States Department of Justice, and the

18   United States Attorney's Office. The investigation involves [Doe's] alleged failure to disclose

19   on his federal income tax returns his ownership of, and income derived from, foreign bank

20   accounts. [Doe] is also alleged to have failed to file Forms TDF 90-22.1, Reports of Foreign

21   Bank and Financial Accounts, as required by 31 U.S.C. § 5314, which would have disclosed

22   ownership of these accounts.

23        As part of its investigation, a grand jury issued a subpoena to [Doe] requesting the

24   production of foreign bank account records required to be maintained by 31 C.F.R. §

25   1010.420, including records that contain the name in which the foreign account is

26   maintained, the number of the account, the name and address of the foreign bank, and the

27   maximum value of the account in any specified year. [Doe] responded to the subpoena with

28   a blanket assertion of his Fifth Amendment privilege against self-incrimination.

1         We now have before us the government's motion to compel compliance with grand

2    jury subpoena and motion to seal, `Doe's` *ex parte* response and motion to seal, and the

3    government's reply. Because `Doe's` response was filed *ex parte*, the government's ability

4    to reply was limited. Nevertheless, we can adequately rule on the motion to compel without

5    additional briefing. Our order is somewhat constrained, however, so as not to reveal any

6    privileged content of the *ex parte* response.

7         `Doe` argues generally that being compelled to comply with the subpoena will violate

8    his Fifth Amendment right against self incrimination. Relying on United States v. Doe, 465

9    U.S. 605, 104 S. Ct. 1237 (1984), he contends that the compelled production of documents

10   is itself "testimonial" for purposes of the Fifth Amendment, and therefore, violates his rights.

11   `Doe's` reliance on Doe is misplaced.

12        In Doe, the Court reiterated that the Fifth Amendment privilege only applies to

13   *compelled* self-incrimination. Id. at 611, 104 S. Ct. at 1241. Therefore, where the

14   preparation of business records is voluntary, there is no compulsion present, and the content

15   of those records, even if incriminating, is not be protected by the Fifth Amendment. Id. at

16   608-09, 104 S. Ct. at 1240. Nevertheless, the Court recognized that the *act of producing* the

17   documents pursuant to subpoena may "have testimonial aspects and an incriminating effect."

18   Id. at 612, 104 S. Ct. at 1242. By producing subpoenaed documents, a respondent may tacitly

19   concede the existence, or non-existence, of the documents demanded, the authentication of

20   the content of the documents, as well as their possession or control by the taxpayer. Id. at

21   612-14, 104 S. Ct. at 1242-43. Whether the act of producing documents has a testimonial

22   significance sufficient to implicate the Fifth Amendment is a fact-intensive inquiry. Fisher

23   v. United States, 425 U.S. 391, 410, 96 S. Ct. 1569, 1581 (1976).

24        However, under certain circumstances, "[r]ecords that are required to be maintained

25   by law are outside the scope of the [Fifth Amendment] privilege," even where the compelled

26   act of producing the required records might be testimonial and incriminating. In re Grand

