UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

IN RE:  VARIOUS  GRAND JURY SUBPOENAS

-------------------------------------------------------------X

TO BE FILED UNDER SEAL

12  Misc. 00381


# MEMORANDUM OF LAW IN OPPOSITION TO GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH  GRAND JURY SUBPOENAS

Caroline Rule (CR-6503)
Robert S. Fink (RSF-7924)
Bryan C. Skarlatos (BCS-7814)
Juliet L. Fink (JF-5097)

KOSTELANETZ & FINK, LLP
7 World Trade Center, 34th Floor
New York, NY 10007
Tel:    (212) 808-8100
Fax:    (212) 808-8108
crule@kflaw.com
rfink@kflaw.com
bskarlatos@kflaw.com
jfink@kflaw.com

Counsel for Three Respondents

TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION .............................................................................................................1

BACKGROUND ...............................................................................................................1

ARGUMENT.....................................................................................................................3

TO COMPEL COMPLIANCE WITH THE SUBPOENAS WOULD VIOLATE
RESPONDENTS' FIFTH AMENDMENT ACT OF PRODUCTION PRIVILEGE ....................3

    I.    The Required Records Exception To The Act Of Production Privilege Is
        Inapplicable..........................................................................................................6

        A.    The Required Records Exception Stemmed From Emergency Congressional
             Action During Wartime And Has Since Been Overextended By Government
             Prosecutors.......................................................................................................6

        B.    The Government Cannot Satisfy The *Grosso* Test ......................................................9

             1.    The BSA's Record-Keeping Requirements Are Not Part Of An
                 "Essentially Regulatory" Civil Regime .................................................10

                 a.    The language and context of the BSA evidence its criminal purpose..............15

                 b.    The legislative history of the BSA demonstrates that it was enacted
                     primarily to aid criminal law enforcement.......................................18

             2.    The Records Being Sought Are Not Those "Customarily Kept" By The
                 Regulated Party..................................................................................21

    II.    An Individual Who Engages In An Activity That Later Turns Out To Be
        Regulated By The Government Does Not *Ipso Facto* Waive The Fifth
        Amendment Privilege. .......................................................................................29

CONCLUSION.................................................................................................................31

## TABLE OF AUTHORITIES

**CASES**

*Bionic Auto Parts and Sales, Inc. v. Fahner*, 721 F.2d 1072 (7th Cir. 1983) ................................ 19

*California Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974) ....................................................... 19, 20

*Fisher v. United States*, 425 U.S. 391 (1976) ......................................................................... 3, 7

*Grosso v. United States*, 390 U.S. 62 (1968) ..................................................................... passim

*Hoffman v. United States*, 341 U.S. 479 (1951) ....................................................................... 5

*In re Doe*, 711 F.2d 1186 (2d Cir. 1983) ..................................................... 9, 13, 24, 25

*In re Grand Jury 89-4 Subpoena Duces Tecum*, 727 F. Supp. 265 (E.D. Va. 1989) .................... 4

*In re Grand Jury Investigation M.H.*, 648 F.3d 1067 (9th Cir. 2011) .................................. passim

*In re Grand Jury Subpoena, No. 11-20750*, 696 F.3d 428 (5th Cir. 2012) ................. 2, 15, 20, 22

*In re Grand Jury Subpoenas Dated September 9, 2011*, 11-mc-00747 (JFB) (E.D.N.Y. Dec. 30, 2011) ................................................................................................................................ 2

*In re Kenny*, 715 F.2d 51 (2d Cir. 1983) ................................................................................ 31

*In re Special February 2011-1 Grand Jury Subpoena Dated September 12, 2011*, 691 F.3d 903 (7th Cir. 2012) ............................................................................................................ 2, 30

*In re Underhill*, 781 F.2d 64 (6th Cir. 1986) ..................................................................... passim

*In re: Two Grand Jury Subpoenas Duces Tecum Dated August 21, 1985*, 793 F.2d 69 (2d Cir. 1986) .............................................................................................................................. 25

*Marchetti v. United States*, 390 U.S. 39 (1968) .................................................................. passim

*Miranda v. Arizona*, 384 U.S. 436, (1966) ............................................................................ 30

*Rajah v. Mukasey*, 544 F.3d 427 (2d Cir. 2008) ................................................................. passim

*Shapiro v. United States*, 335 U.S. 1 (1948) ...................................................................... passim

*Smith v. Richert*, 35 F.3d 300 (7th Cir. 1994) .................................................................... passim

*Ullman v. United States*, 350 U.S. 422 (1956) ......................................................................... 3

*United States v. Cianciulli*, 2002 WL 1484396 (S.D.N.Y. July 10, 2002) ...................... 22, 26, 27

*United States v. Des Jardins*, 747 F.2d 499 (9th Cir. 1984) ...................................................... 12

*United States v. Dichne*, 612 F.2d 623 ................................................................................ 11, 12

*United States v. Doe*, 465 U.S. 605 (1984) ......................................................................... 3

*United States v. Hajecate*, 683 F.2d 894 (5th Cir. 1982) ....................................................... 15, 20

*United States v. Hubbell*, 167 F.3d 552 (D.C. Cir. 1999), *aff'd*, 530 U.S. 27 (2000) ...... 3, 4, 6, 12

*United States v. Lack*, 11-cr-60184 (S.D. Fla., Indictment filed Aug. 2, 2011) .......................... 22

*United States v. Lehman*, 887 F.2d 1328 (7th Cir. 1989) ................................................. 14

*United States v. Porter*, 711 F.2d 1397 (7th Cir. 1983) ....................................................... passim

*United States v. San Juan*, 405 F. Supp. 686 (D. Vt. 1975) ............................................. 12, 13, 20

*United States v. Silva*, 10-cr-00044 (E.D. Va., Indictment filed Feb. 6, 2012) ........................... 22

*United States v. Silverman*, 449 F.2d 1341 (2d Cir. 1971) ........................................................ 24

*United States v. Singenberger*, 11 Crim. 620 (S.D.N.Y., Indictment, filing date unknown) ....... 23

*United States v. Sternfeld*, 10-cr-00328 (S.D.N.Y., Indictment filed April 13, 2010) ................ 23

*United States v. Sweets*, 526 F.3d 122 (4th Cir. 2007) ................................................. 4

*United States v. Vogliano*, 10-cr-00327 (S.D.N.Y., Indictment filed April 13, 2010) ................ 23

*United States v. Wegelin & Co. et al.*, S1 12 Cr. 02 (S.D.N.Y., Indictment filed Feb. 2, 2012) .. 23

*United States v. Werdiger*, 10-cr-00325 (S.D.N.Y., Indictment filed April 13, 2010) ........... 22, 23

**CONSTITUTIONAL PROVISIONS, STATUTES, AND REGULATIONS**

U.S. Constitution, Amendment V ................................................................................ passim

12 U.S.C. § 3401 *et seq.* ...................................................................................... 27

18 U.S.C. § 3282 ................................................................................................ 16

26 U.S.C. § 6001 ................................................................................................ 26

26 U.S.C. § 6103 ................................................................................................ 19

26 U.S.C. § 6501 ................................................................................................ 21

31 U.S.C. § 1051 *et seq* ...................................................................................... passim

31 U.S.C. § 1101 ........................................................................................................ 11

31 U.S.C. § 5311 ........................................................................................................ 15

31 U.S.C. § 5322 ................................................................................................... 5, 17

26 C.F.R. § 1.6001-1(a) ............................................................................................. 26

31 C.F.R. § 1010.350 ........................................................................................... passim

31 C.F.R. § 1010.420 ........................................................................................... passim

## LEGISLATIVE HISTORY

H.R. Rep. No. 91-175, 91st Cong., 2d Sess  (1970), 1970 U.S.C.C.A.N. 4394 .................... 15, 18

S. Rep. No. 91-1139, 91st Cong., 2d Sess. (1970) ........................................................ 19

## OTHER AUTHORITIES

Samuel A. Alito, Jr., *Documents and the Privilege Against Self-Incrimination*, 48 U. Pitt. L. Rev. 27 (1986) ........................................................................................................ 8, 9

Christopher M. Ferguson, *The Required Records Doctrine: The Fifth Amendment Privilege Under Attack*, 115 Journal of Taxation 219 (Oct. 2011) .......................................... 10

Hale E. Sheppard, *District Court Rules That Where There's No Will, There's A Way to Avoid FBAR Penalties*, 113 Journal of Taxation 293 (Nov. 2010).................................... 18

New York State Bar Ass'n Tax Section, *Report on the Rules Governing Reports on Transactions with Foreign Financial Agencies (FBARS)* (Oct. 30, 2009).................................... 19

FinCEN, *Amendments to the Bank Secrecy Act Regulations – Reports of Foreign Financial Accounts*, Federal Register, Vol. 76, No. 37 ...................................................... 5, 17

Form TD F 90-22.1, "Report of Foreign Bank and Financial Accounts"........................................ 4

http://federaltaxcrimes.blogspot.com/2011/08/9th-circuit-applies-required-records.html ........... 10

http://www.fincen.gov/about_fincen/wwd/ ................................................................ 17

http://www.irs.gov/businesses/small/article/0,,id=152532,00.html............................................ 16

http://www.justice.gov/tax/offshore_compliance_intiative.htm.................................................... 15

## INTRODUCTION

We respectfully submit this memorandum of law in opposition to the government's motion to compel compliance with three grand jury subpoenas, Exhibits B, C & D to the Declaration of Assistant United States Attorney Daniel W. Levy (the "Levy Dec") (jointly "the Subpoenas"). The government applies the same arguments to all three Respondents to whom these Subpoenas were addressed, and the same arguments demonstrate that each of the Respondents should not be required to produce documents called for by the Subpoenas. Consequently, a single memorandum of law is being filed on behalf of all three Respondents.[1]

For the reasons set forth below, the Court should hold that compliance with the Subpoenas would violate the Respondents' Fifth Amendment act of production privilege.

