UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :

IN RE: VARIOUS GRAND JURY SUBPOENAS   :        12 Misc. 381 (WHP)

                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**GOVERNMENT'S MOTION**
**<u>FOR ADDITIONAL CONTEMPT SANCTIONS</u>**


                                     PREET BHARARA
                                     United States Attorney for the
                                     Southern District of New York


JARED LENOW
Assistant United States Attorney
        - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :

IN RE: VARIOUS GRAND JURY SUBPOENAS    :        12 Misc. 381 (WHP)

                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**GOVERNMENT'S MOTION**
**FOR ADDITIONAL CONTEMPT SANCTIONS**

The Government respectfully submits this motion for additional contempt sanctions due to the failure of a particular individual ("Subject E") to comply with this Court's 2013 order (the "Compulsion Order") compelling Subject E to comply with a 2010 grand jury subpoena ("Subpoena E") seeking records of foreign bank accounts, despite the Court holding Subject E in contempt in 2013 and imposing a sanction of a $1,000 fine per day until Subject E complied (the "Contempt Order").

In 2014, after the issuance of the Compulsion Order and Contempt Order and Subject E's withdrawal of her appeal of the Court's orders, Subject E produced just two documents, together comprising three pages, in response to Subpoena E. Counsel for Subject E informed the Government on multiple occasions that Subject E's production was complete. However, the Government's continued investigation has to date uncovered numerous additional documents, comprising hundreds of pages, from other sources, that fall within the scope of Subpoena E and should have been produced by Subject E long ago. These documents also make clear the existence of *even more* documents, which the Government has not yet been able to obtain through other sources, that should have been produced by Subject E in response to Subpoena E. Accordingly, the Government respectfully requests that the Court impose additional contempt

1

sanctions on the defendant, including increasing the contempt fine to $5,000 per day until she complies.

**I.**     **Factual and Legal Background**

    **A.**     **The Applicable Regulatory Regime**

Subject E is the target of an ongoing grand jury investigation being conducted by the Internal Revenue Service ("IRS") and the United States Attorney's Office for the Southern District of New York.  The grand jury seeks to determine, among other things, whether there exist bank accounts held in Switzerland or elsewhere overseas that Subject E failed to disclose to the IRS as required by the regulatory regime described below and, therefore, whether Subject E violated, among other statutes, 31 U.S.C. §§ 5314(a) and 5322(a), both of which are part of the Bank Secrecy Act of 1970 (the "BSA"), P.L. 91-508, 84 Stat. 1114, 31 U.S.C. §§ 5311 *et seq.*[1]

Section 5314(a) requires, among other things, that the Secretary of the Treasury promulgate regulations to require individuals to keep records regarding foreign bank accounts:

> Considering the need to avoid impeding or controlling the export or import of monetary instruments and the need to avoid burdening unreasonably a person making a transaction with a foreign financial agency, the Secretary of the Treasury shall require a resident or citizen of the United States or a person in, and doing business in, the United States, to keep records, file reports, or keep records and file reports, when the resident, citizen, or person makes a transaction or maintains a relation for any person with a foreign financial agency.

31 U.S.C. § 5314(a); *see also* 31 U.S.C. § 5312(a)(1-2) (defining "financial agency" and "financial institution").  Pursuant to this statutory directive, the Secretary of the Treasury has

_____

[1] A copy of all of the statutes and regulations cited in this motion were included in Appendix A to the Government's memorandum of law in support of its motion to compel.  *See* Docket Entry No. 14.

promulgated regulations that require individuals who have a specified relationship with an account maintained outside the United States to: (1) inform the Secretary of the Treasury of certain details concerning the account; and (2) maintain certain records concerning the account for a specified time period.

Specifically, as to the first requirement, the reporting requirement, 31 C.F.R. § 103.24, now codified at § 1010.350,[2] provides, in pertinent part, that:

> Each United States person having a financial interest in, or signature or other authority over, a bank, securities, or other financial account in a foreign country shall report such relationship to the Commissioner of Internal Revenue for each year in which such relationship exists and shall provide such information as shall be specified in a reporting form prescribed under 31 U.S.C. 5314 to be filed by such persons.  The form prescribed under section 5314 is the Report of Foreign Bank and Financial Accounts (TD-F 90-22.1), or any successor form.

31 C.F.R. § 1010.350(a).  The form prescribed for this reporting is commonly known as an FBAR.  A sample FBAR form was attached as Exhibit F to the Declaration of Daniel W. Levy ("Levy Decl."), filed in this matter on November 19, 2012 in support of the Government's motion to compel.  *See* Docket Entry No. 13.  The Treasury Department's regulatory regime provides for a specific timeframe in which FBARs are to be filed.  *See*, *e.g.*, 31 C.F.R. § 1010.306(c) (requiring FBAR to be filed "on or before June 30 of each calendar year with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year").

---

[2] Regulations concerning foreign bank accounts were recodified in March 2011.  A chart cross-referencing the original regulations with the newly codified regulations was included at the end of Appendix A to the Government's memorandum of law in support of its motion to compel. *See* Docket Entry No. 14.

