UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
IN RE: VARIOUS GRAND JURY SUBPOENAS   :        12 Misc. 381 (WHP)

                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**GOVERNMENT'S REPLY**
**IN SUPPORT OF MOTION FOR ADDITIONAL CONTEMPT SANCTIONS**
<u>**AND MOTION FOR ORDER TO COMPEL COMPLIANCE**</u>


PREET BHARARA
United States Attorney for the
Southern District of New York


JARED LENOW
Assistant United States Attorney
       - Of Counsel -

Table of Contents

**I.   The Court Should Determine Whether Subject E Violated This Court's Order** ........... **2**

   A.   The Government Is Properly Continuing Its Grand Jury Investigation ......................... 2

   B.   The Potential for a Jury Trial on Related Facts Is Irrelevant ........................................ 4

   C.   The Ability to Obtain Records from Other Sources Is Irrelevant .................................. 5

**II.   Subject E Should Be Further Sanctioned for Violating This Court's Order** ................. **6**

   A.   "Control" Means the Legal and Practical Ability to Obtain Records ............................. 6

   B.   Subject E Withheld Responsive Documents Within Her Control .................................. 9

      i.   *Foreign Bank A Accounts Held in Subject E's Name* .................................... 9

      ii.   *Credit Suisse Account Over Which Subject E Had Power of Attorney* ..................... 10

      iii.   *Accounts Held by the Subject E Foundation* ................................................. 11

**III.   The Court Should Compel Compliance with the 2016 Subpoena** .................................. **15**

**IV.   Conclusion** ................................................................................................................. **15**

<u>Table of Authorities</u>

*Balt. City Dep't of Social Services* v. *Bouknight*, 493 U.S. 549 (1990)........................................ 8

*In re Grand Jury Subpoena Dated February 2, 2012*, 741 F.3d 339, 342 (2d Cir. 2013)............. 8

*Smith v. Doe*, 538 U.S. 84 (2003) ............................................................ 15

*United States v. Stein*, 488 F. Supp. 2d 350 (S.D.N.Y. 2007) ...................................................6-7

*United States v. Meregildo*, 876 F. Supp. 2d 445 (S.D.N.Y. 2012)........................................... 2

*United States v. Powell*, 85 S. Ct. 248 (1964)......................................................... 5

*United States* v. *R. Enters., Inc.*, 498 U.S. 292 (1991) ................................................. 5

*United States* v. *Salameh*, 152 F.3d 88 (2d Cir. 1998) ............................................. 2, 4

The Government respectfully submits this reply in support of its motion for additional contempt sanctions against Subject E.[1]  In her response brief, Subject E argues that this Court should not even reach the merits of the sanctions issue because, according to Subject E: (1) further use of the grand jury to investigate Subject E is improper; (2) further sanctioning Subject E for her lack of compliance would prejudice her "trial rights"; and (3) the Government obtained the withheld records from others sources, mooting the dispute.  Subject E also argues that, should the Court reach the merits of the sanctions dispute, Subject E did not violate the Compulsion Order because she did not withhold any responsive documents within her control.  Subject E's arguments are without merit, and should be rejected by the Court.

Subject E's arguments for why this Court should not even reach the merits of the sanctions dispute have no legal foundation; indeed, the case law in this District make clear that the Government's continuing grand jury investigation is completely proper, the possibility of a jury trial on related facts has no relevance to the sanctions matter before this Court, and the Government's ability to obtain some (but not all) of the requested documents from other sources is similarly irrelevant.  Subject E's arguments on the merits of the sanctions issue are also without foundation: the exhibits previously submitted by the Government, most of which Subject E does not substantively address in any particularity in her response, demonstrate by clear and convincing evidence that Subject E had "control" over the requested documents yet deliberately withheld them in violation of the Compulsion Order.

Further, the Government respectfully requests that the Court compel Subject E's compliance with a June 2, 2016 subpoena ("Subpoena E (2016)"), which is attached to the

---

[1] This reply brief uses the same defined terms as the Government's opening brief.

