UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                        :
In re:                                  :      12 Misc. 381
                                        :
VARIOUS GRAND JURY SUBPOENAS            :      OPINION & ORDER
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

        The Government moves for additional contempt sanctions against Respondent

Subject E on grounds that she violated this Court's previous order compelling her compliance

with a 2010 grand jury subpoena seeking foreign bank account records pursuant to the Bank

Secrecy Act of 1970.  31 U.S.C. § 5311, et seq.  For the reasons that follow, the Government's

motion is granted in part and denied in part.

## FACTUAL BACKGROUND

    I.   The Compulsion Order and Contempt Order

        This miscellaneous proceeding stems from Subject E's refusal to comply with a

grand jury subpoena dated October 4, 2010 seeking "[a]ny and all records created, obtained, and

or maintained from October 5, 2005, to the present that are in [Subject E's] care, custody, or

control relating" to foreign bank accounts in which she maintained a financial interest (the "2010

Subpoena").  (Declaration of Daniel W. Levy Ex. E.)  Subject E asserted the act of production

privilege against self-incrimination under the Fifth Amendment as the basis for her refusal to

comply.

On February 19, 2013, this Court ordered Subject E and other accountholders to comply with their respective subpoenas (the "Compulsion Order").  See In re Various Grand Jury Subpoenas, 924 F. Supp. 2d 549 (S.D.N.Y. 2013).

The Compulsion Order directed Subject E to respond to a narrow set of demands under the 2010 Subpoena.  Consistent with the Bank Secrecy Act's record-keeping requirements, Subject E was directed to produce only "records [of bank accounts] reflecting the name in which each such account is maintained, the number or other designation of such account, the name and address of the foreign bank or other person with whom such account is maintained, the type of such account, and the maximum value of each such account during each calendar year."  31 C.F.R. § 1010.420.  Because producing these records would not invoke "independent communicative aspects" that risked self-incrimination under the Fifth Amendment, this Court held that Subject E could not resist compliance based on the act of production privilege.

Separately, to assure Subject E's compliance, this Court entered an order in April 2013 holding her in civil contempt and sanctioning her $1,000 per day until she complied (the "Contempt Order").  (See ECF No. 12.)

II.   Subject E's Production Under the 2010 Subpoena

On March 28, 2014, Subject E made a single production consisting of two documents totaling three pages.  (See Government's Motion for Additional Contempt Sanctions ("Mot.") at 9; Memorandum of Law of Subject E in Opposition to Government's Motion for Additional Contempt Sanctions ("Opp.") at 8.)  The two documents reflect communications between Subject E and HSBC France representatives.  (Declaration of Jared Lenow ("Lenow Decl.") Ex. AA.)  Subject E represented that her March 28 production constituted a "complete production of records required by the subpoena."  (Lenow Decl. Ex. CC.)  The Government

2

never pressed Subject E to pay any monetary sanctions under the Contempt Order.  (See Hearing Transcript dated Nov. 3, 2016 ("Tr.") at 5:20–21, 14:11.)

III.    The Liechtenstein Documents and Other Foreign Accounts

In December 2015, more than a year and a half after Subject E's production, the Government received documents from the Principality of Liechtenstein in connection with its ongoing investigation (the "Liechtenstein Documents").  The Liechtenstein Documents revealed that Subject E "held foreign bank accounts with millions of dollars in assets through a sham foreign entity, the [Subject E Foundation], during the time period covered by" the 2010 Subpoena.  (Mot. at 10–11.)

More specifically, after reviewing translations of the Liechtenstein Documents, the Government discovered that Subject E was identified as a beneficiary of the Subject E Foundation (the "Foundation"),[1] an allegedly sham foundation organized in Liechtenstein that maintained several foreign bank accounts and had, on several occasions, transferred tens of thousands of dollars directly to Subject E.  (Mot. at 13.)  The Government also unearthed documents signed by Subject E indicating that she was the "beneficial owner" of the Foundation (Lenow Decl. Ex. DD at 15), possessed all of its assets (Lenow Decl. Ex. DD at 10), and had authorized changes to the listed beneficiaries (Lenow Decl. Ex. DD at 7).  Finally, the Liechtenstein Documents provided information regarding several of the Foundation's foreign accounts, each of which held in excess of several million.  (Lenow Decl. Ex. DD at 94, 165, 178.)

