UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                                :
In re:                                          :    12 Misc. 381
                                                :
VARIOUS GRAND JURY SUBPOENAS                    :    OPINION AND ORDER
                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

Respondent Subject E seeks to purge the contempt citation in this Court's January 24, 2017 order (the "Compulsion Order") on the basis that she has "complied in all respects." (Memorandum of Law of Subject E in Support of Motion to Purge Contempt and Vacate Contempt Citation ("Mot.") at 1.) For the following reasons, Subject E's motion to purge is denied, but the sanctions scheduled to begin on February 14, 2017, are suspended until March 20, 2017.

DISCUSSION

On January 24, 2017, this Court found Subject E in civil contempt for violating its February 2013 Memorandum and Order, 924 F. Supp. 2d 549 (S.D.N.Y. 2013), and compelled her to produce foreign bank records pursuant to a 2010 grand jury subpoena (the "2010 Subpoena) and a 2016 grand jury subpoena (the "2016 Subpoena"). See In re Various Grand Jury Subpoenas, 2017 WL 361685 (S.D.N.Y. Jan. 24, 2017); ECF No. 60. The Compulsion Order imposed monetary sanctions of $1,000 per day—to begin accruing on February 14, 2017—until Subject E fully complied with both the 2010 Subpoena and 2016 Subpoena (collectively, the "Subpoenas"). Subject E now moves to purge the contempt and vacate its citation.

The Compulsion Order recites the relevant factual background for purposes of resolving this motion. (Compulsion Order at 1–5.) Following entry of the Compulsion Order, Subject E "execute[d] and deliver[ed] authorizations to the banks named in the [Compulsion Order] and the Gestino Foundation" and additional banks "glean[ed] from the related criminal case discovery produced by the Government" to produce the relevant records. (Mot. at 3.) According to Subject E, this is all that she is obliged to do under the terms of the Compulsion Order. She argues that requiring "anything further from her would . . . hold her hostage to third parties"—the foreign entities—"over whom she has no control beyond directing disclosure from them." (Mot. at 6.)

The Government opposes the motion on grounds that Subject E has not fully complied with the Compulsion Order "to produce" records in response to the Subpoenas. According to the Government, making a request for the disclosure of documents "falls short" of Subject E's actual obligation to produce. (Government's Response Letter dated February 10, 2017 ("Resp."), at 2.) Moreover, the Government asserts that it has "serious concerns" about whether the foreign entities will actually honor Subject E's requests to produce records directly to the Government because the requests omitted standard waiver language that taxpayers have employed in similar situations. (Resp. at 2.)

A "civil contemnor is ordinarily able to purge the contempt and obtain his release by committing an affirmative act." Close-Up Intern., Inc. v. Berov, 2010 WL 5558296, at *6 (2d Cir. Jan. 10, 2010) (internal quotation marks omitted). Indeed, the "power to impose a coercive civil contempt sanction is limited by a party's ability to comply with the Court's order." A.V. By Versace, Inc. v. Gianni Versace, S.p.A., 2004 WL 691243, at *5 (S.D.N.Y. Mar. 31, 2004) (internal quotation marks omitted). If a party believes it has done all it can to comply with a

2

court order, the "burden is on the contemnor to show plainly and unmistakably that compliance is impossible." Versace, 2004 WL 691243, at *5.

Here, Subject E has taken affirmative steps to comply with the Compulsion Order. But she has not fully complied with the Compulsion Order's principal directive which, in clear and plain terms, compelled her "to locate and produce all foreign bank account records responsive to the 2010 Subpoena that she has the legal authority or practical ability to obtain," and to "comply with the June 2016 Subpoena with respect to any foreign bank accounts held by, or for the benefit of, her or the Foundation . . . [and] to produce any foreign bank accounts held by the [Gestino] Foundation for the benefit of her children."[1]  (Order at 14, 20.)

Subject E therefore has the burden of demonstrating that further efforts to comply with the Compulsion Order will be fruitless. At this juncture, she has not satisfied that burden because there are, contrary to Subject E's assertions, several ways through which production of documents can be achieved. She maintains that the "only course by which [she] could undertake to produce any additional 'required records' was to execute and deliver authorizations to the banks," which instructed them to produce records directly to the Government. (Mot. at 3.) But that contention is belied by the fact that "only days after serving the directives," she received "a volume of bank documents" including "records of accounts at six (6) banks" from the Gestino Stiftung trust, which were then "tendered to the Government." (Mot. at 8 (citing Declaration of Alain Leibman, Ex. K).) Indeed, Subject E acknowledges that she could have requested the foreign entities to send the records to her so that she could produce them to the Government. But Subject E chose not to do that to "anticipat[e] and obviat[e] any Government concerns about

---

[1] The selective references to the Compulsion Order cited by Subject E to justify her purported compliance are unavailing. Her claims that the Compulsion Order only directed her to "undertake to produce," (Compulsion Order at 8) "exercise her legal authority and practical ability to obtain," (Compulsion Order at 12) or "make a good faith effort . . . to produce any 'required records'" (Compulsion Order at 13) miss the mark.

delays in disclosure" and "to create a direct, Point A to Point B, transmission without those records first passing through [Subject E] (perhaps not ever their customer) and her counsel."[2] (Mot. at 5, 7.)

