**FOX ROTHSCHILD LLP**
Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, New Jersey 08648
Telephone: (609) 896-3600
Facsimile: (609) 896-1469
*Attorneys for Respondent (Subject E)*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE VARIOUS GRAND JURY SUBPOENAS

12 Misc. 381 (WHP)

**MEMORANDUM OF LAW OF SUBJECT E IN SUPPORT OF CONCLUDING MOTION TO PURGE CONTEMPT AND VACATE CONTEMPT CITATION**

**On the Brief:**
Alain Leibman, Esq. (Bar # AL8971)

## TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES ..... ii

PRELIMINARY STATEMENT ..... 1

SUMMARY OF ARGUMENT ..... 8

LEGAL ARGUMENT ..... 9

THIS CONTEMPT PROCEEDING THREATENS TO VEER FROM THE PRINCIPLES GOVERNING THE IMPOSITION AND MAINTENANCE OF THE AWESOME CONTEMPT POWER AND MUST NOW BE CONCLUDED WITH PURGATION ..... 9

CONCLUSION ..... 15

## TABLE OF AUTHORITIES

**Page(s)**

*In re Grand Jury Subpoena, Two Grand Jury Contemnors*, 826 F.2d 1166 (2d Cir. 1987) .......... 7, 12

*In re Grand Jury Witness*, 835 F.2d 437 (2d Cir. 1987) .......... 10

*In re N.D.N.Y. Grand Jury Subpoena (Alexander)*, 811 F.2d 114 (2d Cir. 1987) .......... 8, 11, 12, 13, 15

*United States v. Davis,* 767 F.2d 1025, 1027 (2d Cir. 1985) .......... 14

*United States v. Local J804-1, Int'l Longshoremen's Assn., AFL-CIO*, 44 F.3d 1091 (2d Cir. 1995) .......... 9

*United States v. United Mine Workers of America*, 330 U.S. 258 (1947) .......... 10, 13

**Other Authorities**

31 C.F.R. § 1010.420 .......... 2

**PRELIMINARY STATEMENT**

The background to this concluding effort to purge the contempt citation imposed on ,Respondent is by now quite familiar to the Court, which has issued a number of rulings which pertain, including Opinions and Orders of January 24, 2017 (Doc. #60), February 13, 2017 (Doc. #65), and April 3, 2017 (Doc. #72). In addition, two prior motions to purge filed by Respondent detailed the procedural history leading to the contempt citation and Respondent's good faith efforts to comply and resulting applications to purge. *See* Motion to purge contempt, February 8, 2017 (Doc. #62); Renewed Motion to purge contempt, March 29, 2017 (Doc. #70). The multiple exhibits attached to Declarations of counsel dated February 8, 2017 and March 29, 2017 are also incorporated by reference, and sometimes hereafter referred to here by reference to the Declaration to which they are appended (respectively, the Leibman Dec., 2/8/17, and the Leibman Dec., 3/29/17). A small number of additional pertinent exhibits and facts are appended to or contained in the further Declaration of Alain Leibman, dated April 17, 2017 (hereafter, the "Leibman Dec., 4/17/17").

For the sake of brevity and a clear record, Respondent relies on these previously filed motions and declarations, adding only essential new exhibits by way of the Declaration filed under seal today. Brevity is readily accommodated here because the only issue which remains before the final purgation of contempt concerns one bank (Credit Suisse) and one hypothetical set of records which that bank may or may not possess (bank records providing the "required records" information requested of the bank in a turnover directive provided in early February 2017 by Respondent, and now only for records of any individual account in

Respondent's name from January 1, 2005 to December 31, 2016, should any such hypothetical account exist).

After first insisting that Respondent execute a waiver form objectionable and testimonial in various ways, Credit Suisse's attorneys partially relented, agreeing to accept Respondent's originally-tendered February 2, 2017 Directive as long as it deleted reference to being submitted under compulsion of court order. Credit Suisse stands alone among several Swiss banks which received identical Directives containing the statement that they were supplied under compulsion of court order, as the other banks all responded to their respective Directives without like objection. This demand of Credit Suisse Respondent cannot meet and, under controlling Second Circuit precedent, cannot be ordered to meet.

