

Fox Rothschild LLP
ATTORNEYS AT LAW

Mail: P.O. Box 5231, Princeton, NJ 08543-5231

Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, NJ 08648-2311
Tel 609.896.3600 Fax 609.896.1469
www.foxrothschild.com

Alain Leibman
Direct Dial: (609) 895-6743
Email Address: aleibman@foxrothschild.com

April 20, 2017

***VIA ECF***
Hon. William H. Pauley III, U.S.D.J.
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Re: In re Various Grand Jury Subpoenas (Subject E)
Misc. No. 12-381 (WHP)

Dear Judge Pauley:

This reply letter-brief is submitted in further support of Respondent-Subject E's concluding motion to purge contempt, or, alternatively, for stay of any other Order, pending appeal (Doc. #74). The Government's opposition to this concluding motion (Doc. #76) is, we submit, unsupported by reliable facts, while ignoring inconvenient facts, and continues to reflect a failure to understand the governing law. We submit that purgation should now be granted.

The purgation motion centers on the following unassailable points. Credit Suisse – the last remaining, potential source of records in compliance with the broad Directive served upon it by Respondent, records of which the bank neither admits nor denies possession or even their existence at any time – has in correspondence from its American lawyers attached to the purgation motion made clear that there exist only two pathways for the bank to provide any further individual-account records (after already producing entity records and records for Respondent's ex-spouse): (i) Respondent must sign an amended Directive, one whose form the Second Circuit has unambiguously called false and misleading, and a form which the Court of Appeals has prohibited its district courts from compelling through contempt; or (ii) the



Fox Rothschild LLP
ATTORNEYS AT LAW

Government must pursue a treaty request, an instrument which does not involve Respondent at all.[1]

The Government's response (Doc. #76, 4/19/17) continues to evade the plain meaning and controlling authority of the Second Circuit in *In re N.D.N.Y. Grand Jury Subpoena (Alexander)*, 811 F.2d 114, 117-118 (2d Cir. 1987), an opinion so abundantly and deliberately clear that no further time of this Court need be taken with discussion of the limits imposed there on the contempt power; it evades discussion of Credit Suisse's proffered and only alternative pathway, the Government's treaty authority; it misconstrues Credit Suisse's obligations under a plea agreement with the Government, which affords yet another pathway open only to the Government; and it offers for the first time its own alternative to the sanctioned bank directive approach by suggesting without any legal authority that this Court order Respondent to travel to Europe to personally appear at Credit Suisse to request records which may or may not exist.

<u>Respondent will not execute a false and misleading bank directive</u>

The communications between Respondent's counsel and American counsel for Credit Suisse were conducted transparently and by document, with those documents exhibited to Respondent's moving papers. At their conclusion, the law firm of King and Spaulding, acting for Credit Suisse, advised by letter dated April 12, 2017 (Leibman Dec., 4/17/17, ¶ 6 & Ex. AA) that Swiss law allowed for only two possible paths to a release of individual account records, if they existed at the bank -- Respondent could execute a Directive which omitted the statement necessary to truthfully identify its compelled character, or the bank could act without a

[1] Although the prosecutor's declaration states that the Government has not received Subject E Foundation bank account statements at Credit Suisse from 2006 (Decl. of Jared Lenow, 4/19/17), he is in error. As previously noted: (a) in response to Respondent's Directive, Credit Suisse produced on February 24, 2017 a body of records both as to Foundation accounts Gestino accounts (from the apparent inception of the account <u>in 2006</u>, including account-opening records), and another individual's account records, all of which were turned over to the Government (Leibman Dec., 3/29/17, ¶¶ 10-11); the majority of these had already been produced by the Foundation itself, in response to Respondent's Directive, and turned over to the Government (*ibid.*); and (b) Respondent's counsel also made a request of Gestino Stiftung by letter dated February 17, 2017 to cooperate fully with Credit Suisse and execute any authorizations required of it by Credit Suisse to ensure full production. (Leibman Dec., 4/17/17, ¶ 8 & Ex. CC). Gestino did so, faithfully executing the precise consent form prescribed by the bank. (Leibman Dec., 4/17/17, ¶ 7 & Ex. BB).

Attached as Exhibit 1 hereto are a series of Credit Suisse documents, produced by the bank on February 24, 2017 and thence to the Government, all of which bear 2006 dates, establishing that Mr. Lenow is mistaken. (They have been redacted only for attachment here; the documents in Mr. Lenow's hands are entirely unredacted).



Fox Rothschild LLP
ATTORNEYS AT LAW

Directive with "Swiss government approval through a treaty-based process." The latter is obviously open only to the Government, not the Respondent.

Respondent, as we have made clear, will not execute a fraudulent Directive, and *Alexander* makes equally clear that this Court may not compel Respondent to do so, regardless of what further objections Respondent has to executing such a false instrument. Thus, on this narrow but immovable point, discussions of Fifth Amendment privileges or other constitutional or evidentiary concerns are unnecessary.

