UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                              :
In re:                                        :     12 Misc. 381
                                              :
VARIOUS GRAND JURY SUBPOENAS                  :     OPINION & ORDER
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

WILLIAM H. PAULEY III, United States District Judge:

Respondent Subject E moves to purge her contempt citation. For the reasons that follow, Subject E's motion is denied.

BACKGROUND

This is Subject E's third attempt to purge the contempt citation arising from her failure to comply with this Court's February 13, 2013 Memorandum and Order (the "Order"). The tortured history of this proceeding need not be recited in great detail, but resolving what Subject E has termed her "concluding motion to purge contempt" requires a brief discussion of the relevant background.

On January 24, 2017, this Court held Subject E in civil contempt based on her refusal to respond to a grand jury subpoena seeking foreign bank records. In re Various Grand Jury Subpoenas, 2017 WL 361685 (S.D.N.Y. Jan. 24, 2017). To assure full compliance, this Court imposed monetary sanctions of $1,000 per day. In the weeks that followed, Subject E authorized several foreign banks to release the relevant records to the Government. Based on those authorizations, Subject E filed her first motion to purge contempt, assuring this Court of her full compliance. On February 13, 2017, this Court denied her motion without prejudice. Because Swiss law precluded some of the foreign banks from directly transmitting records to the

Government, this Court directed Subject E to find other ways to facilitate the disclosure of those records. In re Various Grand Jury Subpoenas, 2017 WL 564676 (S.D.N.Y. Feb. 13, 2017).

Subject E's subsequent efforts proved more fruitful. By the time she filed her second motion to purge, Subject E appeared to have produced most of the records to the Government. Instead of directing the banks to produce their records to the Government, Subject E asked for the records and then transmitted them to the Government. But Subject E disclaimed responsibility over a remaining subset of documents, claiming that the bank, Credit Suisse, refused to accede to her consent directive. Credit Suisse objected to a specific phrase in the directive—that Subject E's request for records was compelled by court order—explaining that by operation of Swiss law it could only disclose its records pursuant to a directive omitting such phrase. Subject E refused to sign the bank's version of the directive on grounds that doing so would create a testimonial communication in violation of her Fifth Amendment rights.

On April 3, 2017, this Court rejected that argument and denied her second purgation motion. This Court held that Second Circuit precedent prohibited the use of consent directives omitting reference to a court order on the basis that they were dishonest and misleading, not because they were unconstitutional. In re Various Grand Jury Subpoenas, 2017 WL 1234051 (S.D.N.Y. Apr. 3, 2017). In denying Subject E's second application, this Court expressly declined to dictate the course of action she should take to obtain the Credit Suisse records, holding only that Subject E had not availed herself of all options and failed to meet the burden of demonstrating full compliance.

Subject E now brings a third motion to purge contempt, claiming that issuing a consent directive is the only way to obtain records from foreign banks. Credit Suisse claims that the Swiss Criminal Code prohibits disclosure of records absent Swiss government approval

through a treaty based process. It further asserts that it cannot comply with a directive stating that it is submitted under compulsion of a U.S. court order. (Declaration of Alain Leibman In Support of Concluding Purge Motion, ECF No. 74-1, Ex. AA.) Without a properly worded consent directive, Subject E argues that "no path remains open" to comply with the Order. (Memorandum of Law of Subject E in Support of Concluding Motion to Purge Contempt and Vacate Contempt Citation ("Mot."), ECF No. 74, at 13.)

## DISCUSSION

I. Standard

As an initial matter, Subject E misconstrues the standard under which contempt is purged. She improperly shifts the burden of production to the Government, claiming the Government must show that "proof of non-compliance is clear and convincing," and that she "was not reasonably diligent in attempting to comply." (Mot. at 10 (internal quotation marks and citations omitted).) But once a party is held in contempt, the onus is on the contemnor to show affirmative acts demonstrating compliance. See Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 828 (1994) ("[T]he contemnor is able to purge the contempt and obtain his release by committing an affirmative act, and thus carries the keys of his prison in his own pocket.") (citing In re Nevitt, 117 F. 448, 461 (8th Cir. 1902)). For the past five months, Subject E has been held in contempt and has failed, on multiple occasions, to overcome the burden of proving full compliance.

"In order to purge a civil contempt citation, a contemnor must establish 'clearly, plainly, and unmistakably' that compliance with the underlying order has either been accomplished or is impossible." S.E.C. v. Platinum Inv. Corp., 2004 WL 1886401, at *3 (S.D.N.Y. Aug. 24, 2004) (citing Huber v. Marine Midland Bank, 51 F.3d 5, 10 (2d Cir. 1995));

In re Marc Rich & Co., 736 F.2d 864, 866 (2d Cir. 1984) ("The burden of proving plainly and unmistakably that compliance is impossible rests with the contemnor."). Courts in the Second Circuit have consistently held that a contemnor's inability to comply with a court order "must amount to an impossibility to comply." JSC Foreign Econ. Assoc. Technostroyexport v. Int'l Dev. and Trade Servs., Inc., 2005 WL 1983905, at *9 (S.D.N.Y. Aug. 18, 2005) (citing Huber, 51 F.3d at 10; Platinum Inv. Corp., 2004 WL 1886401, at *3; A.V. By Versace, Inc. v. Gianni Versace S.p.A., 279 F. Supp. 2d 341, 346 (S.D.N.Y. 2003)) (emphasis original).