27   Jury Proceedings ("Doe, M.D."), 801 F.2d 1164, 1167 (9th Cir. 1986) (citing Grosso v.

28

- 2 -

1    United States, 390 U.S. 62, 67-68, 88 S. Ct. 709, 713-14 (1968)). Under the "required
2    records doctrine," the Fifth Amendment privilege does not apply if: (1) the purpose of the
3    record-keeping requirement is "essentially regulatory," not criminal; (2) the records are of
4    the type customarily kept, and (3) the records have public aspects. Grosso, 390 U.S. at
5    67-68, 88 S. Ct. at 713-14. The exception is based on the rationale that if a person "conducts
6    an activity in which record-keeping is required by statute or rule , he may be deemed to have
7    waived his privilege with respect to the act of production–at least in cases in which there is
8    a nexus between the government's production request and the purpose of the record-keeping
9    requirement." In re Two Grand Jury Subpoenae Duces Tecum, 793 F.2d 69, 73 (2d Cir.
10   1986); In re Grand Jury Subpoena Duces Tecum (Underhill), 781 F.2d 64, 70 (6th Cir. 1986).
11          The first prong of the Grosso test requires that the statutory scheme giving rise to the
12   record-keeping requirement is "essentially regulatory" and not criminal in nature. The
13   records sought by the subpoena in this case are required to be kept under the Bank Secrecy
14   Act ("BSA"), 31 U.S.C. § 5314 and 31 C.F.R. § 1010.420. The purpose of the BSA is to "(1)
15   to facilitate the supervision of financial institutions properly subject to federal supervision,
16   (2) to aid duly constituted authorities in lawful investigations, and (3) to provide for the
17   collection of statistics necessary for the formulation of monetary and economic policy." H.R.
18   Rep. No. 91-975, at 4405 (1970). The Ninth Circuit has stated that although the BSA is not
19   "exclusively regulatory," it nevertheless "does not involve a field 'permeated with criminal
20   statutes.'" United States v. Des Jardins, 747 F.2d 499, 508 (9th Cir. 1984) (quoting Albertson
21   v. Subversive Activities Control Bd., 382 U.S. 70, 79, 86 S. Ct. 194, 199 (1965)). And while
22   "Congress did enact the reporting requirement in part because it believed it would yield
23   information useful in criminal investigations," the reporting requirement is not directed at
24   a "highly selective group inherently suspect of criminal activities." Id. at 509. Instead, the
25   reporting requirements are directed to the public at large and are intended to advance the
26   important public purposes inherent in the regulatory tax scheme. See Doe, M.D., 801 F.2d
27   at 1168 ("It is irrelevant that records kept for regulatory purposes may be useful to a criminal
28

1  grand jury investigation."). We conclude that the record-keeping requirements of 31 U.S.C.

2  § 5314 and 31 C.F.R. § 1010.420 are essentially regulatory in nature.

3  ⬚Doe⬚ concedes that the requested bank records are of the type customarily kept by all

4  account holders, regardless of any reporting requirement. Therefore, the second requirement

5  under Grosso is satisfied.

6  Finally, Grosso requires a showing that the records at issue have "assumed 'public

7  aspects' which render them at least analogous to public documents." 390 U.S. at 67-68, 88

8  S. Ct. at 713. In Shapiro v. United States, 335 U.S. 1, 68 S. Ct. 1375 (1948), the Court

9  recognized that the notion of "public aspects" applies "not only to public documents in public

10  offices, but also to records required by law to be kept in order that there may be suitable

11  information of transactions which are the appropriate subjects of governmental regulation,

12  and the enforcement of restrictions validly established." Id. at 17, 68 S. Ct. at 1384. Courts

13  have found a variety of documents "public" for purposes of the required records doctrine,

14  including confidential patient records related to prescription drugs, Doe, M.D., 801 F.2d at

15  1168; odometer statements, In re Grand Jury Subpoena (Spano), 21 F.3d 226, 230 (8th Cir.

16  1994); sales records under the Price Control Act, Shapiro, 335 U.S. at 34, 68 S. Ct. at 1393;

17  and escrow records, In re Grand Jury Subpoena, 497 F.2d 218, 221 (6th Cir. 1974).

18  The required records in this case have assumed a "public aspect" in that the records

19  are required to be maintained pursuant to a valid regulatory program. The offshore banking

20  activity of United States citizens is an appropriate subject of governmental regulation to the

21  extent that it affects the federal tax system. By engaging in this regulated activity, ⬚Doe⬚ is

22  deemed to have waived his Fifth Amendment privilege as to the production of records that

23  are required by law to be maintained.

24  We conclude that the subpoenaed records fall within the "required records exception"

25  to the Fifth Amendment and that ⬚Doe⬚ must produce the requested documents

26  notwithstanding any possible self-incriminating, testimonial implications arising from the

27

28

- 4 -

1  production.  We have considered each of the arguments raised in [Doe's] *ex parte* response
2  to the motion and find that they do not alter our conclusion.

3      **IT IS ORDERED GRANTING** the government's motion to compel compliance with
4  grand jury subpoena. [Doe] shall comply with the subpoena within 15 days of the filing of
5  this Order.

6      **IT IS FURTHER ORDERED** that the government's motion to compel, [Doe's] *ex*
7  *parte* response, the government's reply, and this Order shall be filed under seal.

8      DATED this 18th day of May, 2011.

9

10                      *Frederick J. Martone*
11                        Frederick J. Martone
                     United States District Judge

12

13

14  (cc: All counsel)

15

16

17

18

19

20

21

22

23

24

25

26

27

28