## BACKGROUND

The Subpoenas each call for the production of :

> [A]ny and all records created, obtained, and or maintained from [date] to the present that are in your care, custody, or control relating to any and all bank, securities, or other types of financial accounts in any foreign country in which you have a present or future financial interest, legal interest, beneficial ownership interest, or over which you have signature or other authority, if the aggregate value of these accounts exceeded $10,000 at any time during the calendar year, including but not limited to records required to be maintained pursuant to 31 C.F.R. § 1010.420, namely, records reflecting the name in which each such account is maintained, the number or other designation of such account, the name and address of the foreign bank or other person with whom such account is maintained, the type of such account and the maximum value of each such account during each calendar year.

---

[1] The individual Respondents are identified in separate letters joining in this Memorandum of Law. The Government also moves with respect to, and applies the same arguments to, two other Respondents represented by separate counsel, whose subpoenas are attached as Exhibits A and E to the Levy Dec. We understand that these two additional Respondents will be joining in this Memorandum of Law.

Thus, the Subpoenas target records required to be maintained pursuant to 31 C.F.R. § 1010.420, promulgated under the Currency and Foreign Transaction Reporting Act of 1970, 31 U.S.C. § 1051 *et seq.* (the "Bank Secrecy Act" or "BSA"). Under that regulation, each person having "a financial interest in or signatory authority over" a foreign bank account is required to maintain records of that account for five years and to keep those records available "at all times . . . for inspection as authorized by law." *Id.* The records are required to "contain the name in which each such account is maintained, the number or other designation of such account, the name and address of the foreign bank or other person with whom such account is maintained, the type of such account, and the maximum value of each such account during the reporting period." *Id.* The regulation also contains a provision tolling the five-year period for maintaining records while criminal tax proceedings are pending against the recordkeeper. *Id.*

We are, of course, aware of the Ninth Circuit's decision in *In re Grand Jury Investigation M.H.*, 648 F.3d 1067 (9th Cir. 2011) ("*In re M.H.*"), as well as decisions from the Fifth and Seventh Circuits in *In re Grand Jury Subpoena, No. 11-20750*, 696 F.3d 428 (5th Cir. 2012), and *In re Special February 2011-1 Grand Jury Subpoena Dated September 12, 2011*, 691 F.3d 903 (7th Cir. 2012), and the Eastern District of New York in *In re Grand Jury Subpoenas Dated September 9, 2011*, 11-mc-00747 (JFB) (E.D.N.Y. Dec. 30, 2011), all of which substantially adopt the reasoning set forth in *In re M.H.* All of these decisions, cited by the government, hold that the "required records exception" to the Fifth Amendment act of production privilege applies in these circumstances. This is a rapidly-developing area of the law, however, which the Second Circuit Court of Appeals has not addressed, and we believe that certain critical and outcome-determinative issues were not fully discussed in the memoranda filed in these cases, nor considered by the courts issuing the decisions. Indeed, we believe these decisions were incorrectly decided and ultimately will be reversed.

## ARGUMENT

### TO COMPEL COMPLIANCE WITH THE SUBPOENAS WOULD VIOLATE RESPONDENTS' FIFTH AMENDMENT ACT OF PRODUCTION PRIVILEGE

The Constitutional guarantee that "[n]o person ... shall be compelled in any criminal case to be a witness against himself," U.S. CONST., Amend. V, reflects "a judgment ... that the [government] should [not] be free to build up a criminal case, in whole or in part, with the assistance of enforced disclosures by the accused." *Ullman v. United States*, 350 U.S. 422, 427 (1956). The act of production privilege has been a well-recognized facet of the Fifth Amendment's privilege against self-incrimination since the Supreme Court's decisions in *Fisher v. United States*, 425 U.S. 391, 410 (1976) ("The act of producing evidence in response to a subpoena [to a taxpayer] . . . has communicative aspects of its own, wholly aside from the contents of the papers produced. Compliance with the subpoena tacitly concedes the existence of the papers demanded and their possession or control by the taxpayer. It also would indicate the taxpayer's belief that the papers are those described in the subpoena."); and *United States v. Doe*, 465 U.S. 605, 612 (1984) ("A government subpoena compels the holder of the document to perform an act that may have testimonial aspects and an incriminating effect."). The act of production privilege recognizes that, while the contents of records generally are not privileged because the writing of the records was not compelled, the forced act of *producing* the records may be testimonial and incriminating, and is therefore protected by the Fifth Amendment.

The act of producing documents in response to a subpoena communicates at least four different assertions: (1) that responsive documents exist; (2) that the responsive documents are in the possession and control of the subpoenaed party; (3) that the responsive documents are authentic; and (4) that the party producing the documents believes that the documents are responsive to the subpoena. *United States v. Hubbell*, 167 F.3d 552, 567-68 (D.C. Cir. 1999),

3

*aff'd*, 530 U.S. 27 (2000). *See also United States v. Sweets*, 526 F.3d 122, 127 (4th Cir. 2007); *In re Grand Jury 89-4 Subpoena Duces Tecum*, 727 F. Supp. 265, 268 (E.D. Va. 1989).

The Supreme Court in *Hubbell* confirmed that the Fifth Amendment affords the same protection to the testimonial aspects of a person's act of producing documents as it does to any other compelled testimony:

> [W]e have no doubt that the constitutional privilege against self-incrimination protects the target of a grand jury investigation from being compelled to answer questions designed to elicit information about the existence of sources of potentially incriminating evidence. *That constitutional privilege has the same application to the testimonial aspect of a response to a subpoena seeking discovery of those sources.*

530 U.S. 27, 43 (2000) (emphasis added).

This is precisely the situation here. The government seeks to have the Respondents "testify" in response to the Subpoenas, either by producing records of foreign bank accounts, or by acknowledging a failure to have maintained such records. The government obviously believes that Respondents (who are not related to one another) have or had an interest in foreign accounts that they did not report under 31 C.F.R. § 1010.350 (requiring any United States person with an ownership interest in or signatory authority over a foreign bank account to report that interest or authority to the Secretary of the Treasury annually by filing Form TD F 90-22.1, "Report of Foreign Bank and Financial Accounts," commonly known as an FBAR (see Levy Dec. Exh. F)), and that this failure to report the accounts is criminal. If each Respondent produces documents responsive to his Subpoena, he will be telling the government: (1) that foreign account records pertaining to him exist; (2) that he possesses or has some form of control over those documents; (3) that the documents are authentic; and (4) that he believes that these documents are responsive to the Subpoena, *i.e.*, that he is a person who is subject to the regulation cited in the Subpoena, 31 C.F.R. § 1010.420, because he has or had an interest in a foreign account or accounts. The government will be able to use each of these testimonial

4

assertions as an outright admission, or at least as a link in the chain of evidence,[2] to prosecute

each Respondent, under 31 USC § 5322, for willfully failing to report a foreign bank account as

required by 31 C.F.R. § 1010.350.  If a Respondent responds to a Subpoena by stating that he has

no records, that assertion may be used against him as well, either (1) to prosecute him, also under

31 U.S.C. § 5322, for the willful failure to retain foreign account records as required by 31

C.F.R. 1010.420; and/or (2) to argue consciousness of guilt (*i.e.*, that a Respondent knew it was

unlawful to have an undisclosed foreign account, so he purposely did not retain any records).[3]

What the government seeks through the Subpoenas is the functional equivalent of

calling each Respondent to testify before the grand jury as to whether or not he has or had a

foreign bank account, and whether or not he knew to retain records relating to that account.  As

---

[2]"The privilege afforded [by the Fifth Amendment] not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." *Hoffman v. United States*, 341 U.S. 479, 486 (1951).