As to the second requirement, the record-keeping requirement, 31 C.F.R. § 103.32, now codified at 31 C.F.R. § 1010.420, provides that:

> Records of accounts required by § 1010.350 [formerly codified at § 103.24] to be reported to the Commissioner of Internal Revenue shall be retained by each person having a financial interest in or signature or other authority over any such account.  Such records shall contain the name in which each such account is maintained, the number or other designation of such account, the name and address of the foreign bank or other person with whom such account is maintained, the type of such account, and the maximum value of each such account during the reporting period.  Such records shall be retained for a period of 5 years and shall be kept at all times available for inspection as authorized by law.  In the computation of the period of 5 years, there shall be disregarded any period beginning with a date on which the taxpayer is indicted or information instituted on account of the filing of a false or fraudulent Federal income tax return or failing to file a Federal income tax return, and ending with the date on which final disposition is made of the criminal proceeding.

31 C.F.R. § 1010.420.  Section 1010.430 specifies that "[a]ll records that are required to be retained by this chapter" "shall be filed or stored in such a way as to be accessible within a reasonable period of time, taking into consideration the nature of the record, and the amount of time expired since the record was made."  31 C.F.R. § 1010.430(d).

The types of relationship that a person must maintain with an overseas account in order to become subject to the reporting and record-keeping requirements are defined in 31 C.F.R. § 1010.350(e-f).  Specifically, that subsection defines a "financial interest" in an account and "signature or other authority" over an account, as described more fully below.

A failure to comply with the reporting requirement or the record-keeping requirement may be punishable civilly, criminally, or both.  *See*, *e.g.*, 31 C.F.R. § 1010.820(g) (providing for civil penalty); 31 U.S.C. § 5321 (same); 31 C.F.R. § 1010.840 (providing for criminal penalty);

4

31 U.S.C. § 5322 (same); *see also* 31 U.S.C. § 5321(d) (providing that "civil money penalty may be imposed under subsection [5321](a) with respect to any violation of this subchapter notwithstanding the fact that a criminal penalty is imposed with respect to the same violation."). Civil injunctive relief is also available "[w]hen the Secretary of the Treasury believes a person has violated, is violating, or will violate this subchapter or a regulation prescribed or order issued under this subchapter."  31 U.S.C. § 5320.

**B.       Subpoena E and the Subpoena E Foundation**

The grand jury investigation revealed preliminarily that Subject E had a financial interest in, or signature or other authority over, at least one foreign bank account.  As a result, Subpoena E was issued on October 4, 2010.

Subpoena E required Subject E to produce:

> Any and all records created, obtained, and or maintained from October 5, 2005, to the present that are in your care, custody, or control relating to any and all bank, securities, or other types of financial accounts in any foreign country in which you have a financial interest, beneficial ownership interest, or over which you have signature authority, if the aggregate value of these accounts exceeded $10,000 at any time during any calendar year, including but not limited to records required to be maintained pursuant to 31 C.F.R. § 103.32, namely, records reflecting the name in which each such account is maintained, the number or other designation of such account, the name and address of the foreign bank or other person with whom such account is maintained, the type of such account, and the maximum value of each such account during each calendar year, including but not limited to accounts held in the name of or for the benefit of:

> [Subject E]; and/or

> [a Specified] Stiftung, a/k/a "[a Specified] Foundation"

Levy Decl. Ex. E.

5

Subpoena E specified that accounts held in the name of, or for the benefit of, a particular "stiftung," or foundation (the "Subpoena E Foundation") were required to be produced. A stiftung is a legal entity akin to a trust and exists under the law of the Principality of Liechtenstein. Various investigations conducted by the Government revealed that many U.S. taxpayers caused these foundations to be created under the law of Liechtenstein in order to hide bank accounts in Switzerland. Typically, the stiftungs held the accounts at the Swiss banks and the U.S. taxpayers were the beneficiaries of the foundations. Typically, U.S. taxpayers who utilized stiftungs and other similar entities worked through financial and/or legal advisors to create the stiftungs and the financial advisors and/or legal advisors were appointed by the U.S. taxpayers to act on behalf of the stiftungs.

One of the financial advisors who was involved in using stiftungs to help U.S. taxpayers maintain secret Swiss bank accounts is Beda Singenberger ("Singenberger"). In approximately July 2011, a grand jury sitting in this District returned Indictment 11 Cr. 620 (LAK) (the "Singenberger Indictment") charging Singenberger with conspiring with U.S. taxpayers, among others, to defraud the IRS, evade taxes, and file false tax returns. A copy of the Singenberger Indictment was attached to the Levy Declaration as Exhibit H. Financial advisors such as Singenberger effected transactions in the Swiss bank accounts at the request of the U.S. taxpayers and provided cash to the U.S. taxpayers in the United States and elsewhere. The use of a stiftung and a financial advisor as an intermediary had the effect of insulating the U.S. taxpayers from the Swiss bank accounts and making detection of the account, and the income in the account, difficult for U.S. taxation authorities. The use of sham foundations and other entities (such as Liechtenstein-based "establishments") to hide Swiss bank accounts is described

in several paragraphs of the Singenberger Indictment.  *See* Levy Decl. Ex. H at ¶¶ 4, 14-20, 22, 31-32, 45-46, 53-55, 74-77.  Information obtained in the course of the investigation led the Government to believe that Subject E used the services of Singenberger to create the Subpoena E Foundation and, as a result, the IRS directed Subpoena E to Subject E.