August 29, 2016 Decl. of Alain Leibman as Ex. 11, and which is virtually identical to Subpoena

E with the exception that the former covers a different time period (June 3, 2011 through June 2,

2016).

**I.**      **The Court Should Determine Whether Subject E Violated This Court's Order**

      **A.**      **The Government Is Properly Continuing Its Grand Jury Investigation**

Subject E is but one target of an ongoing grand jury investigation into a continuing

conspiracy, involving numerous individuals, to defraud federal and state tax authorities.  Under

these circumstances, Subject E's argument that the grand jury investigating Subject E has

"concluded its business," Subject E's Response Brief ("Response") at 1, because the grand jury

has returned a two-count indictment against Subject E, is without foundation.  The continuing

post-indictment grand jury investigation of Subject E and other members of the conspiracy is

completely proper.

"The investigative power of a grand jury does not necessarily end with the return of an

indictment."  *United States v. Jones*, 129 F.3d 718, 723 (2d Cir. 1997).  "Post-indictment action

is permitted to identify or investigate other individuals involved in criminal schemes, or to

prepare superseding indictments against persons already charged."  *Id.* (internal quotations

omitted); *see also United States v. Meregildo*, 876 F. Supp. 2d 445, 449 (S.D.N.Y. 2012)

(Pauley, J.) (quoting *Jones*).  "A grand jury subpoena is presumed to have a proper purpose, and

the defendant bears the burden of showing that the grand jury has exceeded its legal powers."

*United States* v. *Salameh*, 152 F.3d 88, 109 (2d Cir. 1998).  "A defendant must present

'particularized proof' of an improper purpose to overcome the presumption of propriety of the

grand jury subpoena." *Id.*; *see also Meregildo*, 876 F. Supp. 2d at 449 (S.D.N.Y. 2012) (Pauley,

J.) ("[A]bsent some indicative sequence of events demonstrating an irregularity, a court has to take at face value the Government's word that the dominant purpose of the Grand Jury proceedings is proper.").

In this case, Subject E has been indicted under two federal statutes for specific time periods: (1) subscribing to a false and fraudulent U.S. individual income tax return for the 2009 tax year, in violation of 26 U.S.C. § 7206, and (2) obstructing and impeding the due administration of the internal revenue laws from 1989 through 2012, in violation of 26 U.S.C. § 7212(a).  Based on information obtained by the Government to date, there are a number of valid grounds for the continuing grand jury investigation of Subject E and her co-conspirators, including (a) continuing to investigate Subject E's violations of other federal statutes, including 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1349 (wire and mail fraud conspiracy), and 18 U.S.C. § 401 (criminal contempt), among other statutes; (b) continuing to investigate the involvement of other individuals who have not yet been indicted; and (c) continuing to investigate Subject E's violations of federal law from 2013 through the present under 26 U.S.C. §§ 7206 and 7212(a).

The argument that the Government's efforts to enforce Subpoena E are done solely for trial preparation purposes is undermined by a number of facts, including (1) Subpoena E was issued over five years before Subject E was indicted; (2) a trial has not even been scheduled for the charges in the Subject E Indictment; and (3) the broad scope of the continuing investigation. The sole fact that Subject E points to in support of her argument is that much of the conduct for which Subject E has been indicted is also directly relevant to the ongoing grand jury investigation.  Response at 29.  But there is nothing out of the ordinary or improper about that,

3

especially in complex, wide ranging investigations where the conduct covered by an initial indictment may be just the tip of the iceberg and continuing investigation may lead to superseding indictments under additional statutes, for additional time periods, and with additional co-defendants.  *See, e.g.*, *United States v. Meregildo*, 11 Cr. 576 (WHP) (sixteen superseding charging instruments filed).  Subject E has failed to present "particularized proof" of an improper purpose for the issuance of Subpoena E, and therefore cannot overcome the presumption of propriety.  *See Salameh*, 152 F.3d at 109.