---

[1]    The Foundation was organized as a "stiftung," a legal entity akin to a trust under the laws of Liechtenstein. Stiftungs have been used regularly by U.S. taxpayers to conceal bank accounts overseas.  Financial advisors and/or legal advisors are appointed and directed to act on behalf of the stiftungs for the benefit of the taxpayers.  (Mot. at 6.)  In essence, by holding bank accounts in its own name, the stiftung conceals any connection between taxpayers and their foreign assets.

While many of the Liechtenstein Documents were responsive to the 2010 Subpoena, Subject E had produced none of them. Based on the discrepancy between Subject E's bare production of three pages and the mass of materials comprising the Liechtenstein Documents, the Government concluded that she failed to comply with the 2010 Subpoena. Additionally, the Government contends that Subject E failed to produce records relating to other foreign accounts—records from a supposed joint account at Credit Suisse that Subject E shared with her former husband, and additional records from the previously referenced HSBC France account. (See Mot. at 23–24.)

Thereafter, in June 2016,[2] the Government moved for additional contempt sanctions and sought an order increasing the contempt fine to $5,000 per day. A day later, the Government also served a new subpoena on Subject E, seeking records maintained from June 3, 2011 to the present relating to accounts held in her name, or in the name of or benefit of the Foundation or her two children (the "June 2016 Subpoena"). (Declaration of Alain Leibman ("Leibman Decl.") Ex. 11.) Subject E has not made any productions in response to the June 2016 Subpoena.

About a month later, in July 2016, the Government indicted Subject E, charging her with (1) obstructing and impeding the due administration of the internal revenue laws (26 U.S.C. § 7212(a)), and (2) subscribing to a false and fraudulent U.S. individual income tax return

---

[2]      When asked why it took nearly seven months after receiving the Liechtenstein Documents and almost 20 months after Subject E's production to seek additional sanctions, the Government responded that it needed time to investigate its suspicion that Subject E had not fully complied with the 2010 Subpoena. According to the Government, the Liechtenstein Documents served as the primary means to corroborate that suspicion. (Tr. at 13:9–14:2 ("I think what I would say is after receiving the documents from Li[e]chtenstein in 2015, that's when we saw all the kind of data points together, and it was only with those documents that it was clear across the board that there had been a flagrant failure to comply. There were some data points that the government didn't know back then, but I don't think it was clear how willful the failure to comply was . . . it's only when we saw all these data points together and received these documents in December of 2015, the DOJ, main justice, and then early 2016 at my office . . . when we realized there was just a wholesale failure to comply with the Court's order.").)

(26 U.S.C. § 7206(1)).  The indictment asserts many of the same allegations that the Government advances in this contempt proceeding.  That criminal action is now pending before another judge in this District.  As of the date of this Opinion and Order, the parties are embroiled in several pretrial disputes.  No date has been fixed for jury selection and trial.

DISCUSSION

I.   <u>Standard</u>

In civil contempt cases, a court has discretion to fashion sanctions which are necessary to "coerce the [Respondent] into compliance with the court's order, and to compensate the complainant for losses sustained."  <u>Local 28 of the Sheet Metal Workers' Int'l Ass'n v. EEOC</u>, 478 U.S. 421, 443 (1986) (citation omitted).  In imposing monetary sanctions, courts should consider (1) the character and magnitude of the harm threatened by continued contempt; (2) the probable effectiveness of the proposed sanction; and (3) the financial consequence of the sanction on the contemnor.  <u>See</u> <u>United States v. United Mine Workers of America</u>, 330 U.S. 258, 304 (1947).  "The ultimate consideration is whether the coercive sanction . . . is reasonable in relation to the facts.  That determination is left to the informed discretion of the district court."  <u>New York State NOW v. Terry</u>, 886 F.2d 1339, 1353 (2d Cir. 1989).

II.   <u>Analysis</u>

The Government contends that Subject E violated the Compulsion Order because she willfully refused to obtain and produce any records relating to the Foundation's bank accounts, the HSBC France account, and the Credit Suisse account, among others.  Subject E counters, in essence, that she was required only to produce responsive records in her possession. She further argues that in view of the pending indictment against her, enforcement of the 2010 Subpoena at this time would improperly aid the Government in its trial preparation.

A.  <u>Care, Custody, or Control</u>

The primary issue underlying the dispute between the parties is whether Subject E was required to produce foreign bank account records that are not in her immediate physical possession.  The Government advances the argument that the phrase, "care, custody, or control" in the 2010 Subpoena requires Subject E to produce records that she has "the legal and practical ability to obtain" <u>or</u> are in her physical possession.  (Mot. at 17.)  Subject E construes her obligation narrowly, arguing that "[r]ecords which are not in [her] possession cannot be produced."  (Opp. at 8.)