The Government voices a concern that Subject E's pending requests—which instruct the foreign entities to produce records directly to the Government—will result in no production at all.  According to the Government, at least one bank has notified Subject E that "Swiss law bars the production of records directly to a foreign government agency in response to" Subject E's requests.  (Resp. at 1.)  Subject E has the ability to obviate that concern through various means.  She can obtain the records directly from the foreign entities and then transmit them promptly to the Government.  Further, "in the entirely hypothetical event that Bank X insists on making production only to Respondent," she can "expeditiously re-transmit such records to the Government."  (Mot. at 7.)  Finally, as the Government notes, "there is nothing preventing Subject E from executing the standard waivers [typically executed by taxpayers seeking to obtain Swiss bank documents] that the relevant banks have honored in similar situations."  (Resp. at 2.)  In view of these options, Subject E has not shown "plainly and unmistakably that compliance" with this Court's Compulsion Order and the Subpoenas "is impossible."  Versace, 2004 WL 691243, at *5.

The contempt citation incorporated in the Compulsion Order remains effective until Subject E produces all documents demanded by the Subpoenas.  However, imposing sanctions after Subject E has taken good faith steps to comply would defeat the purpose of civil

---

[2] There is no reason to believe that the foreign entities in question will refuse Subject E's request to produce records directly to her, which she can then transmit promptly to the Government.  There is ample evidence—submitted during the course of the Government's motion for additional sanctions (ECF No. 42)—revealing that these entities were responsive to Subject E's requests made both in her capacity as a beneficiary of accounts maintained by the Gestino Foundation, or as its settlor, to withdraw and transfer funds, change listed beneficiaries, or effect other changes.  (See, e.g., Compulsion Order at 13.)

4

contempt.  The "chief characteristic of civil contempt is that its purpose is to compel obedience to an order of the court to enforce the rights of the other party to the action.  Consistent with this remedial purpose, the sanction imposed is generally made contingent on compliance."  Armstrong v. Guccione, 470 F.3d 89, 101 (2d Cir. 2006) (citing In re Irving, 600 F.2d 1027, 1031 (2d Cir. 1979)).  Civil contempt sanctions "may not be imposed as a purely punitive measure."  Paramedics Electromedicina Comercial, Ltda v. GE Medical Sys. Info. Tech., Inc., 369 F.3d 645, 657 (2d Cir. 2004).

        The Government argues that sanctions should begin accruing in spite of Subject E's good faith efforts because, among other things, she "had ample time to obtain the relevant documents from third parties in a timely fashion and simply declined to do so."  (Resp. at 2.)  But the amount of time it took between the Compulsion Order and Subject E's efforts to locate all possible accounts and submit authorizations to produce records—approximately nine days—is not unreasonable.  Subject E actually appears to have taken several steps which, in her own view, were intended to facilitate an uninterrupted production of documents.  (Mot. at 5–6.)  But some of those steps, namely "production in the first instance to the prosecutor," (Mot. at 5) may actually have the effect of delaying production and creating unnecessary barriers to compliance.

        Subject E correctly observes that neither she nor "any government authority or court, for that matter, [can] compel a foreign bank to respond by producing records as of February 14th."  (Mot. at 7.)  And the Government has represented that after contacting "legal counsel for the relevant banks to determine whether they will honor [Subject E's directives]," it is still "awaiting responses."  (Resp. at 2.)  Imposing sanctions during this period—when both Subject E and the Government are awaiting third party action—would amount to punishment.  But the Government cannot wait forever.  If the foreign entities do not respond to the

Government's inquiries, or simply refuse Subject E's instructions in their current form, Subject E, unlike a hostage, has options to achieve compliance.

Accordingly, the imposition of sanctions, currently scheduled to take effect on February 14, 2017, is suspended until March 20, 2017, to allow the parties to work together and determine the best means through which production of all records demanded by the Subpoenas can be accomplished.  The suspension period is intended to allow, for example, the Government to ascertain whether the foreign entities will actually produce documents directly to it.  But it is also designed to provide Subject E with more time to continue her good faith efforts, and ultimately for her to achieve compliance with the Compulsion Order, whether that means opting for one of the alternative methods outlined above or an entirely new one.

## CONCLUSION

The contempt order cited in the Compulsion Order "shall remain in effect, and sanctions of $1,000 per day imposed thereunder shall" accrue beginning on March 20, 2017 payable to the Registry of Court "until Subject E produces documents responsive to the 2010 Subpoena and 2016 Subpoena."  (Compulsion Order at 20–21.)  The Clerk of Court is directed to terminate the motion pending at ECF No. 62.

Dated: February 13, 2017          SO ORDERED:
       New York, New York

_____
WILLIAM H. PAULEY III
U.S.D.J.