To summarize from prior submissions the yeoman efforts at compliance undertaken in obedience to this Court's January 24, 2017 compulsion order (Doc. #60), we note the following:

(a) on February 2, 2017, Directives bearing Respondent's notarized signature were transmitted by commercial carrier to five foreign banks requesting as to any individual account in the name of Respondent, any other account in which Respondent held a power of attorney, and any account in the name of Gestino Stiftung, any records reflecting the five data points contained in the "required records" exception to the Fifth Amendment's act-of-production privilege embodied now in 31 C.F.R. § 1010.420. The Directive in each instance covered a period of time *broader than the grand jury subpoenas whose compliance had been ordered by the Court.* (Leibman Dec., 2/8/17, ¶¶ 2-7 & Exs. A-F; Leibman Dec., 3/29/17, ¶ 3) (*see also* Opinion and Order of January 24, 2017, at 2, using same definition

for "required records" as was used in the Directives). Four of those banks were Swiss banks. (Leibman Dec., 2/8/17, ¶¶ 3-4, 5, 6, 7);

(b) a like Directive was transmitted by commercial carrier to the Gestino Stiftung trust entity. (Leibman Dec., 2/8/17, ¶ 8 & Ex. G);

(c) on February 8, 2017, the Gestino Stiftung produced a body of responsive records concerning its bank accounts in foreign banks, including records from additional banks beyond those referenced above (Leibman Dec., 2/8/17, ¶ 12 & Ex. K);

(d) the Gestino Stiftung production, immediately turned over to the Government, included records *even beyond the 12-year time period of the subject Directives* and consisted of hundreds of pages of records into 2017. (Leibman Dec., 3/29/17, ¶¶ 3(k), 4, 5). Despite the fact that only a fraction of the Gestino production was needed to satisfy the scope of the "required records" (providing bank name/location; account name and number; type of account; highest balance during any year), Respondent produced to the Government all of the Gestino production and all of the ensuing productions of the banks;

(e) addressing Respondent's subsequent motion to purge contempt, this Court issued an Opinion and Order on February 13, 2017 (Doc. #65) denying the motion. The Opinion and Order did not criticize Respondent's dependence on written directives to the affected banks; after all, no other means of obtaining bank records was or is open to Respondent. Moreover, this Court recognized that Respondent had "taken good faith steps to comply" with the earlier Compulsion Order. (*Id.*, at 4). The Court even suspended the imposition of sanctions until March 20, 2017. (*Id.*, at 5). The Court's only further direction was that, rather than direct production to the Government which the Government explained was

problematic for the foreign banks, Respondent was to obtain the bank records directly and then re-transmit them to the Government (*Id.*, at 6);

(f) faithfully observing the dictate of the February 13th Order, Respondent requested that each bank make its production to Respondent's counsel rather than to the Govenrment. (Leibman Dec., 3/29/17, ¶¶ 7-8); and

(g) one bank after another responded, several producing hundreds of additional pages of their records, all of which were dutifully retransmitted to the Government – HSBC France, Basler Kantonalbank, and Bank Frey all produced records, and Basler and Bank Frey advised pointedly that Respondent had not had any individual accounts at those banks. (Leibman Dec., 3/29/17, ¶¶ 9, 12-13, 14-18, 21-25). DZ Privatbank stated that they had, in fact, produced records responsive to the Directive directly to the Government after all. (Leibman Dec., 3/29/17, ¶¶ 19-20). Additionally, a redundant Directive was transmitted to a Bank Alpinum, whose Gestino Stiftung account records had already been produced by Gestino. (Leibman Dec., 3/29/17, ¶¶ 26-27). Two banks, PHZ Bank and Bank Frey, requested authorization from Gestino Stiftung to produce Gestino accounts records (already produced by Gestino and turned over to the Government); accordingly, requests were made to Gestino on behalf of Respondent, to cooperate with those banks in any way needed. (Leibman Dec., 3/29/17, ¶¶ 15, 25). Bank Frey responded, producing hundreds of pages of Gestino account records on March 29, 2017, which were re-transmitted in their entirety to the Government. (Leibman Dec., 3/29/17, ¶¶ 16-18).