As we point out in our principal moving brief (*id.,* at 9-10), the character and magnitude of the harm caused by any alleged non-compliance by a contemnor must factor into any contempt determination, making relevant for consideration the alternative avenues open to the Government. We pointed out the ample treaty authority open to the Government vis-à-vis Credit Suisse (*id.*, at 14), but the Government is notably silent concerning its apparent treaty rights, which could enable it to obtain the same records subject to bank directive from an individual respondent, and may well have already been used by the Government to obtain numerous Credit Suisse records recently produced in criminal-case discovery. It is not hard to hypothesize a number of bad-faith reasons why a prosecution would fail to be candid with the Court about its alternative powers to obtain records, ranging from evidentiary advantages secured in derogation of the Fifth Amendment to sheer leverage against a Respondent-now defendant obtained through Court sanctions; it beggars the imagination to come up with a single good-faith reason.

The Government, confronted in Respondent's Motion with a filed Credit Suisse plea agreement and obligation to provide records and information upon request of the Government (Leibman Dec., 4/17/17, ¶¶ 9-10 & Exs. DD, EE) (facts never shared with the Court by the Government), relegates that further evidence-discovery mechanism to a footnote, and fails to fully credit its broad reach. (Doc. #76, at 3 n.1). A reading of the plea agreement, and the related provisions of the Department of Justice's Swiss Bank program terms, shows that Credit Suisse could be required to provide a wide array of records, if only the Government would ask.[2] Again,

---

[2] For example, the plea agreement provides that "Credit Suisse AG must promptly disclose all evidence and information [described in specified sections of the DOJ Swiss Bank program]," (Ex. DD, ¶ 7(B)(1)); "Credit Suisse AG will provide all necessary information for the United States to draft treaty requests to seek account records and other information, and will collect and maintain all records that are potentially responsive to such treaty requests to facilitate prompt responses" (Ex. DD, ¶ 7(B)(4)). Under the incorporated terms of the Swiss Bank program, the bank is required to provide upon request detailed information about all so-called "U.S. Related Accounts." (Ex. EE, Section II(D)(2)).



Fox Rothschild LLP
ATTORNEYS AT LAW

the Government for its own reasons prefers instead to continue to follow a course putting this Court in direct collision with *Alexander*.

The lack of straightforwardness in the Government's position goes further. Given that Credit Suisse, according to its own web site, has multiple United States locations, it appears that the Government could serve a grand jury subpoena upon an American office or subsidiary of the bank, and thus readily compel the bank to produce even records held in European locations, no matter the limitations imposed by Swiss law. *See, e.g., In re Grand Jury Subpoena Dated Aug. 9, 2000,* 218 F. Supp.2d 544, 554, 562 (S.D.N.Y. 2002) (entity with offices in U.S. and a foreign country cannot resist production of the foreign-held records on that ground, and must produce them in response to a grand jury subpoena even if doing so engenders a risk of criminal or civil penalties in the foreign jurisdiction). For its own reasons, the Government has chosen not to subpoena Credit Suisse directly.

The singular thing the Government does choose to say about the instruments which exist for obtaining hypothetical bank records for 2005-2006 from Credit Suisse is remarkable. For the first time in motion practice going back to June 2016, and in contradiction to its prior positions, the Government response actually suggests that this Court order Respondent to travel to Europe to personally request Credit Suisse to produce records in order to purge contempt. No legal authority supporting such an extraordinary proposition is provided. The Government studiously ignores the failure of the on-record April 12th correspondence from King and Spaulding to list a "let's go to Europe" option. Instead, AUSA Lenow cites in his declaration to a statement (A letter? Email? -- none are attached or identified) from an unnamed "legal counsel for Credit Suisse" (Unwilling to go on record? Anonymous source?) who purportedly told Mr. Lenow that "an account holder may obtain their account records by physically traveling to, or designating an authorized representative to physically travel to, a Credit Suisse location in Switzerland and requesting the records …." (Decl. of Jared Lenow, Doc. #76-1, ¶ 2).

There are so many things either impermissible or paradoxical about this foolhardy suggestion that they may be summarized fairly quickly:

> (1) <u>No authority exists for such a forced travel order.</u> The Government's response, of course, cites no case law for the proposition that a district court may go beyond ordering a subpoena respondent to produce more than records in his/her possession and to seek out records from third-party banks (as this Court had ordered done, over Respondent's opposition that the Bank Secrecy Act provides no authority for doing so), to actually ordering both the physical transport of the individual respondent



Fox Rothschild LLP
ATTORNEYS AT LAW

and the pursuit abroad of the meetings and conversations necessary to press the subject request.