II. Analysis

The thrust of Subject E's argument is that an appropriately phrased consent directive is the only way to obtain documents from foreign banks. Signing any directive omitting the operative language—that it is either compelled by court order or made under protest—would result in executing a false document contravening Second Circuit precedent. Thus, according to Subject E, Credit Suisse's refusal to recognize her consent directive leaves her with no options and should relieve her from seeking disclosure of the records in question. In support of her motion, Subject E describes in great detail the "yeoman efforts" she has undertaken, explaining that every bank except Credit Suisse accepted her version of the consent directive. (Mot. at 2–5.)

As a general matter, the law of the Second Circuit, at least for the past thirty years, has been that a subpoena recipient may not be compelled "to sign a form that does not explicitly state that it is being signed under protest or pursuant to court order." Bank of Crete v. Koskotas, 1989 WL 46587, at *2 (S.D.N.Y. Apr. 21, 1989) (citing In re N.D.N.Y. Grand Jury Subpoena, 811 F.2d 114, 118 (2d Cir. 1987) ("In re Alexander")). Doing so would be "dishonest and misleading," Koskotas, 1989 WL 46587, at *2, especially in view of the Second Circuit's

4

holding that "conceal[ing] the true nature of the purported 'Consent Directive'" offends "basic precepts of honest behavior by invoking the district court's imprimatur" on a misleading document. In re Alexander, 811 F.2d at 117–18.

But the Second Circuit made clear that its ruling was rooted in its "supervisory authority over district courts in this [C]ircuit," and not on constitutional grounds. In re Alexander, 811 F.2d at 118. And the case law affirming that sound precept before and after In re Alexander is legion. See Doe v. United States, 487 U.S. 201, 215–16 (executing the directive "has no testimonial significance"—by "signing the form, [respondent] makes no statement, explicit or implicit, regarding the existence of a foreign bank account or [her] control over any such account."); United States v. Ghidoni, 732 F.2d 814, 818 (11th Cir. 1984) ("Because the directive contains no statement by Ghidoni on either control or existence of the accounts, the directive could not be used by the government as an admission thereof."); In re Grand Jury Subpoena, 826 F.2d 1166, 1171 (2d Cir. 1987) ("[I]t is clear that the fifth amendment would not stand as a bar to admission of the directives into evidence at trial because the directives contain no testimonial assertions that are incriminating, and thus do not implicate fifth amendment questions."); Hansel 'N Gretel Brand, Inc. v. Savitksy, 1997 WL 633467, at *1 (S.D.N.Y. Oct. 10, 1997) ("A judicially compelled consent directive does not violate the Fifth Amendment privilege against self-incrimination."). Moreover, neither the substance of the records at issue in this proceeding nor the act of producing them are protected by the Fifth Amendment. In re Grand Jury Subpoena Dated Feb. 2, 2012, 908 F. Supp. 2d 348, 358 (E.D.N.Y. 2012) ("[T]he records sought by the Subpoena are 'required records' exempt from the Fifth Amendment privilege against self-incrimination.").

5

The question underlying this motion has less to do with whether Subject E should be compelled to submit a false directive and more to do with whether she has undertaken reasonable, affirmative actions to demonstrate sufficient compliance with this Court's Order. While the Second Circuit's holding in In re Alexander may be worth re-visiting, it is not implicated here. Nothing in this Court's prior order compelled Subject E to submit a false directive. Nor is Subject E constructively compelled to do so because the absence of a properly worded consent directive hardly closes the path to achieving compliance.

The standard to purge contempt is clear—Subject E is required to show clearly, plainly, and unmistakably that she has fully complied with this Court's Order or that such compliance is impossible. At this juncture, she has done neither. Subject E has not achieved compliance because Credit Suisse has declined to release the remaining subset of Credit Suisse documents to the extent they exist. (See Leibman Decl., Ex. AA.)

Nor has Subject E demonstrated that compliance is impossible. Subject E's argument, boiled down to its essence, is that absent a conventional way to obtain documents, compliance is practically and effectively impossible. But even without consent directives, Subject E may embark on paths less traveled. Though the surrender of Subject E's passport forecloses the possibility of retrieving the documents herself, Subject E has the power to authorize a representative or agent—perhaps a lawyer in Switzerland—to request and retrieve these documents directly from Credit Suisse. Cf. In re Grand Jury Proceedings Bank of Nova Scotia, 740 F.2d 817, 822 (11th Cir. 1984) (subpoena recipient bank instructed its representative/agent to "go to the Bahamas and insure that an effective search had been carried out of the Bank's records in the Bahamas."). The Government submitted a sworn declaration confirming the plausibility of this option—that is, a Credit Suisse lawyer explained that as an

alternative to issuing a consent directive, an accountholder may designate "an authorized representative to physically travel to[] a Credit Suisse location in Switzerland and request[] the records, a copy of which will then be provided in person to … the authorized representative for whatever purposes [the accountholders] deem appropriate." (Declaration of Jared Lenow in Support of Government's Opposition to Motion to Vacate Contempt, ECF No. 76-1, ¶ 2.a.) That sworn declaration properly is a part of the record on which this Court may rely in resolving this motion.