[3]The government's motion for an order compelling compliance with the Subpoenas *assumes* that the unrelated Respondents all had a duty to disclose foreign accounts and maintain records under the BSA.  Yet, the government asserts only that it is investigating "*whether* there exist bank accounts held in Switzerland or elsewhere overseas that the Subjects failed to disclose to the IRS as required by the regulatory regime described below." (Gov't Mem. p.1 (emphasis added).)  It must be borne in mind that there are exceptions to the reporting requirements under the BSA even if an individual or entity has an interest in a foreign account.  For example, a corporation in which a United States person has less than a 50% interest is not required to file an FBAR, 31 C.F.R § 1010.350(e)(2)(ii); nor is a trust in which a United States person has less than a 50% present beneficial interest, or in which a United States person has only a remainder interest; *id.* at (e)(2)(iv); FinCEN, *Amendments to the Bank Secrecy Act Regulations – Reports of Foreign Financial Accounts*, Federal Register, Vol. 76, No. 37 at 10234, 10240 (Feb. 24, 2011).  These are only examples of the exceptions.  Thus, even if the government is correct that the required records exception to the act of production privilege applies here – and the government is *not* correct -- the only Order the Court can issue is one that requires Respondents to produce records *if* Respondents are in fact required to keep records under the BSA.  *See* 31 CFR 1010.420 (only "[r]ecords of accounts *required by § 1010.350 to be reported to the Commissioner of Internal Revenue* shall be retained by each person having a financial interest in or signature or other authority over any such account" (emphasis added)).

the government would surely admit, any response to the Subpoenas is thus clearly testimonial at its core and is protected by the act of production privilege as articulated by *Hubbell*.

## I.   The Required Records Exception To The Act Of Production Privilege Is Inapplicable

In moving to compel compliance with the Subpoenas, however, the government contends that the "required records exception" overcomes the Fifth Amendment act of production privilege in this context.  Under the required records exception, production of records that would otherwise fall within the act of production privilege may be required if: (1) the purpose of the statutory scheme that requires the records to be maintained is *essentially* regulatory and civil, rather than prosecutorial; (2) the regulated party would ordinarily keep the kind of records sought by the government; *and* (3) the records have assumed public aspects rendering them analogous to public documents.  *Grosso v. United States*, 390 U.S. 62, 67-68 (1968); *see also Rajah v. Mukasey*, 544 F.3d 427, 442 (2d Cir. 2008) (there must be a "valid *civil* regulatory scheme" for the *Grosso* test to be met (emphasis added)).  The government is incorrect that the "narrow parameters" of this exception, *In re Underhill*, 781 F.2d 64, 70 (6th Cir. 1986), apply here.

### A.   The Required Records Exception Stemmed From Emergency Congressional Action During Wartime And Has Since Been Overextended By Government Prosecutors

The so-called "required records exception," to the act of production Fifth Amendment privilege is really a misnomer, in that not all records required to be kept by statute or regulation fall within the exception, and this over-simplified label has clouded the recent application of what is in fact a narrow exception to the Fifth Amendment privilege.  It is critical to recognize at the outset that the required records doctrine, which has its roots in *Shapiro v. United States*, 335 U.S. 1 (1948), was formulated against a background of exigent wartime circumstances that do not underlie the Bank Secrecy Act and regulations promulgated

6

thereunder.  Hearings on the statute and regulations at issue in *Shapiro* specifically pointed out that, "It should not be forgotten that the statute to be administered is an *emergency statute*." *Id.* at 12 (citation omitted) (emphasis added).[4]

       In *Shapiro*, the petitioner was licensed by the government to sell fruits and vegetables to the public under emergency wartime regulations governing commodities pricing in order to prevent inflation and price gouging immediately following the outbreak of World War II.  As a licensee, Shapiro was required to maintain "invoices, sales tickets, cash receipts or other evidences of sale or delivery," *id.* at 5 n.3.  The *Shapiro* Court held that Shapiro's Fifth Amendment privilege was not violated by requiring him to produce these routinely-maintained kinds of records in the context of this heavily-regulated wartime program.  Because Shapiro was engaged in a commercial activity with the public; because he could engage in that activity "solely by virtue of the license granted to him under the statute," *id.* at 35, which license obligated him to maintain records relating to that activity; and because the activity was regulated as a result of the exigencies of World War II,  the records had assumed the character of public records, which are not protected by the Fifth Amendment from production or disclosure.  The linchpin of the Court's opinion was that the records had "public aspects," *id.* at 34, *not* simply because they were required to be maintained by a statute enacted by Congress or by a regulation promulgated by the Office of Price Administration, but as a result of the *public* nature of the business activity in which Shapiro was engaged, which activity was licensed and regulated by

---

[4] *See also  id.* at 10 ("It is significant to note that the Senate Committee on Banking and Currency began its consideration of the bill…the day after Congress declared the existence of a state of war between this country and the Imperial Government of Japan.").

       It should also be noted that the act of production privilege was not on the Court's radar screen when it decided *Shapiro*.  In the first place, the act of  production privilege was first articulated by the Supreme Court in *Fisher v. United States*, 425 U.S. 391 (1976), twenty-eight years after *Shapiro*.  Further, the act of production privilege may not have been applicable under the facts in *Shapiro*, since, *inter alia*, Shapiro himself appears to have readily admitted that he

Congress.  There is, in contrast, nothing public about the unlicensed activity of owning a private foreign bank account.

The *Shapiro* Court stated that the required records doctrine applies "not only to public documents in public offices, but also to records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation, and the enforcement of restrictions validly established." *Id.* at 17.  The records sought by the Subpoenas here are simply not going to be used by the government in any way to obtain "suitable information" about transactions in the field of international banking, but are instead to be used *exclusively* to obtain evidence concerning suspected criminal activity.

The *Shapiro* Court was clearly aware of the risk that its holding could be extended too far, being careful to note that:

> It may be assumed at the outset that there are limits which the government cannot constitutionally exceed in requiring the keeping of records which may be inspected by an administrative agency and may be used in prosecuting statutory violations committed by the record-keeper himself.

335 U.S. at 32.

Justice Alito observed when he served as a Deputy Attorney General:

> The required records doctrine has never recovered from [its] difficult birth.  Moreover, the doctrine forces recognition of one of the darker truths about the modern regulatory state.  Chief Justice Vinson assumed in *Shapiro* that there were 'limits which the Government cannot constitutionally exceed' in requiring the keeping of records for administrative inspection.  But expansive interpretations of the Commerce Clause and other grants of governmental power leave vast, perhaps unbounded, areas where recordkeeping may be required.  For these and possibly other reasons, the required records rule has been regarded for nearly forty years like an illegitimate war baby.

---

routinely maintained the records required by the regulations at issue. He simply claimed that he need not produce them based on his Fifth Amendment privilege.

Samuel A. Alito, Jr., *Documents and the Privilege Against Self-Incrimination*, 48 U. Pitt. L. Rev. 27, 72-73 (1986) (footnotes omitted); *see also In re Doe*, 711 F.2d 1186, 1196 (2d Cir. 1983) (Friendly, J., dissenting) ("[t]he required records exception . . . has been problematic from the outset").    Indeed, Respondents believe that, if the Supreme Court re-examines the issue, it will hold that the required records doctrine is unconstitutional in light of the later-established act of production doctrine.  *In re M.H.* and its progeny, however -- in essence -- wrongly regard the required records rule as a simplistic means of swallowing and obliterating the act of production privilege whenever a statute requires that records be maintained or information disclosed.

**B.**      **The Government Cannot Satisfy The *Grosso* Test**

After *Shapiro*, as noted, the Supreme Court in *Grosso v. United States* attempted to clarify the relation of the required records doctrine to the act of production privilege, and held that the required records doctrine did not apply unless the government could establish all three of the following elements:

(1)      that the statutory regime giving rise to the record-keeping requirement is "essentially regulatory;"

(2)      that the records at issue are of a kind "which the regulated party has customarily kept;" and,

(3)      that the records themselves have assumed "public aspects" which render them analogous to public documents.

390 U.S. at 67-68.  *Accord Marchetti v. United States*, 390 U.S. 39, 57 (1968).  Although the *Grosso* Court clearly intended to limit expansion of its decision in *Shapiro*, the Government has turned *Grosso* on its head and attempts to expand the *Shapiro* holding whenever the factors

discussed in *Grosso* are even arguably met.[5]  Nevertheless, *none* of the *Grosso* elements is satisfied here.