Confirming the accuracy of the information obtained in the course of the investigation concerning Subject E, following the issuance of Subpoena E, Subject E filed a 2010 tax return indicating, in substance and in part, that she received total distributions of $49,267 from the Subject E Foundation over the years 2006, 2007, 2008, and 2008.  Subject E's 2010 tax return further indicated that those distributions were received in cash and that the Subject Foundation had been in existence for four years.  Singenberger's providing cash to his U.S. taxpayer clients was typical of the manner in which he helped them maintain secret bank accounts in Switzerland. *See*, *e.g.*, Levy Decl. Exh. H at ¶¶ 22(i-j), 70.

The regulatory regime created by the Treasury Department contemplated that there would be those who used sham entities and financial intermediaries to avoid the reporting and record-keeping requirements.  As noted above, Subpoena E sought information about accounts in which Subject E had a "financial interest" or over which Subject E had "signature or other authority." Levy Decl. Ex. E.  The definition of "financial interest" embraces standard concepts such as the owner of record or legal title to the account.  *See* 31 C.F.R. § 1030.350(e)(1).  The definition of "financial interest" also contained what it terms an "anti-avoidance rule," which provides that:

> A United States person that causes an entity, including but not
> limited to a corporation, partnership, or trust, to be created for a
> purpose of evading this section shall have a financial interest in
> any bank, securities, or other financial account in a foreign country
> for which the entity is the owner of record or holder of legal title.

31 C.F.R. § 1030.350(e)(3).  As a result of these definitions, Subpoena E sought records of accounts maintained in the name of the Subpoena E Foundation.  Similarly, contemplating the possibility that  Subject E might share authority over an offshore bank account with a financial advisor, Subpoena E sought records of accounts even where Subject E had only some authority, or shared authority, to control the disposition of funds in the accounts.  *See* 31 C.F.R. § 1030.350(f) ("Signature or other authority means the authority of an individual (*alone or in conjunction with another*) to control the disposition of money, funds or other assets held in a financial account by direct communication (whether in writing or otherwise) to the person with whom the financial account is maintained") (emphasis added).[3]

### C.    The 2013 Compulsion and Contempt Orders

Initially, Subject E did not produce any records in response or file a motion to quash Subpoena.  Instead, counsel for Subject E responded, in substance and in part, by asserting that Subject E intended to assert Subject E's Fifth Amendment privilege.

On November 19, 2012, the Government moved to compel compliance with Subpoena E on the ground that Subject E had no Fifth Amendment right to withhold the records called for by Subpoena E.

On February 19, 2013, this Court issued the Compulsion Order, compelling Subject E to comply with the Subpoena.  Docket Entry No. 9.

On April 23, 2013, based on a stipulation entered into by Subject E and other facts in the record, this Court issued the Contempt Order, holding Subject E in civil contempt for failing to comply with the Subpoena and sanctioning Subject E with a $1,000 fine per day until Subject E

---

[3] Subpoena E also sought additional documents that Subject E refused to produce.  The Government does not seek contempt sanctions for failure to produce these additional items.

complied.  Docket Entry No. 12 at pgs. 3-4.[4]  This Court's contempt order found, among other things, that "[o]ther than [Subject E's] claimed Fifth Amendment privilege, [Subject E] has no other valid basis for failing to comply with the February 19, 2013, Memorandum and Order and the direction that [Subject E] produce documents responsive to the Subpoena[]."  *Id.* at 3.

### D.    Subject E's "Complete Production of Records" In 2014

On March 28, 2014, counsel for Subject E sent a letter to the Government, attached as Exhibit AA to the accompanying Declaration of Jared Lenow ("Lenow Decl."), stating that the letter was enclosing documents responsive to Subpoena E.[5]  That letter stated that "in making this response, respondent does not concede that the referenced provisions of Title 31 of the C.F.R. encompass any account in any foreign financial institution connected to her, directly or indirectly, or in any form or fashion" but that Subject E "do[es] not assert the non-applicability of those regulations" or "any attorney-client or other privilege" as a basis to withhold responsive records.  *Id.* at 2.  Subject E's March 28, 2014 production consisted solely of two emails from 2008 and 2010 from representatives of a foreign bank ("Foreign Bank A") to Subject E, which together total three pages.  A draft translation of those documents is attached as Exhibit AA-T to the Lenow Decl.

On October 2, 2014, the Government wrote a letter to counsel for Subject E to confirm that Subject E had produced all records in her care, custody, or control that were responsive to Subpoena E.  Lenow Decl. Ex. BB.  On October 9, 2014, counsel for Subject E reiterated by

---

[4] Although that sanction was stayed until ten days after the resolution of Subject E's appeal of this Court's orders, that appeal was withdrawn as of March 21, 2014.  Case No. 13-1794 (2d Cir. 2013).