### B.   The Potential for a Jury Trial on Related Facts Is Irrelevant

Subject E further asserts that this Court's determination of whether she deliberately violated the Compulsion Order would somehow "ruinously undermine [Subject E's] trial rights under the Fifth and Sixth Amendments…."  *See* Response at 31.  Plainly put, Subject E is concerned that being coerced to actually comply with Subpoena E would result in her producing incriminating documents that would be used against her at a future trial, as well as leading to additional charges by the grand jury. See *id.* at 16.  But Subject E fails to explain specifically how this would violate any cognizable legal right, and cites no cases in support of the notion that pending criminal charges are grounds in themselves to refuse to respond to a grand jury subpoena.  Subject E does cite the Fifth Amendment, but she already litigated and lost that argument. As Subject E acknowledges elsewhere in her response, she has no Fifth Amendment right to refuse to produce the requested documents.  Response at 4 n.1, 7.  As for the Sixth Amendment, the only other ground cited by Subject E, it is unclear what provision could conceivably even apply to these facts.  *See* U.S. Const., Amendment VI.

4

Any findings by this Court concerning Subject E's control of the Subject E Foundation are not binding on any jury.  Indeed, courts routinely and necessarily make preliminary findings on issues that may ultimately be put to a petit jury, such as pretrial determinations under the hearsay rule concerning whether a statement was made by a co-conspirator in furtherance of a conspiracy.  *See United States* v. *James*, 712 F.3d 79, 105 (2d Cir. 2013).  Subject E argues that the fruits of the continuing grand jury investigation may be used at trial against her, but that is true of *any* grand jury investigation into a target.  *See Jones*, 129 F.3d at 723.   The same potential for those fruits to be used against Subject E existed in 2010, when Subpoena E was issued, and in 2014, when she claimed to have complied with the subpoena.  Accordingly, Subject E's argument should be rejected.

### C.      The Ability to Obtain Records from Other Sources Is Irrelevant

Subject E also points to the fact that the Government was able to obtain some (but not all) of the requested records through alternate sources, despite Subject E's failure to comply, as a ground for not imposing sanctions.  *See* Response at 1.  Subject E fails to cite any case law holding that records may be withheld from the grand jury, or sanctions not imposed for such conduct, because some portion of those records were available from other sources or already possessed by the Government.  Subject E cites to case law concerning IRS summons, but that is a wholly inapposite analogy in light of the different rules governing such requests.  *Compare United States* v. *R. Enters., Inc.*, 498 U.S. 292, 301 (1991) (describing powers of the grand jury) *with United States v. Powell*, 85 S. Ct. 248, 255 (1964) (discussing limits on summons power). This argument is thus meritless as well.

**II.**     **Subject E Should Be Further Sanctioned for Violating This Court's Order**

Subject E argues that she did not violate the Compulsion Order because she "produced all responsive documents in her possession, custody, and control" in 2014.  Based on the law in this District defining what it means to "control" records for the purpose of subpoenas, and the factual record before the Court, Subject E's assertion of compliance is demonstrably false.

**A.**     **"Control" Means the Legal and Practical Ability to Obtain Records**

Subject E disputes the Government's assertion that she is obligated to produce responsive records that she has the legal and practical ability to obtain, and accuses the Government of advocating an "extra-legal . . . obligation asserted without support."  *See* Response at 20. Contrary to Subject E's claims, and as discussed in the Government's opening brief, the notion that a subpoena recipient is obligated to produce responsive records that she has the legal and practical ability to obtain is actually a judicially crafted rule that is widely accepted in this District, and has been applied across a number of cases by different judges.  *See* Sanctions Motion at 17-20 (citing decisions by Judges Preska, K. Wood, Kaplan, and Sweet).

The "legal and practical ability to obtain" principle is a common sense legal rule that prevents subpoena recipients from avoiding their obligations through physical or legal shell games in which the recipient does not physically hold records in their hands, office, or residence, but nonetheless has the ability to obtain the records should doing so serve the recipient's own purposes.  Under the rule, a subpoena recipient undoubtedly "controls" and must produce documents left in their lawyer's safe or their bank's vault for safekeeping, or documents kept by any other sort of business for the recipient.  *See United States v. Stein*, 488 F. Supp. 2d 350, 361 (S.D.N.Y. 2007).  The only difference between those common scenarios and the one in this case

is physical distance: Subject E has manufactured a situation in which a plane ticket rather than a

cab ride is necessary to retrieve the requested records.  *See* Lenow Dec. Ex. KK.