"The phrase, 'possession, custody or control' has a venerable history in the federal rules of procedure."  <u>United States v. Stein</u>, 488 F. Supp. 2d 350, 360 (S.D.N.Y. 2007).  It first appeared in the relevant discovery provisions of the Federal Rules of Civil Procedure, and subsequently was incorporated into the Federal Rules of Criminal Procedure.  <u>Stein</u>, 488 F. Supp. 2d at 350–51.  "There is no hint in the history of these rules that the meaning of the phrase differs depending upon which rule is in question.  To the contrary, the phrase in each case defines in identical language the extent of the obligation of a party subject to a duty to produce evidence to respond."  <u>Stein</u>, 488 F. Supp. 2d at 351.  Therefore, although Subject E maintains that the phrase "care, custody, or control" is inapposite in the context of a criminal investigation involving violations of the Bank Secrecy Act, "[c]ommon sense, not to mention settled principles of construction, suggests a uniform construction.  Hence, case law under all of the relevant rules—[civil and criminal]—is equally instructive."[3]  <u>Stein</u>, 488 F. Supp. 2d at 351.

---

[3]    In addition to the argument that a subpoena recipient's obligations differ in the civil and criminal context, Subject E advances the position that producing documents in her "control" is an extra-legal obligation that is "unrooted in the pertinent statute or regulation"—the Bank Secrecy Act—which merely requires that records be "kept" and "retained."  (Opp. at 19–20.)  But that argument is unavailing because the grand jury's subpoena power, and Subject E's concomitant obligation to comply, are not rooted in the Bank Secrecy Act or any specific statute

"A witness summoned by the grand jury cannot resist the production of documents on the ground that the documents are located abroad." In re Grand Jury Subpoena dated Aug. 9, 2000, 218 F. Supp. 2d 544, 555 (S.D.N.Y. 2002) ("Grand Jury Subpoena Aug. 9, 2000") (citing Marc Rich & Co. v. United States, 707 F.2d 663, 666–67 (2d Cir. 1983)).  The "test for production is control, not location." Grand Jury Subpoena Aug. 9, 2000, 218 F. Supp. 2d at 555 (internal quotation marks and citation omitted); see also United States v. Greenfield, 831 F.3d 106, 115 n.5 (2d Cir. 2016) (citation omitted).  And control is defined as "the legal right, authority, or practical ability to obtain the materials sought upon demand." SEC v. Credit Bancorp, Ltd., 194 F.R.D. 469, 471 (S.D.N.Y. 2000); In re NTL, Inc. Sec. Litig., 244 F.R.D. 179, 195 (S.D.N.Y. 2007) ("control does not require that the party have legal ownership or actual physical possession of the documents at issue; rather, documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action.").

Here, Subject E's production consisted of two HSBC France emails that she claims were all of the "responsive documents in her possession, custody, and control."  (Opp. at 8.)  At the same time, however, she claims that she was not required to produce (1) additional HSBC France records due to the Government's refusal to pay the bank's $430 processing fee; (2) any Credit Suisse records from a supposed joint account principally in her former husband's name that she no longer controlled; and (3) any records from accounts held by the Foundation because the Government failed to "demonstrate that [Subject E] has knowledge of the location of [the Foundation's] bank account(s) or has the requisite factual/legal relationship to any such account(s)."  (Opp. at 15.)  Subject E's position is reinforced by her view that although she "may

---

underlying the conduct at issue in the grand jury investigation.  See In re Grand Jury Subpoena dated Aug. 9, 2000, 218 F. Supp. 2d 544, 555 (S.D.N.Y. 2002).

possess none of the institution's records sought . . . the institutions will have retained and could provide to the grand jury those same records."  (Opp. at 2.)

This Court addresses each account in turn to determine whether Subject E had the legal right or practical ability to obtain the records sought by the 2010 Subpoena.

### 1.  The "Joint" Credit Suisse Account

The Government contends that Subject E willfully failed to produce records relating to a Credit Suisse account in her former husband's name, over which she had "signatory and power of attorney authorities."  (Mot. at 23.)  It appears that Subject E received a power of attorney over her former husband's account in April 1995, which lasted until August 2008 when her husband revoked it.  (See Lenow Decl. Ex. II at CS-DOJ-WAIVER-00001805–1812.)  The Government offers evidence of her capacity to "control" an account that belonged to her husband during that 13-year period—there are multiple communications between Subject E and Credit Suisse representatives in which Subject E specifically directs them to transfer funds between the Credit Suisse and other accounts.  (See Lenow Decl. Ex. II.)  Although Subject E's power of attorney was revoked, and the account has since been closed, she must undertake to produce any records for the period in which she had the authority and ability to obtain them.  (See Mot. at 23; Opp. at 12.; see generally Lenow Decl. Ex. II.)