Alone among several Swiss banks, Credit Suisse raised objections to the form of Directive served upon it. Its American counsel initially insisted by letter of February 16, 2017, that Respondent sign a completely different template waiver form used by the bank

for records disclosure as to any individual account, as well as requesting a notarized copy of Respondent's passport.[1] (Declaration of Alain Leibman, April 17, 2017, ¶ 3 & Ex. X). The bank's template was objectionable on several grounds – it required testimonial statements about Respondent's relationship to particular accounts; it varied from the "required records" description relied upon in the Court's compulsion order of January 24, 2017 and set forth in the pertinent CFR section; and it required waiver of protections under unknown "contractual arrangements" and unspecified "laws of Switzerland." (*Ibid.*).

Notwithstanding the demands of its American counsel, Credit Suisse itself, and only days after its counsel insisted on acceptance of its form of waiver as a condition of producing anything at all, produced a body of records both as to Gestino accounts (from apparent inception of the account in 2006) and as to an account over which Respondent held a power of attorney for a time, an account of her former spouse (records going back to apparent account inception in 1995 and continuing to 2009). (Leibman Dec., 3/29/17, ¶¶ 10-11).[2]

---

[1] Respondent, as we have noted repeatedly, is a defendant in a pending criminal case in this District. The passport in question was surrendered as a condition of bail and is no longer in Respondent's possession.

[2] The Court's Opinion and Order of April 3, 2017 (Doc. #72) misapprehends the facts when it says that a "reasonable option [for compliance], as suggested by the Government, would be for Subject E to direct the 'offices of the Subject E Foundation [to] execute additional directives' to Credit Suisse." (*Id.*, at 7). First, the Government does not complain, nor could it complain, that it has not received all Gestino Stiftung account records – it has received more than the "required records" from two sources, both in the Gestino Stiftung production and in the Credit Suisse production referenced in the text above.

Second, Respondent's counsel went further to make a redundant request of Gestino Stiftung by letter dated February 17, 2017 to cooperate fully with Credit Suisse and execute any authorizations required of it by Credit Suisse to ensure full production. (Leibman Dec., 4/17/17, ¶ 8 & Ex. CC). Gestino did so, in a written form prescribed by the bank. (Leibman Dec., 4/17/17, ¶ 7 & Ex. BB).

Third, the bank's own attorneys make clear in their final letter of April 12, 2017 that the only remaining item to be considered for production is any individual account records *in Respondent's name*, stating explicitly that they were not indicating that such documents exist. However, they will not address the question whether or not such records exist unless Respondent executes a directive which omits reference to its compelled nature. (Leibman Dec., 4/17/17, ¶ 6 & Ex. AA). No other consents, waivers, authorizations, or directives are requested by the bank. No alternative methods open to Respondent are suggested.

Both because the bank itself had appeared to comply with Respondent's Directive and because its counsel's demands were unacceptable, Respondent declined to execute the bank's waiver form. Without further prompting from Respondent's counsel, the bank's American attorneys tendered by letter of February 28, 2017 a revised "Directive" which purported to be identical to Respondent's original Directive to Credit Suisse, except that it "removes (1) the reference to the January 24, 2017 court order and (2) the request to disclose records directly to the U.S. Department of Justice." (Leibman Dec., 4/17/17, ¶ 4 & Ex. Y).

It appears from both the Government submission of the late evening of March 30, 2017 (Doc. #71) and its representations in the telephone conference held on March 31, 2017, that the Government's only remaining objection to purgation concerns the production by Credit Suisse of any individual account records of Respondent, should they exist. (*e.g.*, AUSA Lenow at 3/31 conference: "Yes, your Honor. We believe that the 2005 and 2006 missing documents are Credit Suisse documents," T23:17-18). Whether or not such documents even exist in the possession of Credit Suisse is not germane to the proper use of the contempt power, as argued below. However, it is worth noting that the only basis to believe that such records ***may*** exist is the prosecutor's unsworn and speculative assertion to that effect. (*See* Doc. #71 at 1).[3]

---

Hence, the "reasonable option" of a Gestino authorization was accomplished by Respondent long before the Court's April 3d Order and already satisfied by Gestino. The only open issue with Credit Suisse and this contempt proceeding is the bank's unique demand that an inaccurate Directive be signed by Respondent.