In passing, and only in its discussion opposing a stay of any order (Doc. #76, at 4), does the Government cite *Marc Rich & Co. A.G. v. United States*, 707 F.2d 663 (2d Cir. 1983) for the proposition that "persons in the United States can be required to retrieve subpoenaed material from abroad." *Id.*, at 667. The cited case neither involved an individual, nor did the "retrieval" involve physical travel abroad, and no third party entity (such as a bank) was the custodian of the subject records. Rather, *Marc Rich* involved the far more ordinary circumstance of a dual-located business, where a foreign entity related to a New York entity refused to produce its corporate records; the court held that the foreign entity was within the district court's jurisdiction and could be compelled to produce even records held overseas. The cited case – although supportive of the notion, stated above, that a subpoena directly to Credit Suisse would be enforceable – is very much the proverbial apple to our case's orange.

(2) Up until last night and through months of contempt litigation, the Government has acceded to the sensibility of using bank directives to seek records. This Motion is the fourth in this proceeding since the Government moved in June 2016 for additional contempt sanctions. Until its opposition brief filed yesterday, the Government had not objected to the only sensible and practical method by which a U.S. taxpayer could request a foreign bank to produce account records, if any subpoena-compliant records were in the bank's possession, and the method approved in Second Circuit cases as appropriately sensitive to Fifth Amendment testimonial-privilege concerns: a Directive to the pertinent bank.

Furthermore, both the Government and, more importantly, the Court have explicitly or implicitly endorsed that approach taken by Respondent here. In early February 2017, Respondent served a number of Directives to Credit Suisse and other institutions for an expansively-described body of records going back to January 2005. Those Credit Suisse Directives (directed, respectively, to two separate bank offices in Switzerland appearing in Government criminal-case discovery) were promptly provided to AUSA Jared Lenow by Respondent's counsel, as were Directives issued in identical form to several other foreign banks noted in that discovery or in Government motion papers in this parallel grand jury proceeding.


Fox Rothschild LLP
ATTORNEYS AT LAW

After serving those Directives on the affected banks, Respondent then moved for purgation. (Doc. #62, 2/8/17). In its opposition to that first purge motion (Doc. #64), the Government *made no objection at all to the Respondent's reliance on the bank-directive approach with foreign banks* To the contrary, the only concerns expressed by the Government were, first, that "the making of the Requests [i.e., the multiple Directives, to Credit Suisse and other banks]" did not equate to production of documents, and so compliance required follow-on production of records not yet released by the banks receiving Directives. (*Id.,* at 2); second, that banks might have concerns about producing compliant records directly to the Government, as provided in the Directives, and about acting on Directives which noted that they were executed under compulsion of Court order. (*Ibid.*). (As to the first objection, we provided notice to all recipient banks, successfully redirecting production to Respondent's counsel, and we have as to the last concern made clear our obedience to *Alexander*).

The Court's Opinion and Order which followed (Doc. #65, 2/13/17) also endorsed the bank-directive approach, commending the "affirmative steps" taken by Respondent to comply with the compulsion order in effect. *Id.*, at 3. Embracing the Government's concerns, the Court then indicated that Respondent should "obtain the records directly from the foreign entities and then retransmit them promptly to the Government," *id.*, at 4, which was done. The Court also indicated that Respondent could execute waivers in a form which failed to note their execution under compulsion, *ibid.*, a suggestion which failed to account for the holding of *Alexander.* But nothing in the Court's Order found flaws in the bank-directive approach.

(3) <u>It would impinge upon Respondent's Fifth Amendment testimonial privilege to take any steps acknowledging that Respondent is or ever was an "account holder" at Credit Suisse; hence, the bank directive approach</u>. As the Second Circuit made clear in *In re Grand Jury Subpoena, Two Grand Jury Contemnors*, 826 F.2d 1166 (2d Cir. 1987), it is vital to retaining one's Fifth Amendment testimonial privilege that a bank directive observe certain constitutional dictates: a compelled bank records directive avoids a Fifth Amendment violation only if it ***"[does] not acknowledge that accounts in foreign financial institutions were in existence or that they were controlled by appellants*** ... [and does not] indicate whether documents or any other information relating to appellants were present at foreign financial institutions." *Id.*, at 1167, 1170 (emphasis added). Ergo, the bank directive, which makes no claim of the person executing it being a customer, now or ever, of the subject bank and contains no concession that an account ever existed at the bank.



Under these 30-year old statements of constitutional principles, a suggestion that any respondent be ordered to travel anywhere in order to present themselves as a bank customer, now or ever, would force a Fifth Amendment violation and is unlawful. The suggestion, then, is a non-starter.

(4) At the Government's request, Respondent is barred from travel generally within the United States, much less abroad, and was obliged to surrender a passport. This presents a smaller, practical problem, but it is curious that the Government's submission fails to note or propose a remedial approach to the very bail restrictions upon which the Government insisted, without which remediation Respondent cannot visit Disneyworld, much less Zurich.

In sum, then, Respondent truly has done all which may be compelled by this Court. We urge the Court not to adopt the views or concerns of the Government, which would lead this Court astray.