But what Subject E could do to get these documents is not within this Court's purview. Subject E has competent, experienced, and sophisticated counsel to guide her through those quandaries. At this juncture, however, there is no indication that Subject E has even attempted to explore the possibility of retaining and instructing an agent in Switzerland to request the records from Credit Suisse. Instead, she simply writes off the option as a "foolhardy suggestion," (Reply Ltr. dated Apr. 20, 2017, ECF No. 77, at 4) steadfastly maintaining that there is only one option in her toolbox—the conventional instrument that is a consent directive—to obtain records from the banks. But being deprived of the ability to issue a consent directive is not tantamount to an "<u>impossibility</u> to comply" with this Court's Order. <u>JSC Foreign Econ. Assoc. Technostroyexport</u>, 2005 WL 1983905, at *9 (emphasis original). To relieve Subject E, or any other foreign bank accountholder, from producing all records within her control simply because she cannot do it the conventional way would result in the adoption of a "close enough" approach absolving a contemnor from exhausting all affirmative acts necessary to satisfy the burden of proving compliance. Here, Subject E "carries the keys of [her prison] in [her] own pocket," but appears reluctant to utilize all but one. <u>Bagwell</u>, 512 U.S. at 828.

7

Subject E urges this Court to observe "[f]ealty to other precedent"—namely, that it must balance the interests of continued contempt and the Government's ability to obtain evidence through other means. (Mot. at 13.) But in this Court's informed discretion, the factors underlying that consideration—(1) the character and magnitude of the harm threatened by continued contempt; (2) the probable effectiveness of the proposed sanction; and (3) the financial consequence of that sanction upon the contemnor—militate in favor of imposing sanctions. First, Subject E's continued contempt would impede the grand jury in its tasks and duties to investigate all alleged, uncharged misconduct. The subset of Credit Suisse documents, if they exist, are characterized by the Government as key documents that relate to critical and central subjects of the ongoing grand jury investigation. (See Gov't Ltr. Opposition dated Mar. 30, 2017, ECF No. 71, at 1.) Thus, whether these records exist in the first place, and if so, what they say, are important to the grand jury's function. Second, although Subject E has never had to pay the daily fine, the threat of or actually being fined $1,000 a day will likely assure compliance. Third, the financial consequences of a daily fine, while not insignificant, are reasonable in this Court's discretion.

Finally, Subject E asserts that she will appeal if this Court "enters any but a purgation order now," and requests a stay of sanctions pending review by the Court of Appeals. (Mot. at 15.) Subject E argues that a stay is appropriate because this Court previously entered a stay order when multiple respondents were before the Court addressing the "required records" doctrine. (ECF No. 12.) That this Court issued a stay more than four years ago is immaterial to whether this Court should enter a stay of sanctions today. Moreover, the 2013 Order affected four other respondents and addressed a very different issue from the one confronting Subject E today.

"The four factors to be considered in issuing a stay pending appeal are well known: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." McCue v. City of New York (In re World Trade Ctr. Disaster Site Litig.), 503 F.3d 167, 170 (2d Cir. 2007) (internal quotation marks and citation omitted). "[T]he degree to which a factor must be present varies with the strength of the other factors, meaning that more of one factor excuses less of the other." McCue, 503 F.3d at 170. But all the factors here weigh against a stay.

First, Subject E is unlikely to succeed on the merits because as this Court noted, this motion has nothing to do with the propriety of compelling the use of a false directive. Indeed, nothing in this Opinion and Order conflicts with the holding in In re Alexander. And to the extent that Subject E believes there are constitutional issues implicated, the Second Circuit has already resolved her Fifth Amendment objection (raised in her original appeal and later withdrawn). See also In re Grand Jury Subpoena Dated Feb. 2, 2012, 741 F.3d 339 (2d Cir. 2013). Second, Subject E will suffer a financial loss, but the amount of the fine is reasonable and will not irreparably harm her. A stay, however, would substantially prejudice the ongoing grand jury investigation and increase the risk that the statute of limitations will expire on criminal conduct allegedly committed by Subject E. Fourth, after four years of litigation, the public interest is served by a speedy resolution.

CONCLUSION

Accordingly, Subject E's motion to purge contempt is denied. The sanction of $1,000 per day shall commence on June 1, 2017. The Clerk of Court is directed to terminate the motion pending at ECF No. 74.

Dated: May 25, 2017
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.