As noted, the Court of Appeals for the Second Circuit has not ruled on the issue currently before the Court.  We respectfully submit that application of the required records exception by *In re M.H.*, and subsequent cases, in the context of grand jury subpoenas for foreign bank account records under the BSA, is an unconstitutional extension of Supreme Court precedent that will ultimately be reversed.[6]

### 1. The BSA's Record-Keeping Requirements Are Not Part Of An "Essentially Regulatory" Civil Regime

As noted, 31 C.F.R. § 1010.420, the regulation at issue in this case, requires each person having "a financial interest in or signatory authority over" a foreign bank account to maintain records of that account for a period of five years and to keep such records available "at all times . . . for inspection as authorized by law."  This provision operates hand-in-hand with 31 C.F.R. § 1010.350, which requires the filing of an FBAR.  (Levy Dec. Exh. F.)  Both regulations derive their authority from the BSA.  A review of the relevant provisions of the BSA itself, the BSA's legislative history, and pre-*In re M.H.* case law interpreting the BSA, all leave little doubt that, far from being an "*essentially* regulatory" *civil* regime, the BSA is a statutory and regulatory scheme whose *principal* purpose is to provide law enforcement with evidence of

---

[5] It should be borne in mind that the Supreme Court implied in *Marchetti* that even if this three-prong test is satisfied, the required records exception may *yet* require further constitutional scrutiny. *See Marchetti*, 390 U.S. at 56.

[6] *See, e.g.,* Christopher M. Ferguson, *The Required Records Doctrine:  The Fifth Amendment Privilege Under Attack*, 115 Journal of Taxation 219 (Oct. 2011) (arguing that *In re: M.H* was wrongly decided);  http://federaltaxcrimes.blogspot.com/2011/08/9th-circuit-applies-required-records.html (same).

criminal financial transactions, such as tax evasion, that the government previously was unable to obtain because of foreign bank secrecy laws.

As an initial matter, it must be made clear that Respondents do not, by asserting their Fifth Amendment privilege in response to the Subpoenas, challenge the *facial* constitutionality of the BSA itself or its record-keeping provisions. Even if the regulations at issue here are facially constitutional, however, their provisions do not give the government *carte blanche* to compel an individual to "testify" via the act of producing personal bank records in response to a grand jury subpoena.

In asserting that the first prong of the *Grosso* test is met, the government relies heavily on *United States v. Dichne*, 612 F.2d 632 (2d Cir. 1980), which was a case that upheld currency reporting requirements[7] of the BSA against facial Fifth Amendment challenge. *Dichne*, and the other cases cited by the government (Gov't Memo at p. 15) – which cases also mistakenly form the basis for much of the reasoning of *In re M.H.* and its progeny -- did *not* involve any analysis of the Fifth Amendment act of production privilege in response to a subpoena; instead they all involved a facial challenge to a reporting statute. While the two analyses overlap somewhat (and are often confused) the analysis of whether a statutory reporting requirement is facially constitutional has a different focus from the analysis of whether the required records exception to the Fifth Amendment act of production privilege applies to a response to a subpoena. Analysis of the facial validity of reporting requirements focuses on the overall *effect* of the statute or regulation at issue, and balances the competing interests of the government in regulating the area in question against the constitutional risk of self-incrimination posed to members of the *general public*. Under this analysis, courts have determined that the

---

[7] *Dichne* involved a different part of the BSA than is at issue here; it discussed the requirement that an individual report that he or she is transporting over a certain amount of cash into or out of the country. *See* 31 U.S.C. § 1101.

risk of self-incrimination in the act of reporting does not violate the Fifth Amendment when the reporting is required to be made in an area that is not permeated with criminal statutes or directed at an inherently suspect group. *See e.g., United States v. Dichne*, 612 F.2d at 639; *United States v. Des Jardins*, 747 F.2d 499, 508 (9th Cir. 1984).[8]

In contrast, the first prong of the *Grosso* test has an altered focus from the analysis in *Dichne*; it is focused on the *purpose* of the government inquiry under the statutory scheme at issue, *i.e.*, the government's *intent* in promulgating the statute, and there is no balancing test involved. As *Grosso* stated, a court is required to determine if a recordkeeping requirement arises out of an "*essentially* regulatory" statutory regime. *Nowhere* do the words "essentially regulatory" appear in the *Dichne* opinion. That the two analyses are distinct, and may reach different results, is made clear by a case relied upon by *Dichne*, *United States v. San Juan*, 405 F. Supp. 686 (D. Vt. 1975), in which the court upheld against facial challenge the currency reporting requirements of the BSA, *see* n.7, *ante*, but nevertheless stated unequivocally that the required records doctrine would *not* apply to records required to be kept by those very same *facially-valid* provisions:

> The Court does not agree with the Government that the defendant's claims can be easily dismissed under the 'required records' doctrine of Shapiro. That doctrine is applicable only to statutes which are regulatory in nature and to records that are ordinarily kept and have assumed public aspects. None of these essential factors . . . are attributable to the reporting requirements challenged here.

---

[8] In *United States v. Des Jardins*, cited by the government, the court held that "the information that an individual must provide under the [currency] reporting requirements will not 'prove a significant "link in the chain" of evidence tending to establish guilt.'" 747 F.2d at 509 (citation omitted). As established in *Hubbell*, however, the *act of production* in response to a government subpoena is *of necessity* a significant link in the chain of evidence against an individual respondent required to produce records. *See ante*, pp. 3-6.

*Id.* at 693-94.[9]  *Cf. Rajah v. Mukasey*, 544 F.3d at 442 (applying the two different analyses sequentially – first required records, then facial validity -- to regulations requiring aliens from certain countries to produce passports and Forms I-94 in the wake of the 2001 terrorist attacks). Thus, a statute may survive facial Fifth Amendment challenge and yet fail the *Grosso* test in the context of the act of production privilege.

Turning then to the first prong of the *Grosso* test, when examining the Congressional purpose behind a statute, as that cases's *"essentially* regulatory" language demonstrates, it is not enough for the act of production analysis that the statute or regulation at issue have *some* non-prosecutorial, regulatory purpose to meet that test.  Rather, the very *essence* of the legislative regime, viewed as a whole, must serve non-prosecutorial ends.  The scheme must be a "valid *civil* regulatory scheme."  *Rajah v. Mukasey*, 544 F.3d at 442 (emphasis added). Courts have imposed this requirement to prevent Congress from circumventing the Fifth Amendment act of production privilege simply by enacting record-retention legislation, and then allowing the government to criminally prosecute those who possess the specified records, after requiring their production via subpoena.  *See, e.g., In re Doe*, 711 F.2d at 1191 (in act of production case, recognizing that there are "constitutional limits on the government's power to compel record keeping which might circumvent the privilege contained in the Fifth Amendment" under the guise of the required records exception); *United States v. Porter*, 711 F.2d 1397, 1405 (7th Cir. 1983) (the mere fact that the government has "'formalized its demands in the attire of a statute'" does not overcome the Fifth Amendment act of production privilege).

---

[9]The court acknowledged that the reporting requirements of the BSA did not arise in an area permeated by criminal statutes.  *Id.* at 691-692.  Rather than treating this as the end of the analysis, however, the court went on to hold that this fact could not "mask the underlying *purposes* of Congress in promulgating the foreign reporting requirements of the [BSA] – *purposes which were fundamentally prosecutorial.*"  *Id.* at 693 (emphasis added).  These Congressional *purposes* are what is relevant for analysis of the first prong of the *Grosso* test.

Whatever civil regulatory purpose might be served by a demand for "[a]ny and all records required to be maintained pursuant to 31 C.F.R. § 1010.420," the true purpose of a governmental inquiry in the context of the BSA – criminal law enforcement -- is exemplified by this very case, where Respondents are each the target of a grand jury investigation in which the government now seeks to compel each Respondent's production of records.  Indeed, it is essential to note that we are not aware of *any* formal governmental request seeking from an individual information required to be kept under the BSA's provisions concerning foreign bank accounts that has been issued in *any* form *other* than via a grand jury subpoena.[10]

In addition, unlike many truly regulatory schemes, like that in *Shapiro*, in which a person's employment or license may depend on his or her retaining records, there is no licensing or other employment condition at issue in the BSA.  *See e.g., United States v. Porter*, 711 F.2d at 1405 (distinguishing the situation of a taxpayer from *Shapiro* because the petitioner in *Shapiro* was, unlike the taxpayer, required to keep records as a condition of operating his business under a license issued as part of a comprehensive government regulatory scheme).