[5] The Lenow Declaration and accompanying exhibits are filed under seal in light of the fact that they contain and reference sensitive personal information, including tax and bank records and personal identifying information.

letter that Subject E's March 28, 2014 production of records constituted Subject E's complete

production.  Lenow Decl. Ex. CC.  Specifically, counsel for Subject E stated, in relevant part:

> I can only reiterate what was implicit in my letter to [AUSA]
> Cowley and what was explicitly stated by me in our telephone call:
> the March 28th production is my client's complete production of
> records required by the subpoena to be produced, once the
> subpoena's verbiage is conformed to that found in Section
> 1010.420.
>
> To the extent that page three of your letter further seeks a kind of
> interrogatory-like answer or attorney gloss, I respectfully decline
> to provide it, and one is of course not compelled by the subpoena.
> Contextual understanding and discussion may have its time and
> place here, but given the Fifth Amendment minefield in this
> subpoena area, and the very narrow pathway which the Second
> Circuit has provided to the Government and attorneys to traverse
> it, it would be especially imprudent to venture gratuitously further
> in regard to the subpoena.
>
> Finally, your letter refers to seeking relief from a court in regard to
> this matter. You, of course, are best positioned to determine the
> Government's interests, but I have a hard time envisioning what
> different outcome such an application might be thought to achieve.
> I have experience on both sides of the courtroom with a court
> compelling a document production in the absence of any
> production, but am unfamiliar with any case in which a court took
> up the task of assessing the completeness of a production which
> was in fact made, particularly in such a Fifth Amendment-bounded
> area.

*Id.*

### E.    The Receipt of New Documents From Liechtenstein

In or about December 2015, the Government obtained a number of documents from

Liechtenstein relating to the investigation into Subject E (the "Liechtenstein Documents"),

selections of which are attached to the Lenow Declaration as Ex. DD.  As described below, these

documents demonstrate that Subject E held foreign bank accounts with millions of dollars in

assets through a sham foreign entity, the Subpoena E Foundation, during the time period covered by Subpoena E.  None of these documents, or any other documents relating to those foreign accounts, were produced by Subject E.

The Liechtenstein Documents include documents relating to Subject E's formation of the Subpoena E Foundation, including documents signed by Subject E providing as follows, in substance and in part:

    a.    The Subpoena E Foundation was to be set up as a foundation under the laws of Liechtenstein.

    b.    The members of the Subpoena E Foundation's board of directors would be "Beda A. Singenburger, Zurich" and another individual ("Board Member 1"), and the entity "Allgemeine Repraesentationsanstalt" was to be appointed as a representative of the Subpoena E Foundation.

    c.    The board of directors was to open a bank account with Credit Suisse, in Zurich, for the purpose of holding foundation assets.

    d.    The Subpoena E Foundation's assets were to consist of an inheritance of $4.2 million from Subject E's father.

    e.    Subject E was "personally . . . entitled to the assets to be brought into [Subpoena E Foundation]" and that she "was not act[ing] in trust for third parties."

    f.    Subject E was the beneficial owner of the Subpoena E Foundation.

    g.    The Subpoena E Foundation was established for "Assets Management" and "Estate Planning" purposes.

Ex. DD at 15.  A copy of Subject E's U.S. Passport was included along with these formation

11

documents.  *Id.* at 16.

The Liechtenstein Documents also include by-laws for the Subpoena E Foundation issued on February 6, 2006.  Those by-laws stated, in substance and in part, that the sole beneficiary of all assets of the Subpoena E Foundation was Subject E; the beneficiaries of the Subpoena E Foundation following Subject E's death would be her two children (together, the "Subject E Children"); and that during Subject E's lifetime "all claims to the assets of the Foundation and on earnings derived therefrom shall be exclusively hers to the extent that she is entitled wholly or partially to dispose of her entitlement by means of informal written instructions."  *Id.* at 10-12.

In or about June 2006, Subject E and her spouse (the "Spouse") separated, and a contentious divorce proceeding ensued during which Subject E, as she has done in the instant investigation, falsely denied having any control over a Credit Suisse account containing significant assets from Subject E's deceased father.[6]  The Liechtenstein Documents demonstrate that Subject E took steps to further hide and protect her significant hidden overseas assets in the wake of the separation.  Specifically, one document shows that on May 15, 2007, the Subpoena

---

[6] On or about March 18, 2008, Subject E testified in a deposition in New York, New York in connection with her pending divorce.  During that deposition, Subject E made statements about her knowledge of and control over foreign accounts containing assets from Subject E's deceased father that, based on the information contained in the Liechtenstein Documents, were false and deliberately misleading.  Subject E stated in the deposition, in substance and in part, that in the late 1990s Subject E provided her father with the contact information of a Credit Suisse banker in Switzerland, and that Subject E's father thereafter established an account with Credit Suisse for the purpose of transferring money to the Subject E Children.  However, Subject E claimed, in substance and in part, that she did not know if the Credit Suisse account established by her father, who died in 2003, still existed; that only a Credit Suisse banker in Switzerland would have knowledge of the status of that account; and that Subject E did not know whether a trust was involved in managing the money that her father had placed in the account for the Subject E Children.  Nonetheless, Subject E asserted that she believed Credit Suisse would ensure that the Subject E Children would be given the money from that account when it was due to them.  Lenow Decl. Ex. EE at Tr. 158-163, 168-172

E Foundation changed the listed beneficial owners of the deposits held by the Subpoena E

Foundation at Credit Suisse to the Subject E Children.  *Id.* at 7.