Subject E seeks to distinguish each of the cases cited by the Government on various

grounds, including that some of those cases concern civil subpoenas or Rule 16 criminal

subpoenas, rather than grand jury subpoenas, and none deal specifically with grand jury

subpoenas seeking records required to be maintained under the Bank Secrecy Act ("BSA").

Response at 22-25.  But those distinctions are meaningless, as the cited cases were based on

general principles of "control" in the context of document requests in federal proceedings.  Judge

Kaplan, in the *Stein* case, directly rejected the notion that the nature of the proceeding (criminal

or civil) mattered.  *Stein*, 488 F. Supp.2d at 361.

In any event, the distinctions that Subject E points to with respect to the type of subpoena

at issue actually cuts against her argument, since the scope of grand jury subpoena power is

much broader than that of civil subpoenas issued under Fed R. Civil P. 32 or criminal trial

subpoenas issued under Fed. R. Crim. P. 16.  *See United States* v. *R. Enters., Inc.*, 498 U.S. 292,

301 (1991) ("The function of the grand jury is to inquire into all information that might possibly

bear on its investigation until it has identified an offense or has satisfied itself that none has

occurred.").

The fact that none of the cases cited by the Government deals specifically with requests

for records required to be maintained under the BSA is a red herring, as the grand jury's wide-

ranging power to compel the production of documents is not derived from, and in fact pre-dated,

that statute.  Subject E fundamentally misframes the issue as being about whether the BSA

authorized Subpoena E's request.  *See, e.g.*, Response at 19 ("[T]he 2010 Subpoena and this

7

motion depend on a definition of "possession" which is not found in the governing statute or regulation.").  This argument confuses (1) the source of the grand jury's power to compel the production of documents here (which stems not from the BSA but from the grand jury's inherent power to investigate) with (2) one topic of the grand jury's investigation and the source of the exception to the Fifth Amendment privilege (the BSA).

While the BSA determines the scope of the privilege a subpoena recipient may assert, the BSA has nothing to say about the permissible scope of the subpoena request.  The BSA's implementing regulations require that individuals who voluntarily elect to maintain "a financial interest in or signature or other authority over" a foreign account must "retain[]" certain account records.  31 C.F.R. § 1010.420.  As a result, those individuals waive any Fifth Amendment act of production privilege with respect to those account records under the required records doctrine on the ground that "if a person conducts an activity in which record-keeping is required by statute or rule, he may be deemed to have waived his privilege with respect to the act of production . . . ." *See In re Grand Jury Subpoena Dated February 2, 2012*, 741 F.3d 339, 342 (2d Cir. 2013) (internal quotation marks omitted); *see also Balt. City Dep't of Social Services* v. *Bouknight*, 493 U.S. 549, 559 (U.S. 1990) (holding that by voluntarily engaging in a regulated activity, an individual had "accepted the incident obligation to permit inspection." (internal quotation marks and citations omitted)).  Thus, Subject E's voluntary decision to maintain authority over foreign bank accounts under the BSA's regulatory structure waives her right to resist on Fifth Amendment grounds the broad power of the grand jury to compel her to produce foreign account records.  Contrary to Subject E's claims, the BSA acts not as a limiting force on the grand jury's

subpoena power, but actually increases that grand jury's functional power to obtain documents by restricting the scope of a subpoena recipient's Fifth Amendment privilege.[2]

**B.      Subject E Withheld Responsive Documents Within Her Control**

Subject E's claim that once she "stipulated to dismissal of the Second Circuit appeal, she produced all responsive documents in her possession, custody, and control, with the assistance of counsel," (Response at 8), is demonstrably false with respect to both (1) accounts held in Subject E's own name or over which Subject E had power of attorney and (2) other accounts held through the sham Subpoena E Foundation.  The exhibits previously submitted by the Government, most of which Subject E does not even address with any particularity in her response, demonstrate by clear and convincing evidence that Subject E had "control" over the requested documents yet deliberately withheld them in violation of the Compulsion Order.