### 2.  The HSBC France Account

The sum total of Subject E's response to the 2010 Subpoena as it related to the HSBC France account amounted to two emails.  Aside from those emails, Subject E asked HSBC France for other responsive records.  The bank notified Subject E that it would make additional documents available for a processing fee of $430.  (Opp. at 11.)  Subject E sought to

shift the cost of producing those documents to the Government.  (Opp. at 11; <u>see also</u> Leibman Decl. Exs. 9 and 10.)

Courts have recognized the "well-established premise that the subpoenaed party must bear the expense of compliance."  <u>In re Grand Jury Investigation</u>, 459 F. Supp. 1335, 1340 (E.D. Pa. 1978); <u>In re Grand Jury No. 76-3 (MIA) Subpoena Duces Tecum</u>, 555 F.2d 1306, 1308–09 (5th Cir. 1977) (rejecting "any assertion that a potential witness has some sort of 'right' to be reimbursed for his expenses in testifying.  The same must be true for the production of documents" especially in cases involving records sought under the Bank Secrecy Act).  While this Court retains the discretion to shift the burden of bearing such costs to the Government, there must be a "clear showing of unreasonableness or oppressiveness in order to warrant modification" of the grand jury subpoena.  <u>In re Grand Jury Subpoenas to Midland Asphalt Corp.</u>, 616 F. Supp. 223, 225 (W.D.N.Y. 1985).  A $430 bank processing fee hardly qualifies as unreasonable or oppressive.[4]

Subject E has demonstrated "control" over her once-active HSBC France account. In addition to her "diligent search" for emails with HSBC France, she "as a former customer of HSBC France" submitted a written request for required records created in the relevant periods outlined in the 2010 Subpoena.  (Opp. at 9–10; Leibman Decl. Ex. 6 ("a request will be made to HSBC in France for the Required Records for the time period spanned by both the 2010 Subpoena and the 2016 Subpoena").)  Because HSBC account records are in her "care, custody, or control," she is obligated to produce them.

---

[4]     At oral argument, Subject E's counsel stated that his client would pay the processing fee to facilitate production of outstanding HSBC France records.  (Tr. at 21:19-22:8.)  As of the date of this Opinion and Order, it is unclear whether that has happened.

3.   <u>Accounts Held by the Subject E Foundation</u>

The Government has offered evidence demonstrating that the Foundation maintained several bank accounts holding assets to which Subject E was "personally . . . entitled" as "beneficial owner of the [Foundation]."  (Mot. at 11; Lenow Decl. Ex. DD at 15.) There are also documents establishing that Subject E continued to "functionally control and benefit from accounts held by" the Foundation.  (Mot. at 13.)

Subject E counters that she was not required to produce records of accounts held by the Foundation because she lacks the requisite associational relationship under the Bank Secrecy Act to any of the Foundation's accounts, and that in any event, any "factual and legal issues concerning the association" should be left to the trial jury in the pending criminal action. (<u>See</u> Opp. at 12–13.)  But that contention is belied by the various documents revealing that Subject E directed the creation of the Foundation to manage a sizeable inheritance from her father and subsequently received distributions from certain of the accounts linked to the Foundation.  (Lenow Decl. Ex. DD at 15, 69–73, 75.)  For one of the accounts, opened at Credit Suisse, Subject E directed the Foundation to modify the listed beneficial owners of deposits from herself to her children.  (Lenow Decl. Ex. DD at 7.)

Moreover, Subject E's 2010 tax returns reflecting distributions received from the Foundation provide some indication, at the very least, that she knew the monies were coming from some foreign bank account held by the Foundation.  (<u>See</u> Lenow Decl. Ex. FF.)  Indeed, even if the beneficiary of such account is "a person of great wealth surely they want to know where that wealth is located."  <u>United States v. Doe (In re Grand Jury Subpoena Dated Feb. 2, 2012)</u>, 741 F.3d 339, 349 (2d Cir. 2013) (internal quotation marks and alternations omitted).

And "common sense dictates that beneficiaries keep these records in part because they need the information to access their foreign bank accounts." Doe, 741 F.3d at 349.