[3] Reliance on the prosecutor's unsworn speculation led to the Court's Opinion and Order of April 3, 2017 misapprehending the facts upon which it relied, and erroneously treating a prosecutor's speculation as fact; even worse, to support its factual conclusions this Court affirmatively used Respondent's silence as acquiescence to the those hypothesized facts, in plain violation of Respondent's Fifth Amendment testimonial privilege. (Doc. #72) (e.g., "The Government claims, ***and Subject E does not dispute***, that a discrete category of documents – Credit Suisse records dating to the 2005 and 2006 period – which clearly fall within the ambit of the grand jury subpoena

In a final effort to cause production by Credit Suisse if at all possible, consonant with Second Circuit law and Respondent's rights, counsel for Respondent wrote to the American attorneys for Credit Suisse on April 10, 2017. (Leibman Dec., 4/17/17, ¶ 5 & Ex. Z). We provided the notarized passport copy which they had requested – the Government having provided that copy recently – but explained that we would ***not*** accede to the bank attorneys' insistence that the Directive omit the truthful statement that it was provided under compulsion. We wrote: "Omitting such a statement would 'conceal the true nature' of the directive and would 'offend[] basic precepts of honest behavior,' and the enforcement of such an omission by any court would 'invok[e] the district court's imprimatur on a

---

have not been produced," *id.*, at 3, emphasis added; ***"[T]he parties already know*** that such accounts do exist," *id.*, at 5-6, emphasis added, underscore in original).

What actually occurred at the March 31st telephonic conference was that Respondent's counsel declined to comment or speculate about the existence of further records from 2005-2006 at Credit Suisse (e.g., Respondent's counsel: "All of the banks, Judge, were requested in the directive to go back to January 2005. It may be that there aren't compliant records. Maybe there never were. The accounts were not opened. It may be that the banks didn't retain records" T, 3/31/17, 15:16-19; "I don't know whether it [Credit Suisse records for a hypothetical account in Respondent's name in 2005 and 2006] exists or doesn't exist. My client is not required to speak to that," *Id.*, 27:4-5).

First, the only person or entity with actual knowledge concerning whether such records exist at Credit Suisse is Credit Suisse, and its attorneys have assiduously and explicitly avoided commenting on the existence *vel non* of any accounts in Respondent's name, for any time period. (*See, e.g.*, letter from Credit Suisse attorneys, February 28, 2017, Leibman Dec., 4/17/17, ¶ 4 & Ex. Y) ("Please note that, by virtue of this letter, Credit Suisse does not purport to make any statement concerning whether [Respondent] is or was a client of Credit Suisse at any time"). So, there are no facts to be found on this point, contrary to the Court's Opinion and Order.

Second, Respondent and counsel will of course rest on her Fifth Amendment testimonial privilege in this grand jury proceeding and with a criminal trial on the near horizon, and we will have no comment to make to this Court or otherwise regarding the existence or not of any accounts at any particular bank. As the Second Circuit explained in *In re Grand Jury Subpoena, Two Grand Jury Contemnors,* 826 F.2d 1166 (2d Cir. 1987), a compelled bank records directive avoids a Fifth Amendment violation only if it "[does] not acknowledge that accounts in foreign financial institutions were in existence or that they were controlled by appellants … [and does not] indicate whether documents or any other information relating to appellants were present at foreign financial institutions." *Id.*, at 1167, 1170.

By repeatedly using Respondent's silence on the question of Credit Suisse accounts against Respondent, in making factual findings crucial to this continuing contempt citation, this Court's actions violated Respondent's Fifth Amendment *testimonial* privilege, which is undiminished by the "required records" exception to a different aspect of the Fifth Amendment privilege. Continuing the contempt based on facts treated as true because Respondent properly withholds comment on them would only exacerbate that violation.

document that would be misleading.' *In re N.D.N.Y. Grand Jury Subpoena (Alexander)*, 811 F.2d 114, 117-118 (2d Cir. 1987)." (*Ibid.*).