Without intending to appear to take this most serious of matters in any other way, the Government's position, heedless of Second Circuit precedent, practicality or consistency, and fundamental Fifth Amendment principles, cannot help but bring to mind the conclusion of the film Thelma and Louise. At the picture's end, a car is being driven, recklessly and fast, by one of two friends, the other occupying the passenger seat. They are the protagonists of the film. They are desperate, and have in their desperation chosen to ignore or dismiss available courses of action. They dramatically race the car along a road leading to a cliff, paying no attention to signs warning of impending disaster, and sail off the cliff to their demise.

The Government is metaphorically driving that same car here, and inviting the Court to go along for the ride. The cliff nears, marked by a sign warning: "*Alexander*: the road's end has been reached."

The Government's opposition, its unwillingness to release a point of pressure on its Respondent/defendant, is undiminished and regrettable. However, we do ask this Court to observe that road sign, and to agree that the contempt citation must now be purged. Of course, should the Court disagree with Respondent, we ask that any Order be stayed pending an expedited appeal. Given the now-familiar Second Circuit cases, the likelihood of success on an appeal would be substantial and the injury to Respondent of a continued contempt citation


irreparable. District courts routinely grant stays pending appeal in contempt cases, and this Court did so on an earlier occasion, with the Government's ready consent.

The Government's lament that a stay pending appeal would pose "an ongoing risk that the statute of limitations will expire" on certain unspecified charges (Doc. #76, at 4) is poorly taken for several reasons. First, as we noted in our memorandum of law in support of renewed motion to purge (sealed, filed 3/29/17), for almost two years the Government took no action in this Court to dispute the adequacy of Respondent's initial production under the Court's February 2013 Order and was justly criticized for its lassitude at oral argument on the Government's June 2016 motion for additional contempt sanctions. (*See id.*, at 2-3, 4 n.2) ("The Government never pressed Subject E to pay any monetary sanctions under the Contempt Order [of February 2013];" the Government waited "almost 20 months after Subject E's production to seek additional sanctions ...."); (see also Hearing on Government's Motion for additional contempt sanctions, Nov. 3, 2016, at 3:23-24, with Court asking prosecutor: "Why did the government wait so long to bring this matter back to this Court?"; *id.*, at 5:14-17, the Court: "It's now more than three and a half years later [from the February 2013 Order]. The government can't even tell me whether any fine was imposed, so why should I issue another order if the government doesn't enforce the order it got?"). So, the Government's hands are decidedly unclean on the issue of delays.

Second, it is fairly outrageous to suggest that Respondent's rights, including ones of constitutional import, be abrogated or even diminished in favor of the non-constitutional and less imperative interests of the Government.

Third, it is highly doubtful that obtaining additional records from calendar years 2005 and 2006, even if they exist at Credit Suisse, will affect any *bona fide* prosecutorial decisions. Generally, the statutes of limitation applicable to most Title 18 offenses are five years, and those for Title 26 tax offenses are six years. Any events in 2005 and 2006 are many years outside the typical statutes of limitation.



Fox Rothschild LLP
ATTORNEYS AT LAW

Hon. William H. Pauley III, U.S.D.J.
April 20, 2017
Page 9

We appreciate the Court's patient attention to this reply letter.

Respectfully yours,

Alain Leibman

AL/bc
Attachment (Ex. 1)
cc. AUSA Jared Lenow (*via ECF*)
AUSA Katherine Reilly (*via ECF*)
Matthew S. Adams, Esq. (*via ECF*)

# EXHIBIT 1

Maria Bahgat
SignBase / CLFP 11

- 7 MRZ. 2006

Inaktiv / gelöscht / geprüft: Ae

Formalities Controls
kontrolliert CLFF 23

28. FEB. 2006

Weber Caroline
A165208

20060322453022224,0460,0002

# Specimen signatures of the company

for domiciliary companies and special financial intermediaries

Company [redacted]

Residence: Street/No. Heiligkreuz 49
Zip Code/Town FL-9490 Vaduz

Registered office VADUZ

Legal form (corporation, foundation, etc.) FOUNDATION

The persons named below are authorised to represent the company in its business relations with CREDIT SUISSE (hereinafter referred to as the Bank) without restrictions. In particular, they are authorised to operate accounts and safekeeping accounts in the company's name, take up loans, enter obligations on bills of exchange, issue urgent payments, and sell, pledge or withdraw securities, rights and other instruments on behalf of the company. Regardless of any changes published in the Commercial Register and in case of death or loss of capacity to act (Art. 35 of the Swiss Federal Code of Obligations) of the proprietor of a sole proprietorship, the signatures below and the corresponding signatory and representative rights are valid until revoked by special notice to the Bank

| Persons authorized to sign | | Specimen signatures |
|---|---|---|
| First name Brigitte | Date of birth 19.12.1955 | [signature] |
| Name Schaufelberger | ☐ individually ☒ jointly by two | |
| Nationality CH | ☐ collectively | |
| First name | Date of birth | |
| Name | ☐ individually ☐ jointly by two | |
| Nationality | ☐ collectively | |
| First name | Date of birth | |
| Name | ☐ individually ☐ jointly by two | |
| Nationality | ☐ collectively | |