In *In re Underhill*, 781 F.2d at 68, cited by the government (Gov't Memo pp. 10-11), the court noted that "there is nothing ordinarily criminally suspect about selling a motor vehicle," in upholding a subpoena to a car dealer for odometer records required to be maintained by statute.  Similarly, in *United States v. Lehman*, 887 F.2d 1328, 1333 (7th Cir. 1989), the court held that there was "nothing ordinarily criminally suspect in buying and selling livestock," in permitting enforcement of a subpoena for records pertaining to cattle dealing.  In contrast, despite the government's again-simplistic argument that there is *nothing* suspect about owning a foreign bank account (and despite the fact that there are some civil aspects to the statute), the BSA as a whole represents a "*presumption*" by Congress that secret foreign bank accounts are

---

[10]Except perhaps under the IRS's voluntary disclosure program where holders of secret foreign bank accounts come forward voluntarily to *avoid prosecution.*

14

"*inevitably* linked to *criminal* activity," *United States v. Hajecate*, 683 F.2d 894, 901 (5th Cir. 1982) (emphasis added), and the statute was enacted in response to the "proliferation of white collar crime" commited via secret foreign bank accounts, H.R. Rep. No. 91-175, 91st Cong., 2d Sess, at 10 (1970), reprinted in 1970 U.S.C.C.A.N. 4394, 4404.   There *is* something suspect about a secret foreign bank account, and a large percentage, if not a majority, of foreign bank accounts are, seemingly, secret. *See* http://www.justice.gov/tax/offshore_compliance_intiative.htm.

> a.   **The language and context of the BSA evidence its criminal purpose**

The language and context of the BSA several times emphasize criminal law enforcement and criminal proceedings.  The BSA's "declaration of purpose" expressly states that the statute's aim is "to require certain reports or records where they have a high degree of usefulness in *criminal*, tax, or regulatory investigations or proceedings . . . ." 31 U.S.C. § 5311 (emphasis added).  Even if this were all the explanation of the BSA available, the government's argument that the BSA is therefore *essentially* regulatory (Gov't Memo pp. 14-15) – and recent courts' adoption of that argument – would even then be insupportable, because this argument ignores a *primary* purpose of the BSA, i.e. its usefulness in criminal investigations or proceedings.  A statute cannot represent an *essentially* regulatory civil regime when one of its *primary* purposes is to aid in criminal law enforcement.[11]   In *Grosso*, the Court noted that, even

---

[11] The government relies on language in one of the recent, wrongly-decided cases on the issue of whether the BSA is essentially regulatory, *In re Grand Jury Subpoena, No. 11-20750*, 696 F.3d 428, 434 (5th Cir. 2012), to the effect that, in order not to be "essentially regulatory," a statutory scheme must "apply exclusively or almost exclusively to people engaged in criminal activity." Leaving aside the fact that this description might well apply to the BSA, this statement is contrary to the plain meaning of the first prong of the *Grosso* test.  "Essentially" does not mean the same as "exclusively"; and a statute may, like the BSA, have as its *essence* a focus on criminal law enforcement, yet at the same time focus in part on civil issues as well.

though the "principal" interest of the United States underlying the wagering statutes at issue there "must be assumed" to be the collection of revenue, a civil purpose, nevertheless, because of "Congress's apparent wish that any information obtained as a consequence of the wagering taxes be made available to the prosecuting authorities," the statutory scheme was distinguishable from that of *Shapiro* and was not *essentially* regulatory.  390 U.S. at 68.  Thus, a scheme may have a civil purpose, but yet not be essentially regulatory because it has a prosecutorial purpose as well. The BSA's "declaration of purpose" makes clear that a prosecutorial purpose is one of that statute's *primary* purposes.

There is more in the context of the BSA than its declaration of purpose, however.[12]  The text of 31 C.F.R. § 1010.420 itself reflects the regulations' role in criminal law enforcement.  Its requirement that records be maintained for five years coincides with the criminal statute of limitations for willfully failing to file an FBAR, *see* 18 U.S.C. § 3282 (establishing five year statute of limitations for federal offenses), rather than the three-year statute of limitations for civil tax adjustments, 26 U.S.C. 6501.  The regulation also expressly states that, in computing the five-year period for which record-keeping is required, "there shall be disregarded any period beginning with a date on which the taxpayer is indicted or information instituted on account of the filing of a false or fraudulent federal income tax return or failing to

---

[12] The IRS website describes the entire BSA as follows:

> Congress passed the Bank Secrecy Act in 1970 as the first laws to fight money laundering in the United States. . . . . The documents filed by businesses under the BSA requirements are heavily used by law enforcement agencies, both domestic and international to identify, detect and deter money laundering whether it is in furtherance of a criminal enterprise, terrorism, tax evasion or other unlawful activity.

http://www.irs.gov/businesses/small/article/0,,id=152532,00.html.

16

file a federal income tax return, and ending with the date on which final disposition is made of the criminal proceeding." 31 C.F.R. § 1010.420. These overt references to criminal prosecution refute that the BSA's character is "*essentially* regulatory." In addition, the consequence to a accountholder for willfully not retaining records under the BSA is *criminal prosecution. See* 31 U.S.C. § 5322. Willful disregard of the companion regulation, 31 C.F.R. § 1010.350, which creates the obligation to file an FBAR, is also a *crime. Id.*

Finally, it is extremely significant that these regulations are administered by FinCEN, the Financial *Crimes* Enforcement Network (emphasis added) of the Department of the Treasury. "The Secretary of the Treasury has delegated to the Director of FinCEN the authority to implement, administer, and enforce compliance with the BSA and associated regulations." http://www.fincen.gov/about_fincen/wwd/. "The BSA is the nation's first and most comprehensive Federal *anti-money laundering and counter-terrorism financing . . . statute*. In brief, the BSA authorizes the Secretary of the Treasury to issue regulations requiring banks and other financial institutions to take a number of precautions *against financial crime, including . . .* the filing of reports that have been determined to have a high degree of usefulness in criminal, tax, and regulatory investigations and proceedings, and certain intelligence and counter-terrorism matters." *Id.* (Emphases added.) *See also, e.g.*, FinCEN, *Amendments to the Bank Secrecy Act Regulations – Reports of Foreign Financial Accounts*, Federal Register, Vol. 76, No. 37 at 10234 (Feb. 24, 2011) (several times referring to the usefulness to "law enforcement" of the FBAR reporting requirements). Thus, the text and immediate context of the regulation at issue establish that it is not part of an essentially regulatory civil scheme, but rather part of a scheme that is much more concerned with criminal law enforcement than with any civil purpose. 31 C.F.R. § 1010.420 is part of a statutory scheme whose clear aim is law enforcement.[13]

---

[13]Indeed, after years of seemingly being ignored, this regulatory scheme has only recently received attention as part of law enforcement efforts to investigate unreported foreign bank

### b.   The legislative history of the BSA demonstrates that it was enacted primarily to aid criminal law enforcement

The BSA's legislative history, just as strongly as the text and context of the BSA and its regulations concerning foreign bank accounts, makes it abundantly clear that the BSA and these regulations are essentially criminally-focused.   The requirements of the BSA were expressly conceived to assist criminal law enforcement agencies in targeting persons owning secret foreign bank accounts.   For example, the House Report on the BSA explains that the foreign transaction reporting requirement was to be enacted because of the "proliferation of white collar crime," which the House concluded had been aided by secret foreign bank accounts; these crimes including organized criminal operations, tax evasion, securities fraud and other schemes to defraud the United States, conspiracies to steal from the United States, and money laundering. *See* H.R. Rep. No. 91-175, 91st Cong., 2d Sess., at 10 (1970), reprinted in 1970 U.S.C.C.A.N. 4394, 4404.   The House Report also bemoaned that, "United States law enforcement agencies are often delayed or totally frustrated when wrongdoers cloak their activities in the shield of foreign financial secrecy." *Id.*   As the House Report makes clear, the BSA was intended to address the "frustrations" experienced by "law enforcement personnel" who, in the absence of the BSA's provisions, "must subject themselves to a time consuming and often fruitless foreign legal process" when conducting criminal investigations of undisclosed foreign bank accounts. *Id.*

The Senate Committee was equally concerned with the "growing use of secret foreign bank accounts for a wide variety of illegal purposes by U.S. citizens and residents . . . .

---

accounts. *Cf.* Hale E. Sheppard, *District Court Rules That Where There's No Will, There's A Way to Avoid FBAR Penalties*, 113 Journal of Taxation 293 (Nov. 2010) ("before the public scandal centered on UBS in Switzerland, the FBAR was an obscure form with little significance to most taxpayers and practitioners").

Tax evaders, stock swindlers and other white-collar criminals are becoming increasingly aware of the advantages of a secret foreign bank account." *See* S. Rep. No. 91-1139, 91st Cong., 2d Sess., at 3-4 (1970). The major purpose of the BSA, then, was to "root out criminal activity," thus negating a finding that its purpose is essentially regulatory. *Bionic Auto Parts and Sales, Inc. v. Fahner*, 721 F.2d 1072, 1082 (7th Cir. 1983) (while "there is a fine line between a regulatory purpose and the specific effort to root out criminal activity," a statute with the latter aim does not meet the first prong of the *Grosso* test).[14]

      The BSA's legislative history makes it clear that the primary goal and purpose of the statute's reporting requirements were not to regulate an industry, but rather to enhance the evidence-gathering efforts of law enforcement in investigating and prosecuting financial crimes.