However, despite this nominal change in the listed account beneficiary, the Liechtenstein

Documents show that Subject E continued to functionally control and benefit from accounts held

by the Subpoena E Foundation.  For example, in 2009 and 2010, Singenberger issued written

directives on behalf of the Subpoena E Foundation for the payment of funds to Subject E,

including the following:

| Date | Payment Amount |
|---|---|
| July 16, 2009 | €9,500 |
| August 4, 2009 | €9,200 |
| October 2, 2009 | €8,900 |
| January 18, 2010 | €8,900 |
| February 15, 2010 | €8,900 |
| April 15, 2010 | €8,900 |

*Id.* at 69-73, 75.  On or about December 8, 2011, *after* she had been served with Subpoena E,

Subject E filed an IRS Form 3520: Annual Return To Report Transactions with Foreign Trusts

and Receipt of Certain Foreign Gifts, for the tax year 2010, in which Subject E reported

receiving four cash distributions from the Subpoena E Foundation for the 2010 tax year,

including the following:

| Date | Payment Amount |
|---|---|
| January 1, 2010 | $12,792 |
| February 15, 2010 | $12,135 |
| March 15, 2010 | $12,257 |
| April 16, 2010 | $12,083 |

Lenow Decl. Ex. FF at 4.  Subject E did not list any such distributions in her tax filings for the

2009 tax year.

According to the Liechtenstein Documents, the value of the Credit Suisse account held by

13

the Subpoena E Foundation on December 31, 2008 was approximately $3,548,380; the value of

an account held by the Subpoena E Foundation at another foreign bank was approximately

$3,432,742.08 on December 31, 2009; and the value of an account held by the Subpoena E

Foundation at yet another foreign bank was approximately $3,151,961.37 on May 31, 2010.

Lenow Decl. Ex. DD at 94, 165, 178.

  The Liechtenstein Documents show that in June 2010 the Subpoena E Entity was re-

domiciled from Liechtenstein to the Republic of Panama. *Id.* at 41-56, 65. Further, on or about

November 5, 2012, Beda Singenberger provided a foreign bank with paperwork relating to the

opening of an account to be held by a "Stiftung" entity in Panama, with the settler of the entity

being Subject E, and the beneficiaries of the entity being the Subject E Children. *Id.* at 8-9.

  **F.**  **Subject E's Continued Refusal to Produce Responsive Documents**

  On June 1, 2016, the Government sent a letter to counsel for Subject E to clarify what

actions Subject E and her counsel had taken to respond to Subpoena E, and noting that Subject E

was obligated not only to produce any responsive documents that she had in her physical

possession, but also to produce any responsive documents that she had the legal authority to

obtain from any other person or entity, including foreign banks. Lenow Decl. Ex. GG at 1.

  On June 8, 2016, counsel for Subject E responded by letter that Subject E's March 28,

2014 production of records "was compliant to" Subpoena E because "those were the only

Section 1010.420 records able to be produced following a good faith and diligent effort." Lenow

Decl. Ex. HH at 3. Counsel for Subject E refused to state what steps had been taken to obtain

responsive records on the ground that counsel was "unaware of any authority . . . compelling the

provision of such a narrative to the Government." *Id.* Nonetheless, counsel for Subject E

14

asserted that "a request will be made to [Foreign Bank A] in France for the Required Records within the time period spanned by [Subpoena E], and responsive records thereby obtained will be produced." *Id.* at 4.  However, counsel for Subject E contended that the Government's assertions about Subject E's control of the Subject E Foundation and its accounts were "incorrect" and "inapt." *Id.*  Counsel for Subject E also accused the Government of "ignor[ing] the text of 31 C.F.R.§ 1010.350, which sets forth the associational interests which a United States person must have in a financial account in a foreign country in order even to trigger an FBAR filing requirement," but at the same time counsel Subject E failed to acknowledge or address in his letter the "anti-avoidance rule" set forth at 31 C.F.R. § 1030.350(e)(3), which, as noted above, provides that "[a] United States person that causes an entity, including but not limited to a corporation, partnership, or trust, to be created for a purpose of evading this section shall have a financial interest in any bank, securities, or other financial account in a foreign country for which the entity is the owner of record or holder of legal title."

## II.    Relevant Law

### A.    Sanctions for Civil Contempt

"In civil contempt cases, a court has discretion to fashion sanctions which are necessary to coerce compliance with its orders, and remedies which 'compensate complainant for losses sustained.'" *Local 28 of the Sheet Metal Workers' Int'l Ass'n* v. *EEOC*, 478 U.S. 421, 443 (1986) (quoting *United States* v. *Mine Workers*, 330 U.S. 258, 303-04 (1947)).[7]  A district court may

---

[7] Three elements are required to hold a party in civil contempt: (a) the order that the party failed to comply with must be clear and unambiguous; (b) the proof of noncompliance must be clear and convincing; and (c) the party must not have been reasonably diligent in attempting to comply. *See United States* v. *Local J804-I, International Longshoremen's Ass 'n, AFL-CIO*, 44 F.3d 1091, 1096 (2d Cir. 1995).  This Court has already made such a finding as to Subject E. Docket Entry No. 12

impose either confinement or a monetary fine as a sanction for civil contempt in order to coerce compliance with its orders.  *See In re Grand Jury Witness*, 835 F.2d 437, 443 (2d Cir. N.Y. 1987).