*i.      Foreign Bank A Accounts Held in Subject E's Name*

As discussed in the Government's motion, Subject E's purported complete production in response to Subpoena E (made on March 28, 2014) did not include any account numbers, any description of the type of any account, or the value of any account, Lenow Decl. Exhibit AA-T, information which must be maintained under the BSA and its regulations, *see* 31 C.F.R. § 1010.420.  Yet Subject E clearly had the legal and practical ability to obtain records containing that information, as demonstrated by Subject E's ability to obtain records for a Foreign Bank A

---

[2] Subject E also contends that the fact that the Government added the parenthetical "(or available to you upon request)" to the phrase "care, custody, or control" in a later subpoena is a concession that there was an "inherent lack of clarity," Response at 19, in Subpoena E.  But, as discussed above and in the Government's opening brief, the phrase "care, custody, and control," has long been interpreted in this District and around the country in a consistent way.  Subpoena E is unambiguous then and it is unambiguous now.  The fact that the Government added additional language to a subsequent Subpoena has no bearing on the plain meaning of Subpoena E.

account during a 2011 trip to Paris, Lenow Dec. Ex. KK,[3] and her 2009 letter (also signed by the Spouse) to Foreign Bank A instructing that bank to transfer ownership of their joint bank account (with the account number listed) to the sole possession of the Spouse.  Lenow Decl. Ex. JJ.

Subject E's failure to make good faith efforts to comply with Subpoena E with respect to her Foreign Bank A accounts is most clearly demonstrated by the steps she has taken in 2016 that she could and should have taken (but did not) in 2014.  On June 8, 2016—more than two years after Subject E's purported complete production in response to Subpoena E—counsel for Subject E informed the Government that "a request will be made to HSBC in France for the Required Records for the time period spanned by both [Subpoena E] and [Subpoena E (2016)], and responsive records thereby obtained will be produced."  Response at 10.  Despite Subject E's pro forma legal disclaimer after this statement that "no concession is thereby intended that [Subject E] either has the legal entitlement to, or practical ability to obtain, those records or that the March 2014 production was somehow incomplete," it is a concession nonetheless.  *Id.*

ii.   *Credit Suisse Account Over Which Subject E Had Power of Attorney*

As discussed in the Government's motion, Subject E had signatory and power of attorney authorities over a Credit Suisse account held in the name of the Spouse between 1995 and 2008, and sent written directives to Credit Suisse concerning funds in that account.  Lenow Decl. Ex. II at 1805, 1812, 1824, 1827, 1833, 1835, 1837, 1841.  In her response, Subject E emphasizes that the account was not in her name and reverted to the Spouse's exclusive ownership in 2008, Response at 11-12, but neither point changes the fact that Subject E had the requisite "authority" over this Credit Suisse account during a portion of the 2005 through 2010 time period covered by

---

[3] These records were seized, copied, and then returned to Subject E at JFK.

Subpoena E.  Based on her authority with respect to the account during the 2005 to 2008 portion

of the Subpoena E time period, Subject E could have obtained account records from Credit

Suisse for that time period following her receipt of Subpoena E.  But Subject E does not appear

to have even made a belated request for those documents, as she did with respect to Foreign

Bank A records.  At the very least, Subject E knew the name of the account holder, the name of

the bank, the type of account, and the approximate account value from 2005 to 2008, and could

have provided that information.