Subject E's 2010 tax return and the Liechtenstein Documents sufficiently establish the associational relationship between Subject E and the accounts held by the Foundation for purposes of resolving the underlying motion. More importantly, they underscore the significance of the Bank Secrecy Act's anti-avoidance rule, which was designed to ensure that taxpayers would not engage in the type of conduct that this Court characterized as "sophistry"—claiming that they "cannot be held accountable because [they] engineered [their] offshore account to be secret." In re Various Grand Jury Subpoenas, 924 F. Supp. 2d at 554.

Subject E argues that the anti-avoidance rule, which was codified after the 2010 Subpoena was served, compare 31 C.F.R. § 103.24 with 31 C.F.R. § 1010.350(e)(3), fundamentally altered the definition of "financial interest," and therefore urges this Court to apply the "ex post facto prohibition[,] which forbids imposing punishment for an act which was not punishable at the time it was committed." (Opp. at 27.) But the amendment to the Bank Secrecy Act, clarifying the term "financial interest"—a term that had never been defined by the predecessor statute—did not introduce anything new. See United States v. McBride, 908 F. Supp. 2d 1186, 1202, 1203 (D. Utah 2012) (analyzing then Section 103.24—the former version of Section 1010.350—and holding that defendant had reportable "financial interest" in foreign accounts that belonged to a "deliberately disguised ownership structure" created by defendant's financial advisor from which defendant "had the expectation of enjoying the benefit of the assets in the accounts."). The Bank Secrecy Act's original purpose was to aid the relevant authorities in carrying out criminal, tax, or regulatory investigations into foreign accounts that were shielded

from taxation.  See Currency and Foreign Transactions Reporting Act, Pub. L. No. 91–508, tits. I-II, § 202 (1970).  The anti-avoidance rule simply furthers that purpose.

Importantly, Subject E's ex post facto argument is unpersuasive because "[i]t is beyond dispute that the ex post facto clause applies only to criminal cases."  United States v. D.K.G. Appaloosas, Inc., 829 F.2d 532, 540 (5th Cir. 1987); see also Plaza Health Labs., Inc. v. Perales, 702 F. Supp. 86, 89–90 (S.D.N.Y. 1989).  And as this Court has previously held, the Bank Secrecy Act's record-keeping and reporting requirements "are 'essentially regulatory' in nature."  In re Various Grand Jury Subpoenas, 924 F. Supp. 2d at 554.  They merely impose reporting and record-keeping requirements.  Any prosecution related to a violation of the Bank Secrecy Act's requirements must be predicated on a statute criminalizing misconduct resulting from the willful failure to report or keep foreign bank account records, such as tax evasion.  For example, Subject E faces violations of 26 U.S.C. §§ 7212(a) and 7206(1), both criminal statutes, in the pending criminal action.

Here, Subject E should have produced the "required records" of the Foundation's foreign bank accounts because she had the legal authority and practical ability to obtain them.  The Foundation's by-laws dictate that during Subject E's lifetime, "all claims to the assets of the Foundation and on earnings derived therefrom shall be exclusively hers to the extent that she is entitled wholly or partially to dispose of entitlement by means of informal written instructions."  (Lenow Decl. Ex. DD at 11 (emphasis added).)  Further, the Certificate of Continuation, memorializing the Foundation's re-domiciliation from Liechtenstein to Panama, provides that "[p]ersons to whom beneficial entitlements were granted pursuant to the by-laws . . . are entitled to receive information from the Foundation Council concerning the Foundation's affairs" insofar as it is "necessary for the correct exercise of their beneficiary rights."  (Lenow Decl. Ex. DD at

12

46 (emphasis added).)  That the Foundation "keeps the records on [Subject E's] behalf does not mean [she] lacks access to them or that they are records offshore banking customers would not customarily keep."  In re Grand Jury Investigation M.H., 648 F.3d 1067, 1076 (9th Cir. 2011).

It is clear that Subject E has control over the Foundation.  In 2007, she caused the Foundation to change the named beneficiaries.  (Lenow Decl. Ex. DD at 7.)  In 2009 and 2010, she ordered large cash withdrawals.  (Lenow Decl. Ex. DD at 69–73, 75.)  And when the Foundation was re-domiciled in Panama, she assumed the role of settlor.  (Lenow Decl. Ex. DD at 8.)  Because she is functionally the beneficiary of a bank account maintained by the Foundation, she "necessarily has access to [] essential information as the bank's name, the maximum amount held in the account each year, and the account number"—in other words, "required records" sought by the 2010 Subpoena.  Doe, 741 F.3d at 349.  Although her designation does "not explicitly state that [she] had the authority to receive [Foundation] account documents, the ability to receive such documents is an essential part of being able to instruct the entity."  Greenfield, 831 F.3d 106, 119 (2d Cir. 2016).