By letter dated April 12, 2017, the bank's attorneys restated their demand that the Directive omit the statement as to its compelled character. (Leibman Dec., 4/17/17, ¶ 6 & Ex. AA). They did identify an alternate route to any further document production, but it is one open only to the Government -- Swiss law, they wrote, allows the bank to act without a Directive with "Swiss government approval through a treaty-based process." (*Ibid.*). In addition to pursuing treaty requests, the Government exclusively could also act pursuant to a plea agreement entered into in May 2014 with Credit Suisse, obliging the bank to provide upon request a volume of information and evidence regarding accounts of U.S. taxpayers. (Leibman Dec., 4/17/17, ¶¶ 9-10 & Exs. DD, EE).

But these instruments of evidence-gathering are the Government's concern. The success or not of the Government in collecting evidence to prosecute Respondent is not a legitimate concern of this Court, not a proper subject of the contempt power, and not a matter for which Respondent in accountable. The matter of the Directive to Credit Suisse necessarily concludes there, as must this contempt proceeding at long last.

## SUMMARY OF ARGUMENT

Respondent cannot and will not execute the false and misleading form of directive demanded by Credit Suisse and the Government acting here at its behest. The potential use by the Government of such a directive against Respondent in a parallel criminal action raises numerous constitutional and evidentiary concerns.[4] Most important for present

[4] It is unnecessary to this proceeding, which under Second Circuit precedent turns, and ends, on the matter of a false directive, for Respondent to share attorney opinion work product concerning the multiple rationales for holding to the stated position, nor is Respondent required to do so to satisfy the Court or the Government.

purposes, the Court of Appeals has enunciated the clarion principle that any bank records directive be accurate and truthful in stating that it has been compelled, if as here, that be the case. Any directive which fails to note its compelled origin may not be enforced in this Court or anywhere in this Circuit. No circumvention of that dictate is permissible.

We state unambiguously that Respondent will not be a party to a false or misleading Directive, regardless of the desires of Credit Suisse or the prosecutor acting on its behalf in pressing a false Directive upon Respondent, one which fails to note the truth that it exists solely by force of this Court's contempt power.

## LEGAL ARGUMENT

### THIS CONTEMPT PROCEEDING THREATENS TO VEER FROM THE PRINCIPLES GOVERNING THE IMPOSITION AND MAINTENANCE OF THE AWESOME CONTEMPT POWER AND MUST NOW BE CONCLUDED WITH PURGATION

The foundational principles underlying the coercive power of contempt cannot be stated too often, lest sight of them be lost in a misplaced focus on end-results and on an errant concern with the Government's level of satisfaction with those results. "[T]he contempt power is among the most formidable weapons in the court's arsenal, and on, and with significant potential for harm if it is wielded imprudently." *United States v. Local J804-1, Int'l Longshoremen's Assn., AFL-CIO*, 44 F.3d 1091, 1095-96 (2d Cir. 1995) (quotation omitted). Not only must the Government carry the burden of showing that "the proof of non-compliance is 'clear and convincing,'" but it must also persuade the Court that

For the record, we wish to make clear that Respondent's position is staked on several rationales, as noted above, and is not limited to those expressions during the telephonic conference in response to inquiry from the Court. We intend no waiver of Fifth Amendment, due process, evidentiary or other objections to the courses of action commanded by this Court or implicated in the Directives employed or sought here, and do not waive objections to the Government's misuse of a grand jury proceeding in a transparent effort to gain trial evidence.

the contemnor "was not reasonably diligent in attempting to comply." *Id.*, at 1096 (citations omitted).

Even if that doubly rigorous showing is made – not just initially in order to invoke the power in the first instance, but continuing through the maintenance of a contempt citation -- the Court must further assess factors including the character and magnitude of the harm threatened by continued contempt. *United States v. United Mine Workers of America*, 330 U.S. 258, 304 (1947) (*cited with approval in In re Grand Jury Witness,* 835 F.2d 437, 443 (2d Cir. 1987)).

The declarations of Respondent's counsel painstakingly set forth the thorough efforts, beyond mere reasonable diligence, exhibited by Respondent in attempting to secure the "required records" from third party banks and Gestino Stiftung. Many hundreds of pages of records are now with the Government solely due to that substantial effort, often involving redundant records Directives provided simply in order to be thorough.