The undersigned authenticates the signatures above as well as the indicated form of signature and representation. Furthermore, the company confirms receipt of the Bank's **General Conditions and Safe Custody Regulations.** The contents thereof and all other conditions communicated by the Bank have been approved. The place of performance is the location of the Swiss branch of the Bank with which the contractual relationship exists. For companies currently domiciled abroad or who move their domicile abroad in the future, this remains the place of performance as well as the place of enforcement (special domicile in terms of Article 50 Paragraph 2 of the Swiss Federal Law on Debt Enforcement and Bankruptcy [Schuldbetreibungs- und Konkursgesetz]). **All legal relations between the company and the Bank are governed by Swiss law. The sole place of jurisdiction for all legal proceedings is Zurich or the place of business of the Swiss branch of the Bank with which the contractual relationship exists. The Bank also reserves the right to take legal action against the company before any other competent court.**

Cross the box as appropriate: ☒ New ☐ Annex to one or more existing forms/company signatures ☐ Replaces all previous forms/company signatures ☐ ______

Place, date Vaduz, 10. Februar 2006/cif

Signature of the company (see regulations on the following page) [signature]

To be completed by the Bank
CIF No. 0835-840381-4
**Product code: 01001**

Signature and stamp [signature]

SWLN 1 - 334 73 44
Susanne Rüegg Meier
A962295

Maria Bahgat
SignBase / CLFP 11

- 7 MRZ. 2006
Inaktiv / gelöscht / geprüft:

Formalities Controls
kontrolliert CLFF 23
2 8. FEB. 2006
Weber Caroline
A165208

20060322245302224,0460,0000

# Specimen signatures of the company

**for domiciliary companies and special financial intermediaries**

Company [redacted]

Residence: Street/No. Heiligkreuz 49
Zip Code/Town FL-9490 Vaduz

Registered office VADUZ    Legal form (corporation, foundation, etc.) FOUNDATION

The persons named below are authorised to represent the company in its business relations with CREDIT SUISSE (hereinafter referred to as the Bank) without restrictions. In particular, they are authorised to operate accounts and safekeeping accounts in the company's name, take up loans, enter obligations on bills of exchange, issue urgent payments, and sell, pledge or withdraw securities, rights and other instruments on behalf of the company. Regardless of any changes published in the Commercial Register and in case of death or loss of capacity to act (Art. 35 of the Swiss Federal Code of Obligations) of the proprietor of a sole proprietorship, the signatures below and the corresponding signatory and representative rights are valid until revoked by special notice to the Bank.

| Persons authorized to sign | | Specimen signatures |
|---|---|---|
| First name Beda<br>Name Singenberger<br>Nationality CH | Date of birth 04.08.1953<br>[X] individually<br>[ ] jointly by two<br>[ ] collectively | [signature] |
| First name Daniel Eric<br>Name Joerin<br>Nationality CH | Date of birth 29.03.1958<br>[ ] individually<br>[X] jointly by two<br>[ ] collectively | [signature] |
| First name Erwin Matthias<br>Name Schulthess<br>Nationality CH | Date of birth 11.12.1963<br>[ ] individually<br>[X] jointly by two<br>[ ] collectively | [signature] |

The undersigned authenticates the signatures above as well as the indicated form of signature and representation. Furthermore, the company confirms receipt of the **Bank's General Conditions and Safe Custody Regulations.** The contents thereof and all other conditions communicated by the Bank have been approved. The place of performance is the location of the Swiss branch of the Bank with which the contractual relationship exists. For companies currently domiciled abroad or who move their domicile abroad in the future, this remains the place of performance as well as the place of enforcement (special domicile in terms of Article 50 Paragraph 2 of the Swiss Federal Law on Debt Enforcement and Bankruptcy [Schuldbetreibungs- und Konkursgesetz]). **All legal relations between the company and the Bank are governed by Swiss law. The sole place of jurisdiction for all legal proceedings is Zurich or the place of business of the Swiss branch of the Bank with which the contractual relationship exists. The Bank also reserves the right to take legal action against the company before any other competent court.**

Cross the box as appropriate: [X] New  [ ] Annex to one or more existing forms/company signatures
[ ] Replaces all previous forms/company signatures
[ ] ____________

Place, date Vaduz, 10. Februar 2006/cif

Signature of the company (see regulations on the following page)

Signature and stamp

To be completed by the Bank
CIF No. 0835-840381-4
**Product code: 01001**

SWLN 1 - 334 73 44
Susanne Rüegg Meier
A962295

110118 (Version 3 03, CREDIT SUISSE legal form)

Formalities Controls
kontrolliert CLFF 23

2 8. FEB. 2006

Weber Caroline
A165208

20060322245302224,0462,0000

# Contract for the opening of an account and/or safekeeping account

Between

[redacted]

Heiligkreuz 49

FL-9490 Vaduz

(hereinafter referred to as depositor)

and CREDIT SUISSE , ZÜRICH

(hereinafter referred to as Bank)

the following has been agreed upon:

**1. Account**

The Bank is instructed to credit funds to an account to be opened in the name of

[redacted]

Said account is subject to the terms and conditions fixed separately.