      The BSA is thus in stark contrast, for example, with the scheme upheld in *In re Underhill*, whose "basic regulatory purpose" was simply to "provide consumers with accurate automobile mileage information." 781 F.2d at 68. The government's citation of *California Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974) (Gov't Memo p. 14-15) is also unavailing. In that case – a facial-validity case, not an act of production case, in any event, *see ante* pp. 10-13 -- the Court recognized that "concern for the enforcement of the criminal law was undoubtedly *prominant* [sic] in the minds of the legislators who considered the [BSA]." *Id.* at 76-77

---

[14] As further evidence of the BSA's aim to aid criminal law enforcement, Congress placed the foreign account reporting requirements in Title 31 of the United States Code, rather than Title 26, the Tax Code, thereby enhancing law enforcement's ability to share information related to taxpayers' interests in foreign accounts for prosecutorial purposes. If the reporting requirements had been in Title 26, the information would have been limited to use by the IRS. *See* 26 U.S.C. § 6103 (prohibiting the disclosure of taxpayer information outside the IRS, except in limited circumstances); *see also* New York State Bar Ass'n Tax Section, *Report on the Rules Governing Reports on Transactions with Foreign Financial Agencies (FBARS)* at 13-14 (Oct. 30, 2009), available at http://www.nysba.org/AM/Template.cfm?Section=Tax_Section_Reports_2009&Template=/TaggedPage/TaggedPageDisplay.cfm&TPLID=29&ContentID=24082.

(emphasis added).   The Court also stated that, "We do not think it is strange or irrational that Congress, having its attention called to what appeared to be serious and organized efforts to avoid detection of *criminal activity*, should have legislated [via the BSA] to rectify the situation." *Id*. at 77 (emphasis added).   Finally, the Court termed the BSA "a legislative enactment [that] *manifests a concern for the enforcement of the criminal law*." *Id*. (emphasis added).   Of necessity, if a *prominent* purpose of the BSA is criminal law enforcement, and it was enacted to rectify serious, organized efforts to avoid detection of criminal activity, the BSA does not have as its *essence* a civil regulatory goal.   That there may have been some peripheral civil concerns behind the BSA (Gov't Memo pp 14-15) does not render it *essentially* regulatory.   *See also* n.11, *ante*; *Grosso*, 390 U.S. at 68.   The government's analysis would have the word "essentially" mean nothing at all.

### c.  Courts have held that the BSA's purpose is fundamentally prosecutorial

Finally, courts also have held that the purpose of BSA's reporting requirements is, in essence, prosecutorial.   In *United States v. Hajecate*, 683 F.2d at 901, the court held that both the language and legislative history of the statute demonstrate that the essential character of its foreign account reporting provisions is "investigatory" and, moreover, that these provisions evidence a "*presumption by Congress that secret foreign bank accounts and secret foreign financial institutions are inevitably linked to criminal activity in the United States.*" (Emphasis added).[15]   *See also United States v. San Juan*, 405 F. Supp. at 693 (the "underlying purposes of Congress in promulgating [the BSA's] foreign reporting requirements . . . were *fundamentally prosecutorial*" (emphasis added)).

The first prong of the *Grosso* test is not met here.

---

[15] The Fifth Circuit entirely ignored its prior precedent in *Hajecate* in its recent incorrectly-decided decision, *In re Grand Jury Subpoena, No. 11-20750*, 696 F.3d 428 (5th Cir. 2012).

2.     **The Records Being Sought Are Not Those "Customarily Kept" By
The Regulated Party**

Under the second prong of the *Grosso* test, the records being sought must be ones

that are "customarily kept" by the regulated party.  For this factor to be satisfied, the records

must be of a type which one would expect the regulated party to maintain in the ordinary course

of his or her affairs, if the regulation did not exist.  *See, e.g., Marchetti*, 390 U.S. at 57 (types of

information required by wagering statute at issue were not those which the defendant would have

maintained in the course of his business, absent the regulation).  Despite the government's

assertion that "these basic bank records," would ordinarily be kept by a foreign bank-

accountholder (Gov't Memo at p. 17), we submit that records of a *foreign* bank account are not

"basic," and that the records sought by the government in this case are not of a kind that

individual foreign bank-accountholders customarily would maintain if the BSA did not exist.

As an initial matter, the period of required recordkeeping under 31 C.F.R. §

1010.420 is five years, two years beyond the statute of limitations for civil tax adjustments, 26

U.S.C. § 6501.  Thus, one would not expect accountholders "customarily" to keep bank records

or other documents relating to foreign accounts for such an extended period, absent the BSA

regulations.

More importantly, the significance of the fact that the records sought by the

Subpoenas are those of *foreign*, not domestic, bank accounts cannot be overstated.  Foreign

banks, especially those in the "secrecy" jurisdictions that the BSA intended to target, are

notorious for failing to provide their customers with records.  Accordingly, as a practical matter,

one would not expect individuals regulated by 31 C.F.R. § 1010.420 even to possess, much less

maintain, records targeted by the regulation.  And, the very accountholders that the BSA's

21

recordkeeping requirements intended to target, *i.e.*, those trying to conceal their foreign banking activities, are the persons *least* likely to maintain foreign banking records.[16]

The fallacy of the government's repeatedly-held position in this and other recent cases to the effect that foreign bank records are the type of record that would customarily be maintained by individuals regulated by the BSA, if the BSA did not exist, is demonstrated by allegations also repeatedly made by the government -- in recent indictments filed in multiple District Courts around the country -- wherein the government charges that Swiss bankers and other facilitators expressly advised their customers *not* to maintain bank records related to their undeclared foreign accounts, and ensured that such records did *not* reach the United States. *See United States v. Silva*, 10-cr-00044 (E.D. Va., Indictment filed Feb. 6, 2012, at ¶ 22) ("It was further a part of the conspiracy that the Zurich Attorney would and did advise defendant . . . that he *should not be in possession of* account statements or other documentation relating to his undeclared Swiss account in order to maintain secrecy." (emphasis added)); *United States v. Lack*, 11-cr-60184 (S.D. Fla., Indictment filed Aug. 2, 2011, at ¶ 27) ("It was further a part of the conspiracy that [the defendant] would and did advise U.S. customers *not to maintain* in the United States records related to their undeclared accounts." (emphasis added)); *United States v.*

_____

[16]*In re M.H.*, 648 F.3d at 1076, and *In re Grand Jury Subpoena, No. 11-20750,* 696 F.3d at 435, constructed a tautological premise to find that foreign bank records are of a kind customarily kept (indeed, in the latter case, the court stated that this issue was "not contested," *id.*); both courts reasoned that, because the BSA requires that the information be kept and reported, the information must *therefore* be of a kind that is customarily kept by an accountholder. This reasoning, however, completely does away with the second prong of the *Grosso* test. It posits that, if a court finds that a statute requires records to be kept and certain information reported, a subpoena for those records may be enforced. If this were all that was required, however, no Fifth Amendment act of production privilege would *ever* have been recognized where records were required to be kept by statute and information reported, and courts would not have been required to struggle with the parameters of the required records exception in those circumstances. The cavalier reasoning of *In re M.H.* and, in particular, of *In re Grand Jury Subpoena, No. 11-20750*, should therefore be rejected. *See, e.g., United States v. Cianciulli*, 2002 WL 1484396 at *3 (S.D.N.Y. July 20, 2002).

*Werdiger*, 10-cr-00325 (S.D.N.Y., Indictment filed April 13, 2010, at ¶ 7c) ("Among the means by which UBS assisted certain United States taxpayers who had accounts at UBS in concealing the existence of UBS accounts . . . from the IRS, [was] . . . *[f]ailing to send* to the United States account statements for the UBS accounts of United States taxpayers . . ." (emphasis added)); *United States v. Sternfeld*, 10-cr-00328 (S.D.N.Y., Indictment filed April 13, 2010, at ¶ 7c) (same); *United States v. Vogliano*, 10-cr-00327 (S.D.N.Y., Indictment filed April 13, 2010, at ¶ 7e) ("At the time the account was opened, Swiss Financial Advisor A . . . instructed UBS to send all mail relating to the account to Swiss Financial Advisor A's business address in Zurich.").

Indeed, *both* of the indictments attached to the Levy Dec. *in this very case* contain similar allegations. *See* Exh. G, *United States v. Wegelin & Co. et al.*, S1 12 Cr. 02 (S.D.N.Y., Indictment filed Feb. 2, 2012 at ¶ 16.d) ("Wegelin . . . ensured that account statements and related documents were not mailed to their U.S. taxpayer-clients in the United States"); Exh. H, *United States v. Singenberger*, 11 Crim. 620 (S.D.N.Y., Indictment, filing date unknown, at ¶ 22.h.) ("Singenberger and his co-conspirators arranged for account statements for the undeclared accounts of U.S. taxpayers not to be sent to the U.S. taxpayer in the United States"). It is the government's argument that is, therefore, "utterly meritless" (Gov't Memo at p. 18), as proven by its own allegations in numerous cases -- allegations that over and over again assert that it was *not* customary for foreign bank account records to be maintained by the United States accountholders in the ordinary course of their affairs.