"When imposing coercive sanctions, a court should consider (1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the contemnor's financial resources and the consequent seriousness of the sanction's burden."  *New York State NOW* v. *Terry*, 886 F.2d 1339, 1353 (2d Cir. N.Y. 1989).  "The ultimate consideration is whether the coercive sanction . . . is reasonable in relation to the facts. That determination is left to the informed discretion of the district court."  *Id.*; *see also In re Grand Jury Witness*, 835 F.2d at 443 ("The imposition of coercive sanctions by way of fines is generally an area in which appellate courts  must rely heavily on the informed exercise of the district court's discretion.").

The imprisonment of an individual for civil contempt is governed by 28 U.S.C. § 1826(a), which provides as follows:

> Whenever a witness in any proceeding before or ancillary to any court or grand jury of the United States refuses without just cause shown to comply with an order of the court to testify or provide other information, including any book, paper, document, record, recording or other material, the court, upon such refusal, or when such refusal is duly brought to its attention, may summarily order his confinement at a suitable place until such time as the witness is willing to give such testimony or provide such information. No period of such confinement shall exceed the life of--
>     (1) the court proceeding, or
>     (2) the term of the grand jury including extensions, before which such refusal to comply with the court order occurred, but in no event shall such confinement exceed eighteen months.

Before a witness is imprisonment under Section 1826(a), the witness must receive notice

of the charge against them and the facts upon which it is based, and time to prepare a defense. *In re Kitchen*, 706 F.2d 1266, 1272 (2d Cir. N.Y. 1983). Such a witness also has the right to counsel, and the right to a public hearing to the extent compatible with the secrecy of grand jury proceedings. *Id.*; *see also In re Rosahn*, 671 F.2d 690, 697 (2d Cir. N.Y. 1982) ("[A] witness subjected to a § 1826 civil contempt proceeding is entitled to counsel, and is entitled to the procedural regularities prescribed by Rule 42(b) of the F.R.Cr.P. for criminal contemners, even though no parallel rule exists in the Federal Civil Rules." (internal citations omitted)). All of these protections do not necessarily apply in the case of a fine. *New York State NOW*, 886 F.2d at 1350 ("Absent the threat of imprisonment, these Constitutional due process protections generally are not required in a civil contempt proceeding."); *In re Grand Jury Witness*, 835 F.2d at 441 ("A witness charged with civil contempt, absent the imminent threat of confinement, is not entitled to 'every right available to a defendant in a criminal contempt proceeding.' . . . The reason is simply that those constitutional due process protections afforded a contemnor facing prison are not perceived to be necessary to the same degree to a civil contemnor not facing that prospect.").

**B.      The Obligation to Produce Documents in the "Control" of a Subpoena Recipient**

The concept of "care, custody, or control" is not limited to immediate physical control of the requested materials by the person to whom the subpoena is directed, but also the legal and practical ability to obtain the requested materials.

In *United States* v. *Stein*, 488 F. Supp. 2d 350 (S.D.N.Y. 2007), Judge Kaplan summarized the relevant case law concerning a subpoena recipient's obligation to produce responsive documents, and wrote that "[o]ne noted commentator aptly summarized the scope of

17

the obligation: 'Legal ownership of the requested documents or things is not determinative, nor is actual possession necessary if the party has control of the items.  Control has been defined to include "the legal right to obtain the documents requested upon demand."  The term "control" is broadly construed.'"  *Id.* at 361 (quoting Moore's Federal Practice § 34.14[2][b], at 34-63 to 34-64 (3d ed. 2006) (footnotes omitted), and also citing *Gerling Int'l Ins. Co. v. CIR*, 839 F.2d 131, 140 (3d Cir. 1988) (quoting 8 Charles Alan Wright and Arthur Miller, Federal Practice and Procedure § 2210) (control includes "the legal right to obtain the documents required on demand"); *In re Citric Acid Litig.*, 191 F.3d 1090, 1107-08 (9th Cir. 1999) (same); *Cochran Consulting, Inc.* v. *Uwatec USA, Inc.*, 102 F.3d 1224, 1229-30 (Fed. Cir. 1996) (same); *In re Bankers Trust Co.*, 61 F.3d 465, 469 (6th Cir. 1995) (same); *Chaveriat* v. *Williams Pipe Line Co.*, 11 F.3d 1420, 1426 (7th Cir. 1993) (same); *United States* v. *Int'l Union of Petroleum & Indus. Workers*, AFL-CIO, 870 F.2d 1450, 1452 (9th Cir. 1989) (same); *Searock* v. *Stripling*, 736 F.2d 650, 653 (11th Cir. 1984) ("Control is defined not only as possession, but as the legal right to obtain the documents requested upon demand."); *SEC* v. *Credit Bancorp, Ltd.*, 194 F.R.D. 469, 471 (S.D.N.Y. 2000) (control is "the legal right, authority, or practical ability to obtain the materials sought upon demand"); *Florentia Contracting Corp.* v. *Resolution Trust Corp.*, No. 92 Civ. 1188 (PKL), 1993 U.S. Dist. Lexis 5275, 1993 WL 127187, at *3 (S.D.N.Y. Apr. 22, 1993) (same)).