<em>iii.    Accounts Held by the Subject E Foundation</em>

Subject E asserts that "as to [the Subpoena E] Foundation, the Government fails to

demonstrate that Respondent has knowledge of the location of its bank account(s) or has the

requisite factual/legal relationship to any such account(s) to render her responsible for

maintaining the entity's related records."  Response at 15.  That claim is directly contradicted by

a single page in the Liechtenstein Documents, in particular a document signed by Subject E in

2006 directing the Liechtenstein entity Allgemeine Repraesentationsanstalt to establish the

Subpoena E Foundation (with board members to include Beda Singenberger and an associate) in

order to manage a $4.2 million inheritance from Subject E's father, with those funds to be

deposited in one or more bank accounts at Credit Suisse in Zurich, Switzerland (described in the

directive as "CS, Zurich").  Lenow Decl. Ex. DD at 15.  The Liechtenstein Documents further

confirm that the Credit Suisse account for the Subpoena E Foundation was in fact set up, as

directed by Subject E, and had a balance of $3,548,380 on December 31, 2008.  *Id.* at 178.

Those facts alone demonstrate that Subject E had a "a financial interest in or signature or other

authority over" a Credit Suisse account nominally held by the Subpoena E Foundation, yet

11

Subject E does not even address them in her response apart from stating in conclusory fashion that the Government has not met its burden.

Subject E contends that her disclosure of $49,267 in income in 2010 from the Subpoena E Foundation on tax forms after she received Subpoena E "does not establish, and does not require for its accuracy, *any understanding of where those funds originated*, nor imply *any control over the documents reflecting the monies' source*."  Response at 25 (emphasis added). The assertion that a person could receive nearly $50,000 without *any idea* where it came from or *any documents* reflecting the money's source is incredible and not worthy of belief.[4]

Subject E also argues that she did not have the necessary "financial interest in or signature or other authority" in any account held by the Subpoena E Foundation because the "anti-avoidance rule," set forth at 31 C.F.R. § 1010.350(e)(3), which further defines the term "financial interest," was not issued and made final until 2011, after Subpoena E was served. This argument fails because the 2011 amendments to the BSA regulations, of which the anti-avoidance rule was just a part, did not mark some sort of wholesale expansion or significant shift in the overall scope of those regulations.  Rather, the 2011 amendments were primarily clarifying regulations that defined certain terms such as "financial interest in or signature or other authority" that had not been specifically defined in the regulations for over 30 years.

---

[4] The Government is also prepared to present evidence, should the Court deem that helpful, from other U.S. taxpayers who used the same services provided by Beda Singenberger as Subject E, including information about the purpose and operation of foundations such as the Subpoena E foundation that were established and managed by Singenberger.  The Government anticipates that this evidence would show that Singenberger and his associates essentially operated as a one-stop-shop for U.S. taxpayers to establish foreign entities to hold Swiss bank accounts for the purpose of insulating those U.S. taxpayers from the Swiss bank accounts and making detection of the accounts, and the income in the accounts, difficult for U.S. taxation authorities.  The Government anticipates that this evidence would further show that those U.S. taxpayers maintained functional control and authority over accounts held by those foreign entities and were provided account documents upon request.

Between 1977 (when the relevant BSA implementing regulations were issued) and 2011, the meaning of "financial interest in or signature or other authority" was not specifically defined. *See* 31 C.F.R. §§ 1010.350, 1010.420 (previously issued at 31 C.F.R. §§ 103.24, 103.32). In 2011, numerous definitions were added to the regulations, including definitions for "bank account," "securities account," "other financial account," "foreign country," "financial interest," and "signature or other authority." *See* Amendment to Bank Secrecy Act Regulations -- Reports of Foreign Financial Accounts, Feb. 24, 2011, 76 Fed. Regis. 10234; *compare* 31 C.F.R. § 1010.350 (2011) *with* 31 C.F.R. § 103.24 (2010). A "financial interest" was given the following definition (with that definition including the anti-avoidance rule):