### 4.  Other Accounts

While the underlying motion principally identifies three accounts, it also alludes to other accounts from which Subject E may be required to obtain records pursuant to the 2010 Subpoena.  (See Mot. at 23 (referring to an account that it "understands to be different" from the other accounts maintained at HSBC France), 24 ("documents written in French from another foreign bank"); see also Lenow Decl. Exs. JJ, KK-T).)  The Government knows only as much as the Liechtenstein Documents disclose, and it is incumbent upon Subject E to make a good faith effort, consistent with this Opinion and Order, to produce any "required records" that fall within the ambit of the 2010 Subpoena.  See In re Grand Jury Subpoena Dated Feb. 2, 2012, 908 F.

Supp. 2d 348, 351 (E.D.N.Y. 2012) ("Grand Jury Subpoena Feb. 2, 2012") ("Although the

government attached to its motion to compel a selection of documents from one foreign bank

account . . . those documents are hardly (on their face) co-extensive with the scope of the

Subpoena.").  That effort would include, as the Government suggests in its Reply, directing Beda

Singenberger—the financial advisor who formed the Foundation and served as its director—to

"provide her with the requested records for" the Foundation.  (Government's Reply in Support of

Motion for Additional Contempt Sanctions and Motion for Order to Compel Compliance

("Reply") at 15.)  It may be that those accounts principally identified by the Government in its

motion are the only ones that Subject E must produce.  But "it is self-evident that the government

would have no way of ensuring that all such records from all foreign bank accounts . . . have

been uncovered."  Grand Jury Subpoena Feb. 2, 2012, 908 F. Supp. 2d at 351.  Only Subject E

knows with certainty.  Because this Court finds that Subject E's 2014 production fell far short of

her obligation to produce records in her "care, custody, or control," Subject E violated the

Compulsion Order.  Accordingly, this Court directs her to locate and produce all foreign bank

account records responsive to the 2010 Subpoena that she has the legal authority or practical

ability to obtain.

Finally, Subject E points out the irony of the current situation in that the

Government seeks records which it has already obtained from foreign banks.  (Opp. at 2, 10.)

But "the fact that the government has some of [Subject E's] foreign bank records clearly does not

preclude it from seeking all such relevant foreign bank records."  Grand Jury Subpoena Feb. 2,

2012, 908 F. Supp. 2d at 351; see also United States v. Dionisio, 410 U.S. 1, 13 (1973) ("The

grand jury may well find it desirable to call numerous witnesses in the course of an investigation.

It does not follow that each witness may resist a subpoena on the ground that too many witnesses have been called.").

    B.  <u>Interference with Trial Rights</u>

        Subject E separately argues that enforcement of the grand jury subpoena, concurrent with a pending indictment against her, would "catastrophically harm" her rights at trial in the criminal action. (Opp. at 29.) She claims that the issues in this contempt proceeding are more appropriate for resolution in the pending criminal action. (<u>See</u> Opp. at 29.) Subject E's argument, in view of the grand jury's continuing investigation and her non-compliance under the 2010 Subpoena, is unavailing.

        As a general matter, a grand jury's wide-ranging investigative power "does not end when it indicts a defendant. Instead, a post-indictment action is permitted to identify or investigate other individuals involved in criminal schemes or to prepare superseding indictments against persons already charged." <u>United States v. Meregildo</u>, 876 F. Supp. 2d 445, 448–49 (S.D.N.Y. 2012). But "it is improper to utilize a grand jury for the sole or dominating purpose of preparing an already pending indictment for trial." <u>United States v. Bin Laden</u>, 116 F. Supp. 2d 489, 491–92 (S.D.N.Y. 2000). Subject E bears the burden of rebutting the "presumption of regularity [that] attaches to grand jury proceedings" and must demonstrate that "the Government's use of the grand jury was improperly motivated." <u>Bin Laden</u>, 116 F. Supp. 2d at 492. Put another way, "absent some indicative sequence of events demonstrating an irregularity, a court has to take at face value the Government's word that the dominant purpose of the grand jury proceedings is proper." <u>United States v. Raphael</u>, 786 F. Supp. 355, 358 (S.D.N.Y. 1992).