The prosecutor, searching for evidence usable in his own parallel criminal case, will likely remain discontented, but that is irrelevant. The repeated references in the Court's April 3d Opinion and Order to records which the prosecutor speculates may still rest in Credit Suisse's files suggest that this contempt proceeding has lost its way: no case cited by the Government or in the Court's multiple opinions conditions the lifting of contempt on the Government's level of satisfaction with the results derived from a respondent's bona fide efforts to seek records from third parties. Good faith efforts by a respondent may often yield no documents in return, but no just court can punish a respondent who has made the requisite effort even if it gains nothing.

Yet, despite what is objectively a showing by this Respondent of complete compliance, even redundant compliance, the Court's opinions and orders suggest that

purgation is still being viewed as subject to the Government's satisfaction with its evidentiary bounty. It would behoove us all to recall what the Second Circuit told its district courts 30 years ago in the same circumstance:

> We recognize that so-called 'off-shore' and other foreign banking institutions present frustrating roadblocks to the government's efforts to enforce our tax and criminal laws, and we sympathize with the government's desire to develop an effective vehicle for limiting the utility of such accounts for illegally sheltering income. *Nevertheless, we sense that there are boundaries to appropriate judicial involvement in these activities,* and, because we believe the district court contravened sound judicial policy in this instance, we reverse.

*In re N.D.N.Y. Grand Jury Subpoena (Alexander)*, 811 F.2d at 115 (emphasis added). The Court of Appeals believed it necessary to remind judges that the obligations of the judiciary to be faithful to law and truth-telling are not co-terminous with the zealous ambitions of the executive, and that meeting the former does not require satisfying the latter.

Those boundaries have been traversed here, as the Government has led the Court astray. For example, and respectfully speaking, this Court trampled on Respondent's Fifth Amendment rights when it made factual findings central to its April 3d Opinion and Order based on Respondent's failure to address factual speculation from the prosecutor. As we forewarned in the purgation motion which was denied in that Order, the Government bears responsibility for leading this Court into error, by the former's unbridled and desperate efforts to find evidence to support what is at best a tenuous criminal case. But in the end, as always, we must look to the Court for justice and the Court must be mindful of the Court of Appeals' admonitions.

The *Alexander* case presented **exactly the same scenario** as the present case. A foreign bank insisted on its form of directive, one which did not include the statement that the directive was being executed under compulsion. An overeager prosecutor, perhaps desperate for evidence there as well, persuaded the district court to hold the respondent in contempt for failing to

execute an untruthful document, one which failed to report its compelled origin. The *Alexander* Court three decades ago reversed that contempt sanction imposed on that respondent in language unmistakable for its import here:

> We are of the view that it was improper to bring the considerable sanction of contempt to bear as part of a procedure which would conceal the true nature of the purported "Consent Directive." While we have noted that enforcement of this directive does not rise to a constitutional violation, it nevertheless offends basic precepts of honest behavior by invoking the district court's imprimatur on a document that would be misleading.

*Id.*, at 117-18 (holding that a respondent may insist upon, and a district court may not override, the inclusion in a directive that it is entered under compulsion of court order); *see In re Grand Jury Subpoena, Two Grand Jury Contemnors,* 826 F.2d at 1174 n.6 (Newman, J., concurring) ("Were the issue open [and not already decided in *Alexander*], I would have acceded to appellants' request that the consent form be revised to state expressly that it is being signed 'under protest.' I would have thought that our supervisory power should be exercised to make clear that the 'consent' is being signed, not merely pursuant to court order but also under protest.").

Remarkably, since one would think unnecessary any further guidance in the face of such direct language, the *Alexander* Court additionally instructed its subordinate courts:

> Therefore, we exercise our supervisory power over the district courts in this circuit to preclude the use of this form of consent directive. In so doing, despite our distaste for its tactics here, we do not attempt to control the executive branch's behavior ... but only that of the district courts when requested to intervene to enforce this disingenuous practice.

811 F.2d at 118. No emphasis, no highlighting in this brief would serve any useful purpose: what this Court is being asked to do, or is itself contemplating doing, is forbidden to it. It does not avoid the imperative of *Alexander* for this Court to say, as it did in the April 3d Opinion and Order, that "this Court has not and is not directing Subject E to sign any CS Directive."