**2. Safekeeping account**

If, at the present time or on a subsequent date, assets such as securities or other valuables (hereinafter referred to as Safe Custody Assets) should be transferred to the Bank for safekeeping, these items are to be placed into a safekeeping account carried in the same name as the account.

**3. Accounting**

In the absence of instructions to the contrary, transactions executed on behalf of the depositor will be passed through the account referred to under section 1. The same account will also be credited with the income derived from securities in safekeeping as well as with all remittances in foreign currency received in favour of the depositor, provided conversion is possible.

**4. More than one depositor**

Each depositor is entitled, individually and independently, to deposit, pledge or withdraw, in whole or in part, any Safe Custody Assets or cash funds in the account. The right to act individually or independently will continue in the event of death or incapacity to act on the part of one of the depositors. Upon fulfilling its obligations towards any one of the depositors, the Bank is legally released toward all of them. Each depositor may confer power of attorney upon any third person or persons who will then be entitled to act as agent or agents for all the depositors.
Each depositor, as joint debtor, is liable to the Bank if the account shows a debit balance.
Provided no other instructions are given to the contrary, all remittances or Safe Custody Assets received by the Bank in favour of one of the joint depositors will be credited to the account or, alternatively, placed into the safekeeping account referred to under sections 1 and 2.

| To be completed by the Bank<br>CIF No 0835-840381-4 | Product code: 01007 |
|---|---|

112 603 (Version 4 03, CREDIT SUISSE legal form)

09.02.2006 15:13:12

20060322453022224,0462,0001

**5. Correspondence**

All correspondence and statements pertaining to the account and/or safekeeping account are to be mailed regularly

to: [redacted]

Idastrasse 15, 8003 Zürich

**6. Retaining of correspondence**

☐ The depositor hereby instructs CREDIT SUISSE (hereinafter referred to as the Bank) to retain all the correspondence and documents pertaining to the account and safekeeping account. The depositor and every present and future holder of unlimited powers of attorney and external asset managers (EAMs), regardless of the existing signatory authority (joint or single signature), have the right to collect correspondence at any time.

Correspondence that is neither collected nor forwarded on the instructions of the depositor, is to be sent on a

☐ weekly ☐ monthly ☐ bi-monthly ☐ quarterly ☐ semi-annual ☐ annual

basis to ____________________

Correspondence retained by the Bank in accordance with the above instructions shall be deemed – irrespective of whether it is sent or handed over at a later date – to have been delivered as soon as it is filed either electronically or physically. The depositor therefore assumes full responsibility for any consequences and possible damages that might result from the retaining of the correspondence. The Bank is under no obligation whatsoever to undertake any corporate actions unless the depositor has given specific instructions to this effect. Correspondence not collected by the depositor will be destroyed by the Bank three years after its date of issue. An annual fee shall be charged for the safekeeping.
The depositor takes note that no copies can be made of certain original documents collected (in particular credit cards, PIN and other correspondence).

Comments:

**7. General Conditions and Regulations**

All mutual rights and obligations deriving from this Contract as well as all questions regarding jurisdiction and the applicable law are subject to the Bank's forms of

- General Conditions
- Safe Custody Regulations

which form part of this Contract.

**8. Special arrangements**

Place, date Vaduz, 10. Februar 2006/cif

CREDIT SUISSE

The depositor

Susanne Rüegg Meier

Cüneyt Karadag

112 603 (Version 4 03, CREDIT SUISSE legal form)

09.02.2006 15:13:12

Formalities Controls
kontrolliert CLFF 23

16. FEB. 2006

Weber Caroline
A165208

20060322245302224,0465,0000

# General authorization for fiduciary deposits

I/We herewith authorize you to arrange with a foreign bank or a foreign branch of your institution fiduciary deposits for my/our account. The deposits and their extensions, if any, are made in your name and at your disposal, but at my/our risk.

The applicable law shall be Swiss law whereby measures of the country of the currency and of the country where the funds are invested shall be given effect.

If a foreign bank does not fulfil its commitments or fulfils them only partially, especially due to measures of the country of the currency or of the country where the funds are invested, you are obliged solely, if necessary, to assign me/us your claim against the foreign bank.

**Should you not or not in due course receive from me/us instructions to the contrary,** you are authorized, at your discretion, to decide if and when a deposit should be effected and to fix the amount, the currency, the depository bank, the duration and the interest conditions. You will act in my/our best interest, but you will not assume any liability.

Interest payments on such deposits are to be credited to my/our account after deduction of the usual fiduciary commission.