For the above reasons, the Court should hold that the records sought by the Subpoenas are not ones that are customarily kept by individuals regulated by 31 C.F.R. 1010.420, and that the second prong of the *Grosso* test is not met here.

### 3.   The Records Required To Be Maintained By 31 C.F.R. § 1010.420 Lack "Public Aspects"

Finally, under the third prong of the *Grosso* test, in order for the required records exception to apply, the records at issue must also have "public aspects." *See Grosso*, 390 U.S. at

67-68.   The argument advanced by the government – that records of an unreported secret offshore bank account become public records simply by virtue of a regulation requiring that they be kept (Gov't Memo at p. 18) – attempts to turn a three-prong test into a two-prong one.   The cases cited by the government contain little or no analysis.   Much more apposite is the Supreme Court's language in *Marchetti* specifically rejecting an argument that merely because a statute requires that records be kept, the records are thereby rendered "public"; if this were so "the constitutional privilege could be entirely abrogated by any Act of Congress." 390 U.S. at 57.[17]

Moreover, as Justice Frankfurter explained, "[i]f records merely because required to be kept by law *ipso facto* become public records, we are indeed living in glass houses. Virtually every major public law enactment – to say nothing of State and local legislation – has record-keeping provisions." *Shapiro*, 335 U.S. at 50 (Frankfurter, J., dissenting). *See also In re Doe*, 711 F.2d at 1198 (Friendly, J. dissenting) ("[i]t may be assumed at the outset that there are limits which the Government cannot constitutionally exceed in requiring the keeping of records which may be inspected by an administrative agency and may be used in prosecuting statutory violations committed by the record-keeper himself"); *id.* at 1191 (majority op.) (agreeing with Judge Friendly).   The government's suggestion that it has met the third prong of the *Grosso* test if it merely has shown that the statutory scheme is essentially regulatory (which it has failed to do, in any event, as demonstrated, *ante*), must therefore be rejected.   A full, separate analysis of this prong of the *Grosso* test is required.

Under this analysis, courts have found that records acquire "public aspects" in three, somewhat-overlapping ways:  (1) when the records further a regulatory scheme which is

_____

[17]And, in *United States v. Silverman*, 449 F.2d 1341, 1345 (2d Cir. 1971), cited by the government, the court was careful to note that the records at issue – attorneys' retainer agreements and closing statements in contingent fee cases -- unlike the foreign bank records here, "have no relevance to the revelation of criminal conduct."

essential in order to protect sectors of the public or to promote the public welfare, *see, e.g., In re Doe*, 711 F.2d at 1291 (requirement that physicians maintain prescription records and forward copies to the state was part of a comprehensive regime designed to regulate dissemination of dangerous drugs, rendering those prescription records "public"); *In re: Two Grand Jury Subpoenas Duces Tecum Dated August 21, 1985*, 793 F.2d 69, 73 (2d Cir. 1986) (requirement that attorneys file contingency fee arrangements with the New York Office of Court Administration was part of a regime designed to regulate the attorney-client relationship and the records therefore were "sufficiently 'public'"); (2) when the records are otherwise vital to the proper functioning of an essentially regulatory regime promulgated in response to emergency or other exigent conditions, *see, e.g., Shapiro*, 335 at 17-18 (records that were contemplated by Congress as a necessary wartime device and a condition for commercial operation under emergency price control regulations had sufficient "public aspects" (*see* discussion at pp. 6-8, *ante*)); *Rajah v. Mukasey*, 544 F.3d at 442, 433 n.3 (immigration documents such as passports and Forms I-94 fell within the required records exception as being essential to enforcement of immigration laws promulgated after 2001 terrorist attacks to ensure proper immigration status of immigrants from specified countries, such as, for example, Iran, Iraq, Libya and Sudan);[18] or (3) when the records are routinely forwarded to a regulatory or licensing body, *see In re Doe*, 711 F.2d at 1291-92 (requirement that physicians forward copies of prescription records to New York State imbued those records with public aspects; and a Form W-2 had public aspects because of the requirement that it be filed with an individual's tax returns); *but cf. Smith v. Richert,* 35 F.3d 300, 304 (7th Cir. 1994) (Forms W-2 are protected by the act of production privilege unless they are required to be kept as part of a business operation).

---

[18]And when an individual voluntarily entering into the scheme may, unlike the Respondents here, be held to have waived his or her Fifth Amendment rights *in advance*. *See* Point II, *post.*

An individual's personal bank records fall under none of these categories and do *not* possess sufficient public aspects to satisfy the required records exception. The bank records required to be maintained by 31 C.F.R. § 1010.420 do not further a regulatory scheme that protects the public's welfare; they are not otherwise vital to the functioning of an emergent pervasive civil regulatory scheme (and the government has made no showing that they are); and they are not routinely disclosed to regulatory authorities.

In *United States v. Porter*, 711 F.2d at 1405, a taxpayer who was a sole proprietor of a business appealed an order requiring the production of his bank records, including cancelled checks and bank deposit slips, in response to an IRS summons. The court rejected the government's argument that, based on 26 U.S.C. § 6001, the required records exception negated the taxpayer's act of production privilege. 26 U.S.C. § 6001 requires taxpayers to "keep such records . . . as the [IRS] may from time to time prescribe," and the IRS has, pursuant to this authority, mandated that taxpayers "keep such permanent books of account or records, including inventories, as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax or information." 26 C.F.R. § 1.6001-1(a). The *Porter* court *nevertheless* held that 26 U.S.C. § 6001 cannot overcome the taxpayer's constitutional act of production privilege. *Cf. United States v. Cianciulli*, 2002 WL 1484396 at *3 (S.D.N.Y. July 10, 2002) (required records exception does not apply to books, records and other documents that are not tax returns or W-2 statements).[19]

---

[19] The court in *Smith v. Richert*, 35 F.3d at 303, cited by the government, also specifically distinguished the situation in *Shapiro* from that of a taxpayer: "A statute that merely requires a taxpayer to maintain records necessary to determine his liability for personal income tax is not within the scope of the required-records doctrine." Indeed, *Smith* held that *even* Forms W-2 and 1099 may fall within the act of production privilege where, like the foreign bank account records here, they are not required to be kept as part of a business operation. *Id.* at 304.

In distinguishing *Shapiro*, the *Porter* court pointed out that the petitioner in *Shapiro*, unlike a taxpayer, was "required to keep . . . records as an ongoing condition of operating his business under a comprehensive government regulatory scheme." *Id*. at 1405. The court reasoned that "[the] taxpayer-IRS relationship is, instead, a more limited one which creates an imperative for access to records only in rare cases . . . ," and hence that "the taxpayer's substantive activities are not positively 'regulated' by the IRS sufficient to create a *Shapiro*-type interest in unconditional access to those records." *Id*. The court went on to observe that:

> [T]he very nature of the limited taxpayer-government relationship is, we think, insufficient to imbue the taxpayer's cancelled checks and deposit slips with "public aspects" as required under *Shapiro*. Unlike the transaction records [in *Shapiro*] which the Emergency Price Control Act provided would be routinely available to the government as a condition of the business' operation, a sole proprietor's checks and bank transactions are inspected by revenue authorities only in the unusual situation of an audit. This rarely attempted access hardly transforms the gamut of an individual businessman's financial records into an extension of the public archives.

*Id. See also Cianciulli*, 2002 WL 1484396 at *3. Here, the relationship between the Financial Crimes Enforcement Network, FinCEN, and a taxpayer with a foreign bank account is, by analogy, nearly identical to the relationship between the IRS and a taxpayer with a domestic bank account. Both relationships are certainly much more limited than the relationship between the government and businesses operating under the pervasive wartime regulatory scheme at issue in *Shapiro*. *See also* text accompanying n.10, *ante*. Records required to be kept by the BSA thus do not have public aspects within the meaning of *Grosso*.[20]

------

[20] A finding that private bank records are public documents is also contradicted by the Right to Financial Privacy Act of 1978, 12 U.S.C. § 3401 *et seq*., under which the government is prohibited from having access to an individual's domestic bank records except by subpoena or search warrant. If by subpoena, the accountholder must be given an opportunity to contest the subpoena. 12 U.S.C. §§ 3402, 3405, 3407, 3408. Although the records at issue here are of

The Supreme Court held in *Marchetti* that the record-keeping provisions of a federal wagering statute did not cloak those records with "public aspects" in the *Shapiro* sense:

> The Government's anxiety to obtain information known to a private individual does not without more render that information public; if it did, no room would remain for the application of the constitutional privilege.  Nor does it stamp information with a public character that the Government has formalized its demands in the attire of a statute; if this alone were sufficient, the constitutional privilege could be entirely abrogated by any Act of Congress.