Judge Kaplan went on to note the diversity of circumstances in which an entity or individual not in physical possession of documents has nonetheless been held to have "control" of those documents for discovery purposes:

> These principles have been applied in a wide variety of situations.
> Parent corporations have been compelled to produce documents in
> the hands of subsidiaries, subsidiaries documents in the hands of

18

> their parent entities, corporations documents in the hands of
> employees, clients documents in the hands of attorneys, corporate
> officers and directors documents in the hands of their corporations,
> and patients documents in the hands of health care providers.

*Id.* at 361.

Other judges in this district have similarly held the concept of possession, custody, or control is not limited to immediate physical control of requested materials, but rather also includes the legal and practical ability to access the requested materials. *See, e.g.*, *In re Potanina*, 14 Misc. 31, 14 Misc. 57, 2015 U.S. Dist. Lexis 96340, at *4 (S.D.N.Y. June 30, 2015) (Preska, J.) ("[C]ontrol can be found where a party has the practical ability to acquire or access documents by (1) legal entitlement or (2) any other means."); *Wiwa* v. *Royal Dutch Petroleum Co.*, Nos. 96 Civ. 8386 (KMW) (HBP), 01 Civ. 1909 (KMW) (HBP), 02 Civ. 7618 (KMW) (HBP), 2009 U.S. Dist. Lexis 61898, 2009 WL 529224, at *2 (S.D.N.Y. Feb. 17, 2009) (K. Wood, J.) (for discovery purposes, "a party has control over documents held by a third party . . . if the party (1) is legally entitled, or (2) has the practical ability, to acquire the documents from the third party"); *S.E.C.* v. *Credit Bancorp, Ltd.*, 194 F.R.D. 469, 471 (S.D.N.Y. 2000) (Sweet, J.) ("'Control' has been construed broadly by the courts as the legal right, authority, or practical ability to obtain the materials sought upon demand"); *see also In re Grand Jury Subpoena Duces Tecum Dated May 29, 1987*, 834 F.2d 1128, 1133-34 (2d Cir. 1987) (in the context of responding to a subpoena, custody or control means that the subpoenaed person can "find" the document).

The Second Circuit, in its recent opinion upholding a contempt order against an individual for failing to produce foreign bank records required to be maintained under 31 C.F.R. § 1010.420, expressly contemplated the notion that an individual with a foreign bank account has

the ability to obtain records for that account upon demand:

> A bank account's beneficiary necessarily has access to such essential information as the bank's name, the maximum amount held in the account each year, and the account number. Common sense dictates that beneficiaries keep these records in part because they need the information to access their foreign bank accounts. The amount of money in the account is relevant to most foreign bank account holders in that many people are regularly forced to assess prospective purchases against the balance of their accounts. Most people check a bank account before making a major purchase; not everyone who holds a foreign bank account could, without a second thought, incur (for example) vast litigation costs in a feckless attempt to avoid paying lawfully-imposed taxes vital to the functioning of the United States without needing to assess whether losing such a challenge would leave them incapable of paying the inevitable hefty sanctions. And even if the account holder is a person of great wealth surely they want to know where that wealth is located. [And] [e]ven if we were to look at only the customs of criminal circles, if a criminal don't have this information, how can he retrieve his ill gotten gains? He must either possess a photographic memory or well-encrypted devices hidden in some offshore location.

*United States* v. *Doe (In re Grand Jury Subpoena Dated February 2, 2012)*, 741 F.3d 339, 350-51 & n.7 (2d Cir. 2013) (internal quotation marks and alterations omitted).

Indeed, in ruling that Subject E was obligated to produce documents in response to Subpoena E, this Court already considered and rejected the argument that a taxpayer can avoid providing foreign bank records in response to a subpoena by engineering a situation in which those records are physically held by another person or entity overseas: "it is . . . unacceptable for an American taxpayer to profit from American markets, refuse to report that profit as taxable income, and then claim he cannot be held accountable because he engineered his offshore account to be secret. This Court declines to credit such sophistry." *In re Various Grand Jury Subpoenas*, 924 F. Supp. 2d 549, 554 (S.D.N.Y. 2013).

**III.**     **Additional Sanctions Should Be Imposed On Subject E**

The record before the Court demonstrates that Subject E continues to flout the Compulsion Order, despite the $1,000 per day fine impose by the Contempt Order.  As a consequence, additional sanctions are necessary to coerce Subject E's compliance.

Under the applicable law, surveyed at length above, Subject E was obligated not only to produce any responsive documents that she had in her physical possession, but also to produce any responsive documents that she had the legal authority to obtain from any other person or entity, including foreign banks and foundations.  Subject E and her counsel brazenly disregarded this obligation.  Subject E, through her counsel, repeatedly asserted that she had fully complied with Subpoena E and the Court's order by producing two emails from 2008 and 2010.  Those emails failed to provide any account numbers or the value of any account, or any information about accounts at other banks.  *See* Lenow Dec. Ex. AA at 001-003.

When, in light of the minimal production from Subject E, the Government inquired whether Subject E was withholding responsive documents for any reason (so, if that was the case, the Government could seek further relief from the Court), defense counsel responded that he had "a hard time envisioning what different outcome such an application might be thought to achieve" because defense counsel was "unfamiliar with any case in which a court took up the task of assessing the completeness of a production which was in fact made . . . ."  Lenow Decl. Ex. CC at 2.