> **(e) Financial interest.** A financial interest in a bank, securities or other financial account in a foreign country means an interest described in this paragraph (e):
>
> > **(1) Owner of record or holder of legal title.** A United States person has a financial interest in each bank, securities or other financial account in a foreign country for which he is the owner of record or has legal title whether the account is maintained for his own benefit or for the benefit of others. If an account is maintained in the name of more than one person, each United States person in whose name the account is maintained has a financial interest in that account.
> >
> > **(2) Other financial interest.** A United States person has a financial interest in each bank, securities or other financial account in a foreign country for which the owner of record or holder of legal title is--
> >
> > > **(i)** A person acting as an agent, nominee, attorney or in some other capacity on behalf of the United States person with respect to the account;
> > >
> > > **(ii)** A corporation in which the United States person owns directly or indirectly more than 50 percent of the voting power or the total value of the shares, a partnership in which the United States person owns directly or indirectly more than 50 percent of the interest in profits or capital, or any other entity (other than an entity in paragraphs (e)(2)(iii) through (iv) of this section) in which the United States person owns directly or indirectly more than 50 percent of the voting power, total value of the equity interest or assets, or interest in profits;
> > >
> > > **(iii)** A trust, if the United States person is the trust grantor and has an ownership interest in the trust for United States Federal tax purposes. See 26 U.S.C. 671-679 and the regulations thereunder to determine if a grantor has an ownership interest in the trust for the year; or

13

>    **(iv)** A trust in which the United States person either has a present beneficial interest in more than 50 percent of the assets or from which such person receives more than 50 percent of the current income.
>
>    **(3) Anti-avoidance rule.** A United States person that causes an entity, including but not limited to a corporation, partnership, or trust, to be created for a purpose of evading this section shall have a financial interest in any bank, securities, or other financial account in a foreign country for which the entity is the owner of record or holder of legal title.

31 C.F.R. § 1010.350 (2011).

This was not a watershed change in the definition of "financial interest" in the regulations, but rather a clarifying amendment that set out common sense applications of a term that had been on the books for over thirty years.  For example, the fact that the new definition explicitly includes an individual who is the owner of record or holder of legal title obviously does not mean that such an individual was not covered by the term "financial interest" when it was not specifically defined.  Similarly, the fact that (1) Subject E instructed others to create the Subpoena E Foundation for the express purpose of holding her multi-million dollar inheritance, (2) Subject E was the entity's sole beneficiary "for the duration of her lifetime" at the time of its creation and was "entitled wholly or partially to dispose of her entitlement by means of informal written instructions," and (3) Subject E is the only person according to the Liechtenstein Documents and the Government's investigation to have received a distribution from a Subpoena E Foundation account, means that Subject E had a "financial interest" in the Subpoena E foundation even prior to the 2011 amendments to the BSA regulations.  Lenow Decl. Ex. DD at 10-11, 15, 69-73, 75, Ex. FF at 4.[5]

---

[5] Even assuming that Subject E is correct that the 2011 amendment expanded the scope of the term "financial interest," applying the anti-avoidance rule for the purposes of the regulatory record keeping rules of 31 C.F.R. § 1010.420 would not, as she claims, violate the *Ex Post Facto* Clause of the Constitution, because that record keeping rule does not itself alter the definition of a crime or increase the punishment for a criminal act.  *See Smith v. Doe*, 538 U.S. 84, 105-06 (2003) (holding that state sex offender registration act was non-punitive, and its retroactive application thus did not violate the *Ex Post Facto* Clause).  At most, the *Ex Post Facto* Clause would bar

14

III. **The Court Should Compel Compliance with the 2016 Subpoena**

Based on Subject E's response brief, it is clear that she does not intend to produce records for bank accounts held by the Subpoena E foundation in response to Subpoena E (2016). Therefore, for the same reasons discussed in the Government's sanctions motion and this brief, the Government respectfully requests that this Court order Subject E to comply with Subpoena E (2016), which would include Subject E directing Beda Singenberger and his company to provide her with the requested records for the Subpoena E Foundation.  Beda Singenberger and his company have complied with similar requests from other U.S. taxpayer clients.

IV. **Conclusion**

For the foregoing reasons, the Government respectfully requests that the Court impose additional contempt sanctions, and compel Subject E to respond to Subpoena E (2016).

Dated:   New York, New York
          September 12, 2016

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

By: _____

Jared Lenow
Assistant United States Attorney
Telephone: (212) 637-1068

---

application of the criminal enforcement provisions of the regulations of 31 C.F.R. § 1010.840, but not the regulatory record keeping rules of 31 C.F.R. § 1010.420, which Subject E would still be required to follow.

15