        Here, Subject E has failed to offer any sequence of events demonstrating irregularity to rebut the presumption that continued use of a grand jury subpoena, even after an

indictment, is improper.  Although more than six years elapsed since service of the 2010

Subpoena, the Government's conduct has not been irregular.  A significant portion of that

interval was devoted to litigating the question of whether Subject E was exempt by reason of the

act of production privilege from responding to the 2010 Subpoena.  Following issuance of the

Compulsion Order and the Contempt Order, Subject E located and produced two responsive

documents.  And the Government had to wait for production of the Liechtenstein Documents to

piece together its current view that she had not fully complied with her obligations.  (Tr. at

10:19–21 ("What I'd say is just that there is some delay.  I believe it was several years before

Li[e]chtenstein turned over documents to us."), 13:21–14:1 ("it's only when we saw all these

data points together and received these documents in December of 2015 . . . and then early 2016

at my office . . . when we realized there was just a wholesale failure to comply . . .").)

        While the Government filed an indictment approximately one month after moving

for additional sanctions in this proceeding, that does not mean the grand jury must conclude its

investigation if there are other objectives to pursue.  Nor does that excuse Subject E from her

obligation to fully comply with the 2010 Subpoena especially where there is a judicial finding

that she violated the Compulsion Order.

        The Government maintains that it is continuing the grand jury investigation on

several grounds, including (1) investigating Subject E for potential violations of other federal

statutes that have not been charged in the pending criminal action; (2) investigating other

individuals who have not yet been indicted; and (3) investigating Subject E's potential violations

of the federal laws charged in the Indictment but for uncharged periods (i.e., from 2013 through

the present).  (Reply at 3.)  Subject E's argument that the fruits of the 2010 Subpoena will be

used for trial preparation is further undermined by the fact that it was issued six years before her

indictment.  (Reply at 3.)  Any evidence acquired at any point during the enforcement of the

2010 Subpoena—in 2010 when it was first issued, in 2014 when Subject E completed her

production, or any point thereafter—would have been used in the same manner by the

Government then as it would today.

      Finally, the threat that any incriminating evidence obtained by the grand jury

pending the indictment will be used against Subject E in violation of her Fifth and Sixth

Amendment rights (Opp. at 31) is mitigated by this Court's holding in the Compulsion Order.

This Court narrowed the universe of documents to "required records" which, by their very

nature, bear no independent communicative element and therefore do not present the risk of self-

incrimination under the Fifth Amendment.[5]  In re Two Grand Jury Subpoenae Duces Tecum

Dated Aug. 21, 1985, 793 F.2d 69, 73 (2d Cir. 1986) ("The rationale behind the ["required

records"] exception . . .  [in part is that] the record-holder 'admits' little in the way of control or

authentication by producing them.").

C.  Sanctions

      Because Subject E has not produced all records within her "care, custody, or

control"—defined as the legal authority or practical ability to obtain such records—she is in

violation of the Compulsion Order.  Nevertheless, this Court declines to issue additional

contempt sanctions because a valid sanctions order—the Contempt Order—is already in place.

Nearly four years ago, this Court entered the Contempt Order holding Subject E in civil

contempt and sanctioning her $1,000 per day until she complied.  (See ECF No. 12.)

      Subject E never paid any fine as a consequence of her noncompliance in 2013.

When this Court pressed the Government on the reason why, more than three and a half years

---

[5]     It is unclear what Sixth Amendment issues are implicated by the continued use of the grand jury during the
indictment period.

later, it did not enforce the sanctions provision, its response was underwhelming.  Nevertheless, when this Court asked the Government whether the sanctions provision could be imposed prospectively, the Government agreed "that [it] would be a reasonable approach."  (Tr. at 7:1–9.)

In analyzing the three prongs of the test to determine whether civil sanctions are appropriate, this Court finds that the character and magnitude of the harm threatened by Subject E's continued contempt of the Compulsion Order is significant.  Subject E has withheld a number of required records from the Government, impeding the relevant authorities from conducting their investigation and undermining one of the purposes of the governing regulatory regime here, which is to "ameliorate the difficulties and challenges associated with obtaining [foreign bank] records by means of a foreign treaty."  Grand Jury Subpoena Feb. 2, 2012, 908 F. Supp. at 357.  The Government has represented that it is "vigorously" investigating "substantial additional violations" for "different years, different people, and different charges."  (Tr. at 8:4, 15–16.)  The records Subject E has yet to produce—or could obtain and produce—may substantially assist the Government in achieving those investigatory objectives.