(*Id.*, at 7). The choice before this Court is clear and cannot be linguistically sidestepped by implying unspecified, unknown, and unimagined ways of meeting the demand of a foreign bank before potentially producing records. Credit Suisse has in its counsel's most recent correspondence of April 12th provided a clarity putting an end to such circumventions -- no path remains open to Respondent other than executing a false directive on the bank's terms, placing any action by this Court other than purgation on a direct collision course with *Alexander*.

Fealty to other precedent has been lacking, as well. The balancing of interests required to be followed here has been entirely one-sided and unbalanced. While improperly taking Respondent's privileged silence as admission and as a result ordering Respondent to face the pain of sanctions, the Court has inexplicably failed to give any weight at all to the Government's ability to obtain its evidence through its own means. The Supreme Court has required in civil contempt matters that courts assess the character and magnitude of the harm threatened by any continued contempt, *United Mine Workers of America*, 330 U.S. at 304, which logically must mean accounting for the Government's ability to gather its own evidence through the means available to it.

At oral argument on March 31st, counsel for Respondent pointed out that Credit Suisse in 2014 entered into a plea agreement of record with the Department of Justice, obligating it to provide a broad swath of information and records regarding accounts held by U.S. taxpayers. The Leibman Declaration of April 17, 2017 attaches both the plea agreement, which counsel had offered on March 31st to provide to the Court, and the related Swiss bank program document of the DOJ, portions of which Credit Suisse bound itself to obey under the plea agreement. The terms of those documents require Credit Suisse upon

request of the Government to provide a welter of detail and evidence concerning a range of bank accounts. The Court has yet to be provided with a sworn declaration from the prosecutor detailing his efforts to utilize those tools.

Further, the letter of April 12th from the Credit Suisse attorneys acknowledges that the bank is able to respond with regard to individual accounts records with "Swiss government approval through a treaty-based process." (Leibman Dec., 4/17/17, ¶ 6 & Ex. AA). Resort to international treaties is exclusively the province of the Government, and yet the Government has offered no sworn account of its resort to such instruments, an effort which would bear directly on the Court's assessment of the character and magnitude of any harm to the grand jury.

Finally, we know that in fact the Government through its own devices entirely been able to secure a volume of records from not only Swiss banks in general, but Credit Suisse in particular. The discovery provided in the parallel criminal case by the same prosecutor as in this matter is replete with Credit Suisse entity and individual account records going back to 1995 (e.g., USLD 229-374, representing the Government's production numbers), none of which were acquired through any action of Respondent. The Second Circuit long ago noted the Government's expansive ability to avail itself of treaty rights with Switzerland to secure records of bank accounts held by U.S. citizens. *United States v. Davis,* 767 F.2d 1025, 1027 (2d Cir. 1985) (referencing Treaty between the United States and Switzerland on Mutual Assistance in Criminal Matters of 1973). It is difficult to reconcile in the contempt calculus how the Government's obvious ability to secure Credit Suisse records absent any Directive at all can receive no weight mitigating against contempt, while Respondent's unwillingness to execute a misleading and inaccurate Directive can continue to subject Respondent to contempt sanctions.

This proceeding has narrowed exclusively to a bank Directive demanded by Credit Suisse, advocated by the prosecution, and urged upon the Court. Respondent faces two options, but only one choice. To sign it, would be to execute a false document. Not to sign it risks offending the Court. But the meaning of *Alexander* cannot be doubted, its language needs no parsing, and its applicability here is apparent. The choice is clear and buttressed by the Second Circuit: Respondent will not sign such a Directive.

If the Court holds otherwise, or enters any but a purgation order now, we respectfully request that the Court stay that order to allow Respondent to seek review in the Court of Appeals for what we submit would be evident error. This Court previously entered a stay order at an earlier stage in the proceedings, when multiple respondents were before the Court addressing the "required records" doctrine in the first instance. (Doc. #12, entered April 23, 2013). We believe that purgation is required now, and respectfully wish to have the Court of Appeals review against its prior, clear jurisprudence any Order which falls short of that outcome.

## CONCLUSION

We submit respectfully that this contempt proceeding should now conclude, with the Respondent having taken all steps which may permissibly be required by the Court. The contempt citation should finally be purged.

**FOX ROTHSCHILD LLP**
*Attorneys for Respondent (Subject E)*

By: ______________________
ALAIN LEIBMAN
Bar # AL8971

DATED: April 17, 2017