This authorization is valid until cancelled. The cancellation must reach CREDIT SUISSE not later than five business days before the maturity of the current deposit.

Sender [redacted]

Place, date

Vaduz, 10. Februar 2006/cif

Signature [redacted]

To be completed by the Bank
CIF No. 0835-840381-4 Product code: 0300

SWLN 1 - 334 73 44
Susanne Rüegg Meier
A962295

20060322453302224,0467,0000

US withholding tax
Declaration not to invest in US securities for non-US persons

Formalities Controls
kontrolliert CLFF 23
16. FEB. 2006
Weber Caroline
A165208

# Declaration – non-individuals

Safekeeping account no.: 0835-840381-45

Name of safekeeping account holder: [redacted]

Legal form: Foundation

We hereby declare that US securities that could produce reportable amounts within the meaning of section 2.43 of the QI Agreement will not be held in the safekeeping account specified above.

We acknowledge that the bank will no longer hold such US securities in the aforementioned safekeeping account. Purchase orders for such US securities will no longer be executed and such US securities will not be accepted for safekeeping. We declare our agreement that the bank will in future, without separately notifying ourselves or any of our authorized representatives, treat such orders as if they had not been issued. We further acknowledge that the bank accepts no liability in this connection.

Place, date

Vaduz, 10. Februar 2006/cif

Signature

[signature]

To be completed by the bank

CIF No. 0835-840381-4 Product code: 09064

[signature]

SWLN 1 - 334 73 44
Susanne Rüegg Meier
A962295

125 458 9 03

Formalities Controls
kontrolliert CLFF 23

2 8. FEB. 2006

Weber Caroline
A165208

20060322453302224,0456,0000

# General Deed of Pledge

1. The undersigned



(hereinafter referred to as the pledgor)

herewith **pledges** in favour of CREDIT SUISSE (hereinafter referred to as Bank) any and all securities, savings and investment books of any kind (hereinafter referred to as the books), loan stock rights not evidenced by certificates (especially securities for which the issue of certificates is deferred), metal deposits and other valuables which at present or in the future are held by the Bank or are held under its name but for the pledgor's account by any agent or representative of the Bank, as well as any rights to recovery of possession of such assets. Securities which are not in bearer form are pledged to the Bank in accordance with Article 901, Section 2 of the Swiss Civil Code (hereinafter referred to as the SCC).

The pledgor pledges to the Bank all of his present and future outstanding claims and rights against the Bank. The pledge therefore covers any and all of the pledgor's assets which are held at the Bank in any and all of the pledgor's Swiss or foreign currency accounts, metals or coin accounts, including fiduciary investments held by the Bank for the pledgor's account.

The pledge also includes all forfeited, current and future associated rights such as interest and dividend payments and subscription rights.

2. The purpose of this pledge is to cover any and all claims of the Bank against



~~ourselves~~

(hereinafter referred to as the debtor)




as a result of any contract or agreement entered into or to be entered into in the future within the framework of business relationships. This applies to both the principal and the accrued and maturing interest, commissions and fees. Collateral deposited with one of the Bank's offices is also liable for claims of other offices of the Bank. In the case of several claims, the Bank shall determine for which claim the collateral or liquidation proceeds are liable.

3. Where real estate, commercial paper or negotiable instruments, goods and chattels or securities issued on the basis of goods are pledged as collateral, the pledgor is liable for the customary insurance in respect of the pledged property, real estate, items or goods represented thereby.

The pledgor hereby assigns to the Bank all insurance and other private or public law claims (including expropriation claims) accruing to him with respect to the aforementioned securities and property, and the Bank is entitled to effect the necessary communications and to collect such proceeds or indemnification and to give receipt on his behalf.

4. The present pledge shall be in addition to and independent of any existing or future guarantees and shall remain in force until such time as the obligations to the Bank shall have been fulfilled in their entirety. The release of individual pledged items from the pledge does not affect the Bank's lien on the other pledged items. In the event that collateral is exchanged, the new items shall be subject to this pledge without further formalities. The whole item is subject to this pledge, even if its value is increased by reason of additional payments or for any other reason.

| To be completed by the Bank | |
|---|---|
| CIF No. 0835 - 840381 - 41 | Product code: 09030 |

20060322453022224,0466,0001

5. The Bank is entitled to call upon the debtor to provide additional collateral if its value decreases or if the ratio of its value to the claims is no longer satisfactory in the Bank's opinion. Should the debtor not comply with this demand within the period stipulated by the Bank, or fail to duly effect payment for a debt secured under the pledge, all of the Bank's claims against the debtor automatically become due, entitling the Bank to dispose of the collateral at its discretion (including, without limitation, a purchase by the Bank) and without any formalities and to apply the proceeds thereof to cover its total claims after deduction of any expenses incurred, or to satisfy its lien by set-off, if necessary, of its claims on the debtor against the pledgor's claim on the Bank, regardless of the currency. In the case of pledged books, the Bank exercises its specified right to dispose of a book by liquidating the book and applying the proceeds thereof to cover its claims. For this purpose the Bank is entitled at its discretion to call in the book for repayment, to collect payments, and to give legally valid receipt thereof.