390 U.S. at 57.

*Marchetti* thus specifically rejected the government's claim here that requiring an individual to keep a record pursuant to any statutory scheme magically converts that record into a "public record."  If the government were correct, then the holdings in *Grosso* and following cases discussed herein, defining the limits of what confers "public aspects" on records, are meaningless; all those courts which grappled with the definition of "public record" were simply engaging in an empty exercise, for the government now posits that even documents that are typically private become public documents whenever they are required by law to be maintained. This simply cannot be so in light of *Grosso* and its progeny, which cases rightly treat the third prong of the *Grosso* test as requiring a separate and distinct analysis.  Under that analysis, as shown, private bank records are not public documents.

As demonstrated, none of the three prongs of the *Grosso* test has been met here. In order for the required records exception to apply, however, all three prongs must be satisified. The documents sought by the Subpoenas do not, therefore, fall within the required records exception to the Fifth Amendment act of production privilege.

---

foreign, not domestic, bank accounts, the Right to Financial Privacy Act represents a recognition by Congress that an individual's personal bank records are private, not public, records.

II.   **An Individual Who Engages In An Activity That Later Turns Out To Be Regulated By The Government Does Not *Ipso Facto* Waive The Fifth Amendment Privilege.**

The government mistakenly argues that, if an individual chooses to engage in activity that is, it turns out, regulated by the government, then he or she *necessarily* must be deemed to have waived his or her Fifth Amendment privilege as to the production of records required to be kept by government regulation (Gov't Memo pp. 10-11), citing *In re Underhill*, 781 F.2d at 70, and *Smith v. Richert*, 35 F.3d at 301-02.   *Underhill,* however, involved an automobile salesman who, by purposefully establishing or continuing to run a used car business under a regulatory scheme that required him to maintain odometer records, necessarily agreed ahead of time to maintain those records; the individual in *Underhill* made a knowing and voluntarily waiver of the act of production Fifth Amendment protections before submitting himself to the relevant record-keeping regulations.   "[I]f an individual *chooses* to begin or continue *to do business* in an area in which the government requires record keeping, he may be deemed to have waived any Fifth Amendment protection which would otherwise be present in the absence of the record keeping regulation."   *Underhill*, 781 F.2d at 70 (emphases added). And, the language from *Smith v. Richert* that the government cites was merely *dicta*, unrelated to the ultimate issue in that case, in which the court reasoned that a taxpayer *did not* voluntarily enter into a regulated field and thereby waive his Fifth Amendment rights despite the existence of the extensive tax code and tax regulations.   35 F.3d at 303.

The difference between *Underhill* and like cases, and foreign account cases, is the fact that individuals who open a foreign account do not *knowingly* choose to enter a regulated area.   It is highly likely that most people who opened a foreign account in the past were completely unaware of any U.S. recordkeeping rules when they made their initial deposit into the account; an accountholder likely only learned of those rules (if ever) if and when a knowledgeable accountant advised the accountholder about the rules when preparing the

accountholder's annual income tax return, *i.e.*, *after* the accountholder had already engaged in the regulated activity and thereby *unknowingly* entered a regulated area. *Compare Rajah v. Mukasey*, 544 F.3d at 442 (non-citizens who voluntarily *apply* to enter the United States under immigration laws and regulations thereby knowingly waive any right to refuse to produce passports or Forms I-94 in response to requests from immigration authorities). The reporting obligations associated with foreign accounts are triggered *after* an accountholder opens a foreign bank account – an FBAR and tax return may not be due for months after an account is opened.

Of course, Fifth Amendment rights may only be knowingly and intelligently waived. *Miranda v. Arizona*, 384 U.S. 436, 492 (1966). These fundamental rights cannot be *inadvertently* waived by engaging in conduct that one only learns after the fact requires one to keep records and provide information to the government.[21] In this case the government has made no showing whatsoever that Respondents knew of 31 C.F.R. § 1010.420's requirement that bank account information be maintained, or of the FBAR reporting requirement, at the time they allegedly entered the regulated activity, *cf.* n.13*, ante*, and therefore it has totally failed to show that Respondents made a *knowing* waiver of an essential constitutional right. This case would be much different if a foreign accountholder were required to obtain permission from the government before being allowed to open an offshore account; that would be the point at which

---

[21] In its recent decision adopting *In re M.H.*, the Seventh Circuit reasoned: "The voluntary choice to engage in an activity that imposes record-keeping requirements under a valid civil regulatory scheme carries consequences, perhaps the most significant of which, is the possibility that those records might have to be turned over upon demand, notwithstanding any Fifth Amendment privilege." *In re Special February 2011-1 Grand Jury Subpoena Dated September 12, 2011*, 691 F.3d at 909. Leaving aside the fact that the BSA is not, in essence, a "civil regulatory scheme," as demonstrated *ante*, the court was incorrect in determining that the witness in that case had made a *voluntary choice* to engage in an activity that imposed record-keeping requirements; there was no evidence that the witness knew of the BSA's requirements when he opened his foreign bank accounts, and thus no evidence that he voluntarily waived the Fifth Amendment's protections by doing so.

the Fifth Amendment could validly be waived.[22]  *Smith v. Richert* makes this distinction clear: "The hypothetical case in which every individual is required to maintain a record of everything he does that interests the government is remote from the case of the individual who enters upon a regulated activity *knowing* that the maintenance of extensive records available for inspection by the regulatory agency is one of the conditions of engaging in that activity."  35 F.3d at 303. (emphasis added).  We are, unsurprisingly, aware of no case in which the government has made a showing that Swiss banks or other foreign financial institutions advised their United States clients of the BSA's record-keeping provisions when the clients opened their accounts (or thereafter for that matter); nor are we aware of any case in which the Government has made a showing that the target of a grand jury investigation suspected of opening a foreign account had any prior knowledge that extensive records pertaining to that account should be kept available for inspection, or that an FBAR should be filed.  Nevertheless, the government invites the Court blindly to find that simply opening a foreign bank account operated as an advance, knowing waiver of fundamental Fifth Amendment rights.  Such cannot be the case.

## CONCLUSION

The Subpoenas call for the production of records which are clearly within the Fifth Amendment's act of production privilege and which do not fall within the *narrow* required records exception to that constitutional privilege.  And, Respondents did not *knowingly* waive their Fifth Amendment act of production privilege simply by opening foreign bank accounts.

---

[22] As with, for example, those who knowingly obtain a license from the government under a regulatory scheme that requires them to keep the records at issue, *see Shapiro*, 390 U.S. at 14-15; *In re Kenny*, 715 F.2d 51, 53 (2d Cir. 1983), or those who knowingly seek permission to enter the United States under a regulatory scheme which requires them to produce passports or Forms I-94, *see Rajah v. Mukasey*, 544 F.3d 427 at 442.

31

In *Shapiro*, Justice Jackson warned that, if the required records doctrine were allowed to expand to "the limits of logic," the Fifth Amendment privilege would be eviscerated:

> The protection against compulsory self-incrimination, guaranteed by the Fifth Amendment, is nullified to whatever extent . . . that Congress may require a citizen to keep an account of his deeds and misdeeds and turn over or exhibit the record on demand of government inspectors, who can then use it to convict him. T[his] decision introduces a principle of considerable moment. Of course, it strips of protection only business men and their records; but we cannot too often remind ourselves of the tendency of such a principle, once approved, to expand itself in practice 'to the limits of its logic,' . . . . It would, no doubt, simplify enforcement of all criminal laws if each citizen were required to keep a diary that would show where he was at all times, with whom he was, and what he was up to. The decision of today, applying this rule . . . invites and facilitates that eventuality.

335 U.S. at 70-71 (Jackson, J., dissenting). To be sure, enforcing the Subpoenas in this case will result in something very similar to the "eventuality" that Justice Jackson feared, and will certainly signify the end of the Fifth Amendment privilege against self incrimination as applied to production of records; a decision enforcing the Subpoenas would simply obliterate the act of production privilege.

For all of the foregoing reasons, the government's motion should be denied.

Dated:  December 10, 2012

Respectfully submitted,

By: _____
Caroline Rule (CR-6503)
Robert S. Fink (RSF-7924)
Bryan C. Skarlatos (BCS-7814)
Juliet L. Fink (JF-5097)

KOSTELANETZ & FINK, LLP
7 World Trade Center, 34th Floor
New York, NY 10007
Tel:      (212) 808-8100
Fax:      (212) 808-8108
crule@kflaw.com
rfink@kflaw.com
bskarlatos@kflaw.com
jfink@kflaw.com

Counsel for Three Respondents