The Lichtenstein Documents now permit this Court to take up "the task of assessing the completeness of a production which was in fact made."  With these documents, the Government is able to demonstrate that Subject E has improperly withheld responsive documents from the

grand jury.  *Credit Bancorp, Ltd.*, 194 F.R.D. at 472 ("[T]he burden is on the party seeking

discovery to make a showing that the other party has control over the materials sought.").  The

Lichtenstein Documents show that Subject E held foreign bank accounts with millions of dollars

in assets through a sham foreign entity, the Subpoena E Foundation, and personally received

cash distributions from these foreign bank accounts, during the time period covered by Subpoena

E.  Accounts held in the name of the sham Subpoena E Foundation entity are unquestionably

those "in which [Subject E had] a financial interest, beneficial ownership interest, or over which

[Subject E had] signature authority," and therefore fell within the ambit of Subpoena E and the

Court's compulsion order.  And the Lichtenstein Documents make clear that Subject E

functionally controlled the Subpoena E Foundation from its inception through the issuance of the

subpoena, and thus had the legal authority to obtain the requested documents: Subject E

established the Subpoena E Foundation in 2006, arranged for named account beneficiaries to be

changed in 2007 to further shield her foreign assets during her divorce, made large cash

withdrawals from Subpoena E Foundation funds in 2009 and 2010, and was the settlor of a new

Subpoena E Foundation account in 2012.  In short, the Subject E Entity was part of Subject E's

long-running fraudulent scheme, executed with the assistance of Beda Singenberger and others,

to evade taxes and hide her assets.  Any assertion that Subject E does not have legal and practical

control over the Subject E Foundation is pure sophistry; Subject E set up the Subject E

Foundation *for the express purpose* of being able to make such disingenuous and fraudulent

claims.

        The Government's investigation to date has revealed that Subject E's willful violations of

the Court's order are not limited to failing to exercise her legal authority to obtain responsive

documents from others; Subject E also failed to provide responsive materials that she had within her immediate physical control.  The Government has obtained documents showing that, between 1995 and 2008, Subject E had signatory and power of attorney authorities over a Credit Suisse account held in the name of her Spouse, and that Subject E sent written directives to a Credit Suisse banker that listed, among other things, the amount of money to be transferred to yet *another* foreign account controlled by Subject E in France.  Lenow Decl. Ex. II at 1805, 1812, 1824, 1827, 1833, 1835, 1837, 1841.  For example, on December 27, 2006, Subject E directed a banker at Credit Suisse by letter faxed from a location in New York, New York to wire €9,800 from a Credit Suisse account to another account.  In the letter, Subject E referred to the Credit Suisse account from which the funds were to be transferred as "our joint account."  *Id.* at 1837. The Government has also obtained a copy of a letter sent by Subject E and her Spouse to Foreign Bank A, dated February 6, 2009, instructing that foreign bank to transfer ownership of their joint bank account (with the account number listed) to the sole possession of the Spouse.  Lenow Decl. Ex. JJ.  Subject E failed to produce any documents concerning any Credit Suisse accounts, and only limited information (and no account number or balance information) concerning an account with Foreign Bank A which the Government understands to be different from the joint account referenced in the February 6, 2009 letter discussed above.

Subject E's lack of good faith efforts to comply with Subpoena E is also demonstrated by the fact that on October 21, 2011 (approximately one year after being served with Subpoena E) Subject E arrived at John F. Kennedy International Airport ("JFK") in New York City on a flight from Paris, France, at which time U.S. Customs and Border Patrol found the following items in Subject E's possession, among other items:

- European currency with an approximate value of $9,700;

- a document written in French, dated October 20, 2011, and signed by Subject E, reflecting the closing of an account with Foreign Bank A, and listing the number for that account; and

- documents written in French from another foreign bank memorializing a wire transfer of €25,000 on or about October 20, 2011 from Subject E to an art gallery in Paris, France.

Lenow Dec. Ex. KK.  A draft translation of those French documents is attached as Exhibit KK-T to the Lenow Declaration.  One of the two emails produced by Subject E indicates that the closed account existed as early as 2008.  Lenow Dec. Ex. AA at 001.  The Foreign Bank A account closing document shows that Subject E had records reflecting the account number for a Foreign Bank A account she held during the time period covered by Subpoena E, yet did not produce those records, in direct, clear, and flagrant violation of the Court's orders.

In sum, Subject E has failed to heed this Court's warning in the Compulsion Order that "it is . . . unacceptable for an American taxpayer to profit from American markets, refuse to report that profit as taxable income, and then claim [s]he cannot be held accountable because [s]he engineered his offshore account to be secret.  This Court declines to credit such sophistry." *In re Various Grand Jury Subpoenas*, 924 F. Supp. 2d at 554.  As a consequence, the Government respectfully submits that an increase in the contempt sanction from $1,000 per day to $5,000 per day is appropriate.

## IV.   <u>**Conclusion**</u>

In light of Subject E's flagrant disregard of the Court's Compulsion Order, the

Government respectfully requests that the Court impose additional contempt sanctions on the

defendant, including increasing the contempt fine to $5,000 per day until she complies with that

order.

Dated:   New York, New York
            June 13, 2016

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

By: _____
        Jared Lenow
        Assistant United States Attorney
        Telephone: (212) 637-1068