Keeping in place the original Contempt Order will likely be effective to assure Subject E's compliance.  Subject E has not paid a penny in sanctions despite her noncompliance since 2013, but the specter of losing $1,000 a day presents a strong likelihood that she will comply.

Finally, a $1,000 per day, while costly by any measure, will not wreak ruinous financial consequences on Subject E.  And relative to the Government's request of $5,000 per day in the underlying motion, $1,000 per day will "coerce [Subject E] to conform [her] conduct to the court's order," and avoid the risk that it is construed as punitive.  CBS Broadcasting Inc. v.

FilmOn.com, Inc., 814 F.3d 91, 101 (2d Cir. 2016).  The amount is reasonable in relation to the facts underlying Subject E's contumacious conduct.  See Terry, 886 F.2d at 1353.

    D.  June 2016 Subpoena

        For the first time in its reply brief, the Government seeks an order compelling Subject E's compliance with the June 2016 Subpoena for largely the same reasons it offered in connection the underlying motion.  (Reply at 15.)  The law in the Second Circuit is clear that arguments or requests for relief raised for the first time in reply briefs need not be considered. See ABN Amro Verzekeringen BV v. Geologistics Americas, Inc., 485 F.3d 85, 100 n.16 (2d Cir. 2007) ("[W]e decline to consider an argument raised for the first time in a reply brief."). "Generally, a court does not consider issues raised in a reply brief for the first time because if a party raises a new argument in a reply brief the opposing party may not have an adequate opportunity to respond to it."  Sacchi v. Verizon Online LLC, 2015 WL 1729796, at *1 n.1 (S.D.N.Y. Apr. 14, 2015) (citations omitted).  But the "Second Circuit has made it abundantly clear that a district court has discretion to consider a belatedly-raised argument, and that a judge's decision to countenance such argument will be reviewed for abuse of discretion." American Hotel Intern. Group, Inc v. OneBeacon Ins. Co, 611 F. Supp. 2d 373, 375 (S.D.N.Y. 2009) (citations omitted) (emphasis original).

        Here, no new arguments are raised in the Government's reply.  The Government seeks relief with respect to the June 2016 Subpoena on exactly the same basis as its request relating to the 2010 Subpoena.  (Reply at 15 ("for the same reasons discussed in the Government's sanctions motion and this brief, the Government respectfully requests that this Court order [Subject E] to comply with [the June 2016 Subpoena]").)  Therefore, there is no risk of prejudice against Subject E because she has already responded to all of the Government's

arguments.  And, in any event, Subject E specifically invoked the June 2016 Subpoena in her opposition brief, acknowledging that the 2016 June Subpoena simply "added to the demand in [the Subpoena] . . . a new demand for accounts in the names of [her] two children," and utilizing the specific language of the June 2016 Subpoena to advance the same argument that the phrase, "care, custody, or control," did not support the Government's expansive interpretation.  (Opp. at 13–14.)

The June 2016 Subpoena contains substantively the same requests as the 2010 Subpoena, with the exception of requests seeking records from accounts held by, or for the benefit of, her children.  Therefore, Subject E is directed to comply with the June 2016 Subpoena with respect to any foreign bank accounts held by, or for the benefit of, her or the Foundation. Moreover, Subject E is directed to produce any foreign bank accounts held by the Foundation for the benefit of her children.

However, this Court declines to compel production of any records relating to accounts specifically held in the name(s) of Subject E's children.  Subject E's children were not subpoenaed and have no obligation to produce anything.  If the Government is inclined to seek records of their accounts, it must do so in a subpoena specifically directed to them.  Indeed, as Subject E notes in her opposition brief, her recently emancipated children "were obliged to engage counsel in order to address demands by the Government."  (Opp. at 13.)

CONCLUSION

For the foregoing reasons, the Government's motion for additional sanctions is granted in part and denied in part.  This Court finds that Subject E violated the Compulsion Order and holds her in civil contempt of court.  The Contempt Order shall remain in effect, and sanctions of $1,000 per day imposed thereunder shall begin to accrue beginning on February 14,

2017, payable to the Registry of the Court until Subject E produces documents responsive to the

2010 Subpoena and 2016 Subpoena in accord with this Opinion and Order.

The Clerk of Court is directed to terminate the motion pending at ECF No. 42.


Dated:  January 24, 2017                              SO ORDERED:
             New York, New York


_____
                                                     WILLIAM H. PAULEY III
                                                            U.S.D.J.