Should the Bank refrain from exercising its right to dispose of pledged property, or delay in doing so, this neither constitutes a waiver of the Bank's right nor does it entail any responsibility for the Bank.

Upon its claims becoming due, the Bank shall also be entitled to dispose of the pledged collateral at its discretion, provided, however, previous notice has been given to the debtor. The obligation to give notice shall be waived in the event of impending danger (marked fluctuations in market prices, etc.).

The Bank is entitled to institute ordinary execution for payment of a debt against the debtor without having first to realise the collateral by forced execution or by free sale. In doing so, the Bank does not, however, waive its rights under the lien or pledge.

6. If the deed of pledge is issued on behalf of third parties, all notices shall be deemed to be valid if they have been sent to the debtor. In the case of pledged books, the Bank is entitled to notify the issuer that a book has been pledged. The pledgor undertakes to cooperate with the Bank to transfer the collateral to a new buyer. Pledged securities which are not in bearer form are hereby assigned blank to the Bank in the event that it should become necessary to dispose of them.

7. In the case of pledged titles to real estate and other claims on a pledge secured by real property, the pledgor shall undertake all necessary measures, such as applications, giving notice, amortisation, etc., to maintain the rights deriving from the pledge; he relieves the Bank of any responsibility in this regard. Moreover, the Bank shall be entitled, but not compelled, to exercise all those rights and to make decisions which are the prerogative of the pledgor or the owner of the pledged property. In particular the Bank is entitled, but not compelled, in the event of termination of a claim secured by the pledge, to directly terminate the pledgor's claims against the mortgagor and to exercise all rights against the mortgagor in its own name. In the case of pledged titles to real estate, particularly property owner bonds, it is hereby agreed that in the event of termination by the Bank, no notice shall be required. If the relevant cantonal legislation contains different mandatory provisions, it is hereby agreed that the minimum termination notice fixed by the relevant cantonal legislation shall take precedence. Consequently, the Bank shall be authorised to directly collect the capital, interest and other proceeds of the mortgages, and to enforce the claims for rent within the meaning of Article 806 SCC as if it were the actual owner of the title or pledged real estate title. In the case of sale or division of the pledged property, the rights which accrue to the creditor according to Articles 832, 833 and 852 SCC shall be solely vested in the Bank for the duration of the pledge relationship; the pledgor agrees to transfer to the Bank any and all of the respective notices which come to his attention without delay and to accept its decision. Non-compliance shall result in the immediate call for repayment of the claims.

In the case of pledged titles to real estate (in particular property owner bonds), the lien shall cover the current annual interest and the annual accrued interest since the title's date of issue. The interest shall be charged at 5 % p.a. unless a higher rate or a higher maximum interest level is specified, in which case the latter takes precedence. The Bank may require part or the whole of either the principal or interest of pledged titles to real estate as collateral for its claims.

8. The assets pledged hereunder shall also serve to secure claims of the Bank against the debtor based on outstanding credit card payments. The pledgor herewith confirms that the Bank is authorized in this regard to cover outstanding credit card payments (including charges and costs) of the debtor, without providing the debtor and/or the pledgor with notification or a deadline, by a private sale of the assets pledged hereunder (including through a purchase by the Bank) and by applying the resulting proceeds against the outstanding payments, as soon as the debtor is in arrears on these payments. The assets can be retained by the Bank for at least three months after the credit card account has been closed or until full payment has been received for all the funds owed on the card (including charges and costs) which existed before the credit card account was closed or that were incurred in collection proceedings.

20060322453022224,0466,0002

9. The Bank's form of Safe Custody Regulations and General Conditions, receipt of which is hereby confirmed, supplement the terms of this contract.

10. The place of performance is the location of the Swiss branch of the Bank with which the contractual relationship with the debtor exists. For pledgors currently domiciled abroad or who move their domicile abroad in the future, this remains the place of performance as well as the place of enforcement (special domicile in terms of Article 50 Paragraph 2 of the Swiss Federal Law on Debt Enforcement and Bankruptcy [Schuldbetreibungs- und Konkursgesetz]).

**All legal relations between the pledgor and the Bank are governed by Swiss law. The sole place of jurisdiction for all legal proceedings is Zurich or the place of business of the Swiss branch of the Bank with which the contractual relationship with the debtor exists. The Bank also reserves the right to take legal action against the pledgor before any other competent court.**

| Place, date | Signature |
|---|---|
| Vaduz, 10. Februar 2006/cif | |
| Place, date | Signature |
| Place, date | Signature |
| Place, date | Signature |
| Place, date | Signature |

SWLN 1 - 334 73 44
Susanne Rüegg Meier
A962295

09.02.2006 15:30:39